Paula A. Fleck P.C., WY State Bar
No. 6-2660
Bryson C. Smith, WY State Bar No. 7-6199
HOLLAND & HART LLP
645 South Cache Street, Suite 100
P.O. Box 68
Jackson, WY 83001-0068
Telephone: (307) 734-9741
Facsimile: (307) 739-9744
pfleck@hollandhart.com
bcsmith@hollandhart.com

Jeanifer E. Parsigian (*Pro Hac Vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1469
Fax: (415) 591-1000
jparsigian@winston.com

W. Gordon Dobie (*Pro Hac Vice*)
Emily N. Kath (*Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-5600
Fax: (312) 558-5700
wdobie@winston.com
ekath@winston.com

*Attorneys for Defendants*
*Nicholas Piazza, SP Capital Management,*
*LLC, Oleksandr Yaremenko, and TNA*
*Corporate Solutions, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| Gramercy Distressed Opportunity Fund II, L.P., Gramercy Distressed Opportunity Fund III, L.P., Gramercy Distressed Opportunity Fund III-A, L.P., Gramercy Funds Management LLC, Gramercy EM Credit Total Return Fund, and Roehampton Partners LLC,<br>　　　　　Plaintiffs,<br><br>　　　　vs.<br><br>Oleg Bakhmatyuk, Nicholas Piazza, SP Capital Management, LLC, Oleksandr Yaremenko, and TNA Corporate Solutions, LLC,<br>　　　　　Defendants. | **MEMORANDUM IN SUPPORT OF DEFENDANTS NICHOLAS PIAZZA, SP CAPITAL MANAGEMENT LLC, OLEKSANDR YAREMENKO, AND TNA CORPORATE SOLUTIONS, LLC'S MOTION TO DISMISS**<br>Civil Action No. 0:21-cv-00223-NDF<br><br><br>Judge:  Hon. Nancy D. Freudenthal |

---

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS NICHOLAS PIAZZA, SP CAPITAL
## MANAGEMENT, LLC, OLEKSANDR YAREMENKO, AND TNA CORPORATE
## SOLUTIONS, LLC'S MOTION TO DISMISS

---

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................... 1
BACKGROUND ...................................................................................................... 3

I. PLAINTIFFS ARE SOPHISTICATED INVESTORS THAT PURCHASED UNSECURED ULF AND AVG NOTES WITH DISCLOSURE OF THE RISKS DESCRIBED IN THE COMPLAINT ........................................................ 3

II. THE TRUST DEEDS GOVERN THE PARTIES' RIGHTS AND OBLIGATIONS INCLUDING AS TO DISPUTE RESOLUTION .................... 6

III. PLAINTIFFS HAVE REFUSED TO ACCEPT REASONABLE TERMS TO RESTRUCTURE THE NOTES ........................................................................ 9

IV. PLAINTIFFS ALLEGE RICO AND TORT CLAIMS AGAINST DEFENDANTS WITHOUT ESTABLISHING THEIR INVOLVEMENT IN THE ACTUAL DISPUTE ................................................................................ 11

LEGAL STANDARD............................................................................................. 13
ARGUMENT ........................................................................................................ 13

I. THE COURT MUST STAY THIS LITIGATION AND COMPEL ARBITRATION IN LONDON, PURSUANT TO THE ULF AND AVG TRUST DEEDS ................................................................................................ 13

A. Plaintiffs are equitably estopped from avoiding the valid, enforceable arbitration agreements in the Trust Deeds ................................................ 14

B. The arbitration agreements in the Trust Deeds are broad and encompass all of Plaintiffs' claims ............................................................ 19

II. THE "NO-ACTION" CLAUSE PRECLUDES THIS ACTION .......................... 22
III. THE COMPLAINT SHOULD BE DISMISSED BECAUSE ULF AND AVG ARE INDISPENSABLE PARTIES THAT CANNOT BE JOINED .................. 26

A. ULF and AVG are required parties under Rule 19(a)............................... 26
B. ULF and AVG are indispensable parties under Rule 19(b)..................... 27

IV. THE CASE SHOULD BE DISMISSED UNDER THE DOCTRINE OF FORUM NON CONVENIENS ........................................................................ 28

A. The London Court of International Arbitration is an adequate alternative forum............................................................................................ 29
B. English law applies. ................................................................................... 30
C. Private and public interests weigh in favor of dismissal........................... 31

V. GRAMERCY'S COMPLAINT MUST BE DISMISSED BECAUSE ITS RICO CLAIMS FAIL ON MULTIPLE GROUNDS. ........................................ 34

A.    RICO does not reach the extraterritorial conduct alleged ........................ 35
B.    The Private Securities Litigation Reform Act bars Gramercy's RICO
      claims .................................................................................................... 37
C.    Plaintiffs fail to allege a pattern of racketeering activity ......................... 40
D.    Gramercy does not have cognizable RICO damages ................................ 42
E.    The Complaint does not satisfy Rule 9(b) for any claim asserted ............ 43

VI.   GRAMERCY'S OTHER CLAIMS FAIL FOR LACK OF SUBJECT
      MATTER JURISDICTION .................................................................... 47

VII.  DEFENDANT YAREMENKO IS NOT SUBJECT TO PERSONAL
      JURISDICTION IN WYOMING ........................................................... 48

CONCLUSION ............................................................................................. 50

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*,
677 F.3d 1286 (11th Cir. 2012) ................................................................23, 24

*Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*,
764 F.3d 1268 (10th Cir. 2014) .........................................................................43

*Archangel Diamond Corp. Liquidating Trust v. Lukoil*,
812 F.3d 799 (10th Cir. 2016) ....................................................................29, 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................13

*ASI, Inc. v. Aquawood, LLC*,
2020 WL 5913578 (D. Minn. Oct. 6, 2020) .....................................................36

*Baltus-Michaelson v. Credit Suisse First Bos., LLC*,
116 F. App'x 308 (2d Cir. 2004) ......................................................................23

*BCB Holdings Ltd. v. Gov't of Belize*,
110 F. Supp. 3d 233 (D.D.C. 2015), *aff'd*, 650 F. App'x 17 (D.C. Cir. 2016).......................14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................13

*Belnap v. Iasis Healthcare*,
844 F.3d 1272 (10th Cir. 2017) ...........................................................19, 20, 21

*Birdwell v. Glanz*,
790 F. App'x 962 (10th Cir. 2020) ..............................................................47, 48

*Bixler v. Foster*,
596 F.3d 751 (10th Cir. 2010) ................................................................. *passim*

*Boone v. Carlsbad Bancorporation, Inc.*,
972 F.2d 1545 (10th Cir.1992) ...................................................................40, 41

*Braverman v. LPL Fin. Corp.*,
2011 WL 13289787 (D.N.M. Apr. 21, 2011) .............................................39, 40

*Brown v. Coleman Co.*,
220 F.3d 1180 (10th Cir. 2000) .......................................................................22

*Burnett v. Mortg. Elec. Registration Sys., Inc.*,
706 F.3d 1231 (10th Cir. 2013) .......................................................................44

*Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*,
 567 F.3d 1191 (10th Cir. 2009) ..........................................................22

*In the matter of Colt Telecom Group plc*,
 [2002] EWHC 2815 (Ch) ¶ 62 .......................................................25, 26

*Daimler AG v. Dauman*,
 571 U.S. 117 (2014)..........................................................................49

*Dodson Int'l Parts, Inc. v. Williams Int'l Co. LLC*,
 12 F.4th 1212 (10th Cir. 2021) .....................................................21, 22

*Drummond Co., Inc. v. Collingsworth*,
 2017 WL 3268907 (N.D. Ala. Aug. 1, 2017) ......................................36

*Eighteen Seventy L.P. v. Jayson*,
 532 F. Supp. 3d 1125 (D. Wyo. 2020)...............................................48

*Elektrim SA v. Vivendi Holdings 1 Corp*,
 [2008] EWCA Civ 1178 ....................................................................25

*Gas Sensing Tech. Corp. v. Ashton*,
 2017 WL 2955353 (D. Wyo. June 12, 2017)............................30, 31, 34

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
 140 S. Ct. 1637 (2020).....................................................1, 15, 19, 20

*GFF Corp. v. Associated Wholesale Grocers*,
 130 F.3d 1381 (10th Cir. 1997) ...........................................................4

*Good v. Khosrowshahi*,
 296 F. App'x 676 (10th Cir. 2008) ....................................................50

*Gschwind v. Cessna Aircraft Co.*,
 161 F.3d 602 (10th Cir. 1998) .................................................29, 30, 31

*Hall v. Witteman*,
 584 F.3d 859 (10th Cir. 2009) ...........................................................40

*Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*,
 347 F. App'x 711 (2d Cir. 2009) .......................................................43

*Hart v. Salois*,
 605 F. App'x 694 (10th Cir. 2015) ....................................................50

*Innospec Ltd. v. Ethyl Corp.*,
 2014 WL 5460413 (E.D. Va. Oct. 27, 2014).......................................21

iv

*Kaplan v. Reed*,
    28 F. Supp. 2d 1191 (D. Colo. 1998) ....................................................................42

*Kempe v. Ocean Drilling & Expl. Co.*,
    876 F.2d 1138 (5th Cir.), *cert. denied,* 493 U.S. 918 (1989) .............................30

*Lawit v. Maney & Gordon, P.A.*,
    2014 WL 11512612 (D.N.M. Jan. 17, 2014) .......................................................22

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
    449 F. App'x 704 (10th Cir. 2011) .................................................15, 16, 17, 18

*Levien v. Hibu PLC*,
    475 F. Supp. 3d 429 (E.D. Pa. 2020) ...........................................................29, 33

*Melea, Ltd. v. Jawer SA*,
    511 F.3d 1060 (10th Cir. 2007) ....................................................................49, 50

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998) ...........................................................................42, 43

*Merrill Scott & Assocs., Ltd. v. Concilium Ins. Servs.*,
    253 F. App'x 756 (10th Cir. 2007) .......................................................................26

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ..............................................................................................13

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*,
    651 F.3d 268 (2d Cir. 2011) .................................................................................38

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ..................................................................................................13

*Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*,
    855 F. App'x 468 (11th Cir. 2021) ......................................................................13

*Nuevos Destinos, LLC v. Peck*
    2019 WL 6481441 (D.N.D. Dec. 2, 2019), *aff'd,* 999 F.3d 641 (8th Cir. 2021) ...................36

*P&P Indus., Inc. v. Sutter Corp.*,
    179 F.3d 861 (10th Cir. 1999) ............................................................................21

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013) ....................................................................44, 45

*Peak Partners, LP v. Republic Bank*,
    191 F. App'x 118 (3d Cir. 2006) .....................................................................2, 24

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)......................................................................................29, 30, 31, 33

*Reeves v. Enter. Prod. Partners, LP*,
    17 F.4th 1008 (10th Cir. 2021) ............................................................................15, 19

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990).....................................................................................................38

*Riley v. Kingsley Underwriting Agencies, Ltd.*,
    969 F.2d 953 (10th Cir. 1992) ............................................................................13, 14

*RJR Nabisco, Inc. v. European Community*,
    579 U.S. 325 (2016)..........................................................................................2, 35, 37

*Robbins v. Oklahoma*,
    519 F.3d 1242 (10th Cir. 2008) ................................................................................45

*Roe v. Gray*,
    165 F. Supp. 2d 1164 (D. Colo. 2001) .....................................................................19

*ROI Props. Inc. v. Burford Cap. Ltd*
    2019 WL 1359254 (D. Ariz. Jan. 14, 2019) ............................................................21

*Shearson/American Express, Inc. v. McMahon*,
    482 U.S. 220 (1987)..................................................................................................13

*Skillern v. United States*,
    2021 WL 3047004 (11th Cir. Apr. 16, 2021) .....................................................36, 37

*Slater v. A.G. Edwards & Sons, Inc.*,
    719 F.3d 1190 (10th Cir. 2013) ..................................................................................4

*SteppeChange LLC v. VEON Ltd.*,
    354 F. Supp. 3d 1033 (N.D. Cal. 2018) ....................................................................21

*Sullivan v. Boettcher & Co.*,
    714 F. Supp. 1132 (D. Colo. 1989)...........................................................................42

*Sullivan v. Harris*,
    2019 WL 5258045 (W.D. Wyo. Jan. 23, 2019).........................................................48

*Symes v. Harris*
    472 F.3d 754 (10th Cir. 2006) ......................................................................26, 27, 28

*Torwest DBC, Inc. v. Dick*,
    810 F.2d 925 (10th Cir. 1987) ..................................................................................42

*United States v. All Assets Held at Bank Julius*,
    251 F. Supp. 3d 82 (D.D.C. 2017) ....................................................36, 37

*United States v. Napout*,
    963 F.3d 163 (2d Cir. 2020) ...................................................................36

*Walden v. Fiore*,
    571 U.S. 277 (2014) ........................................................................50, 52

*Wallert v. Allan*,
    141 F. Supp. 3d 258 (S.D.N.Y. 2015) ......................................................31

*Weller v. HSBC Mortg. Servs., Inc.*,
    971 F. Supp. 2d 1072 (D. Colo. 2013) ...............................................17, 18

*Williams v. Imhoff*,
    203 F.3d 758 (10th Cir. 2000) ................................................................21

*Yavuz v. 61 MM, Ltd.*,
    576 F.3d 1166 (10th Cir. 2009) ................................................29, 30, 31

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971) ........................................................................42, 43

**Statutes**

9 U.S.C. § 1, *et seq.* ..................................................................................13

9 U.S.C. § 3 ..........................................................................................14, 21

9 U.S.C. § 4 ..........................................................................................14, 19

18 U.S.C. § 1341 ........................................................................................36

18 U.S.C. § 1343 ........................................................................................36

18 U.S.C. § 1962(b) ..............................................................................34, 35

18 U.S.C. § 1962(c) ..............................................................................34, 42

18 U.S.C. § 1962(d) ...................................................................................34

18 U.S.C. § 2314 ........................................................................................36

28 U.S.C. § 1367 ........................................................................................47

Pub. L. No. 104–67 § 107, 109 Stat. 737, 758 (1995) ............................37, 38

United Kingdom Companies Act 2006, Part 11 ..........................................25

**Other Authorities**

Fed. R. Civ. P. 12(b) ...........................................................................................4, 26, 50

Fed. R. Civ. P. 19 ..............................................................................................26, 27, 28

Fed. R. Civ. 23.1 ............................................................................................................23

## INTRODUCTION

Plaintiffs[1] are vulture investors organized in the Cayman Islands and managed out of Connecticut that purchased unsecured Notes in two Ukrainian companies on the London and Irish Stock Exchanges.  The Ukrainian companies, Avangardco IPL ("AVG") and UkrLandFarming PLC ("ULF"), issued Notes to investors in 2010 and 2013, respectively, to raise capital.  Both were highly successful companies that lost almost half of their business assets and value following the 2014 invasion of the Crimea and devaluation of the Ukrainian currency.  Consistent with Plaintiffs' status as vulture investors, Plaintiffs bought their unsecured Notes in AVG and ULF before and *after* the bad news, consistent with three of these Cayman Island Plaintiffs affirmatively calling themselves "*Distressed Opportunity* Funds."

While Plaintiffs now seek litigation opportunities arising from AVG's and ULF's distress, their claims are barred and this Court should grant Moving Defendants' motion to dismiss.[2]

***First***, there are Subscription Agreements and Trust Deeds governing the Notes providing for mandatory arbitration in London, England, under English law for "any dispute arising out of or connected with the Notes."  Plaintiffs' claims should be dismissed, as they are equitably estopped from disclaiming the arbitration clauses in the contracts while asserting legal rights under those same contracts.  *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1643–44 (2020).

***Second***, Plaintiffs lack standing, as their suit is predicated on injury to AVG and ULF, they have suffered the same alleged injury as every other Noteholder, and they are precluded by the

---

[1] Gramercy Distressed Opportunity Fund II, L.P., Gramercy Distressed Opportunity Fund III, L.P., Gramercy Distressed Opportunity Fund III-A, L.P., Gramercy Funds Management LLC, Gramercy EM Credit Total Return Fund, and Roehampton Partners LLC are referred to herein as "Gramercy" and "Plaintiffs."

[2] Moving Defendants are Nicholas Piazza, SP Capital Management, LLC, Oleksandr Yaremenko, and TNA Corporate Solutions, LLC.

"No-Action" clause in the Trust Deed governing their Notes from bringing this suit without first requesting in writing that the Note Trustee institute such proceeding (and the Trustee failing to do so). *See, e.g.*, *Peak Partners, LP v. Republic Bank*, 191 F. App'x 118, 126 (3d Cir. 2006) ("The main function of a no-action clause is to delegat[e] the right to bring a suit enforcing the rights of bondholders to the trustee, or to the holders of a substantial amount of bonds. This function is a central feature of an Indenture, the primary purpose of which is to centralize enforcement powers by vesting legal title to the securities in one trustee.") (internal citations and quotations omitted).

*Third*, Plaintiffs' Complaint should be dismissed under Rule 19 for failure to join AVG and ULF, which are indispensable parties that cannot be joined—both as a matter of jurisdiction and because of the mandatory arbitration clause.

*Fourth*, this Court should dismiss this case under a *forum non conveniens* analysis given that virtually all the alleged facts relate to matters in Europe, the United Kingdom, and Ukraine, with the location of the evidence being almost all overseas (witnesses, documents, and third-party witnesses), English law governing the matter by agreement, and the existence of an adequate alternative forum.

*Fifth*, Plaintiffs RICO claims suffer from a host of infirmities, including:

    a.  The Court should dismiss Gramercy's RICO claims because RICO does not apply extraterritorially to the conduct alleged by Gramercy. *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337–38 (2016).

    b.  In 1995, Congress amended the RICO statute to remove securities-related claims, such as what Plaintiffs allege here from serving as a RICO predicate act. *See Bixler v. Foster*, 596 F.3d 751, 755, 760 (10th Cir. 2010) (claim against company's directors and lawyers for transferring assets away and rendering stockholders' investment "worthless falls" within broad scope of prohibition of RICO related securities claims). Plaintiffs' attempt to circumvent this rule should be rejected.

    c.  The Complaint alleges what amounts to a single scheme to devalue the Notes, not the pattern of racketeering activity required to state a RICO claim.

    d.   Gramercy's claims must be dismissed for lack of RICO injury, as they remain creditors with contractual and other legal remedies that still hold out the possibility that the debt, and therefore the alleged injury, may be eliminated or significantly reduced.

    e.   Plaintiffs have failed to meet the standards of Rule 9(b) for their RICO claims that sound in fraud because there is insufficient factual matter as to the Moving Defendants.

***Sixth***, there is no subject matter jurisdiction over the remaining claims.

***Seventh***, Plaintiffs have not pleaded personal jurisdiction over Defendant Yaremenko.

In the end, by bringing this action before this Court, Gramercy seeks to ignore the plain language of the documents governing the Notes from which this case stems—the Trust Deeds, Subscription Agreements, and prospectuses—in order to cut in line ahead of secured creditors. Gramercy could have initiated a vote or petitioned the Trustee to take action, but it elected to pursue neither option with the aim of negotiating on its own behalf to get a better deal than the other Noteholders. These sophisticated "distressed opportunity" and "emerging markets" funds appeal to xenophobia to try to recover their debts ahead of secured lenders and to the detriment of the other Noteholders with whom they are on equal footing.

This Court should firmly reject the attempt to disguise this contractual dispute, which is subject to arbitration and other dispute resolution provisions, as a salacious conspiracy to extract treble damages through RICO and dismiss the Complaint.

## BACKGROUND

## I.   PLAINTIFFS ARE SOPHISTICATED INVESTORS THAT PURCHASED UNSECURED ULF AND AVG NOTES WITH DISCLOSURE OF THE RISKS DESCRIBED IN THE COMPLAINT.

While maintaining an office in the United States, Plaintiff investment funds are organized in the Cayman Islands. Compl. ¶ 14. As their own names indicate, these investors focus on "distressed opportunities" and "emerging markets." *Id.* Their Complaint centers around Gramercy

holdings of unsecured Notes of two Ukrainian companies, AVG and ULF.  *Id*. ¶¶ 45–50.  Both companies were founded by Oleg Bakhmatyuk and incorporated in Cyprus in the 2000s.  *Id*. ¶¶ 21–22.  AVG produces eggs and egg products in Ukraine, and ULF produces grain, eggs, milk, and meat for human and animal consumption.  *Id*.

As described in the Complaint, AVG and ULF sought capital in international financial markets through Note issuances for AVG in 2010 and for ULF in 2013 in London and Ireland, respectively.  *Id*. ¶¶ 45–50.  Each company provided prospectuses to potential investors that, among other things, disclose the key risks to the companies and to the investment.[3]  *See* Exs. 3–4, 7–8.[4]

The disclosed "Risk Factors" include:

- ***"The Ukrainian currency may depreciate further in the near future, given the absence of significant currency inflow from exports and foreign investment, limited foreign currency reserves, the need for borrowers to repay a substantial amount of short-term external debt."*** Ex. 4, AVG Prospectus at 34; *see also* Ex. 3, ULF Prospectus at 46 (emphasis added).[5]

- "Ukraine's economy depends heavily on its trade flows with Russia and the rest of the CIS and ***any major change in relations with Russia could have adverse effects on the economy***." Ex. 4, AVG Prospectus at 36; *see also* Ex. 3, ULF Prospectus at 41 (emphasis added).

- "The Group and its business has been, and will continue to be, controlled by a single ultimate beneficial owner and ***will be subject to related party transactions.***" Ex. 4, AVG Prospectus at 9; *see also* Ex. 3, ULF Prospectus at 11 (emphasis added).

---

[3] The prospectuses are incorporated by reference into the Complaint. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384–85 (10th Cir. 1997) (holding that courts may consider outside documents that are both central to the plaintiff's claims and to which the plaintiff refers in his complaint without converting the motion to dismiss under Fed. R. Civ. P. 12(b)(6)).  When documents incorporated into the complaint conflict with allegations in the complaint, the Court need not accept those allegations as true.  *See Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013).

[4] All exhibit citations are in reference to the exhibits attached to the concurrently filed Declaration of Jeanifer E. Parsigian in Support of Defendants' Motion to Dismiss.

[5] The June 2013 ULF Prospectus is substantively identical to the ULF prospectuses issued in March and May 2013. *See* Exs. 7, 8.

- "***The Group has engaged and continues to engage in transactions with related parties that may present conflicts of interest, potentially resulting in the conclusion of transactions on less favourable terms than those that could be obtained in arm's-length transactions.***" Ex. 4, AVG Prospectus at 9; *see also* Ex. 3, ULF Prospectus at 23 (emphasis added).

- "Avangard has been and will continue to be controlled by a majority shareholder.  The Issuer has four controlling shareholders, each of which is fully owned by Oleg Bakhmatyuk, the Chairman of the Issuer's Board of Directors, who is also a direct shareholder of the Issuer. The Issuer's controlling shareholders and Oleg Bakhmatyuk control approximately 77.5% of the Issuer.  As such, the controlling shareholders and Mr. Bakhmatyuk continue to exercise control over the Issuer, such as electing or appointing members of the Board of Directors, approving significant transactions, declaring dividends, if any, limiting or waiving pre-emption rights of the Issuer's shareholders, increasing or decreasing the Issuer's authorised share capital and influencing other policy decisions.  In addition, the controlling shareholders and Mr. Bakhmatyuk may engage in business activities with entities that compete with Avangard . . . Any such conflicts of interest or transactions could have a material adverse effect on Avangard's business, results of operations and financial condition." Ex. 4, AVG Prospectus at 9; *see also* Ex. 3, ULF Prospectus at 11.

In addition to these specific disclosures on business risk, the prospectuses disclosed that "the Notes will be structurally subordinated to other liabilities" and that the total outstanding debt was $1.3 billion—most of it secured and ahead of the Notes.  *See* Ex. 4, AVG Prospectus at 12, 26–27; Ex. 3, ULF Prospectus at 37, 54.  Further, the disclosures informed potential investors that Ukrainian courts will not enforce foreign court judgments (including those of this Court) [6] but, pursuant to the New York Convention treaty on arbitral awards to which Ukraine and the United Kingdom are parties, will enforce arbitration decisions, as will Cyprus where AVG and ULF are incorporated.[7]  Ex. 4, AVG 2010 Prospectus at iv–v; Ex. 3, ULF Prospectus at iii–iv.

---

[6] *See also* Ex. 4, AVG 2010 Prospectus at 29; Ex. 3, ULF Prospectus at 46 ("Foreign judgments may not be enforceable in Ukraine.").

[7] The prospectuses also disclosed that the Notes would be subject to arbitration and governing law provisions selecting English law and an English forum.  Ex. 4, AVG 2010 Prospectus at 222, § 20; Ex. 3, ULF 2013 Prospectus at 244, § 19.

In the wake of Russia's annexation of Crimea in 2014, many of these risk factors became a reality, particularly because AVG and ULF had significant operations in eastern Ukraine. Compl. ¶¶ 2, 51, 53–54. The invasion resulted in a global collapse of commodity prices and disruption of the AVG and ULF operations, among other outcomes. *Id*. Yet, even after the invasion, and with notice of its status as an unsecured creditor subordinate to other debts, Gramercy continued purchasing AVG and ULF Notes opportunistically. *Id.* ¶¶ 46–49. Specifically, in October 2014, Gramercy held just over 25% of the AVG Notes, but, by 2017, Gramercy held over 40%, indicating it purchased 15% of the outstanding Notes, amounting to more than one third of its position ***after*** the events causing AVG to be in distress. *Id*. Similarly, Gramercy did not reach a position of holding 25% of the outstanding ULF Notes (at which point it obtained certain contractual rights) until July 2016. *Id*. ¶ 49 n. 4.

## II.   THE TRUST DEEDS GOVERN THE PARTIES' RIGHTS AND OBLIGATIONS INCLUDING AS TO DISPUTE RESOLUTION.

The Complaint admits the Notes are governed by Trust Deeds detailing the rights granted and obligations imposed on the Noteholders (including Plaintiffs), the Trustee, and the Issuers (ULF and AVG) in relation to the AVG and ULF Notes.[8] Compl. ¶¶ 47, 49. Plaintiffs admit they have specific, enumerated rights. *Id*. ¶¶ 47, 49–50, 67. And Plaintiffs assert that the Issuers have specific obligations. *Id*. ¶¶ 47, 49–50, 67, 215–218.

As described in the Complaint, Gramercy alleges that it has the power to block certain modifications to the terms of the Notes and resolutions of the Noteholders. *Id*. ¶¶ 47, 49–50, 67. Gramercy "obtained significant rights, including the right to initiate enforcement proceedings on

---

[8] These documents are incorporated by reference into the Complaint due to Plaintiffs' reliance on them for their claims. *See supra* note 2; Exs. 5–6. In addition to the prospectuses and Trust Deeds, the Subscription Agreements relating to the issuance of the Notes for each company are incorporated into the Complaint and state largely the same terms and disclosures. *See* Exs. 1–2.

the Notes and to block certain resolutions of the Noteholders, which equated to a veto right over any proposed restructuring of the Notes[.]" *Id.* ¶ 50.

Critically, though not revealed in the Complaint, the Trust Deeds select English law as the governing law for the agreements and require arbitration of any disputes connected with the Notes or Trust Deeds.[9]

**AVG Trust Deed**

**20.1    Governing Law**

The Trust Deed, the Notes, and the Surety Agreement, and any non contractual obligations arising out of or in connection with them are **governed by, and will be construed in accordance with, English law**.

**29.    Arbitration**

29.1 **Any dispute arising out of or connected with these presents**, including a dispute as to the validity, existence or termination of the presents or the consequences of their nullity and/or this clause 29.1 (a **Dispute**), shall be resolved:

    (a)    subject to clause 29.1(b) below, by arbitration in London, England, conducted in the English language by three arbitrators, in accordance with the LCIA Rules, which rules are deemed to be incorporated by reference into this Condition . . . ; or

    (b)    at the option of the Trustee (or where entitled to do so) any Noteholder, by proceedings brought in the courts of England, which courts are to have exclusive jurisdiction . . . .

Ex. 5, AVG Trust Deed at 32, § 29; *id.* at 68, § 20 (emphasis added).

---

[9] The Subscription Agreements similarly contain governing law and arbitration provisions. *See* Ex. 2, AVG Subscription Agreement at 24, § 18 ("This Agreement, and any non-contractual obligations arising out of or in connection with it, shall be governed by and construed in accordance with the laws of England . . . The parties irrevocably agree that any dispute arising out of or connected with this Agreement, including a dispute as to the validity, existence or termination of this Agreement or the consequences of its nullity and/or this Clause 18.2 (a Dispute), shall be resolved . . . by arbitration in London, England, conducted in the English language by three arbitrators, in accordance with the LCIA Rules, which rules are deemed to be incorporated by reference into this clause[.]"); Ex. 1, ULF Subscription Agreement at 31, § 22 ("This Agreement, and any non-contractual obligations arising out of or in connection with it, shall be governed by and construed in accordance with the laws of England. . . . [A]ny dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement and a dispute relating to non-contractual obligations arising out of or in connection with this Agreement (a 'Dispute') shall be referred to and finally resolved by arbitration under the LCIA Arbitration Rules.").

**ULF Trust Deed**

**23.1    Governing Law**

This Trust Deed, and any non-contractual obligations arising out of or in connection with it, **is governed by, and shall be construed in accordance with, English law**.

**23.2    Arbitration**

23.2.1 Subject to Clause 23.3 (*Courts*), any dispute arising out of or in connection with this Trust Deed (including a dispute regarding the existence, validity or termination of this Trust Deed and a dispute relating to non-contractual obligations arising out of or in connection with this Trust Deed) (a "**Dispute**") shall be referred to and finally resolved by arbitration under the LCIA Arbitration Rules (the "**Rules**"), which Rules are deemed incorporated by reference into this Trust Deed, as amended herein;

. . .

23.2.5 The seat of arbitration shall be London, England and the language of the arbitration shall be English.

Ex. 6, ULF Trust Deed at 29, § 23.

In addition to determining *where* and *how* an action must be brought, both the AVG and the ULF Trust Deeds dictate *who* may bring the action.  Specifically, the Trust Deeds contain a "No Action Clause," which affords the first right to act to the Trustee—*not the Noteholders*.  The No Action Clause states:

**2.5    Enforcement action after the Notes become due and payable**

Pursuant to Condition 14 (*Enforcement*),[10] at any time after the Notes become due and payable, **the Trustee may, at its discretion and without further notice, institute such proceedings against the Issuer and/or any Surety Provider as it may think fit to enforce the terms of this Trust Deed, the Notes and/or the**

---

[10] Condition 14 states, "At any time after the Notes become due and payable, **the Trustee may, at its discretion and without further notice, institute such steps, actions or proceedings against the Issuer and/or any Surety Provider as it may think fit to enforce the terms of the Trust Deed, the Notes and/or the Surety Deed (whether by arbitration pursuant to the Trust Deed or the Surety Deed or by litigation)**, but it need not take any such steps, actions or proceedings and nor shall the Trustee be bound to take, or omit to take any step or action (including instituting such proceedings) unless (a) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders holding at least one-quarter in principal amount of the Notes outstanding and (b) it shall have been indemnified and/or secured and/or prefunded to its satisfaction.  **No Noteholder may proceed directly against the Issuer or any Surety Provider unless the Trustee, having become bound so to proceed, fails to do so within a reasonable time and such failure is continuing**." Ex. 6, ULF Trust Deed at 89, § 14. *See also* Ex. 5, AVG Trust Deed at 13, § 7.

**Surety Deed** (whether by arbitration pursuant to the Trust Deed or the Surety Deed or by litigation), but it need not take any such proceedings and nor shall the Trustee be bound to take, or omit to take any step or action (including instituting such proceedings) unless (i) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders holding at least one-quarter in principal amount of the Notes outstanding and (ii) it shall have been indemnified and/or secured and/or pre-funded to its satisfaction. **No Noteholder may proceed directly against the Issuer or any Surety Provider unless the Trustee, having become bound so to proceed, fails to do so within a reasonable time and such failure is continuing**.

Ex. 6, ULF Trust Deed at 6–7, § 2.5 (emphases added).[11]

The Trust Deeds provide a clear path for recovery in the event a dispute arises in connection with the Notes, including the right to have the Trustee call for a vote to restructure or petition the Trustee to take action under Section 14 of the Trust Deed.

The AVG Notes also have 15 Sureties, and the ULF Notes have 61 Sureties.  Ex. 2, AVG Subscription Agreement at 28–33 (Schedule 2); Ex. 1, ULF Subscription Agreement at 37–41 (Schedule 2); Ex. 6, ULF Trust Deed at 70, § 5.4 ("to secure Indebtedness that is expressly subordinated to the Notes or a Surety Provider's Suretyship in respect of the Notes, *provided* that all Obligations under the Notes or the Suretyship, as the case may be, are secured on a senior basis to the Indebtedness so secured").

## III.   PLAINTIFFS HAVE REFUSED TO ACCEPT REASONABLE TERMS TO RESTRUCTURE THE NOTES.

While the Complaint touts Gramercy's rights as a Noteholder under the Trust Deeds, Gramercy pursued none of its contractual remedies.

---

[11] *See also* Ex. 5, AVG Trust Deed at 14, § 8.3 ("Only the Trustee may enforce the provisions of these presents.  No Noteholder shall be entitled (i) to take any steps or action against the Issuer or the Surety Provider to enforce the performance of any of the provisions of these presents and/or the Surety Agreement or (ii) take any other proceedings (including lodging an appeal in any proceedings) in respect of or concerning the Issuer or the Surety Providers, in each case unless the Trustee having become bound as aforesaid to take any such action, steps or proceedings fails to do so within a reasonable period and such failure is continuing.")

The Complaint describes the negotiations that began in 2015, following the Russian invasion and devaluation in Ukrainian currency, and continued into 2019. *See* Compl. ¶ 57. Gramercy asserts these negotiations were not undertaken in good faith but provides no support for this claim. Instead, Gramercy admits that for each of these negotiations, AVG and ULF retained and relied upon the advice of outside consultants, including Ernst & Young and Ziff Ivin, consistently indicated its willingness to engage in good-faith negotiations, and actively engaged Plaintiffs, as further discussed below. *Id*. ¶¶ 86–90, 99, 118, 168, 178, 182, 201.

In 2015, AVG and other Noteholders agreed to a restructuring proposal that extended the maturity date from October 29, 2015 to October 28, 2018 and converted the semi-annual interest payments from cash to payments in kind. *Id*. ¶ 57. Gramercy voted in favor of this restructuring, and it was approved on October 26, 2016. *Id.* Gramercy also voted in favor of a similar scheme of arrangement for the ULF Notes, which was approved on April 22, 2016. *Id.* ¶ 58. These restructuring attempts were part of ongoing efforts to negotiate a longer-term solution for the Noteholders.

Not surprisingly, all of these negotiations occurred in Europe. In 2017, the parties met in London to discuss another potential restructuring proposal. *Id.* ¶ 91. Gramercy rejected this offer. *Id.* ¶ 92. Later that year, AVG and ULF retained Ziff, an independent, third-party consultant, whom Gramercy approved of, to provide a restructuring proposal. *Id.* ¶ 99. Under the Ziff proposal, which considered a prior financial audit conducted by Ernst & Young, another third-party consultant, Gramercy would have received 35 to 50 cents on the dollar, with a cash sweep upside. *Id.* While the restructuring proposal expectedly afforded recovery to secured senior creditors first, it would have ensured payment to all creditors over a period of time. Gramercy

blocked this proposal from moving forward, despite knowing secured creditors would maintain priority ahead of unsecured creditors, as was expressly contemplated in the prospectuses. *Id.*

In 2018, after Gramercy blocked these efforts, the parties met in London, and ULF/AVG offered Plaintiffs the option of selling their position, which Plaintiffs also rejected. *Id.* ¶¶ 103, 180. The negotiations continued through 2018, but Gramercy and ULF/AVG were unable to reach an agreement. *Id.* ¶¶ 104–114. They met again in Kyiv in 2019 to further negotiate a potential restructuring that would have resulted in another party's (Cargill's) buyout of Gramercy's position. *Id.* ¶¶ 132–133, 154. Gramercy continued to reject these offers in an attempt to strongarm the negotiations. *Id.* ¶¶ 120–121, 180.

While Gramercy tries to paint itself as the good guy seeking a fair deal for all, even its Complaint reveals this is a farce. Gramercy simultaneously claims it "was consistent in demanding a comprehensive restructuring . . . led by independent advisors, involving a robust due diligence process, and multilateral negotiations [with] all creditors" but admits it *turned down* the request of another unsecured creditor to join together in negotiations. *Id*. ¶¶ 4, 182.

## IV.   PLAINTIFFS ALLEGE RICO AND TORT CLAIMS AGAINST DEFENDANTS WITHOUT ESTABLISHING THEIR INVOLVEMENT IN THE ACTUAL DISPUTE.

Plaintiffs assert seven causes of action against different combinations of Defendants. Plaintiffs do not assert any claims against ULF or AVG. Because Bakhmatyuk has not yet been served, he is not a part of this Motion to Dismiss. The first cause of action is asserted against all Defendants under the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1962(c), alleging Defendants, as part of an enterprise, engaged in a pattern of racketeering activity, including wire and mail fraud and inducement to interstate or foreign travel. *Id.* ¶¶ 161–186. The second cause of action is asserted against Bakhmatyuk under RICO 18 U.S.C. § 1962(b) in addition to and in the alternative to the other RICO claims as a result of Bakhmatyuk's alleged

control over the Company. *Id.* ¶¶ 187–195. The third cause of action under RICO 18 U.S.C. § 1962(d), conspiracy to violate the other RICO provisions, is asserted against all of the Defendants. *Id.* ¶¶ 196–207. The fourth cause of action asserts common law fraud against Bakhmatyuk and Piazza resulting from "numerous false communications directed toward Gramercy in connection with their scheme to defraud Gramercy and maintain Bakhmatyuk's control over the Company." *Id.* ¶¶ 208–213. The fifth cause of action asserts tortious interference with contract—namely, the Trust Deeds—against Bakhmatyuk, Piazza, SP Capital, and TNA. *Id.* ¶¶ 214–218. The sixth cause of action asserts civil conspiracy against all of the Defendants. *Id.* ¶¶ 219–222. The seventh cause of action asserts aiding and abetting against all of the Defendants. *Id.* ¶¶ 223–226.

While Plaintiffs' Complaint is lengthy, more telling is the information Plaintiffs *do not* allege. They do not allege that any of the Moving Defendants made any misrepresentations to Gramercy. Plaintiffs attempt to link Piazza to the information presented by Concorde but fail to allege specific connections beyond "upon information and belief." *Id*. ¶¶ 72, 178. There are also no allegations that the sureties are not capable of making payment. Thus, accepting all of the allegations as true, the only claim is that Moving Defendants purchased AVG and ULF Notes. *Id.* ¶¶ 6, 10. Moreover, Plaintiffs do not and cannot allege that these purchases violate the Trust Deeds or any law. Finally, while Plaintiffs do allege "damages" in theory, those "damages" are far from clear. Plaintiffs vaguely claim that their damages are that they would have sold the Notes at some unspecified time, to an unspecified person, at an unspecified price, or that they would have initiated a restructuring at an unspecified time and would have received something unspecified in return. *Id.* ¶¶ 10, 182, 185, 211. And Plaintiffs seek the same, unspecified relief in an action currently pending in Cyprus court based on the same claimed transfers to Cypriot entity Maltofex alleged in the Complaint. *Id.* ¶¶ 124–127.

## LEGAL STANDARD

To survive a motion to dismiss, the facts alleged in a complaint must be enough to state a claim for relief that is plausible, not merely speculative. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The Court must accept the well-pleaded allegations of the complaint as true and construe them in plaintiffs' favor, *id*. at 555, but allegations that are purely conclusory are not entitled to an assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

## ARGUMENT

### I.   THE COURT MUST STAY THIS LITIGATION AND COMPEL ARBITRATION IN LONDON, PURSUANT TO THE ULF AND AVG TRUST DEEDS.

It is well established that the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, requires courts to "rigorously enforce agreements to arbitrate." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987). Indeed, the FAA codifies "a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)—a policy that "applies with special force in the field of international commerce" where, as here, the New York Convention applies. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *see, e.g.*, *Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*, 855 F. App'x 468, 471–72 (11th Cir. 2021) (explaining the "presumption in favor of arbitration" under the FAA "is stronger when the [New York] Convention" is implicated).

When presented with a request to refer an international dispute to arbitration, courts perform a "very limited inquiry" into whether (1) "there is an agreement in writing to arbitrate the subject of the dispute"; (2) "the agreement provide[s] for arbitration in the territory of the signatory of the Convention"; (3) "the agreement arise[s] out of a legal relationship whether contractual or not, which is considered as commercial"; and (4) whether "a party to the agreement not an American citizen" or "the commercial relationship ha[s] some reasonable relation with one or more

13

foreign states." *Riley v. Kingsley Underwriting Agencie*s, *Ltd.*, 969 F.2d 953, 959 (10th Cir. 1992) (citing *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186–87 (1st Cir. 1982)).

Here, all four jurisdiction requirements are easily met: ***First,*** each of the Trust Deeds that Plaintiffs rely on for their claims contains an agreement in writing to arbitrate those claims. *See infra* § I. The arbitration agreements delegate the question of arbitrability to the arbitrator and, in any event, cover this dispute. *Id.* While Moving Defendants are not parties to the Trust Deeds, equitable estoppel prevents Plaintiffs from avoiding arbitration of their claims under those agreements. *Id.* ***Second***, the arbitration agreement provides for arbitration in England, a signatory of the Convention. *See BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 243 (D.D.C. 2015), *aff'd*, 650 F. App'x 17 (D.C. Cir. 2016) (recognizing that England is a party to the New York Convention). ***Third***, the arbitration agreements arise out of the sale of unsecured Notes from ULF and AVG to Plaintiffs and the resulting contractual relationship governed by the terms of the Trust Deeds. ***Fourth***, and finally, neither ULF nor AVG, each a party to one of the relevant Trust Deeds, is an American citizen. *See* Compl. ¶¶ 21–22.

Therefore, under the Convention and Sections 3 and 4 of the FAA, the court must stay or dismiss Plaintiffs' action in its entirety and refer this international dispute to arbitration in London.[12]

A.    Plaintiffs are equitably estopped from avoiding the valid, enforceable arbitration agreements in the Trust Deeds**.**

Plaintiffs should be compelled to arbitrate their claims because they are equitably estopped from disclaiming the arbitration clauses in the contracts while asserting legal rights under those

---

[12] While the Trust Deeds include a term that states that third parties do not have rights under an English statute, the Contract (Rights of Third Parties) Act 1999 (the "Act") to enforce the Trust Deed, the term states it "does not affect any right or remedy of a third party which exists or is available apart from the Act." Ex. 5, AVG Trust Deed at 33, § 32; *see also* Ex. 6, ULF Trust Deed, Terms and Conditions of the Notes at 19, § 18. Thus, the term does not affect— and expressly preserves—Moving Defendants' right to compel arbitration under the doctrine of equitable estoppel, which exists and is available apart from the Act.

same contracts. *GE Energy Power Conversion France SAS, Corp.*, 140 S. Ct. at 1643–44 (explaining that nonsignatories may enforce arbitration agreements subject to the New York Convention through domestic-law equitable estoppel doctrines). Equitable estoppel "precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 708 (10th Cir. 2011) (internal citation and quotation omitted) (unpublished). Under this doctrine, a signatory to an arbitration agreement "cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Id.* (internal citation omitted).

"The scope of the arbitration agreement, including the question of who it binds, is a question of state contract law." *Reeves v. Enter. Prods. Partners, LP*, 17 F.4th 1008, 1011 (10th Cir. 2021) (citing *Arthur Andersen L.L.P. v. Carlisle*, 556 U.S. 624, 630–31 (2009)). While neither the Wyoming Supreme Court nor any other Wyoming state court or any federal court interpreting Wyoming law has yet to address the circumstances under which a nonsignatory may enforce an arbitration clause, the Court may seek guidance on this question from "the general weight and trend of authority in the relevant area of law." *Id.* at 1012 (internal quotation omitted) (looking to Oklahoma state appellate court decisions and other state and federal jurisdictions for guidance. The Tenth Circuit, like others, has held that equitable estoppel permits a nonsignatory to compel arbitration in two, independent circumstances: (1) when the signatory must "rely on the terms of the written agreement containing the arbitration clause" or (2) when the signatory raises allegations of "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Id.* (noting that "[m]any other states and circuits have

adopted th[is] … understanding of equitable estoppel") (internal citations and quotations omitted).

Here, Plaintiffs are estopped from avoiding the arbitration agreement under either prong, as each

applies.

**First,** there is no question Plaintiffs must rely on the terms of the Trust Deeds in asserting

their claims.  For purposes of equitable estoppel under this first prong, a plaintiff's claims are said

to "rely" on the contract where the contract "form[s] the legal basis of those claims." *Lenox*, 449

F. App'x at 709 (internal citations and quotations omitted).  The claims must be "so intertwined

with the agreement" that "it would be unfair to allow the signatory to rely on the agreement in

formulating its claims but to disavow availability of the arbitration clause of that same agreement."

*Id.* at 710 (internal quotation omitted).  Here, the entire crux of Plaintiffs' allegations is that

Defendants carried out a scheme designed to prevent Gramercy from exercising its rights under

the ULF and AVG Trust Deeds that contain the arbitration agreements:

- Each cause of action asserted in the Complaint is based on Gramercy's inability to exercise its rights under the Trust Deeds.  Compl. ¶ 168 (alleging that the aim of the RICO enterprise's unlawful conduct was to "employ[]all means necessary to prevent Gramercy . . . *[f]rom exercising its contractual rights under the Notes*…"); *id*. ¶ 212 (alleging that Defendants "fraudulently induced Gramercy *to forego enforcement of its contractual rights*"); *id*. ¶ 217 (alleging Defendants "intentionally and wrongfully *interfered with [AVG and ULF's] contractual obligations*, and in doing so, *caused [AVG and ULF] to breach [their] contractual obligations to Gramercy*, rendered [them] completely unable to perform under [the] contracts with Gramercy, and *destroyed Gramercy's contractual rights to remedy the breach*"); *id*. ¶ 220 (alleging Defendants "combined and agreed to participate in a scheme designed to defraud Gramercy and *deprive it of its contractual rights*") (emphases added to all).

- The Complaint alleges that Gramercy purchased AVG and ULF Notes; that the Notes were governed by the AVG Trust Deed and ULF Trust Deed, respectively; that the terms of the Trust Deeds impose certain restrictions on the companies' activity (i.e., requiring any sale of material assets be for fair market value and be reported to the Trustee); and that Gramercy, "as the holder of more than 25% of the principal amount of the total" of each the AVG and ULF Notes outstanding, "*had the power to initiate proceedings to enforce the terms of the Trust Deeds* and to

effectively veto any proposed restructuring of the Notes."   Compl. ¶¶ 45–50 (emphasis added).

- The Complaint then describes in over 100 paragraphs an alleged "multi-faceted scheme . . . that *illegally undermined Gramercy's legal and economic rights*" *under the Trust Deeds* "through the intentional dissemination of misinformation (including direct misrepresentations), non-arms-length debt purchases, and asset stripping." *Id.* ¶ 70 (emphasis added).

- The entire action is predicated on the Trust Deeds and the allegation that Defendants transferred away assets in violation of the arrangement set forth in the Trust Deeds, which is cited multiple times for that purpose. *See, e.g., id.* ¶ 76 ("[C]hanges in the Company structure between 2012 and 2016 . . . caused ULF's 'direct control of its key assets [to be] dispersed between the group's other subsidiaries;" but "[n]one of these transfers were publicly disclosed by the Company or disclosed to the Trustee *as required under both Trust Deeds*."); *id.* ¶ 127 ("[T]he Company failed to give notice to the Trustee of these affiliate transactions, *as required under the Trust Deeds*" and "failed to follow the terms of the asset sale restrictions *in the Trust Deeds*."); *id.* ¶ 145 ("[T]he Company did not disclose the change to the Trustee under the Notes or the Noteholders, *despite being required to do so by the Trust Deeds*."); *id.* ¶ 146 ("*[T]he terms of the Trust Deeds require* the Company to report material dispositions or restructurings promptly and to give notice of affiliate transactions over $5 million, but ULF never provided such a report about either the Maltofex or TNA Transfers") (emphases added to all).

- Plaintiffs' tortious interference claim alleges interference with—and thus relies entirely on—the ULF and AVG Trust Deeds.   *See id.* ¶¶ 214–18 (alleging "Gramercy *formed binding contracts with the Company, the terms of which are contained in the ULF Trust Deed and the AVG Trust Deed*" and Defendants "intentionally and wrongfully interfered with these contractual obligations") (emphasis added).

Thus, Plaintiffs' claims are predicated upon the existence and validity of the Trust Deeds—not only factually but also legally.   It would be unfair to allow Plaintiffs to avoid the arbitration provisions of those same agreements.  *Lenox*, 449 F. App'x at 709; *see also, e.g., Weller v. HSBC Mortg. Servs., Inc.*, 971 F. Supp. 2d 1072, 1083 (D. Colo. 2013) (finding signatory's claim against nonsignatory defendant "should be arbitrated under the principles of equitable estoppel" because "[t]here would be no legal basis for [the] claim without the underlying [] agreement of which the arbitration clause is an integral part").

*Second*, Plaintiffs are estopped under the second prong because they allege concerted misconduct by both nonsignatories *and* signatories to the Trust Deeds: ULF and AVG.  Estoppel under the second prong is appropriate where the allegations show that the claims against the nonsignatory are "intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause."  *Lenox*, 449 F. App'x at 710 (quotation omitted). Importantly, courts apply this prong to estop a signatory from avoiding arbitration even where the "concerted misconduct" alleged is between a defendant-nonsignatory (here, Moving Defendants) and a non-party signatory (here, ULF and AVG).  *See, e.g.*, *Reeves*, 17 F. 4th at 1014–15 ("The linchpin for equitable estoppel is equity—fairness," and "it is 'especially inequitable' when a 'signatory non-defendant . . . is charged with interdependent and concerted misconduct with a nonsignatory defendant' . . . and the signatory 'in essence' becomes a party to the litigation.").

As demonstrated above, Plaintiffs' claims are entirely dependent on AVG and ULF's obligations to Gramercy under the Trust Deeds—so much so, that Plaintiffs devote an entire section of the Complaint to listing those obligations so they can then explain how Defendants allegedly interfered with their ability to enforce them.  *See* Compl. ¶¶ 45–50; *see Lenox*, 449 F. App'x at 710 (A plaintiff's "actual dependance on the underlying contract in making out the claim against the nonsignatory defendant is [] always the *sine qua non* of an appropriate situation for applying equitable estoppel.").  This dispute will unquestionably involve facts regarding how ULF and AVG allegedly failed to comply with the terms of the Trust Deeds that Gramercy was then allegedly prevented from enforcing.  As such, Plaintiffs' claims against Defendants are "inherently inseparable" from and "integrally related" to their relationship and agreement with each of ULF and AVG.  *Reeves*, 17 F.4th at 1014; *see also, e.g.*, *Roe v. Gray*, 165 F. Supp. 2d 1164, 1174–75 (D. Colo. 2001) (holding nonsignatories could compel arbitration where claims against them "were

based on the same factual allegations, and even the same contract, as the claims against [signatories]" to the arbitration agreements).   Plaintiffs cannot now avoid the arbitration agreements in the Trust Deeds merely by intentionally omitting ULF and AVG as named defendants. *See Reeves*, 17 F.4th at 1014 ("The purpose of the doctrine of equitable estoppel is to prevent parties playing fast and loose with the courts and also to protect[] the judicial system. [Plaintiffs] simply plead around [non-party signatories], who would have to become crucial parties to the litigation," to attempt to avoid arbitration.).

*Finally*, Plaintiffs assert no allegations of fraud in the inducement or anything else that would call the validity of the arbitration agreements in the Trust Deeds into question.   Absent any claim the agreements containing the arbitration clauses are themselves are unenforceable (which Plaintiffs could not make because their claims depend on the validity of these agreements) the FAA requires this Court to enforce them. *See Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1280 (10th Cir. 2017) (a "court 'shall' order arbitration 'upon being satisfied that the making of the agreement for arbitration . . . is not in issue'") (quoting 9 U.S.C. § 4).

> **B.**   The arbitration agreements in the Trust Deeds are broad and encompass all of Plaintiffs' claims.

The arbitration agreements in the Trust Deeds require all disputes related to the Notes held by Plaintiffs to be resolved in arbitration in London, England. *See* Ex. 5, AVG Trust Deed at 32, § 29.1; Ex. 6, ULF Trust Deed at 30, § 23.2.1.  This Court "must 'place[ the] arbitration agreements on an equal footing with other contracts, and . . . enforce [it] according to [its] terms.'" *Belnap*, 844 F.3d at 1280 (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)); *accord GE Energy*, 140 S. Ct. at 1643.  Because arbitration "is simply a matter of contract," parties may agree not only to arbitrate the merits of a dispute, but also to arbitrate the threshold question of arbitrability. *Id.*   Thus, before deciding whether a dispute falls within the scope of a valid

arbitration agreement, the court must first determine whether the parties have agreed that *arbitrators*—rather than the court—should decide arbitrability. *Id.* at 1280–81. Whereas here, the parties have agreed to arbitrate arbitrability, the court must stay the litigation and compel all claims to arbitration so that an arbitrator can decide arbitrability in the first instance. *Id.* at 1292–93.

Each Trust Deed delegates arbitrability to the arbitrator. While there is a general presumption under the FAA that the threshold issue of arbitrability should be determined by a court, questions of arbitrability must be referred to an arbitrator where there is "clear and unmistakable" evidence from the arbitration agreement that the parties intended the question of arbitrability to be resolved by an arbitrator. *Id.* at 1290. Moreover, the court may infer such intent from the incorporation in the agreement of rules that making arbitrability subject to arbitration. *Id.* Here, the Trust Deeds incorporate the London Court of International Arbitration (LCIA) Arbitration Rules. *See* Ex. 5, AVG Trust Deed at 32, § 29.1 ("Any dispute…shall be resolved … in accordance with the LCIA Rules, which rules are deemed to be incorporated by reference into this Condition."); Ex. 6, ULF Trust Deed at 29, § 23.2.1 ("[A]ny dispute . . . shall be referred to and finally resolved by arbitration under the LCIA Arbitration Rules (the 'Rules'), which Rules are deemed incorporated by reference into this Trust Deed."). The LCIA Arbitration Rules, in turn, provide for the arbitration of arbitrability disputes:

> The Arbitral Tribunal shall have the power to rule upon its own jurisdiction and authority, including any objection to the initial or continuing existence, validity, effectiveness or scope of the Arbitration Agreement.

LCIA Arbitration Rules (2020), Article 23.1.[13] Thus, the incorporation of the LCIA Rules satisfies the "clear and unmistakable" evidence necessary to require that questions of arbitrability be

---

[13] The previous versions of the LCIA Arbitration Rules in effect at the time the Trust Deeds and Supplemental Trust Deeds were executed include the same rule vesting authority to decide arbitrability disputes with the arbitrator. *See* LCIA Arbitration Rules (2014), Article 23.1; LCIA Arbitration Rules (1998), Article 23.1.

referred to the arbitrator. *See Belnap*, 844 F.3d at 1281 (finding that incorporation of substantively identical JAMS Rules constituted "clear and unmistakable" evidence of an intent to arbitrate arbitrability).[14]

Even if the Court had the authority to decide the issue of arbitrability, Plaintiffs claims fall within the arbitration agreements' broad scope. The strong presumption favoring arbitration "applies with even greater force" when a broad arbitration clause is at issue. *P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999). Under the FAA, "a court *must* stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *Williams*, 203 F.3d at 764 (emphasis added) (quotation omitted); 9 U.S.C. § 3.

Here, the arbitration agreements encompass "any dispute arising out of or in connection with" the Trust Deeds. Ex. 5, AVG Trust Deed at 32, § 29.1; Ex. 6, ULF Trust Deed at 29, § 23.2. The Tenth Circuit has interpreted the phrase "arising out of," as used in an arbitration agreement, broadly to mean "originating from," "growing out of," or "flowing from." *Williams*, 203 F.3d at 765. Moreover, an arbitration agreement adding the language "in connection with" has also been interpreted "quite expansively." *Dodson Int'l Parts, Inc. v. Williams Int'l Co. LLC*, 12 F.4th 1212, 1220 (10th Cir. 2021); *see also Brown v. Coleman Co.*, 220 F.3d 1180, 1184 (10th Cir. 2000) (holding that an arbitration clause covering all disputes "arising under or in connection with" the agreement is "the very definition of a broad arbitration clause as it covers not only those issues

---

[14] *See also, e.g.*, *ROI Props. Inc. v. Burford Cap. Ltd.*, No. CV-18-03300-PHX-DJH, 2019 WL 1359254, at *4 (D. Ariz. Jan. 14, 2019) (The "gateway issue of arbitrability must be left to the arbitrator because the [] arbitration provision specifically provides that the LCIA rules govern arbitrations and the LCIA rules provide that the arbitrator decides the issues of arbitrability."); *SteppeChange LLC v. VEON Ltd.*, 354 F. Supp. 3d 1033, 1043 (N.D. Cal. 2018) ("The invocation of the LCIA Rules in the [deed] constitutes clear and unmistakable evidence that the parties have agreed to arbitrate arbitrability."); *Innospec Ltd. v. Ethyl Corp.*, No. 3:14-CV-158-JAG, 2014 WL 5460413, at *3 (E.D. Va. Oct. 27, 2014) ("The incorporation of the LCIA Rules, which give the arbitrator jurisdiction to determine arbitrability, meets the 'clear and unmistakable' standard.").

arising under the [] contract, but even those issues with any connection to the contract").  Here, as described above, all of Plaintiffs' claims flow from and have a direct connection to the Trust Deeds; indeed, without the Trust Deeds, Plaintiffs would have *no* claims.  Plaintiffs cannot avoid the arbitration provisions they agreed to by masking their contract claims as tort claims.  *See Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc*., 567 F.3d 1191, 1198 (10th Cir. 2009) ("Focusing on the facts rather than on a choice of legal labels prevents a creative and artful pleader from drafting around an otherwise-applicable arbitration clause."); *Lawit v. Maney & Gordon, P.A.*, No. 13-CV-0835 SMV/LFG, 2014 WL 11512612, at *4 n.2 (D.N.M. Jan. 17, 2014) ("It is well-established that a party cannot avoid arbitration by simply casting its complaint in tort instead of contract.") (collecting cases).

## II.    THE "NO-ACTION" CLAUSE PRECLUDES THIS ACTION

Plaintiffs lack standing to bring this action seeking to recover for alleged injuries of ULF and AVG that are alleged to have had assets transferred away.  The Trust Deeds expressly preclude Plaintiffs from bringing those claims.  Under English law, which governs the Trust Deeds and Plaintiffs' claims arising thereunder, Plaintiffs as Noteholders have no standing to pursue claims against third parties on behalf of the issuers, ULF and AVG, without first satisfying procedural requirements set forth in the Trust Deeds (which they have not).  Likewise, Plaintiffs would lack standing to bring the issuers' claims on their own behalf if U.S. law applied to those claims.  Thus, regardless of which law is applied, Plaintiffs lack standing to bring this action.

Plaintiffs assert claims for RICO, RICO conspiracy, fraud and tortious interference based on ULF and AVG's alleged loss of assets that, they claim, rendered the Notes less valuable.  *See, e.g.*, Compl. ¶¶ 181–186, 200–206, 212–213, 219–220.  Plaintiffs, as Noteholders, generally lack standing under U.S. law to seek recovery on their own behalf for injuries to ULF and AVG.  *See Bixler*, 596 F.3d at 758  (dismissing investors' RICO claims for lack of standing because alleged

"injuries were based on the diminution of the value of [investors'] shares, and not on direct injury to them"); *Baltus-Michaelson v. Credit Suisse First Bos., LLC*, 116 F. App'x 308, 310 (2d Cir. 2004) ("It is well-settled that shareholders lack standing to assert individual claims based on injury to the corporation" and not on "a duty owed to them or injury sustained by them that is separate and distinct from that of the corporation."); *Rand v. Anaconda-Ericsson, Inc.,* 794 F.2d 843 (2d Cir.), *cert. denied,* 479 U.S. 987 (1986) (shareholder of an injured corporation did not have individual standing to bring a claim under civil RICO).

Plaintiffs assert rights they have only by virtue of being Noteholders in ULF and AVG and allege no injury different from the injury that affects all Noteholders equally because of the loss of company assets. Generally, under the law of the United States, in order to bring such a derivative claim on behalf of the company, a securityholder must first make a demand on the corporation and its directors and officers to take action, which demand is refused. *See Bixler*, 596 F.3d at 757–58 (Generally, investors are "prohibit[ed] . . . from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment"); *see also, e.g.*, Fed. R. Civ. P. 23.1 (providing that a shareholder may not bring a derivative action to enforce a right of the corporation without first demanding that the directors of the corporation take action, or stating that such demand would be futile). This is particularly true where, as here, a no-action clause in the deed governing the underlying issuance expressly requires individual creditors to act through an appointed trustee to enforce the terms of that deed. *Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1293 (11th Cir. 2012) (recognizing that "no-action clauses have generally been upheld by courts") (quotation omitted); *Peak Partners*, 191 F. App'x at 127 ("The main function of a no-action clause is to delegat[e] the right to bring a suit enforcing the rights of bondholders to the

trustee, or to the holders of a substantial amount of bonds. This function is a central feature of an Indenture, the primary purpose of which is to centralize enforcement powers by vesting legal title to the securities in one trustee.") (internal citation and quotation omitted).

Indeed, the no-action clause in the Trust Deeds governing Plaintiffs claims make this abundantly clear. The Trust Deeds vest the respective Trustee with sole authority to enforce rights arising under the Deeds and expressly prohibit Noteholders, such as Plaintiffs, from doing so on an individual basis:

> **2.5 Enforcement action after the Notes become due and payable**
>
> Pursuant to Condition 14 (*Enforcement*), at any time after the Notes become due and payable, ***the Trustee may, at its discretion and without further notice, institute such proceedings against the Issuer and/or any Surety Provider as it may think fit to enforce the terms of this Trust Deed, the Notes and/or the Surety Deed*** (whether by arbitration pursuant to the Trust Deed or the Surety Deed or by litigation), but it need not take any such proceedings and nor shall the Trustee be bound to take, or omit to take any step or action (including instituting such proceedings) ***unless (i) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders holding at least one-quarter in principal amount of the Notes outstanding*** and (ii) it shall have been indemnified and/or secured and/or pre-funded to its satisfaction. ***No Noteholder may proceed directly against the Issuer or any Surety Provider unless the Trustee, having become bound so to proceed, fails to do so within a reasonable time and such failure is continuing.***

Ex. 6, ULF Trust Deed at 6–7, § 2.5.[15] Specifically, the "no-action clause" precludes Plaintiffs from bringing suit to enforce the terms of the Trust Deed on their own behalf without first requesting in writing that the Trustee institute such proceeding, and the Trustee's failure to do so. Plaintiffs have not taken this step, and do not allege that they have. The requirement that creditors act through a trustee to pursue derivative claims based on injury to the company is entirely consistent with applicable English law. *See* Ex. 11, *In the matter of Colt Telecom Group plc* [2002]

---

[15] *See also* Ex. 5, AVG Trust Deed at 14, § 8.3.

EWHC 2815 (Ch) ¶ 62 (finding no "evidence of harm to the public by the enforceability of [no-action] clauses so far as this country [England] or any other country is concerned"); *see also* Ex. 9, U.K. Companies Act 2006, Part 11 (setting forth procedural requirements that must be met before shareholders may pursue a derivative claim on behalf of the company). English courts do not hesitate in enforcing no-action clauses to prevent Noteholders from doing exactly what Plaintiffs attempt with their Complaint—namely, to circumvent the process negotiated and agreed to through the Trust Deeds, the purpose of which is to "promote liquidity" by ensuring Noteholders "act through the Trustee, and share equally in the fortunes of the investment, and not compete with each other." Ex. 10, *Elektrim SA v. Vivendi Holdings 1 Corp*, [2008] EWCA Civ 1178, ¶ 101 (the "no action clause should be construed, to the extent reasonably possible, as an effective bar to individual bondholders pursuing, for their own account, what are in substance class claims").

Moreover, English courts have interpreted no-action clauses broadly to encompass tort claims where, as here, the alleged injury was ultimately loss of a contractual right. *See, e.g.*, *id.* ¶¶ 104–105 (finding no- action clause barred suit where, although the cause of action was "framed as a claim in the tort of 'fraud' . . . the object of the claim [wa]s to compensate [Bondholder] for the loss of a contractual right or entitlement under the Bond Terms which it had by virtue of being a Bondholder"); Ex. 11, *Colt Telecom* at ¶¶ 56–61 (finding claim for administration was a "remedy with respect to [the] Indenture or the Notes" and, therefore, barred by the no-action clause); Compl. ¶ 181 (alleging Defendants "sabotaged Gramercy's ***legal and economic rights*** as one of the largest creditors of the Company by …. ***rendering Gramercy's contractual right … ineffectual or worthless***") (emphases added). Plaintiffs do not challenge the validity of the no-action clauses or the Trust Deeds themselves; they simply ignore them. Plaintiffs cannot escape English law or their obligations under the Trust Deeds by bringing their derivative claims in a U.S. court.

**III.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE ULF AND AVG ARE INDISPENSABLE PARTIES THAT CANNOT BE JOINED.**

Rule 12(b)(7) provides that a complaint may be dismissed for failure to join a party under Rule 19, which sets out a two-step test for determining whether dismissal is appropriate. First, the court determines whether joinder is required, either because "(1) in th[e] person's absence, the court cannot accord complete relief among existing parties;" or (2) failure to join would "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a). If joinder is not feasible, the court must then decide "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed," considering the factors enumerated in Rule 19(b). *Merrill Scott & Assocs., Ltd. v. Concilium Ins. Servs.*, 253 F. App'x 756, 762 (10th Cir. 2007) (quoting *Davis v. United States*, 192 F.3d 951, 959 (10th Cir. 1999)). Under this test, ULF and AVG are required parties without which it would be improper to proceed under Rule 19. *See Symes v. Harris*, 472 F.3d 754, 760–61 (10th Cir. 2006).

   **A.**   ULF and AVG are required parties under Rule 19(a)**.**

ULF and AVG are required parties under both prongs of Rule 19(a) because the Court cannot accord complete relief in their absence and their absence would create a substantial risk of double recovery or inconsistent obligations.

To begin, ULF and AVG unquestionably have an interest in the subject of this action. Indeed, the entire impetus of Gramercy's claims is its purchase of ULF and AVG's Notes. The Tenth Circuit has held that where a party's claims are premised on rights against a corporation, yet the action is brought against the individual, the corporation is a necessary party. *Id.* at 760. Plaintiffs' claims put squarely at issue ULF and AVG's rights, obligations, and performance with respect to the Notes. Proceeding with this action could lead to a determination that their actions

breached the relevant agreements *in their absence* and would certainly deprive them of their rights to have disputes related to the Notes litigated in the manner described in those agreements.

Further, this Court cannot grant full relief because Plaintiffs will retain their interest in the outstanding Notes and could stand to collect on the debt from ULF and AVG, while recovering here based on the claim that they would have sold the Notes at a market value absent the alleged conduct. Alternatively, Plaintiffs (or other Noteholders) could seek to exercise their rights under the agreements to have the Trustee bring an action in the London Court of International Arbitration that could entitle Plaintiffs to a double recovery. Thus, there is substantial risk that Defendants in this matter may incur "double, multiple, or otherwise inconsistent obligations—the precise harm [Rule 19] was partially designed to avoid." *Id*.

However, while they are required parties, ULF and AVG cannot be joined. In the first instance, if they were named, the arbitration agreement for any dispute arising from the purchase of the Notes and the "no-action" clause of the agreements would unquestionably apply. Moreover, it is extremely unlikely that Plaintiffs could plead personal jurisdiction over the Ukrainian entities. Thus, the Court must move to the second step and determine whether ULF and AVG are indispensable.

**B.**      ULF and AVG are indispensable parties under Rule 19(b)**.**

"Fed. R. Civ. P. 19(b) provides that [i]f a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." *Id*. The Court must consider "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided . . . ; (3) whether a judgment

rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b).

Here, the prejudice to ULF or AVG is obvious, as Plaintiffs' claims would require the Court to decide whether ULF or AVG acted in breach of the Subscription Agreements or Trust Deeds, which creates the possibility of consequences for those entities in other jurisdictions. There is no way to ameliorate this risk. In addition, a judgment rendered without the issuers of the Notes would be inadequate. Gramercy would continue to hold outstanding debt and the restructuring disputes would remain unresolved.

Finally, Gramercy has an adequate remedy through arbitration in London. *See infra* § IV.A (discussing the adequacy of London as adequate alternative forum). Dismissal would not foreclose Gramercy's ability to pursue its claims in the proper forum—arbitration in London. In sum, ULF and AVG are not only necessary but also indispensable parties because all the equitable considerations of Rule 19(b) weigh in favor of dismissal.

## IV.   THE CASE SHOULD BE DISMISSED UNDER THE DOCTRINE OF FORUM NON CONVENIENS.

The proper forum for this matter, as plainly established in the Trust Deeds, Subscription Agreements, and prospectuses, is the London Court of International Arbitration. The Court should dispose of this matter easily under the doctrine of forum non-conveniens.

Two threshold requirements must be met in order to dismiss on the basis of forum non conveniens. First, there must be an "adequate alternative forum where the defendant is amenable to process." *Archangel Diamond Corp. Liquidating Trust v. Lukoil*, 812 F.3d 799, 804 (10th Cir. 2016) (quoting *Fireman's Fund Ins. Co. v. Thyssen Mining Constr. of Can., Ltd.*, 703 F.3d 488, 495 (10th Cir. 2012)). "Second, 'the court must confirm that foreign law is applicable.'" *Id*. "[I]f both threshold requirements are met, the court weighs the private and public interests to determine

whether to dismiss" the case.  *Id*.  Here, the threshold requirements are met because (1) the London

Court of International Arbitration is an adequate, available forum, in light of the Subscription

Agreements, Trust Deeds, and prospectuses and as affirmed by Tenth Circuit case law; (2) foreign

law is applicable, even where the claims alleged arise under RICO; and (3) both private and public

interests weigh in favor of dismissal.

> **A.**     The London Court of International Arbitration is an adequate alternative forum**.**

At the outset of any forum non conveniens inquiry, the court must determine whether there

exists an alternative forum.  Ordinarily, this requirement will be satisfied when the defendant is

"amenable to process" in the other jurisdiction.  *Yavuz v. 61 MM, Ltd*., 576 F.3d 1166, 1172 (10th

Cir. 2009); *Gschwind v. Cessna Aircraft Co*., 161 F.3d 602, 605–06 (10th Cir. 1998); *Piper*

*Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981).   Given that each of the relevant contracts

in this matter not only permit but also affirmatively requires arbitration of any disputes connected

to the Notes arbitration before the LCIA, Moving Defendants are amenable to process in England,

which has been widely recognized as an adequate alternative forum.  *See Levien v. hibu plc*, 475

F. Supp. 3d 429, 439 (E.D. Pa. 2020) ("As numerous courts have recognized, the judicial system

in England is plainly adequate.") (citing *Wilmot v. Marriott Hurghada Mgmt.*, *Inc*., 712 F. App'x

200, 204 (3d Cir. 2017)), *aff'd*, No. 20-2731, 2021 WL 5742664 (3d Cir. Dec. 2, 2021).

Further, English law provides an adequate remedy for Plaintiffs' claims.  The remedy

provided by the alternate forum "need not be the same as that provided by the American court."

*Yavuz*, 576 F.3d at 1174 (quoting *Gschwind*, 161 F.3d at 607).  "Instead, the alternative forum is

not inadequate unless its remedy is "so clearly inadequate . . . that it is no remedy at all."  *Piper*

*Aircraft Co.*, 454 U.S. at 254.  While Plaintiffs' claims are brought under RICO, courts have

expressly held that this is not a basis for denying dismissal on the grounds of forum non

conveniens.  *Archangel*, 812 F.3d 799 at 804–805 ("Federal courts have refused to afford RICO claims special treatment in *forum non conveniens* inquiries and have found dismissal on this basis proper in cases involving RICO claims.") (quoting *Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183, 193 (3d Cir. 2008)).[16]  Thus, as the Tenth Circuit did in *Archangel*, this Court should not foreclose consideration of forum non conveniens when some of the claims are based on U.S. law and some are based on foreign law, particularly where, as here, the contracts unequivocally state that English law governs.  *Id.* ("To do otherwise would allow a party to avoid a forum non conveniens dismissal simply by including a claim based upon a domestic statute."); *Gas Sensing Tech. Corp. v. Ashton*, No. 16-CV-272-F, 2017 WL 2955353, at *15 (D. Wyo. June 12, 2017) (Freudenthal, J.) (dismissing on the basis of forum non conveniens where the "majority of the case" was subject to Australian law).

## B. English law applies.

The Subscription Agreements, Trust Deeds, and prospectuses each select English law as the governing law.  *See supra* pp. 7 – 8.  Even if the Court were to determine these documents do not govern the issue, there would be still no reason U.S. law would apply.  Both ULF and AVG are Ukrainian businesses, such that Ukrainian law would be appropriate.  Further, all the conduct alleged in the complaint occurred in England or Ukraine, such that there is no basis to apply U.S. law over the law of those countries.  Moving Defendants have met the threshold requirements of showing foreign law applies and an adequate alternative forum exists.  The Court should thus move to weighing the private and public interests that all favor dismissal on forum non conveniens.

---

[16] *See also Kempe v. Ocean Drilling & Expl. Co.,* 876 F.2d 1138, 1145 (5th Cir.) (absence of equivalent of RICO in foreign jurisdiction does not bar dismissal on grounds of forum non conveniens where foreign law permits recovery for fraud, negligence, and breach of fiduciary duty), *cert. denied*, 493 U.S. 918 (1989).

C.      Private and public interests weigh in favor of dismissal.

The many private and public interest factors considered for forum non conveniens uniformly weigh against finding Wyoming a proper forum.  Indeed, all signs for the appropriate forum point outside of the United States, namely England or Ukraine.  This case involves the purchase of Notes from a Ukrainian business by Cayman Island investors through the London and Irish Stock Exchanges.  Compl. ¶¶ 14, 21–22; Ex. 2, AVG Subscription Agreement at 6; Ex. 1, ULF Subscription Agreement at 2.  Plaintiffs are not Wyoming residents, so their "choice of forum 'warrants less deference'" in this analysis.  Compl. ¶¶ 13–15; *Yavuz*, 576 F.3d at 1172 (quoting *Gschwind*, 161 F.3d at 605–06); *see also Gas Sensing Tech. Corp.*, 2017 WL 2955353 at *14 (Freudenthal, J.).

Starting with the private interests, the factors include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses;[17] possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Piper Aircraft Co.*, 454 U.S. at 241 n.6 (quoting *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508 (1947)).  But, Plaintiffs' Complaint demonstrates the key witnesses, evidence, and documents are located outside the United States:

- Bakhmatyuk is a dual citizen of Ukraine and Cyprus, residing in Oberwaltersdorf, Austria.  Compl. ¶ 16.

- Piazza resides part-time in Ukraine.  *Id*. ¶ 17.

---

[17] While technology advancements could provide *some* assistance, courts have reasoned that live testimony of witnesses is preferable.  *Wallert v. Allan*, 141 F. Supp. 3d 258, 281 (S.D.N.Y. 2015) ("[W]hile videotaped testimony is usable in court when necessary (e.g., witness unavailability), live testimony is preferable.").  Furthermore, all of the relevant facts occurred outside the United States.

- Yaremenko (who is a likely witness only because he is a Defendant; as described below, he had no involvement in the alleged conduct) is a Ukrainian citizen and resident of Kyiv. *Id*. ¶ 18.

- Petrashko is a Ukrainian citizen and served as Ukraine's Minister of Economic Development and Trade. *Id*. ¶¶ 24, 44.

- SP Capital has an office in Ukraine. *Id*. ¶ 19.

- SP Advisors' primary office is in Ukraine. *Id*.

- The Note issuers upon which Plaintiffs' claims are based, AVG and ULF are incorporated in Cyprus, with all of their operations in Ukraine. *Id*. ¶¶ 21–22.

- Plaintiff funds are organized under the laws of the Cayman Islands. *Id*. ¶ 14.

- All of the negotiations regarding a potential restructuring occurred in London or Ukraine. *Id*. ¶¶ 85, 91, 116, 119, 129, 180.

- The alleged misrepresentations occurred outside the United States in London. *Id*.  ¶¶ 70, 85, 91, 116, 119, 129, 130, 158, 171, 180.

Further, the Notes were issued on the London and Irish Stock Exchanges. *See* Ex. 2, AVG Subscription Agreement at 6; Ex. 1, ULF Subscription Agreement at 2.  None of the surety providers is located in the United States. *See* Ex. 2, AVG Subscription Agreement at 28–30 (Schedule 2); Ex. 1, ULF Subscription Agreement at 37–41 (Schedule 2).  The Trustees are not located in the United States.  Ex. 5, AVG Trust Deed at 82 (Bank of New York Paying Agents and Transfer Agent located in London; Registrar located in Luxembourg); Ex. 6, ULF Trust Deed at 1.  Because all of the key evidence, witnesses (including third-party witnesses), and documents are outside Wyoming or even the United States, private interest factors weigh in favor of dismissal.

Public interest factors include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft*

*Co.*, 454 U.S. at 241 n.6 (quoting *Gilbert*, 330 U.S. at 509).  Indeed, the prospectuses confirm that *Ukraine would not even enforce a judgment entered by this Court*.[18]  That public interest factor alone weighs heavily in favor of dismissal.  The Court should not expend resources on a case whose outcome may have no ultimate effect, especially where a judgment by the agreed upon forum (in arbitration) would be enforced.

Gramercy grasps at straws to try to find a connection to the state.   In fact, Plaintiffs do not allege the transfers actually occurred in Wyoming.  Compl. ¶¶ 139–144.  As supported by the documents, nature of the dispute, and nature of the parties, there is no *local* interest in having this controversy decided in Wyoming.   *Gas Sensing Tech. Corp.*, No. 16-CV-272-F at *17 (Freudenthal, J.) (holding Wyoming had "very little connection" to case focused on conduct in Australia); *see also Levien v. hibu plc*, 475 F. Supp. 3d 429 (E.D. Pa. 2020), *aff'd,* No. 20-2731, 2021 WL 5742664 (3d Cir. Dec. 2, 2021) (granting dismissal on the basis of forum non conveniens where the allegedly fraudulent statements were published through the London Stock Exchange).

This Court's holding in *Gas Sensing Technology Corp. v. Ashton* is particularly informative, where this Court reasoned:

> Defendants reside in Australia and, therefore, a majority of the evidence for Plaintiffs' claims is located in Australia as well. Thus, the administrative difficulties favor Defendants because Plaintiffs not only filed this action, but also actions in Australia alleging similar claims against Defendants. In addition, this Court previously found it lacks personal jurisdiction over several key Defendants, including ProX, Meldrum, and Mactaggart. Moreover, the members of the Wyoming community have very little connection to this case because all claims revolve around the hostile takeover of WellDog, including Plaintiffs' claims that Defendants misappropriated Gas Sensing's intellectual property and trade secrets in furtherance of their conspiracy takeover theory. Rather, Australia and its citizens have a strong interest in resolving this dispute because all Defendants reside in Australia, the majority of the actions at issue took place in Australia, WellDog is the Australian subsidiary of Gas Sensing, and Plaintiffs have already availed themselves to Australia's jurisdiction. Finally, as the Court previously explained,

---

[18] Ex. 4, AVG 2010 Prospectus at iv; Ex. 3, ULF Prospectus at iii. In contrast, the prospectuses expressly state that an arbitration award is enforceable in Ukraine.  *Id.*

although this case involves both American and Australian law, the majority of the issues are properly under Australia's authority. For all of these reasons, the Court finds the private and public weigh in Defendants' favor.

2017 WL 2955353 at *17 (Freudenthal, J.) (citation omitted).  The defendants, witnesses, and evidence in this matter are located outside of the United States.

As discussed in Section VII below, this Court lacks jurisdiction over Yaremenko, and Plaintiffs have not been able to serve Bakhmatyuk, over whom this Court also likely lacks jurisdiction. This Court is not familiar with English law, or Cypriot or Ukrainian law, for that matter, and the Court's resources should not be devoted to applying foreign law in this case. Finally, as stated above, a judgment from this Court would not be enforced by Ukrainian courts. Ex. 4, AVG 2010 Prospectus at iv; Ex. 3, ULF Prospectus at iii. These private and interest factors overwhelmingly favor dismissal.

## V.     GRAMERCY'S COMPLAINT MUST BE DISMISSED BECAUSE ITS RICO CLAIMS FAIL ON MULTIPLE GROUNDS.[19]

Gramercy's RICO claims should be dismissed because Gramercy has alleged predicate acts that do not apply extraterritorially, and Gramercy does not allege a domestic application of those predicates.  These claims also fail because the Private Securities Litigation Reform Act ("PSLRA") bars Gramercy's attempt to disguise allegations of securities fraud as RICO violations through artful pleading, as all the conduct Gramercy alleges is intimately tied to its purchase of securities from ULF and AVG.  Moreover, Gramercy's RICO claims fail because Gramercy has not alleged

---

[19] Title 18 U.S.C. § 1962 has four subsections, three of which (b, c, and d) are at issue.  Section 1962(b) makes it illegal for "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control" in a RICO enterprise, while § 1962(c) makes it illegal for "any person employed by or associated with any" RICO enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ," and § 1962(d) makes it unlawful "to conspire to violate any of" the statute's subsections.  Gramercy has alleged violations of § 1962(c) and (d) by all Defendants and a violation of § 1962(b) by Bakhmatyuk.  Compl. ¶¶ 161–206.  "A conspiracy claim under 18 U.S.C. § 1962(d) fails when the substantive claim based on [other § 1962 subsections] is without merit."  *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999).

a pattern of racketeering activity, and Gramercy does not have cognizable RICO damages.  The Complaint also does not satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) with respect to the RICO claims or state law claims based on the same allegations.  As these inadequacies show, Gramercy's desire to seek treble damages is not enough to transform an isolated incident of alleged securities fraud into a RICO violation.  The RICO statute does not and cannot support such an expansive reach.

### A.    RICO does not reach the extraterritorial conduct alleged.

The Court should dismiss Gramercy's RICO claims because RICO does not apply extraterritorially to the conduct alleged by Gramercy.  In *RJR Nabisco, Inc. v. European Community*, the Supreme Court held that RICO applies extraterritorially "only with respect to certain applications of the statute."  579 U.S. 325, 338 (2016).  Sections 1962(b) and (c) apply to foreign racketeering activity "only to the extent that the predicates alleged in a particular case themselves apply extraterritorially."  *Id.* at 339.  The Supreme Court has set out a two-step process for analyzing extraterritoriality issues.  *Id.* at 337.  First, courts ask "whether the statute gives a clear, affirmative indication that it applies extraterritorially."  *Id.*  If the statute does not apply extraterritorially, the second step is to "determine whether the case involves a domestic application of the statute . . . by looking to the statute's 'focus.'"  *Id.*

If a predicate statute does not apply extraterritorially, "conduct committed abroad . . . cannot qualify as a predicate under RICO's plain terms."  *Id.*  at 339.  "[A] RICO enterprise must engage in, or affect in some significant way, commerce directly involving the United States . . . . Enterprises whose activities lack that anchor to U.S. commerce cannot sustain a RICO violation."  *Id.* at 344.

Gramercy has alleged predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 and inducement to interstate or foreign travel under 18 U.S.C. § 2314.  These statutes do not

"manifest[] an unmistakable congressional intent to apply extraterritorially," and thus the foreign

conduct Gramercy alleges "cannot qualify as a predicate under RICO's plain terms."  *Id.*  In *RJR*

*Nabisco*, *Inc.*, the Supreme Court "left undisturbed the Second Circuit Court of Appeals' decision

below" that neither wire fraud nor mail fraud applies extraterritorially.  *Nuevos Destinos, LLC v.*

*Peck*, No. 3:19-CV-00045, 2019 WL 6481441, at *20 (D.N.D. Dec. 2, 2019), *aff'd*, 999 F.3d 641

(8th Cir. 2021).  Post-*RJR Nabisco, Inc.*, the Second Circuit has reaffirmed its conclusion that the

wire fraud statute does not rebut the presumption against extraterritoriality.  *See United States v.*

*Napout*, 963 F.3d 163, 178 (2d Cir. 2020).  Courts addressing the question in light of the Supreme

Court's guidance in *RJR Nabisco, Inc.* are largely unanimous, holding the mail and wire fraud

statutes do not apply extraterritorially.  *See Skillern v. United States*, No. 20-13380-H, 2021 WL

3047004, at *8 (11th Cir. Apr. 16, 2021); *United States v. All Assets Held at Bank Julius*, 251 F.

Supp. 3d 82, 101–03 (D.D.C. 2017); *ASI, Inc. v. Aquawood, LLC*, No. CV 19-763 (JRT/HB), 2020

WL 5913578, at *12 (D. Minn. Oct. 6, 2020), *motion to certify appeal denied*, No. CV 19-763

(JRT/HB), 2021 WL 396818 (D. Minn. Feb. 4, 2021).  Courts that have held otherwise rely on

case law from the First and Third Circuit decided before *RJR Nabisco, Inc.  See, e.g.*, *Drummond*

*Co., Inc. v. Collingsworth*, No. 2:15-CV-506-RDP, 2017 WL 3268907, at *17 (N.D. Ala. Aug. 1,

2017), *overruled by Skillern*, 2021 WL 3047004, at *8.  This Court should follow those circuits

that have addressed the issue after the Supreme Court's guidance in *RJR Nabisco, Inc.* and find

mail and wire fraud do not apply extraterritorially.

The inducement to interstate or foreign travel statute does not pass step one of the

extraterritoriality analysis because it does not "give[] a clear, affirmative indication that it applies

extraterritorially."  *RJR Nabisco, Inc.*, 579 U.S. at 337.  The statute "includes only a general

reference to 'foreign commerce,' which the Supreme Court has found insufficient to rebut the

presumption against extraterritoriality." *All Assets Held at Bank Julius*, 251 F. Supp. 3d at 98. Thus, none of the predicate statutes at issue applies to extraterritorial conduct.

Applying step two, Gramercy has not alleged a domestic application of the predicate acts. "[T]he focuses of the mail and wire fraud statutes are the acts of 'depositing' and 'transmitting,' respectively." *Skillern*, 2021 WL 3047004, at *8. And "the focus of [the inducement to interstate or foreign travel statute] is the transportation or transfer of property." *All Assets Held at Bank Julius*, 251 F. Supp. 3d at 99. The conduct Gramercy relies on in alleging violations of all three predicates occurred outside the United States, with a focus on securities issued outside the United States and governed by contracts applying foreign law. Gramercy's allegations do not show a permissible domestic application of the predicate statutes. Rather, the conduct at issue revolves around Notes sold by two Ukrainian businesses, AVG and ULF. Compl. ¶ 1. AVG and ULF were both incorporated in Cyprus. *Id.* ¶¶ 21–22. And the Notes at issue were sold on the London Stock Exchange and clearly state that English law governs. *See, e.g., id.* ¶ 45. Finally, the Gramercy funds that bought the Notes are organized under the law of the Cayman Islands. *Id.* ¶ 14. Gramercy has not shown a domestic application of the predicate acts, and thus attempts to impermissibly apply RICO extraterritorially.

**B.    The Private Securities Litigation Reform Act bars Gramercy's RICO claims**.

The Court should dismiss Counts 1–3 because Gramercy's claims sound in securities law, not the criminal conspiracies that the RICO Act is intended to target. Congress has made this clear—amending RICO in 1995 to state that "any conduct that would have been actionable as fraud in the purchase or sale of securities" cannot establish a RICO violation. Pub. L. No. 104–67 § 107, 109 Stat. 737, 758 (1995). The PSLRA was intended to "eliminate securities fraud as a predicate offense in a civil RICO action" and bar plaintiffs from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that

would have been actionable as securities fraud." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 278–79 (2d Cir. 2011) (quoting H.R. Rep. 104–369, at 47 (1995)).  The PSLRA's bar is broadly construed; "[even] alleged predicate acts [that] do not describe securities fraud . . . [if] also *undertaken in connection with the purchase of a security* . . . cannot support a civil RICO claim after enactment of the PSLRA."  *Bixler*, at 760 (emphasis added) (internal quotation omitted).  Because the ULF and AVG Notes are securities, and Gramercy's RICO causes of actions stem from fraud in connection with the Notes, the PSLRA bars these claims.

As an initial matter, Plaintiffs' notes are "presumed to be a 'security,'" considering the four factors provided by the Supreme Court: (1) the purpose of the note; 2) the plan of distribution of the note and "whether it is an instrument in which there is 'common trading for speculation or investment'"; (3) the reasonable expectations of investors; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves v. Ernst & Young*, 494 U.S. 56, 66–67 (1990) (citation omitted).  The ULF and AVG Notes (1) were sold "in an effort to raise capital for [the seller's] general business operations" and purchased "in order to earn profit in the form of interest"; (2) were "offered and sold to a broad segment of the public," (3) are "investments" in character; and, (4) involve risk that is only eliminated "when, and if, a payment is made." *Id.* at 67–70.

As a result, the Notes fall under the broad bar of the PSLRA to any RICO claim based on predicate acts "undertaken in connection with the purchase of a security." *Bixler*, 596 F.3d at 760 (internal quotation omitted).  In *Bixler*, the plaintiffs, minority shareholders in METCO, brought a RICO action against METCO's directors and lawyers alleging shareholders were damaged by METCO's transfer of mining claims in exchange for UKL stock that was not paid. *Id.* at 755.  The

*Bixler* plaintiffs alleged this scheme "defrauded them of their share of the UKL stock and rendered their METCO investment virtually worthless" and functioned as a "fraudulent means of transferring the mining claims to a third entity." *Id.* The Tenth Circuit found the plaintiffs' RICO claims were barred by the PSLRA, noting that the plaintiffs' alleged predicates acts "cannot support a RICO claim after enactment of the PSLRA." *Id.* (quoting *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d at 321, 330 (3rd Cir. 1999)). The court in *Bixler* noted that a contrary decision would "[a]llow[] plaintiffs to engage in 'surgical presentation of the cause of action' [and] would undermine the purpose of the RICO amendment." *Id.* (quoting *Bald Eagle Area Sch. Dist.*, 189 F.3d at 330); *see also Braverman v. LPL Fin. Corp.*, 2011 WL 13289787, at *5 (D.N.M. Apr. 21, 2011) ("Activities such as mail fraud, wire fraud, bank fraud, and interstate travel in support of racketeering activities are considered to be undertaken in connection with the purchase of a security, despite also possibly constituting illegal or fraudulent acts.").

Like in *Bixler*, Gramercy has alleged only predicate acts committed in connection with securities that cannot support a RICO claim. Gramercy alleges mail fraud, wire fraud, and inducement to interstate or foreign travel, intended to "dr[i]ve down the value of Gramercy's Notes . . . prevent [Gramercy] from collectively negotiating a favorable restructuring of its Notes . . . and strip[] [ULF and AVG] of [their] assets, thereby rending Gramercy's investment virtually worthless." Compl. ¶¶ 178, 180. Gramercy describes the alleged RICO enterprise's "overarching goal" as "preserving Bakhmatyuk's control over [ULF and AVG] and eliminating Gramercy's legal and economic rights and devaluing its Notes." *Id.* ¶ 178. Specifically, for the wire fraud and mail fraud predicate acts, Gramercy alleges the Defendants engaged in misrepresentations or omissions related to ULF and AVG financial reports, note purchases, and asset transfers—all for the purported purpose of frustrating Gramercy's attempts to restructure or otherwise collect on its

Notes. *Id*. ¶ 178. And Gramercy's inducement to interstate or foreign travel predicate acts all allege that Gramercy was induced to travel to either London or Kyiv for negotiations to restructure the Notes. *Id*. ¶ 180.

The RICO predicate acts Gramercy alleges are thus intimately connected to the sale or purchase of securities—AVG and ULF Notes—and barred by the PSLRA. This Court should not reward Gramercy's attempt to "dissect [its] claims through artful pleading in order to circumvent the PSLRA exclusion." *Braverman*, 2011 WL 13289787, at *5 (citing *Bixler*, 596 F.3d at 760).

### C. Plaintiffs fail to allege a pattern of racketeering activity.

To bring a RICO claim, Gramercy "must allege a violation of 18 U.S.C. § 1962, which consists of four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Hall v. Witteman*, 584 F.3d 859, 867 (10th Cir. 2009) (internal quotation omitted). "To satisfy RICO's pattern requirement, [Gramercy] need[s] to allege not only that the [D]efendants . . . committed two or more predicate acts, but also 'that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity.'" *Id.* (emphasis added) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)). The continuity requirement is difficult to meet, and "the plaintiff must demonstrate either a closed period of repeated conduct or past conduct that by its nature projects into the future with a threat of repetition." *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1555 (10th Cir. 1992) (internal quotation omitted). The continuity requirement achieves Congress's "intent that RICO reach activities that amount to or threaten long-term criminal activity." *Bixler*, 596 F.3d at 761 (quoting *H.J. Inc.*, 492 U.S. at 243 n.4).

Here, Gramercy fails to allege a pattern of racketeering activity. Gramercy does not allege any facts that constitute long-term criminal activity—in contrast, Gramercy's allegations are wholly based on alleged past transfers of corporate assets in violation of corporate documents, to

the detriment of Noteholders.  All three RICO counts depend on Gramercy's notion that Moving Defendants committed predicate acts so Bakhmatyuk could retain control of AVG and ULF and Gramercy would be prevented from exercising its rights under the Notes or collecting on them. *See* Compl. ¶¶ 168, 171, 172, 178, 179, 180, 185, 187, 191, 193, 196, 204–206.  Gramercy alleges these predicate acts were carried out in a three-part scheme, through:  a "campaign of misinformation," "straw purchasers," and "asset transfers."  *Id*. ¶ 10.  Assuming *arguendo* Gramercy could prove these three phases of the alleged scheme, the RICO claims would still fail to allege the pattern element required under § 1962.  The purported scheme alleges activity by Defendants undertaken to achieve a singular goal and without a threat of continuing wrongful activity.

"[A] closed-ended series of predicate acts constituting a single scheme" does not satisfy the continuity requirement.  *Boone*, 972 F.2d at 1556 ("a single scheme (the transfer of debt) to accomplish a discrete goal (the merger) directed at a finite group of individuals ([] shareholders) 'with no potential to extend to other persons or entities'" does not state a RICO violation) (quoting *Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir.1990)).  Gramercy's RICO counts must be dismissed because Gramercy cannot show continuity—a necessary element of establishing a pattern under RICO.  Gramercy alleges that Defendants acted through an enterprise to prevent Gramercy from initiating enforcement proceedings on the Notes and lower the value of the Notes—even though Gramercy has not followed the arbitration process for such a dispute, set forth in the subscription agreements that they signed.  Compl. ¶¶ 178, 180.  Gramercy also goes to great lengths to make allegations "on information and belief" that Defendants were using the press to spread misinformation about AVG and ULF's financial status.  *Id*. ¶¶ 72, 178.  But taken as a whole, Gramercy's conclusory claims allege only "one scheme, one result, one set of participants

and one method of commission." *Sullivan v. Boettcher & Co.*, 714 F. Supp. 1132, 1136 (D. Colo. 1989); *see also Kaplan v. Reed*, 28 F. Supp. 2d 1191, 1198 (D. Colo. 1998) ("What Plaintiffs have pled is acts by William Reed for the purpose of defrauding those who were his creditors. This is insufficient to plead a violation of § 1962(c).").

This alleged "single scheme to accomplish [one] discrete goal," targeted at a single victim—Gramercy as holder of its AVG and ULF Notes—is not sufficiently distinct activity to allege a pattern under RICO. *Bixler*, 596 F.3d at 761. "[N]o threat of continuing fraudulent activity can be inferred from the nature of th[is] scheme." *Torwest DBC, Inc. v. Dick*, 810 F.2d 925, 929 (10th Cir. 1987). Gramercy thus has not pleaded a claim under § 1962.

### D.      Gramercy does not have cognizable RICO damages.

Gramercy has not stated cognizable RICO damages. Gramercy's RICO damages are unworkable and unprovable because Gramercy could still recover on its Notes. Thus, "when a creditor alleges he has been defrauded RICO injury is speculative when contractual or other legal remedies remain which hold out a real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced. "The RICO claim is [] not ripe until those remedies are exhausted and the damages are clear." *In re Merrill Lynch P'Ships Litig.*, 154 F.3d 56, 59–60 (2d Cir. 1998). Should Gramercy recover on its Notes under the process agreed to with their issuance, it would benefit along with ULF/AVG's other Noteholders and any injury would decrease. *Id.* Thus, Gramercy's damages are insufficiently definite to be deemed accrued.[20] *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339 (1971).

---

[20] Gramercy is caught between a rock and a hard place on this point. If it argues that it has a definite injury even though it has not exhausted other remedies, its claims are likely barred by the four-year statute of limitations for civil RICO claims. *See Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014). In fact, Gramercy was on inquiry notice in early 2015 according to its own Complaint. *See* Compl. ¶ 57-58 (describing inability to make payment at Notes' redemption date and need to restructure to payments in kind during 2015 and early 2016); *id.* ¶ 1 (claiming this "scheme" has been ongoing "[s]ince at least 2016"). Even if Gramercy did not understand the gravity of its potential losses when negotiating restructuring, "[o]nce a plaintiff has inquiry notice of

In short, Gramercy lacks a RICO injury, as it has not shown that it has exhausted "contractual or other legal remedies . . . which hold out a real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced." *In re Merrill Lynch,* 154 F.3d at 59; *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768–69 (2d Cir. 1994) ("a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated"); *cf. Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*, 347 F. App'x 711, 713 (2d Cir. 2009) (dismissing RICO claims where it could not "be determined whether [ongoing recovery] proceedings w[ould] mitigate or remedy Appellants' damages"). Here, Gramercy's alleged injury is too speculative and not cognizable as RICO damages. Any damages that may result from Gramercy failing to collect on its Notes in the future is unrecoverable because "the fact of their accrual is speculative or their amount and nature unprovable." *Zenith Radio Corp.*, 401 U.S. at 339. This Court should find that Gramercy's alleged RICO damages are "too speculative." *Id.* Allowing Gramercy to recover treble damages for a loss that it cannot show it will suffer would amount to an undeserved windfall. Because Gramercy has not alleged cognizable RICO damages, these claims should be dismissed.

### E. The Complaint does not satisfy Rule 9(b) for any claim asserted.

Setting aside the fatal flaws to the RICO claims described above, Gramercy's RICO claims still fail for lack of the particularity Rule 9(b) requires for "RICO predicate acts based on fraud." *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir.1989). "[A]

---

facts that would suggest to a reasonable person that he has been injured, the plaintiff has a duty to commence a diligent investigation concerning that injury." *Robert L. Kroenlein Tr.*, 764 F.3d at 1280. Should the Court deny their motion to dismiss and find Gramercy's injury is sufficiently definite, Moving Defendants will pursue an early summary judgment motion on statute of limitations grounds.

complaint alleging fraud [must] set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (internal quotation marks omitted), *cert. denied*, 549 U.S. 1209, 127 (2007).  This requirement is meant to ensure that defendants have "clear notice of the factual basis of the predicate acts." *Cayman*, 873 F.2d at 1362.  A complaint that makes allegations against a large group of defendants without specifying facts as to why each individual defendant should be liable is insufficient under these standards.  *See Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013).

Under these standards, Gramercy has failed to plead with particularity that any of the Moving Defendants committed predicate acts under RICO or were involved in a conspiracy.  Their bald assertions are insufficient under the pleading standards and cannot satisfy Rule 9(b).  Gramercy cannot summarily allege, as it does here, that Moving Defendants are participants in the underlying scheme to defraud Gramercy without providing any specific allegations about *each* Moving Defendant's alleged role, decisions made by *each* Moving Defendant, or actions taken by *each* Moving Defendant in support of the alleged conspiracy.  *See Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (stressing "the need for careful attention to particulars, especially in lawsuits involving multiple defendants[; where] 'it is particularly important' that plaintiffs 'make clear exactly *who* is alleged to have done *what* to *whom*, … as distinguished from collective allegations") (internal quotation omitted).

As to Defendant Yaremenko, throughout the 102-page Complaint, factual statements about Yaremenko are extremely limited, and those that exist do nothing to explain Yaremenko's involvement in this alleged scheme or any underlying fraud.  There are no allegations that Yaremenko even had a single conversation with Gramercy, let alone made any representations to

Gramercy.  Nor does it allege that he has had any conversation with or relationship with ULF, AVG, or Bakhmatyuk.  The only *facts* relating to Yaremenko are that he is listed as the Chief Legal Officer of SP Advisors, the Chief Operating Officer and a founding partner of SP Capital, and a signatory on the annual statements for TNA.  Compl. ¶ 18.  Gramercy's attempt to rely solely on Yaremenko's professional affiliation with SP Advisors and TNA to meet its burden to plead involvement in a fraudulent scheme is insufficient.  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (where a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'") (internal quotation marks omitted).

The same is true of Defendants Piazza, SP Capital, and TNA.  Gramercy's conclusory claims concerning these three defendants fail to adequately plead their commission of any predicate acts or role in a conspiracy to defraud Gramercy.  For example, Gramercy alleges that it had contact with Piazza only twice, an email on October 18, 2018 and a phone call on March 24, 2020.  Compl. ¶¶ 112, 154, 178, 208.  Gramercy alleges that in the October 2018 email, Piazza expressed interest in purchasing secured debt on behalf of SP Capital.  *Id*. ¶¶ 112, 178, 208.  And Gramercy alleges that in the March 2020 phone call, Piazza offered to buy Gramercy's position as a third party, but "on information and belief" was acting on behalf of Bakhmatyuk.  *Id*. ¶¶ 154, 178, 208.  Neither of these alleged incidents is sufficient to give rise to any inference of malfeasance.  Gramercy's failure to allege more than two isolated incidents of contact with Piazza in over 100 pages demonstrates the conclusory nature of the RICO allegations against him.  Similarly, Gramercy's allegations "on information and belief" that Concorde was acting as an agent of Piazza and Bakhmatyuk are unsupported by fact and conclusory.  *Id*. ¶¶ 72, 178.

Plaintiffs' allegations against SP Capital and TNA, as corporate vehicles for Yaremenko and Piazza, also fail.  *See, e.g.*, *id.* ¶ 170.  Gramercy does not plead any instances of direct interaction between itself and SP Capital or TNA.  Gramercy's conclusory allegations against individuals associated with SP Capital and TNA fall far short of pleading involvement of these two corporate Defendants.  And Gramercy's attempt to tie the corporate Defendants to predicate acts through allegations that SP Capital was involved in a debt purchase from Ashmore and that TNA held a webinar on Wyoming corporate law fall woefully short.  *Id.* ¶ 170.  Thus, Gramercy has failed to particularly allege that either SP Capital or TNA committed any predicate act or was involved in a conspiracy to defraud Gramercy.

"[T]he threat of treble damages and injury to reputation which attend RICO actions justify requiring [Gramercy] to frame its pleadings in such a way that will give the [Moving Defendants], and the trial court, clear notice of the factual basis of the predicate acts."  *Cayman*, 873 F.2d at 1362.  Because the Complaint lacks facts linking the Moving Defendants to any predicate acts or underlying conspiracy, this Court should dismiss Gramercy's RICO claims as inadequately pleaded.

The Court should dismiss Gramercy's state law claims against the Moving Defendants for the same reasons.  The common law fraud claim (Count 4) repeats the same, insufficient allegations with respect to Piazza as those asserted in support of the RICO claim.  Compl. ¶¶ 207–213; *see Lane v. Buckley*, No. 15-CV-155-F, 2015 WL 12915717, at *5 (D. Wyo. Nov. 10, 2015) (Freudenthal, J.) (finding allegations did "not come close to meeting the pleading requirements for a [common law] fraud claim" where complaint alleged only that defendants signed allegedly unlawful agreement violating terms of trust).  Plaintiffs' tortious interference claim against Piazza, SP Capital and TNA (Count 5) is based on the same "orchestrated transfers" but adds no new

allegations demonstrating how the transfers were unlawful, much less the role Piazza or either of the two entity Defendants played in alleged misconduct. *See* Compl. ¶¶ 214-218. Finally, the civil conspiracy (Count 6) and aiding and abetting (Count 7) claims against all Moving Defendants again fail to allege what each Defendant actually did in furtherance or as participants of the alleged scheme (*id*. ¶¶ 219-226) and, in any event, must fail as a matter of law along with the underlying fraud and tortious interference claims. *See, e.g.*, *Lane*, 2015 WL 12915717, at *5 ("a plaintiff cannot claim civil conspiracy … without an underlying cause of action in tort") (quoting *White v. Shane Edeburn Const., LLC*, 285 P.3d 949, 958 (Wyo. 2012)).

## VI.   GRAMERCY'S OTHER CLAIMS FAIL FOR LACK OF SUBJECT MATTER JURISDICTION.

Because the RICO claims should be dismissed for the reasons described above, Gramercy's state law claims for fraud, tortious interference with contract, civil conspiracy, and aiding and abetting should be dismissed for lack of subject matter jurisdiction. Gramercy relies on supplemental jurisdiction under 28 U.S.C. § 1367 to create subject matter jurisdiction for their state law claims because they are related to its federal RICO claims. Compl. ¶¶ 36–37. However, as described above, those RICO claims fail as a matter of law leaving no remaining causes of action over which the district court has federal question jurisdiction. With no federal claims at issue, this Court should decline to exercise supplemental jurisdiction over Gramercy's state law claims. *See Birdwell v. Glanz*, 790 F. App'x 962, 964 (10th Cir. 2020) ("When the federal claims disappear early in the litigation, a federal court should generally decline to exercise supplemental jurisdiction.").

Declining supplemental jurisdiction here would further the relevant interests of "comity, convenience, economy, and fairness." *Id.* These Notes were issued on the London and Irish Stock Exchanges, are governed by English law, and are subject to arbitration provisions designating an

English forum.  In these circumstances, comity, convenience, judicial economy, and fairness all dictate against spending resources to adjudicate legal issues that implicate foreign laws, foreign documents, and foreign interests.  Retaining supplemental jurisdiction is also contrary to concerns of economy and fairness, as the foreign interests would be better resolved by foreign courts.  This Court should dismiss the state law claims for lack of subject matter jurisdiction.  *See, e.g.*, *Sullivan v. Harris*, 2019 WL 5258045, at *5 (W.D. Wyo. Jan. 23, 2019) (dismissing plaintiff's RICO claims and declining to exercise supplemental jurisdiction over the remaining state law claims).

## VII.   DEFENDANT YAREMENKO IS NOT SUBJECT TO PERSONAL JURISDICTION IN WYOMING.

Plaintiffs fail to meet their burden to show that non-resident Yaremenko maintains sufficient contacts with Wyoming such that personal jurisdiction would be proper.[21]  *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1228–29 (10th Cir. 2020).  General jurisdiction is found only where the defendant is domiciled in the forum.  *Daimler AG v. Dauman*, 571 U.S. 117, 137 (2014); *see also Cunningham v. ASI, LLC*, 18-CV-183-F, 2019 WL 5399820, at *2 (D. Wyo. Jan. 9, 2019) (Freudenthal, J.) (the demanding requirements for general jurisdiction are only met "as to individuals *if they are domiciled in the forum state*.") (emphasis added).  Plaintiffs admit that Yaremenko is a Ukrainian resident and therefore not subject to general jurisdiction.  Compl. ¶ 18.  *See Cunningham*, 2019 WL 5399820, at *2 (Freudenthal, J.) (finding Wyoming court had no general jurisdiction over individual defendant residing in Arizona).

Specific jurisdiction arises only where a defendant has "purposefully directed its activities at residents of the forum state" and alleged injuries "arise out of the defendant's forum-related activities." *Dental Dynamics*, 946 F.3d at 1229 (internal quotation marks omitted).  Plaintiffs' *sole*

---

[21] Because Wyoming's long-arm statute extends jurisdiction to the extent authorized by the Due Process Clause, the personal jurisdiction inquiry collapses into a single question of due process.  *See Eighteen Seventy L.P. v. Jayson*, 532 F. Supp. 3d 1125, 1131 (D. Wyo. 2020).

alleged connection to Wyoming is that Yaremenko "upon information and belief, agreed to sign the annual statements" for TNA, a company incorporated in Wyoming.  Compl. ¶ 84.  These annual statements are not related in any way to Plaintiffs' claims, nor do Plaintiffs allege that they are.[22]  *See Walden v. Fiore*, 571 U.S. 277, 284 (2014) (finding only conduct related to the suit creates a substantial connection with the forum).  Further, Plaintiffs do not allege that Yaremenko was involved with any of the purchases of the Notes, or that Yaremenko has ever done business with Bakhmatyuk.  Jurisdiction over Yaremenko cannot be based solely on his position as an agent of a company incorporated in Wyoming.  *See, e.g.*, *Celtig, LLC v. Patey*, 347 F. Supp. 3d 976, 983–84 (D. Utah 2018) (explaining that a court cannot exercise jurisdiction over an agent based on allegations of the company's wrongful act).

Nor can Plaintiffs rely on a "conspiracy" theory of jurisdiction to create jurisdiction over Yaremenko.  For this theory to apply, Plaintiffs must allege "more than 'bare allegations' that a conspiracy existed, and must allege facts that would support a prima facie showing of a conspiracy"—which they have not done, particularly as to Yaremenko.  *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2007)*; see infra* Section V.E.  Even if Plaintiffs could sufficiently plead this claim, they must still show minimum contacts for each Defendant, which they cannot. *See Hart v. Salois*, 605 F. App'x 694, 700 (10th Cir. 2015).  For these reasons, Plaintiffs cannot establish jurisdiction based on a conspiracy.  *See, e.g.*, *Good v. Khosrowshahi*, 296 F. App'x 676, 679–80 (10th Cir. 2008).

---

[22] The Complaint also describes an alleged presentation by Piazza and Yaremenko in which they purportedly explain that "Wyoming is a particularly attractive jurisdiction for businesses."  Compl. ¶ 34.  However, as with the TNA annual statements, Plaintiffs fail to connect this presentation to their claims and, in fact, *admit* that the alleged presentation occurred *after* any of the alleged unlawful conduct.  *See, e.g.*, *id*. ¶¶ 138–143 (describing alleged presentation on November 19, 2020, *after* alleged "TNA Transfers" beginning November 2019).

Finally, the exercise of personal jurisdiction over Yaremenko would violate the principles of fair play and substantial justice. *See Dental Dynamics*, 946 F.3d at 1229. In considering the principles of fair play and substantial justice, the Court weighs similar factors as those under the doctrine of forum non conveniens.[23] *See id*.; *see supra* § IV (discussing these factors at length). The principles of fair play and justice weigh strongly against finding personal jurisdiction here, for the other reasons examined above, and thus, all claims against Yaremenko must be dismissed for lack of personal jurisdiction.

## CONCLUSION

For the foregoing reasons, the Complaint should be stayed or dismissed pending arbitration, pursuant to Rules 12(b)(1), (2), (6), (7), 19(a), and 19(b).

Dated: February 7, 2022

Respectfully submitted,

Nicholas Piazza, SP Capital Management, LLC, Oleksandr Yaremenko, and TNA Corporate Solutions, LLC

BY: __Paula A. Fleck, P.C.__

Paula A. Fleck, P.C., WY State Bar No. 6-2660
Bryson C. Smith, WY State Bar No. 7-6199
HOLLAND & HART LLP
645 South Cache Street, Suite 100
P. O. Box 68
Jackson, WY 83001-0068
Telephone: (307) 734-9741
Facsimile: (307) 739-9744
pfleck@hollandhart.com
bcsmith@hollandhart.com

*Attorneys for Defendants*
*Nicholas Piazza, SP Capital*

---

[23] These factors include burden on defendant, the forum state's interest in resolving the dispute, and the location of the majority of parties, witnesses, and evidence.

*Management, LLC, Oleksandr Yaremenko, and TNA Corporate Solutions, LLC*

Jeanifer E. Parsigian (*Pro Hac Vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111
Tel: (415) 591-1469
Fax: (415) 591-1000
jparsigian@winston.com

W. Gordon Dobie *(Pro Hac Vice)*
Emily N. Kath *(Pro Hac Vice)*
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-5600
Fax: (312) 558-5700
wdobie@winston.com
ekath@winston.com

18227386_v1

### CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of February, 2022, I electronically transmitted the

foregoing document to the Clerk of Court of the U.S. District Court, District of Wyoming, using

the CM/ECF system for filing.  Based on the records currently on file the Clerk of Court will

transmit a Notice of Electronic Filing to all registered counsel of record.

Robert C. Jarosh
Billie L.M. Addleman
Erin E. Berry
Hirst Applegate, LLP
P.O. Box 1083
Cheyenne, WY  82003-1083
(307) 632-0541
rjarosh@hirstapplegate.com

Ryan M. Philp
Alan M. Mendelsohn
Daniel J. Petrokas
Maura C. Allen
Hogan Lovells US LLP
390 Madison Avenue
New York, New York  10017
(212) 918-3000
ryan.philp@hoganlovells.com

Mark D. Gibson
Hogan Lovells US LP
1601 Wewatta Street, Suite 900
Denver, CO  80202
(303) 899-7300
mark.gibson@hoganlovells.com


/s/ Paula A. Fleck, P.C.