**ROBERT C. JAROSH, #6-3497**
**BILLIE LM ADDLEMAN, #6-3690**
**ERIN E. BERRY, #7-6063**
Hirst Applegate, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
rjarosh@hirstapplegate.com

**RYAN M. PHILP** *(admitted pro hac vice)*
**ALAN M. MENDELSOHN** *(admitted pro hac vice)*
Hogan Lovells US LLP
390 Madison Avenue
New York, New York 10017
T. (212) 918-3000
F. (212) 918-3100
ryan.philp@hoganlovells.com
alan.mendelsohn@hoganlovells.com

**MARK D. GIBSON, #7-5495**
Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202
Phone: (303) 899 7300
Fax: (303) 899 7333
mark.gibson@hoganlovells.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| Gramercy Distressed Opportunity Fund II, L.P., Gramercy Distressed Opportunity Fund III, L.P., Gramercy Distressed Opportunity Fund III-A, L.P., Gramercy Funds Management LLC, Gramercy EM Credit Total Return Fund, and Roehampton Partners LLC,<br><br>Plaintiffs,<br><br>v.<br><br>Oleg Bakhmatyuk, Nicholas Piazza, SP Capital Management, LLC, Oleksandr Yaremenko, and TNA Corporate Solutions, LLC,<br><br>Defendants. | Civil Action No. 21-cv-00223-NDF |

# *PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .......................................................................................................5

I.      GRAMERCY BECOMES THE COMPANY'S LARGEST BONDHOLDER PURSUANT TO TRUST DEEDS THAT DO NOT PROVIDE REMEDIES AGAINST THIRD PARTIES ENGAGED IN FRAUD. ..................................................................5

      A.     Gramercy Management Is a Long-Term Investor That Ushered the Company Through Multiple Consensual Restructurings Until It Was Defrauded..................5

      B.     The Trust Deeds Govern Contractual Claims Against the Company and Sureties, But Do Not Shield Remote Third Parties Engaged In Fraud....................................6

II.     GRAMERCY'S SUBSTANTIAL, GOOD-FAITH EFFORTS TO EFFECTUATE A COMPREHENSIVE RESTRUCTURING IN ACCORDANCE WITH INTERNATIONAL NORMS ARE FRUSTRATED BY DEFENDANTS' EXTENSIVE, MULTI-FACETED SCHEME. ..................................................................9

III.    DEFENDANTS' TRANSFER OF OVER $870 MILLION OF ASSETS WAS EFFECTUATED THROUGH WYOMING-BASED COMPANIES FORMED UNDER WYOMING LAW FOR THE EXPRESS PURPOSE OF EXPLOITING WYOMING CORPORATE PROTECTIONS..................................................................12

LEGAL ARGUMENT............................................................................................................14

I.      THE PIAZZA DEFENDANTS CANNOT INVOKE THE TRUST DEEDS' ARBITRATION CLAUSES AS NON-SIGNATORIES UNDER ENGLISH LAW. ......14

      A.     English Law Governs Whether the Piazza Defendants, As Non-signatories, Can Compel Arbitration, and Under English Law, They Cannot. ...............................15

      B.     Even If the Piazza Defendants Could Invoke An Equitable-Estoppel Theory Under U.S. Law, That Theory Fails....................................................................17

            1.     *Gramercy Does Not Seek to Hold the Piazza Defendants Liable for Breaching Duties Imposed By the Trust Deeds.* ........................................ 17

            2.     *Gramercy Has Not Alleged Interdependent and Concerted Misconduct Among ULF, AVG, and Defendants.*......................................................... 19

II.     DEFENDANTS, AS NONSIGNATORIES, ALSO CANNOT INVOKE THE TRUST DEEDS' NO-ACTION CLAUSES UNDER ENGLISH LAW, WHICH, IN ANY CASE, DO NOT APPLY TO GRAMERCY'S NON-CONTRACTUAL CLAIMS AGAINST THIRD PARTIES. ..................................................................21

      A.     The Piazza Defendants Cannot Invoke the No-Action Clauses Under English Law Because They Are Not Signatories to the Trust Deeds........................................21

      B.     Even If the Piazza Defendants Could Invoke the No-Action Clauses, Gramercy's Claims Do Not Fall Within Their Scope..............................................................21

i

III.    ULF AND AVG ARE NOT REQUIRED OR INDISPENSABLE PARTIES. ...............24

IV.    THE PIAZZA DEFENDANTS HAVE NOT, AND CANNOT, CARRY THEIR BURDEN OF SHOWING THAT THE DOCTRINE OF FORUM NON CONVENIENS APPLIES, MUCH LESS SUPPORTS DISMISSAL. .......................................................................27

     A.    The Piazza Defendants Have Not Carried Their Burden to Show That Arbitration in London Is An "Available" Forum and That Foreign Law Governs the Vast Majority of This Dispute......................................................................28

          *1.    The Piazza Defendants Have Not Carried Their Burden to Show That Foreign Law Will Govern the Vast Majority of This Dispute.*.................. 28

          *2.    The Piazza Defendants Have Not Carried Their Burden to Show That Arbitration in London is an "Available" Forum.* ..................................... 30

     B.    The Piazza Defendants Have Not Carried Their Burden to Show That the Private-Interest and Public-Interest Factors Clearly Point Toward Dismissal. .................30

          *1.    The Piazza Defendants Have Not Shown That the Private-Interest Factors Clearly Point Toward Dismissal.*............................................................. 31

          *2.    The Piazza Defendants Have Not Shown That the Public-Interest Factors Clearly Point Toward Dismissal.*............................................................. 32

V.    GRAMERCY'S DETAILED ALLEGATIONS SATISFY ALL RICO REQUIREMENTS. .......................................................................................................................33

     A.    Gramercy Has Alleged Substantial Predicate Acts In the United States. ..............33

     B.    Gramercy's Claims Would Not Be Actionable Under the Securities Laws and Are Not Barred By the PSLRA.....................................................................................36

     C.    Gramercy's Detailed Allegations of an Extensive, Multi-Year Scheme Easily Plead Facts From Which a Jury Could Infer a Pattern of Racketeering Activity............38

     D.    Gramercy's Damages Satisfy RICO's Standing Requirement. .............................42

     E.    Gramercy's Allegations Concerning the Piazza Defendants' Participation In the Fraudulent Scheme Satisfy the Rule 9(b) Standard. .............................................45

VI.    YAREMENKO IS SUBJECT TO PERSONAL JURISDICTION IN WYOMING. ........48

CONCLUSION.....................................................................................................................50

**Cases**

*100 Mount Holly Bypass v. Axos Bank*,
No. 2:20-cv-00856, 2021 WL 3172024 (D. Utah July 27, 2021) ...........................41

*Abbott Point of Care, Inc. v. Epocal, Inc.*,
No. CV-08-S-543-NE, 2008 WL 11297394 (N.D. Ala. June 23, 2008) ...............................25

*Act I, LLC v. Davis*,
60 P.3d 145 (Wyo. 2002) ...........................................................................29

*Aerotek, Inc. v. Beacon Hill Staffing Grp.*,
No. 18-2645, 2019 WL 1455337 (E.D. Pa. Apr. 2, 2019) ......................................26

*Allstate Life Insurance Co. v. Robert W. Baird & Co.*,
No. CV-09-8162-PCT-GMS, 2011 WL 5024269 (D. Ariz. Oct. 21, 2011) ....................22, 23

*Alpha Pro Tech, Inc. v. VWR Int'l LLC*,
984 F. Supp. 2d 425 (E.D. Pa. 2013) ...............................................................25

*Archangel Diamond Corp. Liquidating Trust v. OAO Lukoil*,
75 F. Supp. 3d 1343 (D. Colo. 2014), *aff'd*, 812 F.3d 799 (10th Cir. 2016) ..........................28

*Arkansas v. Texas*,
346 U.S. 368 (1953) ...................................................................................25

*Banco Intercontinental, S.A. v. Alvarez Renta*,
No. 04-20727-CIV, 2005 WL 8168717 (S.D. Fla. Aug. 23, 2005) .......................................44

*BancOklahoma Mortg. Corp. v. Capital Title Co.*,
194 F.3d 1089 (10th Cir. 1999) .....................................................................29

*Bascuñán v. Elsaca*,
927 F.3d 108 (2d Cir. 2019) ...........................................................................34

*Bixler v. Foster*,
596 F.3d 751 (10th Cir. 2010) ...........................................................24, 36, 37, 40

*Boone v. Carlsbad Bancorporation, Inc.*,
972 F.2d 1545 (10th Cir. 1992) .....................................................................40

*Braverman v. LPL Fin. Corp.*,
2011 WL 13289787 (D.N.M. Apr. 21, 2011) .........................................................36

*Centimark Corp. v. Vill. Manor Assocs. Ltd. P'ship*,
113 Conn. App. 509 (Conn. App. Ct. 2009) .........................................................29

*CGC Holding Co. v. Broad & Cassel*,
    773 F.3d 1076 (10th Cir. 2014) .....................................................................24, 42

*Charter Oak Lending Grp., LLC v. Aug.*,
    127 Conn. App. 428 (2011) ........................................................................................29

*ClearOne Commc'ns, Inc. v. Bowers*,
    643 F.3d 735 (10th Cir. 2011) ..................................................................................49

*Cont'l Bank, N.A. v. Caton*,
    No. 88-1611-C, 1990 WL 129452 (D. Kan. Aug. 6, 1990) .............................23, 27

*Cory v. Aztec Steel Bldg., Inc.*,
    468 F.3d 1226 (10th Cir. 2006) ................................................................................42

*Cruden v. Bank of N.Y.*,
    957 F.2d 961 (2d Cir. 1992) ......................................................................................23

*Deck v. Engineered Laminates*,
    349 F.3d 1253 (10th Cir. 2003) ................................................................................44

*Dennis v. JPMorgan Chase & Co.*,
    343 F. Supp. 3d 122 (S.D.N.Y. 2018) ......................................................................35

*Dental Dynamics, LLC v. Jolly Dental Grp., LLC*,
    946 F.3d 1223 (10th Cir. 2020) ................................................................................49

*Downs v. Homax Oil Sales, Inc.*,
    421 P.3d 518 (Wyo. 2018) ........................................................................................29

*Efthimiou v. Smith*,
    268 Conn. 499 (2004) ...............................................................................................29

*Elworthy v. First Tenn. Bank*,
    391 P.3d 1113 (Wyo. 2017) ......................................................................................29

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018) ......................................................................42

*First Nationwide Bank v. Gelt Funding Corp*,
    27 F.3d 763 (2d Cir. 1994) ........................................................................................43

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995) ...................................................................................................15

*Gas Sensing Tech. Corp. v. Ashton*,
No. 16-CV-272-F, 2017 WL 2955353 (D. Wyo. June 12, 2017)............................28

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
140 S. Ct. 1637 (2020).....................................................................................15

*George v. Urb. Settlement Servs.*,
833 F.3d 1242 (10th Cir. 2016) ......................................................................41

*Gschwind v. Cessna Aircraft Co.*,
161 F.3d 602 (10th Cir. 1998) ........................................................................29

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947).........................................................................................32

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
492 U.S. 229 (1989).........................................................................................40

*Hansen v. Native Am. Refinery Co.*,
No. 2:06CV00109, 2007 WL 1108776 (D. Utah Apr. 10, 2007) ..........38, 39, 40, 41

*Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*,
347 F. App'x 711 (2d Cir. 2009) ....................................................................43

*Health Grades, Inc. v. Decatur Mem'l Hosp.*,
190 F. App'x 586 (10th Cir. 2006) .................................................................50

*Hislop v. Paltar Petrol. Ltd.*,
No. 17-cv-02371-RBJ, 2018 WL 5014123 (D. Colo. Oct. 16, 2018)...................30

*Hopkins AG Supply LLC v. First Mountain Bancorp*,
No. CIV-12-1141-C, 2014 WL 12770215 (W.D. Okla. July 1, 2014) ..................49

*Huber v. Taylor*,
532 F.3d 237 (3d Cir. 2008).............................................................................26

*Imperial Cap. Bank v. Sussex Grp.*,
LLC, No. CIV--09-0483-F, 2009 WL 2497326 (W.D. Okla. Aug. 17, 2009) ......45

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*,
11 F.3d 399 (3d Cir. 1993)...............................................................................26

*Johnson v. KB Home*,
720 F. Supp. 2d 1109 (D. Ariz. 2010) ............................................................37

*Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.*,
479 P.3d 1222 (Wyo. 2021) .................................................................................29

*Kaplan v. Reed*,
28 F. Supp. 2d 1191 (D. Colo. 1998) ...................................................................40

*Kusner v. First Penn. Corp.*,
531 F.2d 1234 (3d Cir. 1976) ...............................................................................23

*Lenox MaClaren Surgical Corp. v. Medtronic, Inc.*,
449 F. App'x 704 (10th Cir. 2011) ...............................................15, 17, 18, 19

*In re M&L Business Mach. Co.*,
136 B.R. 271 (Bankr. D. Colo. 1992) ...................................................................24

*Marani v. Cramer*,
No. 19-CV-05538-YGR, 2021 WL 5865517 (N.D. Cal. Dec. 10, 2021) ...............37

*Mars, Inc. v. Szarzynski*,
No. CV 20-01344 (RJL), 2021 WL 2809539 (D.D.C. July 6, 2021) ....................15

*In re Merrill Lynch Ltd. Partnerships Litig.*,
154 F.3d 56 (2d Cir. 1998) ...................................................................................43

*Mezzonen, S.A. v. Wright*,
No. 97 CIV. 9380 LMM, 1999 WL 1037866 (S.D.N.Y. Nov. 16, 1999) ...............37

*Motorola Credit Corp. v. Uzan*,
388 F.3d 39 (2d Cir. 2004) ...................................................................................15

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Kozeny*,
115 F. Supp. 2d 1231 (D. Colo. 2000), *aff'd sub nom. Nat'l Union Fire Ins.
Co. of Pittsburgh, PA v. Kozeny*, 19 F. App'x 815 (10th Cir. 2001) ...............49, 50

*Nuevos Destinos, LLC v. Peck*,
No. 3:19-CV-00045, 2019 WL 6481441 (D.N.D. Dec. 2, 2019) ..........................34

*Parker v. Town of Chelsea*,
620 F.Supp.2d 1266 (N.D. Okla. 2008) ...............................................................48

*Petters Co. v. Stayhealthy, Inc.*,
No. CIV.03-3210 JRT/FLN, 2004 WL 1465830 (D. Minn. June 1, 2004) ...........37

*Pharmacy Providers of Oklahoma, Inc. v. Q Pharmacy, Inc.*,
No. CIV-12-1405-C, 2013 WL 1688921 (W.D. Okla. Apr. 18, 2013) ..................49

*Piper Aircraft Co. v. Reyno,*
454 U.S. 235 (1981) ...........................................................................................27, 31

*Reeves v. Enter. Products Partners, LP,*
17 F.4th 1008 (10th Cir. 2021) ........................................................................15, 20

*Regions Bank v. Blount Parrish & Co.,*
No. 01 C 0031, 2001 WL 726989 (N.D. Ill. June 27, 2001) ...................................23

*Resol. Tr. Corp. v. Stone,*
998 F.2d 1534 (10th Cir. 1993) ........................................................38, 40, 41, 42

*Riley v. Kingsley Underwriting Agencies, Ltd.,*
969 F.2d 953 (10th Cir. 1992) ...............................................................................14

*Rioux v. Barry,*
927 A.2d 304 (Conn. 2007) ....................................................................................29

*Rivendell Forest Prods., Ltd. v. Canadian Pac. Ltd.,*
2 F.3d 990 (10th Cir. 1993) ....................................................................................27

*RJR Nabisco, Inc. v. Eur. Cmty.,*
579 U.S. 325 (2016)................................................................................................34

*Roe v. Gray,*
165 F. Supp. 2d 1164 (D. Colo. 2001) ..............................................................15, 19

*Rusakiewicz v. Lowe,*
556 F.3d 1095 (10th Cir. 2009) ..............................................................................49

*Sac & Fox Nation of Mo. v. Norton,*
240 F.3d 1250 (10th Cir. 2001) ..............................................................................26

*Safe Streets All. v. Hickenlooper,*
859 F.3d 865 (10th Cir. 2017) ................................................................................44

*Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.,*
391 F.3d 871 (7th Cir. 2004) ..................................................................................25

*SBMH Grp. DMCC v. Noadiam USA, LLC,*
297 F. Supp. 3d 1321 (S.D. Fla. 2017) ..................................................................15

*Shepard v. DineEquity, Inc.,*
No. CIV.A. 08-2416-KHV, 2009 WL 8518288 (D. Kan. Sept. 25, 2009) ..............47

*Singer v. Lajaunie*,
    339 P.3d 277 (Wyo. 2014)................................................................................29

*Stone's Pharmacy, Inc. v. Pharmacy Acct. Mgmt., Inc.*,
    875 F.2d 665 (8th Cir. 1989) ..........................................................................25

*Sullivan v. Boettcher & Co.*,
    714 F. Supp. 1132 (D. Colo. 1989)..................................................................40

*Torwest DBC, Inc. v. Dick*,
    810 F.2d 925 (10th Cir. 1987) ........................................................................40

*Town of Islip v. Datre*,
    245 F. Supp. 3d 397 (E.D.N.Y. 2017) ............................................................43

*Trejo v. Xclusive Staffing, Inc.*,
    No. 17-CV-01602-RM-MJW, 2018 WL 4372724 (D. Colo. May 16, 2018).........44

*United States v. Kamahele*,
    748 F.3d 984 (10th Cir. 2014) ........................................................................47

*Weller v. HSBC Mortg. Servs., Inc.*,
    971 F. Supp. 2d 1072 (D. Colo. 2013)........................................................15, 20

*White v. Shane Edeburn Const., LLC*,
    285 P.3d 949 (Wyo. 2012)...............................................................................29

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)........................................................................................43

**Statutes**

9 U.S.C. §§ 201–208.............................................................................................14

18 U.S.C. § 1961...................................................................................................38

18 U.S.C. § 1962.........................................................................................36, 38, 47

Pub. L. No. 104–67 § 107.....................................................................................36

**Rules**

Fed. R. Civ. P. 9(b) ...............................................................................4, 45, 47, 48

Fed. R. Civ. P. 19.....................................................................................3, 24, 25, 26, 27

Fed. R. Civ. P. 44.1...............................................................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page**

SEC Rule 10b–5..................................................................................................36

**Regulations**

17 C.F.R. § 240.10b–5.........................................................................................36

**Other Authorities**

Charles Alan Wright et al., *Federal Practice & Procedure* § 3828.2 ........................................27

17 James Wm. Moore et al., *Moore's Federal Practice* § 111.74(2)(f) (3d ed. 2018) ..................................................................................................................30

Plaintiffs Gramercy Distressed Opportunity Fund II, L.P., Gramercy Distressed Opportunity Fund III, L.P., Gramercy Distressed Opportunity Fund III-A, L.P., and Gramercy EM Credit Total Return Fund (collectively, unless otherwise specified herein, the "Gramercy Funds"), Roehampton Partners LLC ("Roehampton"), and Gramercy Funds Management LLC ("Gramercy Management") (together with the Gramercy Funds and Roehampton, "Plaintiffs" or "Gramercy"), by and through their undersigned counsel, respectfully submit this Opposition to the Motion to Dismiss [Doc. No. 43] filed by Defendants Nicholas Piazza ("Piazza"), SP Capital Management, LLC ("SP Capital"), Oleksandr Yaremenko ("Yaremenko"), and TNA Corporate Solutions, LLC ("TNA") (collectively, the "Piazza Defendants") (the "Motion").[1]

## PRELIMINARY STATEMENT

Defendant Nicholas Piazza is a Cody, Wyoming-based businessman and the founder and Chief Executive Officer of SP Capital Management, LLC, a Wyoming-based company he formed in 2012 with his partner, SP Capital's Chief Operating Officer, co-defendant Oleksandr Yaremenko. Operating from its Wyoming offices, SP Capital is part of a Wyoming cottage industry that received worldwide media attention last year following the release of the so-called Pandora Papers by the International Consortium of Investigative Journalists. The Pandora Papers revealed that the assets of international oligarchs, business tycoons, and politicians (often of ill-repute) have migrated from international financial centers to states like Wyoming to exploit the state's corporate-privacy laws, which are among the strongest in the country. This is the cornerstone of the Piazza Defendants' business plan. Indeed, Piazza and Yaremenko openly tout

---

[1] Capitalized terms not otherwise defined herein shall have the meanings provided in the Complaint.

SP Capital's expertise in shielding the assets of wealthy Eastern European clients by transferring them to Wyoming entities to exploit the confidentiality protections of Wyoming law.

The Piazza Defendants' asset-shielding expertise and "advisory and asset management services" were pivotal to the scheme orchestrated by their largest client and benefactor, Defendant Oleg Bakhmatyuk. As detailed in the Complaint [Doc. No. 1], Bakhmatyuk's years-long, multi-faceted scheme directly targeted Gramercy Management, a Connecticut-based investment-management firm that, through its investment funds, was the largest noteholder of Bakhmatyuk's agricultural conglomerate, UlkraLandFarming PLC ("ULF") and its subsidiary Avangardco IPL ("AVG," and together with ULF, the "Company"). Through a pattern of racketeering activity accomplished through the use of U.S. mail and wires, Bakhmatyuk and his main ally Piazza carried out a scheme of misinformation and deception that culminated in the surreptitious transfers of nearly a billion dollars of Company assets to a Wyoming shell company formed by the Piazza Defendants for that purpose, Defendant TNA (the "TNA Transfers").

Remarkably, within the Piazza Defendants' 50-page motion, the TNA Transfers are hardly mentioned. Instead, they turn a blind eye to the TNA Transfers in order to foist a fictional narrative that portrays them as innocent bystanders to a scheme they contend was enacted wholly in Europe. They contend, for example, that (1) the Complaint does not "establish[] their involvement in the actual dispute," (2) "the only claim is that Moving Defendants purchased AVG and ULF Notes," and (3) "all the conduct alleged in the Complaint occurred in England or Ukraine." Mem. in Support of Motion to Dismiss ("Mot.") [Doc. No. 44] at 11-12, 30. This simply is not credible. And each of the Piazza Defendants' legal arguments are strawmen that flow from this obfuscation.

*First,* the Piazza Defendants' lead argument that Gramercy's claims are subject to LCIA arbitration in London fails because it hinges on the fallacy that the Piazza Defendants, as third-parties, can invoke the Trust Deeds' arbitration provision on an equitable-estoppel theory. But the Piazza Defendants ignore that English law governs whether they can compel arbitration, and under English law, they cannot. Even assuming U.S. law applies, the equitable estoppel-argument is rooted in the fiction that Gramercy's claims are claims to enforce the Notes. They are not.

*Second*, the Piazza Defendants' position that the Trust Deeds' no-action clauses require Gramercy to seek a remedy for the fraudulent and tortious misconduct alleged in the Complaint through an English indenture trustee fails for a familiar reason: under English law, they have no right to invoke the no-action clauses. Even if they could, those clauses apply only to claims asserted against the Company or the Surety Providers to enforce the terms of the Trust Deeds. Gramercy's claims are against strangers to the Trust Deeds based on the Piazza Defendants' fraudulent and tortious conduct, not for breach of contract.

*Third,* the Piazza Defendants' contention that ULF and AVG are required and indispensable parties under Federal Rule of Civil Procedure 19 fails because a judgment in Gramercy's favor would not *impair* the Company's interests; it would *further* the Company's interests in laying blame for the Company's contractual shortcomings on Defendants. In any event, the Piazza Defendants' argument hinges entirely on Gramercy's tortious interference claim; none of the six other claims require a determination that there was a breach. And courts routinely have held that the other parties to a contract are not required or indispensable parties when a tortious interference claim is asserted. This is particularly true here because a ruling that the Company breached the contracts would neither bind the Company in later proceedings nor otherwise sufficiently impair the Company's interests to satisfy Rule 19.

*Fourth*, the Piazza Defendants' contention that the doctrine of forum non conveniens supports dismissal because a London arbitration somehow is a more convenient forum than Wyoming strains credulity given that the Piazza Defendants are Wyoming companies and their principal officers. The contention fails for at least three independent reasons: (1) the Piazza Defendants have not shown—and cannot show—that foreign law governs the vast majority of this dispute, (2) they have not shown that England is an "available" alternative forum, and (3) they have not shown that private- and public-interest factors point clearly toward dismissal.

*Fifth*, each of the Piazza Defendants' scattershot attacks on the RICO cause of action are unavailing because they are rooted in the same mischaracterizations of the Complaint. In short, (a) the RICO claim does not fail based on extraterritoriality because, consistent with well-settled law, Gramercy has alleged substantial use of domestic mail and/or wires – as well as inducements of interstate travel – as a core component of the scheme; (b) PSLRA preemption is a red herring because Gramercy's RICO claims do not involve the purchase or sale of securities; (c) the extensive, multi-year scheme alleged in the Complaint meets RICO's continuity requirement at the pleading stage; (d) the argument that Gramercy has not alleged cognizable damages does not find support in the law and ignores that Gramercy cannot seek a remedy for Defendants' misconduct under the Notes; and (e) the Complaint contains detailed allegations regarding the Piazza Defendants' misconduct that amply satisfy Rule 9(b).

*Finally*, Yaremenko's last-ditch personal jurisdiction argument cannot be squared with his extensive contacts with Wyoming. Gramercy alleges, among other things, that Yaremenko is a "founding partner" and the Chief Operating Officer of SP Capital, a Wyoming company; he directly participated in the alleged scheme, including the TNA Transfers; and, in fact, signs the annual reports for TNA, an entity formed specifically to facilitate the fraudulent transfers into

Wyoming. In any case, if there were any doubt that these contacts were sufficient, the law is clear that jurisdictional discovery should proceed.

The Court should deny the Piazza Defendants' Motion to Dismiss.

## STATEMENT OF FACTS

**I. GRAMERCY BECOMES THE COMPANY'S LARGEST BONDHOLDER PURSUANT TO TRUST DEEDS THAT DO NOT PROVIDE REMEDIES AGAINST THIRD PARTIES ENGAGED IN FRAUD.**

### A. Gramercy Management Is a Long-Term Investor That Ushered the Company Through Multiple Consensual Restructurings Until It Was Defrauded.

Plaintiff Gramercy Management is a Connecticut-based investment management firm. Compl. ¶ 13. From its Connecticut offices, it manages the Gramercy Funds on behalf of the fund's investors, substantially comprised of U.S.-based state, local and corporate pension plans and university endowments. Gramercy also acquired Notes on behalf of other investors, including Plaintiff Roehampton, a Delaware LLC that maintains its principal place of business in Connecticut. *Id.* ¶¶ 14-15.

As a long-term investor in emerging markets, Gramercy made a substantial investment beginning in 2011 in the Ukrainian agricultural conglomerate ULF, which Bakhmatyuk consolidated with AVG to form one of the largest agricultural companies in Eurasia. *Id.* ¶¶ 42, 46, 48. Gramercy believed in the Company's long-term viability. Between 2011 and 2017, Gramercy purchased approximately 41.4% of the AVG Notes and approximately 28.6% of the ULF Notes, making it one of AVG's largest creditors—and its largest noteholder, holding (as of September 30, 2021) ULF Notes and AVG Notes with a face value of $240 million and $123 million, respectively, including principal and accrued interest. *Id.* ¶ 46. All of Gramercy's purchases took place before the onset of the scheme or before it was known. *See, e.g., id.* ¶ 96.

Contrary to the Piazza Defendants' misplaced "vulture fund" characterization, Gramercy did not resort to litigation or orchestrate a non-consensual reorganization plan when the Company first began to face financial difficulties following the annexation of Crimea, despite requests from other creditors to do so. Far from it. Rather than orchestrate a creditor takeover—Bakhmatyuk's preoccupation in the wake of the creditor takeover of another Ukrainian agricultural company in that period, Mriya Agro Holdings ("Mriya"),[2] *see id.* ¶¶ 51, 55—Gramercy supported the Company through two consensual restructurings of the ULF and AVG Notes to address uncertainty in the business and temporary financial pressures. First in 2015, and again in 2016, Gramercy was approached by Bakhmatyuk, and after a period of good-faith negotiations, voted in favor of restructuring proposals that, among other things, extended redemption dates, allowed certain interest payments to be satisfied by payment in kind, and waived certain events of default. *Id.* ¶¶ 57-58. Given that it held in excess of 25% of the Notes, these restructurings could not have been effectuated without Gramercy's consent. *Id.* ¶¶ 46-49.

**B.** **The Trust Deeds Govern Contractual Claims Against the Company and Sureties, But Do Not Shield Remote Third Parties Engaged In Fraud.**

The AVG and ULF Notes are governed by trust deeds (the "Trust Deeds"). *Id.* Each Trust Deed contains a choice-of-law provision stating that the Trust Deed will be governed by and construed according to English law. *See* Doc. No. 44-21 § 27; Doc. No. 44-26 § 19.1. The parties to the Trust Deeds are AVG and ULF, as well as the Surety Providers—*i.e.*, a number of AVG and ULF affiliates whose assets guaranteed the Company's repayment obligations under the Notes. *See* Doc. No. 44-20 at 2; Doc. No. 44-25 at 2. Compl. ¶¶ 47, 49. None of the Defendants are parties to the Trust Deeds.

---

[2] Gramercy was not a Mriya creditor or otherwise involved.

As a holder of more than 25% of the Notes, Gramercy had valuable rights under the Notes. One such right was the power to block certain resolutions of the noteholders (including in relation to restructurings). Another right, reflected in the Trust Deeds' no-action clauses, was the power to instruct the Indenture Trustees to initiate proceedings against the Issuer, the Surety Providers, or both "to enforce the terms of the Trust Deed, the Notes and/or the Surety Deed." Compl. ¶¶ 47, 49; Doc. No. 44-26 § 14. Noteholders, including Gramercy, are prohibited from instituting any proceeding against ULF or any Surety Provider *to enforce the terms of the Trust Deeds, the Notes or Surety Deed* "unless the Trustee, having become bound so to proceed, fails to do so within a reasonable time and such failure is continuing." Doc. No. 44-26 § 14 (emphasis added). The AVG Trust Deed states that "[o]nly the Trustee may *enforce the provisions of these presents*" and that "[n]o Noteholder shall be entitled (i) to take any steps or action *against the Issuer or the Surety Provider* to enforce the performance of any of the provisions of these presents and/or the Surety Agreement or (ii) take any other proceedings (including lodging an appeal in any proceeding) in respect of or concerning the Issuer or the Surety Providers, in each case unless the Trustee having become bound as aforesaid to take any such action, steps or proceedings fails to do so within a reasonable period and such failure is continuing." Doc. No. 44-20 § 8.3 (emphasis added).

Two important limitations confine the scope of the no-action clauses. First, the no-action clauses extend only to proceedings brought against the Issuers (ULF or AVG), the Surety Providers, or both. They do not extend to proceedings brought against parties who are not signatories to the Trust Deeds—such as Defendants. Second, the no-action clauses only prohibit proceedings to enforce the terms of the Trust Deeds. They do not prohibit proceedings asserting extracontractual claims—such as Gramercy's claims under the RICO statute and state tort law. Nothing in the Trust Deeds authorizes—let alone requires—Gramercy to instruct the Indenture

Trustees to sue non-signatories such as the Piazza Defendants for violating the RICO statute and to assert state-law claims sounding in tort.

The Trust Deeds make clear that, because they are not parties to the Trust Deeds, the Piazza Defendants have no power to invoke the no-action clauses or *any* other provision of the Trust Deeds. Both contain a provision that expressly denies all third parties such as the Piazza Defendants, any rights under the Trust Deeds:

> "A person who is not a party to these presents has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of these presents, but this does not affect any right or remedy of a third party which exists or is available apart from that Act." Doc. No. 44-21 § 32.

> "No person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999 except and to the extent, if any, that the Notes expressly provide for such Act to apply to any of their terms." Doc. No. 44-26 § 18.

These provisions mean that the Piazza Defendants have no right to invoke the arbitration agreements in the Trust Deeds to compel Gramercy to arbitration. They also mean that the Piazza Defendants (a) have no right to invoke the no-action clauses as a potential bar to Gramercy's causes of action; and (b) have no right to invoke the choice-of-law provisions to argue (incorrectly) that English law governs Gramercy's RICO claims and state-law tort claims.

While trying to bury in a footnote that the Trust Deeds expressly eliminate any third-party rights, *see* Mot. at 14 n.12, the Piazza Defendants emphasize certain disclosures contained within the ULF and AVG prospectuses concerning the possibility of further depreciation of Ukrainian currency, the possible economic impact arising from any changes in Ukraine's relationship with Russia, and the fact that "[t]he Group and its business has been, and will continue to be, controlled by a single ultimate beneficial owner," namely, Bakhmatyuk, "and will be subject to related party transactions." Mot. at 4. The Piazza Defendants seem to suggest that these risk disclosures mean that the Trust Deeds allowed for the kind of rampant, undisclosed fraud alleged in the Complaint.

That is not true. The risk disclosures clearly do not cover or provide any basis for Gramercy to have anticipated the wide-ranging fraudulent scheme Bakhmatyuk and his allies perpetrated against Gramercy. While Gramercy acknowledges that Russia's annexation of Crimea in early 2014, together with a global collapse in commodity prices, disrupted the Company's operations, none of Gramercy's claims are based on those events. *See* Compl. ¶¶ 53–54. Furthermore, the notion that the disclosure of related party transactions in the "ordinary course of its business" encompassed the extensive misconduct Gramercy alleges, including the covert looting of over a billion dollars of assets to Wyoming and Cyprus shell companies, is absurd.

## II. GRAMERCY'S SUBSTANTIAL, GOOD-FAITH EFFORTS TO EFFECTUATE A COMPREHENSIVE RESTRUCTURING IN ACCORDANCE WITH INTERNATIONAL NORMS ARE FRUSTRATED BY DEFENDANTS' EXTENSIVE, MULTI-FACETED SCHEME.

Although Gramercy ushered the Company through two smaller-scale restructurings, it was expected at the time that a larger-scale restructuring eventually would be needed. *Id.* ¶ 58. Then, in late 2016, the picture became worse for Bakhmatyuk. Not only was he increasingly concerned that a Mriya-like fate would befall the Company, *id.* ¶ 51, in October 2016, the National Anti-Corruption Bureau of Ukraine ("NABU") launched an investigation into Bakhmatyuk in connection with a historic stabilization loan of around UAH 1.2 billion that the National Bank of Ukraine ("NBU") provided in 2014 to VAB Bank, a bank that Bakhmatyuk owned at the time. *Id.* ¶ 59. Presaging the conduct at issue in the Complaint, the focus of the investigation was whether Bakhmatyuk had embezzled the loan funds for his own personal use and benefit (either directly or through companies he owned). *Id.* As a result, Bakhmatyuk fled to Austria, where he now resides. *Id.* ¶ 64. (Later criminal proceedings revealed that VAB Bank had transferred the funds—which were supposed to meet VAB Bank's clients' guaranteed deposits—to Bakhmaytuk-controlled

companies through Meinl Bank AG, which itself had its banking license revoked due to allegations of money laundering.) *Id.* ¶ 60.

Against this backdrop, Gramercy, along with another creditor, Ashmore, opened a dialogue with Bakhmatytuk and his representatives regarding the need for a comprehensive restructuring for the benefit of all stakeholders. *Id.* ¶ 78. Gramercy's substantial good-faith efforts persisted for years, as they were strung along by Bakhmatyuk's minor concessions, such as the appointment of Ernst & Young to conduct a "light independent business review" that ultimately was so restricted in scope that it essentially proved worthless, and the Company's subsequent retention of Ziff Ivin—yet another financial advisor tasked with assessing the Company's financial condition without enough access to provide any real insight. *Id.* ¶¶ 86-87, 99.

Contrary to the Piazza Defendants' narrative, Gramercy did not "refuse to accept reasonable terms." Mot. at 9. Rather, throughout the period of negotiations, Bakhmatyuk used misinformation as a sword in an effort to press Gramercy into accepting a low-ball offer rather than continuing its efforts to effectuate a holistic restructuring on equitable terms for all creditors. One of Bakhmatyuk's most significant misinformation tools was the supposedly independent research firm, Concorde Capital, a firm with extensive ties to Piazza that eventually revealed itself to be nothing more than a shill. Compl. ¶¶ 23, 26-28.

Seizing upon misinformation spread by his allies, Bakhmatyuk and others delivered offers to Gramercy in Connecticut that were far from fair. For example, Bakhmatyuk proposed that Gramercy accept a haircut of half of the notional value of its Notes, half the value of the interest, and to extend the maturity date of the Notes for ten years, without offering any potential upside for these substantial concessions. *Id.* ¶ 91. Later, Ziff Ivin was co-opted to deliver another one-sided proposal—touted by the Piazza Defendants as reasonable—that noteholders take 35-50% on

the Notes, extend the maturity date for 9 years, and accept other unfavorable terms. *Id.* ¶ 99. This proposal, like the others, rightly was rejected by Gramercy, which either received the Defendants' misleading communications knowingly transmitted to Connecticut or was baited to travel from Connecticut to London or Kyiv only to find it had wasted its time. Indeed, while asking Gramercy to accept large concessions, Bakhmatyuk assiduously resisted giving up any of his equity in the Company in order to achieve a consensual restructuring because he needed to preserve his stranglehold on the Company. *See id.* ¶¶ 151, 153. As a prime example, while living in Austria, Bakhmatyuk used the Company to wage his own personal war against the NABU investigation against him, going so far as to cause the Company to print a message against the then-head of the NABU on 1 billion eggs sold to supermarkets in Ukraine. *Id.* ¶ 11. Thus, the underlying circumstances demonstrate that Gramercy's efforts to achieve a consensual restructuring, at its substantial cost and expense, were derailed by Bakhmatyuk's bad faith—not the opposite.

Indeed, as Gramercy's independent investigation eventually would uncover, Bakhmatyuk's participation in the negotiations was nothing more than a facade that allowed him to keep Gramercy at bay long enough so that he could effectuate a multi-faceted scheme with the integral assistance of his close allies, the Piazza Defendants. *See, e.g.*, *id.* ¶¶ 151, 153.

In the first phase of the scheme, Bakhmatyuk and the Piazza Defendants leveraged their media and other connections in Ukraine to disseminate false financial information to artificially devalue the price of Company debt in order to allow Bakhmatyuk to purchase as much debt as he could find at a steep discount—in particular, leveraging the Piazza Defendants' deep connections to Concorde, who issued at least two misleading reports spoon fed to them by Defendants. *See id.* ¶¶ 10, 72-76, 108.

Next, in the second phase, Bakhmatyuk and Piazza orchestrated straw purchases from other creditors, with the Piazza Defendants serving as the most prominent straw purchasers, to marginalize and isolate Gramercy through the substitution of Bakhmatyuk's cronies (who often entered into bogus put-and-call arrangements that left Bakhmatyuk with control over the debt) for independent creditors. *Id.* ¶¶ 10, 93. The Complaint specifically alleges Piazza's acquisition of debt on behalf of Bakhmatyuk, including from Ashmore, which had been Gramercy's main ally in pursuing a holistic restructuring, *Id.* ¶ 102, 109. The Piazza Defendants were not mere debt purchasers; they acquired the debt on non-arms' length terms as a front for Bakhmatyuk and as part of an overall scheme targeting Gramercy.

And finally, having forestalled any enforcement action that Gramercy may have taken, Bakhmatyuk enlisted the Piazza Defendants to employ their "expertise"—the surreptitious transfer of assets into sham Wyoming companies designed to exploit Wyoming law.

## III. DEFENDANTS' TRANSFER OF OVER $870 MILLION OF ASSETS WAS EFFECTUATED THROUGH WYOMING-BASED COMPANIES FORMED UNDER WYOMING LAW FOR THE EXPRESS PURPOSE OF EXPLOITING WYOMING CORPORATE PROTECTIONS.

After myopically highlighting this dispute's connections to Europe without even acknowledging the scheme's deep connections to Connecticut and Wyoming, the Piazza Defendants conclude their self-serving factual recitation by arguing that "accepting all of the allegations as true, the only claim is that Moving Defendants purchased AVG and ULF Notes." Mot. at 12. Nowhere in their recounting of the "facts" do the Piazza Defendants' even acknowledge, much less wrestle with, the detailed allegations regarding the TNA Transfers, which drive home the profound connection between the Defendants' scheme and Wyoming.

As alleged in the Complaint, but ignored by the Piazza Defendants, in 2017 – two months prior to the Company's default on its debt obligations to Gramercy and the other creditors under

the restructured Notes – Bakhmatyuk enlisted Piazza, Yaremenko and SP Advisors to incorporate a new entity, TNA, in Wyoming for the purpose of facilitating fraudulent asset transfers, with Piazza listing himself as the beneficial owner and Yaremenko acting as the signatory of TNA's annual statements. *Id.* ¶¶ 84, 142, 170. Having formed the entities years earlier with premeditation, Bakhmatyuk fully unleashed his asset-transfer plan in 2019, when Piazza, Yaremenko, and SP Advisors orchestrated a complex set of transactions intended to shield more than $1 billion in assets from Gramercy. The first transfers of over $300 million in Company assets were to a Cypriot company called Maltofex (wholly-owned by Bakhmatyuk). Compl. ¶¶ 124-125. Those transfers are the subject of a separate action in Cyprus in which none of the Piazza Defendants are parties. *See id.* ¶ 160.

Thereafter, and without any disclosure to Gramercy, the Defendants effectuated the TNA Transfers, which transferred over $870 million in Company assets and at least one hundred ULF subsidiaries, to TNA in Wyoming for no consideration. *Id.* ¶¶ 125, 128, 139, 140, 218. The TNA Transfers included the transfer of eight companies formerly owned by AVG, effectively dissipating all of AVG, leaving only two subsidiaries, both of which are based in Crimea and therefore no longer under AVG's control. *Id.* ¶ 139. In suggesting that Gramercy should have pursued contractual remedies, the Piazza Defendants ignore the TNA transfers altogether, arguing, for example, that Gramercy could have proceeded contractually against the Surety Providers. As alleged in the Complaint, however, certain of the Surety Providers themselves were among the transferred entities. *Id.* ¶¶ 76, 125.

The TNA Transfers followed the roadmap Piazza and Yaremenko described in a November 2020 webinar presentation, where they touted SP Advisors' establishment of corporate structures in Wyoming through which clients in Eastern Europe can hold their assets, with Piazza listing

himself as a nominal director or shareholder to conceal the true owner's identity. *Id.* ¶¶ 33-34. In the webinar, Yaremenko explained that Wyoming was a particularly attractive jurisdiction for businesses to protect their assets against "corporate raiding" because it offers complete confidentiality and does not have residency requirements for shareholders or directors. *Id* ¶ 34. The Defendants effectuated these transfers surreptitiously, forcing Gramercy to incur significant costs investigating and unraveling their scheme. *Id.* ¶ 218.

While the Piazza Defendants would like to pretend the Wyoming connections do not exist, the Complaint alleges in detail the scheme's deep connections to Wyoming and each Defendant's purposeful availment of Wyoming law.

## LEGAL ARGUMENT

## I.  THE PIAZZA DEFENDANTS CANNOT INVOKE THE TRUST DEEDS' ARBITRATION CLAUSES AS NON-SIGNATORIES UNDER ENGLISH LAW.

The Piazza Defendants move to compel arbitration under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), 9 U.S.C. §§ 201–208. Mot. at 13–14. To determine whether to compel arbitration under § 206, a court first examines whether the parties have "an agreement in writing to arbitrate the subject of the dispute." *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 959 (10th Cir. 1992). No agreement exists here because the Piazza Defendants "are not parties to the Trust Deeds." Mot. at 14. The Piazza Defendants thus resort to seeking to compel arbitration under an equitable-estoppel theory. *Id.* at 14–19. That argument fails for at least two reasons. First, the Piazza Defendants fail to grasp that English law governs whether they can invoke the arbitration agreements, and under English law, they cannot. Second, even assuming U.S. law applies (which it does not), the Piazza Defendants' equitable-estoppel arguments hinge on the fiction that Gramercy's claims are disguised breach-of-contract claims. That is simply not so.

14

**A.      English Law Governs Whether the Piazza Defendants, As Non-signatories, Can Compel Arbitration, and Under English Law, They Cannot.**

When a contract including an arbitration agreement selects a body of law in a choice-of-law provision, that body of law governs whether a non-signatory can compel or be compelled to arbitration.  *See, e.g.*, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50–51 (2d Cir. 2004); *Mars, Inc. v. Szarzynski*, No. CV 20-01344 (RJL), 2021 WL 2809539, at *6 (D.D.C. July 6, 2021); *SBMH Grp. DMCC v. Noadiam USA, LLC*, 297 F. Supp. 3d 1321, 1327 (S.D. Fla. 2017).

The Piazza Defendants ignore the Trust Deeds' English choice-of-law provisions. Instead, they note the absence of authority in Wyoming state court recognizing their equitable-estoppel theory, and then turn to decisions applying federal law for the principle that a non-signatory can sometimes compel a signatory to arbitration based on equitable estoppel. Mot. at 14–19 (citing *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637 (2020); *Reeves v. Enter. Products Partners, LP*, 17 F.4th 1008 (10th Cir. 2021); *Lenox MaClaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704 (10th Cir. 2011); *Weller v. HSBC Mortg. Servs., Inc.*, 971 F. Supp. 2d 1072 (D. Colo. 2013); *Roe v. Gray*, 165 F. Supp. 2d 1164 (D. Colo. 2001)). None of those cases are on point. None discusses whether the contract including the arbitration agreement also contained a choice-of-law provision. Noting that the defendants in *Motorola* had similarly misrelied on decisions applying federal law rather than Swiss law, the Second Circuit stated that "these authorities do not hold that a court must set aside a choice-of-law clause in determining arbitrability; instead, they appear to be cases where neither party raised the choice-of-law issue." 388 F.3d at 51. That is equally true here.

Under English law, as set out in the expert declaration of Ben Valentin attached hereto as Exhibit 1[3] to the Declaration of Mark D. Gibson, the Piazza Defendants cannot compel arbitration, because they are not signatories to the Trust Deeds. Ex. 1, ¶ 8(1). In England, the common-law doctrine of privity of contract provides that a contract cannot confer rights on third parties. *Id.* ¶ 18. Thus, in general, an arbitration agreement can be invoked only by a party to the contract including the arbitration agreement. *Id.* The only potentially relevant exception here stems from an English statute, the Contracts (Rights of Third Parties) Act 1999 ("CRTPA"). *Id.* ¶ 19.

That exception does not apply. *Id.* ¶¶ 23–24. The CRTPA confers rights on third parties only if the contract either expressly provides that non-parties can enforce its terms, or purports to confer a benefit on the non-party. *Id.* ¶ 19(1). The CRTPA also applies only when the contract identifies the third party by name, by description, or as a member of an identified (or identifiable) class. *Id.* ¶ 19(2). And the CRTPA also allows parties to contractually agree that, notwithstanding the CRTPA, non-signatories will have no rights to invoke the terms of the contract. *Id.* ¶¶ 19(2), 19(4), 22.

As explained in the Valentin declaration, the CRTPA does not give the Piazza Defendants the right to invoke the arbitration agreements for at least three reasons. First, the Trust Deeds do not state that third parties can enforce their terms, and neither purports to confer a benefit on any of the Piazza Defendants. *Id.* ¶ 21(2)–(3). Second, the Trust Deeds do not identify the Piazza Defendants by name, description, or class as third parties entitled to enforce the Trust Deeds' terms. *Id.* ¶ 21(1). And third, the Trust Deeds *expressly contract out of the CRTPA*, eliminating any

---

[3] "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

potential third-party rights to invoke the arbitration agreements that they otherwise would have had under the CRTPA. *Id.* ¶ 22; *accord* Doc. No. 44-25 §§ 1.6, 18; Doc. No. 44-21 §§ 21, 32.

The Trust Deeds' express elimination of third-party rights is fatal to the Piazza Defendants' argument. Yet, apart from erroneously suggesting that U.S. law applies, their only response, appearing in a footnote, is that the CRTPA "preserves" their right to invoke equitable estoppel, which they contend "exists and is available apart from the [CRTPA]." Mot. at 14 n.12. They are wrong. Given the English choice-of-law provision, for equitable estoppel to exist and be available to the Piazza Defendants in this context, that theory must exist and operate as an exception to privity of contract under English law. It does not. Ex. 1, ¶¶ 23, 29. There is no authority in English law for the proposition that equitable estoppel permits enforcement of an arbitration agreement by a third party apart from the rights that may exist under the CRTPA—rights that are expressly disclaimed here. *Id.* ¶ 29. As a result, the general rule of privity applies under English law, and bars the Piazza Defendants' attempt to compel arbitration. *Id.* ¶¶ 29, 31.[4]

> **B.    Even If the Piazza Defendants Could Invoke An Equitable-Estoppel Theory Under U.S. Law, That Theory Fails.**
>
> > *1.    Gramercy Does Not Seek to Hold the Piazza Defendants Liable for Breaching Duties Imposed By the Trust Deeds.*

The Tenth Circuit has recognized that equitable estoppel allows a non-signatory to seek to compel arbitration if the plaintiff–signatory seeks to hold the non-signatory liable "pursuant to duties imposed by the agreement." *Lenox*, 449 F. App'x at 708. In other words, "the contract must

---

[4] The structure of the Trust Deeds reinforces this conclusion. The ULF trust deed recognizes third-party rights for indemnification, noting that "[t]he Appointees of the Trustee [third parties] shall have the right under the Contracts (Rights of Third Parties) Act 1999 to enforce their rights against the Issuer or the Surety Providers, as the case may be, under this Clause 7.4." Doc. No. 44-25 § 7.4; Ex. 1, ¶¶ 22(2) n.9, 41(1). This provision shows that, had the parties intended for third parties to have the right to invoke the arbitration agreements, they would have said so.

form the legal basis" for the claims against the non-signatory. *Id.* at 709. The Piazza Defendants try to meet this requirement by cobbling together allegations in the Complaint that reference Gramercy's rights under the Trust Deeds. From this, they argue that Gramercy's claims "rely" on the existence of the Trust Deeds. Mot. at 16–17. But the Tenth Circuit has rejected this precise argument. In *Lenox*, the Court held that "it is not enough that the contract is factually significant to the plaintiff's claims." 449 F. App'x at 709. So Gramercy's mere reference to its contractual rights in the Complaint does not create a basis to invoke equitable estoppel. The *Lenox* Court also held that it is not enough that the contract "has a 'but-for' relationship with" the plaintiff's claims. *Id.* at 709. So the fact that Gramercy's "claims are predicated upon the existence and validity of the Trust Deeds," as the Piazza Defendants argue, Mot. at 17, also is of no moment.

The Trust Deeds do not form the legal basis for Gramercy's claims. Gramercy has not sued the Piazza Defendants for breach of contract. Gramercy does not seek to hold the Piazza Defendants liable for breaching duties owed to Gramercy under the Trust Deeds. And Gramercy's claims do not depend on whether Defendants' conduct violated the terms of the Trust Deeds. Instead, Gramercy alleges that Defendants fraudulently strung Gramercy along during negotiations about restructuring the Company's Notes. Compl. ¶¶ 5–6. Had Defendants been honest and forthcoming, Gramercy could have taken appropriate measures, such as selling its notes or instructing the indenture trustees to initiate proceedings against the Company for defaulting on them. *Id.* ¶ 10(a). Gramercy also alleges that Defendants fraudulently and tortiously stripped over a billion dollars in assets from ULF and AVG, sheltering those assets in Wyoming and Cypriot entities. *Id.* ¶ 10(c). Based on this conduct, Gramercy does not seek to hold Defendants liable to pay the ULF and AVG Notes. Instead, Gramercy seeks damages as a result of Defendants' misconduct that eviscerated Gramercy's rights under the Notes, including their right to seek

repayment and their right as a holder of more than 25% of the notes to block an unfavorable restructuring, which Defendants instead effectuated through illicit means. *Id.* ¶¶ 181–185.

The District of Colorado's decision in *Roe v. Gray*, 165 F. Supp. 2d 1164 (D. Colo. 2001), does not help the Piazza Defendants. There, the court determined that non-signatories could seek to compel arbitration because the plaintiff had sued both the signatory and the non-signatories, and the plaintiff's claims against both were "based on the same factual allegations, and even the same contract." *Id.* at 1175. Here, in sharp contrast, Gramercy has not sued ULF or AVG, because they were looted by the Piazza Defendants; they did not participate in the alleged scheme.

> ### 2. Gramercy Has Not Alleged Interdependent and Concerted Misconduct Among ULF, AVG, and Defendants.

Under the equitable-estoppel doctrine, a non-signatory also can invoke an arbitration agreement when the plaintiff–signatory "alleges substantially interdependent and concerted misconduct" by both the non-signatory and one or more of the signatories to the contract. *Lenox*, 449 F. App'x at 710. But "allegations of collusion between a signatory and a nonsignatory, alone, are not enough to estop a signatory from avoiding arbitration with a nonsignatory." *Id.* Rather, allegations of collusion will support a non-signatory's equitable-estoppel theory only if those allegations "establish that the claims against the nonsignatory are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause." *Id.* Again, even assuming this U.S. law applies (which it does not), that is not the case here.

The Piazza Defendants contend that equitable estoppel applies because Gramercy's claims "are entirely dependent on AVG and ULF's obligations" under the Trust Deeds, and because "this dispute will unquestionably involve facts regarding how ULF and AVG allegedly failed to comply with the terms of the Trust Deeds." Mot. at 18. Those contentions are wrong for all the reasons discussed above. They are also irrelevant. The question is whether Gramercy has alleged

interdependent and concerted misconduct between the Piazza Defendants and the Company. It has not. Gramercy does not allege that the Company worked hand-in-hand with the Piazza Defendants, conspiring together to breach the terms of the Trust Deeds. Gramercy does not allege that the Piazza Defendants *colluded* with the Company; Gramercy alleges that they *abused* the Company by, among other things, misrepresenting its financial condition, resisting a consensual restructuring in favor of buying-up debt using misinformation and straw purchasers, and eventually looting the Company by stripping assets. *See, e.g.*, Compl. ¶¶ 10(c), 12, 128, 168, 171.

The Piazza Defendants' cases are inapposite. In *Reeves*, the plaintiffs alleged that a signatory defendant worked together with non-signatories–defendants to fail to pay the plaintiffs overtime wages. 17 F.4th at 1013. Similarly, in *Weller*, the plaintiff alleged that a signatory–defendant and non-signatories–defendants conspired and worked together to unlawfully force the plaintiff to maintain flood insurance as part of his mortgage. 971 F. Supp. 2d at 1082. In both cases, because the plaintiff alleged that signatory and non-signatory defendants worked together to engage in concerted misconduct, the courts determined that the non-signatories could compel arbitration. *Reeves*, 17 F.4th at 1013; *Weller*, 971 F. Supp. 2d at 1082–83. Here, in stark contrast, Gramercy does not allege that the Company worked together with the Piazza Defendants to breach the Trust Deeds; Gramercy alleges that the Company was exploited by the Piazza Defendants.[5]

---

[5] If the Court were to determine that, despite their non-signatory status, the Piazza Defendants can invoke the arbitration agreements in the Trust Deeds to compel Gramercy to arbitration, whether Gramercy's claims fall within the scope of the arbitration agreements would be a question for the arbitrator—not this Court—to resolve because the arbitration agreements adopt the rules of the London Court of International Arbitration. *See* Mot. at 20 n.13.

## II. DEFENDANTS, AS NONSIGNATORIES, ALSO CANNOT INVOKE THE TRUST DEEDS' NO-ACTION CLAUSES UNDER ENGLISH LAW, WHICH, IN ANY CASE, DO NOT APPLY TO GRAMERCY'S NON-CONTRACTUAL CLAIMS AGAINST THIRD PARTIES.

### A. The Piazza Defendants Cannot Invoke the No-Action Clauses Under English Law Because They Are Not Signatories to the Trust Deeds.

The Piazza Defendants' no-action-clause argument fares no better. That argument fails for the same reason as their arbitration argument: under English law, they have no right to invoke the no-action clauses because they are not parties to the Trust Deeds. Ex. 1, ¶¶ 8(2), 35–38. That should be the end of the inquiry.

### B. Even If the Piazza Defendants Could Invoke the No-Action Clauses, Gramercy's Claims Do Not Fall Within Their Scope.

Even if they could invoke the no-action clauses, the Piazza Defendants' argument still would fail. The no-action clause in the ULF Trust Deed authorizes the Trustee to institute proceedings against the Issuer (ULF), any Surety Provider, or both "to enforce the terms of this Trust Deed, the Notes and/or the Surety Deed." Doc. No. 44-25 § 2.5. It then states that no noteholder can institute a proceeding against ULF or any Surety Provider to enforce the terms of the trust deed, the notes, or the surety deed "unless the Trustee, having become bound so to proceed, fails to do so within a reasonable time and such failure is continuing." *Id.*

The AVG Trust Deed contains similar provisions. It authorizes the Trustee to institute proceedings against or in relation to the Issuer (AVG) and the Surety Providers "to enforce their respective obligations under these presents and the Surety Agreements or otherwise." Doc. No. 44-20 § 7.1. The no-action clause then states:

> Only the Trustee may enforce the provisions of these presents. No Noteholder shall be entitled (i) to take any steps or action against the Issuer or the Surety Provider to enforce the performance of any of the provisions of these presents and/or the Surety Agreement or (ii) take any other proceedings (including lodging an appeal in any proceeding) in respect of or concerning the Issuer or the Surety Providers, in each case unless the

Trustee having become bound as aforesaid to take any such action, steps or proceedings fails to do so within a reasonable period and such failure is continuing.

*Id.* § 8.3. The conditions section of the AVG trust deed echoes these provisions, making clear that, generally, only the Trustee may sue AVG or the Surety Providers to enforce the provisions of the Trust Deed, the Surety Agreements, and the Notes, and that no noteholder can sue AVG or a Surety Provider to enforce these agreements "unless the Trustee, having become bound so to proceed, fails to do so within a reasonable period and such failure shall be continuing." Doc. No. 44-22 §§ 12.1–12.2.

The plain text shows that two conditions cabin the scope of the no-action clauses. *See* Ex. 1, ¶ 40 (noting that English principles of contract interpretation look first to plain text). First, the no-action clauses apply only to suits against the Issuer or a Surety Provider. Second, the no-action clauses apply only to suits seeking to enforce the terms of the Trust Deeds, the Notes, or the Surety Agreements. The provisions in the Trust Deeds eliminating third-party rights, when read together with the no-action clauses and the foregoing provisions, leave no doubt that the no-action clauses do not shield third parties from liability for extra-contractual misconduct. *See* Ex. 1, ¶ 41(1) (noting that English principles of contract interpretation call for reading the contract as a whole). The no-action clauses are thus no bar to Gramercy's claims. Gramercy has not sued the issuer of the ULF Notes (ULF), the issuer of the AVG Notes (AVG), or any of the Surety Providers. Gramercy also is not suing to enforce the terms of the Trust Deeds, the Notes, or Surety Agreements—naturally, the only claims that must be presented to the Trustee first. Stated differently, Gramercy is not suing for breach of contract. Instead, Gramercy is suing strangers to the contracts who fraudulently and tortiously conspired to eviscerate Gramercy's contractual rights. Compl. ¶¶ 181–184. Gramercy's claims thus are not subject to the no-action clauses.

Caselaw reinforces that conclusion. The District of Arizona's decision in *Allstate Life Insurance Co. v. Robert W. Baird & Co.*, No. CV-09-8162-PCT-GMS, 2011 WL 5024269 (D. Ariz. Oct. 21, 2011), is instructive. That case involved a no-action clause, like the ones here, that generally prohibited bondholders from suing to enforce the terms of the indenture. *Id.* at *2. The court determined that the no-action clause did not bar the plaintiffs' claims because, just as here, the plaintiffs asserted statutory and state-law tort claims, not contractual claims. *Id.* at *3. Other courts similarly have held that a no-action clause is no bar to the plaintiff's suit when, as here, the no-action clause extends only to suits to enforce the contract, but the plaintiff's claims do not seek to enforce the contract's terms. *See, e.g.*, *Cruden v. Bank of N.Y.*, 957 F.2d 961, 974 (2d Cir. 1992) (determining that no-action clause was limited to contractual claims, so the clause did not bar a claim for fraudulent conveyance); *Kusner v. First Penn. Corp.*, 531 F.2d 1234, 1239 (3d Cir. 1976) (determining that no-action clause for suit seeking "any other remedy under or upon this Indenture" did not bar the plaintiff's statutory claims under the Securities and Exchange Act); *Regions Bank v. Blount Parrish & Co.*, No. 01 C 0031, 2001 WL 726989, at *7 (N.D. Ill. June 27, 2001) (concluding that no-action clause for suits seeking "any remedy with respect to this Indenture" did not apply to fraud claims).

Even though Gramercy is not suing either the Issuer or the Surety Providers, and even though Gramercy is not pursuing contractual claims, the Piazza Defendants contend that Gramercy must issue a written request to the Trustees to institute an arbitration against them in London, asserting RICO and state-law tort claims. That would be a bizarre result—one that cannot be squared with the caselaw. *See Cont'l Bank, N.A. v. Caton*, No. 88-1611-C, 1990 WL 129452, at *6–7 (D. Kan. Aug. 6, 1990) ("[T]he indenture agreements here limit [the Trustee's] actions to claims on the notes or under the indentures. [The Trustee] has no power to assert individual tort

claims on behalf of the noteholders against third persons which are wholly extraneous to the rights and obligations created by the notes and the indenture agreements."); *see* Ex. 1, ¶ 41(2) (noting that English principles of contract interpretation call for avoiding constructions that flout common sense).[6]

## III.     ULF AND AVG ARE NOT REQUIRED OR INDISPENSABLE PARTIES.

The Piazza Defendants' indispensable-parties argument fails because ULF and AVG are neither required parties under Rule 19(a) nor indispensable parties under Rule 19(b).

The Piazza Defendants contend that ULF and AVG are required parties because they allegedly have interests related to this action, and a judgment in Gramercy's favor could impair or impede those interests. Mot. at 26–27; *see* Fed. R. Civ. P. 19(a)(1)(B)(i). Tellingly, the Piazza Defendants do not—because they cannot—contend that a ruling in Gramercy's favor on its RICO claims or its state-law claims for fraud, civil conspiracy, or aiding and abetting could impair ULF's

---

[6] In seeking to portray this case as an action on the Notes, the Piazza Defendants also suggest in passing that Gramercy lacks standing because its claims are allegedly derivative, not direct. Mot. at 22–23. Not so. Gramercy has pleaded direct injuries. As alleged in the Complaint, many creditors sold their debt to Defendants pursuant to put-call arrangements or on non-arms'-length terms, thus substituting Defendants or their cronies for independent creditors. *See* Compl. ¶ 150. Along the way, Defendants made misrepresentations directly to Gramercy that induced it to forego unique rights that it held. Compl. ¶¶ 10(a), 70–92; *see CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1099 (10th Cir. 2014) (concluding that RICO plaintiffs had standing because they were allegedly the direct targets of the defendants' fraudulent scheme). The purpose of this, as alleged, was to isolate Gramercy, and ultimately to cause it injury by eviscerating its unique rights under the Notes, which were the only threat to Bakhmatyuk's control. Compl. ¶¶ 10(b), 93–121. And Gramercy also has alleged that it incurred damages traveling to Europe for negotiations that were a mere facade and in investigating and unraveling Defendants' scheme. *Id.* ¶¶ 10(c), 218. The fact that certain of the conduct may also have impacted other creditors (but not all creditors) does not impact Gramercy's standing. *See, e.g.*, *Bixler v. Foster*, 596 F.3d 751, 757 (10th Cir. 2010) (holding that when, as here, a corporate constituent alleges a "direct, personal interest in a cause of action," that person has standing "even if the corporation's rights are also implicated"); *In re M&L Bus. Mach. Co.*, 136 B.R. 271, 276 (Bankr. D. Colo. 1992) (concluding that creditors who were direct targets of misconduct, fraud, and misrepresentation had standing).

and AVG's interests. Instead, they focus on one element of one claim, the tortious interference claim, arguing that a determination that ULF or AVG breached the Trust Deeds could impair their interests. Mot. at 26–27. This argument fails for at least three reasons.

First, Gramercy alleges that ULF and AVG breached and defaulted on the Trust Deeds, and were unable to cure, *because of Defendants' fraudulent and tortious misconduct*. Compl. ¶ 217. ULF and AVG likely share Gramercy's interest in blaming Defendants for ULF's and AVG's contractual shortcomings. A ruling in Gramercy's favor would thus not impair ULF's and AVG's interests. To the contrary, it would likely further ULF's and AVG's interests in laying blame on Defendants, particularly since it is indisputable that the Notes were in default.

Second, the Piazza Defendants' argument collides head-on with the caselaw. Courts repeatedly have held that when, as here, a plaintiff asserts a tortious interference claim, the other parties to the contract are not required or indispensable parties. *See, e.g.*, *Arkansas v. Texas*, 346 U.S. 368, 369–70 (1953) (rejecting argument that an absent contracting party was a required party in tortious interference case); *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 880 (7th Cir. 2004) ("[T]here is no rule that you cannot sue the interferer without also suing the party to your contract whom the defendant inveigled into breaking the contract."); *Stone's Pharmacy, Inc. v. Pharmacy Acct. Mgmt., Inc.*, 875 F.2d 665, 666 (8th Cir. 1989); *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 458–59 (E.D. Pa. 2013) ("Indeed, '[t]he mere fact, however, that Party A, in a suit against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved improperly does not, by itself, make C a necessary party.'"); *Abbott Point of Care, Inc. v. Epocal, Inc.,* No. CV-08-S-543-NE, 2008 WL 11297394, at *4 (N.D. Ala. June 23, 2008).

Third, a determination that ULF and AVG breached would not sufficiently impair any interest they might have as required by Rule 19. That is so because neither ULF nor AVG would be bound by the Court's determination. *See Aerotek, Inc. v. Beacon Hill Staffing Grp.*, No. 18-2645, 2019 WL 1455337, at *2–3 (E.D. Pa. Apr. 2, 2019) (concluding that a third party was not a required party under Rule 19 in a tortious interference case because the third party would not be bound by the court's judgment under the issue preclusion doctrine). That the Court's determination might create "an unfavorable or inconvenient" precedent for ULF and AVG in future proceedings does not render them required parties under Rule 19. *Id.* at *3 (citing *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 407 (3d Cir. 1993)); *accord Huber v. Taylor*, 532 F.3d 237, 251 (3d Cir. 2008) ("[W]here the preclusive effect of an action on any related litigation is speculative, joinder of an absent party is not compulsory under Rule 19(a)(2)(i).").

The Piazza Defendants also contend that the Court "cannot grant full relief" because Gramercy could "stand to collect on the debt from ULF and AVG" in an enforcement action under the Trust Deeds "while recovering here." Mot. at 27; *see* Fed. R. Civ. P. 19(a)(1)(A). The Piazza Defendants omit that an absent party is a required party under this provision of Rule 19 only if, "in that person's absence, the court cannot accord complete relief *among existing parties*." Fed. R. Civ. P. 19(a)(1)(A) (emphasis added). There is no question that, even without ULF and AVG, the Court can award Gramercy all the relief it seeks *against Defendants* in this action. *Cf. Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1258 (10th Cir. 2001) (finding that court could accord complete relief among the existing parties because it could award the requested relief without absent party). That Gramercy might theoretically be able to recover from ULF and AVG in a separate proceeding is irrelevant to the Rule 19 analysis.

The Piazza Defendants also contend that, without ULF and AVG, the Piazza Defendants face a substantial risk of incurring double, multiple, or inconsistent obligations, because Gramercy could instruct the Trustees to pursue arbitration. Mot. at 27; *see* Fed. R. Civ. P. 19(a)(1)(B)(ii). This argument rests on the erroneous assumption that the Trustee could sue the Piazza Defendants under the Trust Deeds even though they are not parties to the Trust Deeds. As explained above, that is incorrect. *See supra* § II(B), p. 21; *Cont'l Bank, N.A.*, 1990 WL 129452, at *7 ("[T]he indenture agreements here limit [the Trustee's] actions to claims on the notes or under the indentures. [The Trustee] has no power to assert individual tort claims on behalf of the noteholders against third persons which are wholly extraneous to the rights and obligations created by the notes and the indenture agreements.").

Finally, even if the Court were to determine that ULF and AVG are required parties who cannot be joined, they are not indispensable such that the Court should dismiss the entire case. As explained above, a judgment rendered here without ULF and AVG would not prejudice them. *See* Fed. R. Civ. P. 19(b)(1). And even if the Court thought otherwise, it could eliminate any prejudice to ULF and AVG by dismissing only Gramercy's tortious interference claim, not the case in its entirety. *See* Fed. R. Civ. P. 19(b)(2).

## IV. THE PIAZZA DEFENDANTS HAVE NOT, AND CANNOT, CARRY THEIR BURDEN OF SHOWING THAT THE DOCTRINE OF FORUM NON CONVENIENS APPLIES, MUCH LESS SUPPORTS DISMISSAL.

The Piazza Defendants bear the burden of showing that the Court should dismiss the case based on forum non conveniens. *See Rivendell Forest Prods., Ltd. v. Canadian Pac. Ltd.*, 2 F.3d 990, 993 (10th Cir. 1993). "[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards dismissal and trial in the alternative forum." *Piper Aircraft Co. v. Reyno*, 454 U.S.

235, 255 (1981). That presumption applies with full force here because all of the people and documents associated with or related to Gramercy are located in Connecticut. Compl. ¶¶ 13–15; *see* Charles Alan Wright et al., *Federal Practice & Procedure* § 3828.2 ("Most federal courts, including the Supreme Court, agree that the plaintiff's selection of a forum is entitled to less deference when the plaintiff (or the real party in interest) is not a United States citizen."). The Piazza Defendants have failed to carry their heavy burden to overcome Gramercy's choice of forum.

A. **The Piazza Defendants Have Not Carried Their Burden to Show That Arbitration in London Is An "Available" Forum and That Foreign Law Governs the Vast Majority of This Dispute.**

Where, as here, the movant's proposed alternative forum is in a different country, the court may dismiss under the forum non conveniens doctrine only if the movant establishes three threshold elements: (1) foreign law governs the vast majority of the dispute; (2) the foreign forum is "available"; and (3) the foreign forum in "adequate." *Gas Sensing Tech. Corp. v. Ashton*, No. 16-CV-272-F, 2017 WL 2955353, at *14–15 (D. Wyo. June 12, 2017) (Freudenthal, J.); *Archangel Diamond Corp. Liquidating Trust v. OAO Lukoil*, 75 F. Supp. 3d 1343, 1375–76 (D. Colo. 2014), *aff'd*, 812 F.3d 799 (10th Cir. 2016). The Piazza Defendants have not carried their burden as to at least the first two elements.

1. *The Piazza Defendants Have Not Carried Their Burden to Show That Foreign Law Will Govern the Vast Majority of This Dispute.*

Having ignored English law as to their arbitration argument, the Piazza Defendants do an about-face, arguing in a single conclusory paragraph that English law governs Gramercy's RICO and state-law claims because "[t]he Subscription Agreements, Trust Deeds, and prospectuses each select English law as the governing law." Mot. at 30. This argument, like so many others the Piazza Defendants press, hinges on the fallacy that Gramercy's claims are for breach of contract.

They are not, and thus English law does not govern any of Gramercy's claims. *See* Ex. 1, ¶ 45. Rather, federal law governs Gramercy's RICO claims, and state law governs Gramercy's state-law claims for fraud, tortious interference with contract, civil conspiracy, and aiding and abetting.

When a federal court has supplemental jurisdiction over a state-law claim, the court "applies the substantive law, including choice of law rules, of the forum state." *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). Wyoming has adopted the most-significant-relationship test under the Restatement (Second) of Conflict of Laws. *Elworthy v. First Tenn. Bank*, 391 P.3d 1113, 1120 (Wyo. 2017). Applying that test, the Court need not choose between Wyoming and Connecticut because their laws do not materially differ on the elements of fraud,[7] tortious interference,[8] civil conspiracy,[9] and aiding and abetting.[10] And "[w]hen there is no conflict, the [c]ourt applies the law of the forum." *Act I, LLC v. Davis,* 60 P.3d 145, 149 (Wyo. 2002). Thus, federal law applies to Gramercy's RICO claims and Wyoming law applies to Gramercy's state-law claims. Because none is governed by foreign law, the Piazza Defendants have not shown—and cannot show—that foreign law will govern the vast majority of the dispute, meaning that forum non conveniens does not apply.

---

[7] *Compare Centimark Corp. v. Vill. Manor Assocs. Ltd. P'ship*, 113 Conn. App. 509, 522 (Conn. App. Ct. 2009), *with Singer v. Lajaunie*, 339 P.3d 277, 285 (Wyo. 2014).

[8] *Compare Rioux v. Barry*, 927 A.2d 304, 311–12 (Conn. 2007), *with Downs v. Homax Oil Sales, Inc.*, 421 P.3d 518, 524 (Wyo. 2018).

[9] *Compare  Charter Oak Lending Grp., LLC v. Aug.*, 127 Conn. App. 428, 447 (2011), *with White v. Shane Edeburn Const., LLC*,  285 P.3d 949, 958 (Wyo. 2012).

[10] *Compare Efthimiou v. Smith*, 268 Conn. 499, 505 (2004), *with Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.*, 479 P.3d 1222 (Wyo. 2021).

2. *The Piazza Defendants Have Not Carried Their Burden to Show That Arbitration in London is an "Available" Forum.*

As a general rule, when a defendant has consented to jurisdiction in the alternative forum, that consent is enough to show that the alternative forum is available. *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 606 (10th Cir. 1998). Here, however, the Piazza Defendants offer only a cryptic one-liner: "Moving Defendants are amenable to process in England." Mot. at 29. But they do not make clear that being "amenable to process" means that they will consent to jurisdiction in England. Nor do they do provide an affidavit or declaration stating that they will consent to jurisdiction in England. *Cf. Hislop v. Paltar Petrol. Ltd.*, No. 17-cv-02371-RBJ, 2018 WL 5014123, at *4 (D. Colo. Oct. 16, 2018) (determining that Australia was an available alternative forum because the defendants had "signed a declaration under the penalty of perjury stating they would consent to the jurisdiction of the Federal Court of Australia"). The Piazza Defendants also say nothing about whether Defendant Oleg Bakhmatyuk will consent to, or would otherwise be subject to, jurisdiction in England, much less provide a declaration from him stating that he will consent to jurisdiction in England. *See* 17 James Wm. Moore et al., *Moore's Federal Practice* § 111.74(2)(f) (3d ed. 2018) (alternative forum is "available" only if "the litigation may be conducted in the foreign forum against *all* the defendants remaining in the action" (emphasis added)). Thus, the Piazza Defendants have failed to carry their burden to show that arbitration in England is an "available" alternative forum.

**B. The Piazza Defendants Have Not Carried Their Burden to Show That the Private-Interest and Public-Interest Factors Clearly Point Toward Dismissal.**

Even assuming the threshold requirements could be met, the Piazza Defendants' forum non conveniens argument still fails because each of the private- and public-interest factors weighs against dismissal.

1. *The Piazza Defendants Have Not Shown That the Private-Interest Factors Clearly Point Toward Dismissal.*

The private-interest factors include (a) the relative ease of access to sources of proof; (b) availability of compulsory process for compelling attendance of witnesses; (c) cost of obtaining attendance of willing nonparty witnesses; (d) possibility of a view of the premises, if appropriate; and (e) all other practical problems that make trial of the case easy, expeditious, and inexpensive. *Piper*, 454 U.S. at 241 n.6. As to witnesses and documents, the Piazza Defendants strain to highlight as many connections to foreign jurisdictions as possible (many of them of tenuous relevance, if any), in the process wholly ignoring *all* of the extensive U.S. connections. To start, they ignore that all of Gramercy's witnesses and documents are located in the United States. Compl. ¶¶ 13-14.

The Piazza Defendants also ignore that the majority of Defendants are based in Wyoming:

- Piazza is a United States citizen who lives in Cody, Wyoming. He has "deep ties and property interests in Wyoming." He operates several companies based in Wyoming. One of those companies is Defendant SP Capital, which Piazza runs from offices in Wyoming. *Id.* ¶¶ 8, 17, 19.

- SP Capital is a Wyoming LLC that Piazza runs out of offices in Wyoming. SP Capital's principal office is in Afton, Wyoming. SP Capital's registered agent is a Wyoming LLC with its principal place of business in Cody, Wyoming. There are at least seven Wyoming LLCs that operate under the umbrella of SP Capital. Because SP Capital is based in Wyoming, relevant documents and correspondence within SP Capital's possession, custody, or control are likely available in Wyoming. *Id.* ¶¶ 8, 19.

- Like SP Capital, TNA is also a Wyoming LLC. Its principal place of business is in Jackson, Wyoming. Its registered agent is based in Cody, Wyoming. And from November 2019 through at least May 2020, at least 100 subsidiaries of ULF were transferred to TNA in Wyoming. And just like SP Capital, because TNA is based in Wyoming, relevant documents and correspondence in TNA's possession, custody, or control are likely available in Wyoming. *Id.* ¶¶ 20, 139.

As to Yaremenko, although it is presently unknown to what extent he lives or works in Wyoming, the Complaint alleges deep ties to Wyoming. He is the chief legal advisor of SP

Advisors, a Wyoming-based company, "which is the registered trade name of SP Capital and also refers to the group of SP Capital subsidiaries through which it operates." Yaremenko was directly involved in establishing SP Advisors, is responsible for SP Advisor's operations, and provides legal support to SP Advisors. He is the chief operating officer and a partner of SP Capital. *Id*. ¶¶ 17-18. He also helped organize TNA in Wyoming and signs its annual statements. *Id*. ¶ 84.

Given the Piazza Defendants' deep ties to Wyoming, it is hard to take their argument seriously that it would be more convenient for them to litigate this dispute half a world away in London rather than in their own backyard in Wyoming. Even as to Bakhmatyuk and Yaremenko, neither of them live in England. Thus, none of the private-interest factors point to England; they all point decisively to the fact that this Court is the most appropriate forum.[11]

>    2.    *The Piazza Defendants Have Not Shown That the Public-Interest Factors Clearly Point Toward Dismissal.*

The public-interest factors include (a) administrative difficulties of courts with congested dockets; (b) the burden of jury duty on members of the community with no connection to the litigation; (c) the local interest in having localized controversies decided at home; and (d) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947).

As to the first factor, the Piazza Defendants offer no evidence or argument about congestion in the Court's docket, nor do they contend that an arbitration in London would move faster than this case. Instead, they mainly contend that Ukrainian courts would not enforce the Court's

---

[11] Also, as the Piazza Defendants recognize—and the experience of courts around the country during the pandemic bears out—alternative arrangements exist, such as live testimony by videoconference or deposition testimony in lieu of live testimony, although there is no reason to believe that these alternatives would be necessary here. *See* Mot. at 31 n.17.

judgment. Mot. at 33. Why that matters is anyone's guess. After all, any judgment against Piazza, SP Capital, and TNA could be enforced in Wyoming, because they reside in, are incorporated in, and are headquartered in Wyoming. And a judgment against Bakhmatyuk could be enforced against him in either Cyprus or Austria. *See* Compl. ¶ 16. The Piazza Defendants are therefore mistaken to suggest that there is a risk that the Court would expend resources on this case only to issue a judgment that cannot be enforced.

The Piazza Defendants are similarly misguided on the next three public-interest factors. The contention that "Gramercy grasps at straws to try to find a connection to the state[,]" blinks reality. Mot. at 33. Unlike *Gas Sensing Technology*, which Piazza Defendants rely on, Mot. at 33–34, this case would not burden a Wyoming jury with a case having little to do with Wyoming. Far from it. This case's connections to Wyoming run deep and are central to the dispute. Piazza, SP Capital, and TNA are all Wyoming-based defendants. A key feature of this dispute is how the Piazza Defendants abused the protections afforded by Wyoming law by setting up shell entities in Wyoming that received fraudulent and tortious asset transfers worth hundreds of millions of dollars. And as explained above, Wyoming law governs Gramercy's state-law claims. *See supra* p. 29. Wyoming thus has a compelling interest in resolving a dispute with deep connections to the state, involving Wyoming-based defendants accused of abusing Wyoming's legal framework, and governed by Wyoming law.

## V. GRAMERCY'S DETAILED ALLEGATIONS SATISFY ALL RICO REQUIREMENTS.

### A. Gramercy Has Alleged Substantial Predicate Acts In the United States.

The Piazza Defendants make much of the fact that "RICO does not apply extraterritorially." Mot. at 35. Their argument rests on the false premise that "[t]he conduct Gramercy relies on in alleging violations of all three predicates occurred outside the United States,

with a focus on securities issued outside the United States." *Id.* at 37. However, the threshold question of whether RICO applies extraterritorially is irrelevant here, because Gramercy has alleged substantial domestic conduct. As one of the predicate acts of wire fraud, Gramercy alleges that Piazza (a Wyoming resident) and Yaremenko (COO of SP Capital in Wyoming) formed TNA (a Wyoming entity) as a repository for transfers of Company assets, which they helped orchestrate through U.S. wires. *See* Compl. ¶¶ 138-144, 178. Not only that, but with only a few exceptions, *all* of the predicate acts Gramercy alleges involve U.S. mail or wires or inducements to travel from the U.S. *Id.* ¶¶ 178, 180. These facts are plainly distinguishable from *RJR Nabisco*, for example, which involved "a scheme in which Colombian and Russian drug traffickers smuggled narcotics into Europe and sold the drugs for euros that . . . were used to pay for large shipments of RJR cigarettes into Europe." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 332 (2016).[12]

Even if Gramercy had not alleged asset transfers into TNA in Wyoming, which Gramercy alleges involved acts of mail and wire fraud *within the U.S.*,[13] Gramercy's other allegations support a finding under "step two" of the *RJR Nabisco* analysis because "the case involves a domestic application" of the mail-and-wire-fraud and fraudulent-inducement-to-travel statutes. *See* 579 U.S. at 337. Courts have found that "a claim predicated on mail or wire fraud involves sufficient domestic conduct" for *RJR Nabisco*'s step-two analysis if two conditions are present: "(1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of

---

[12] The Piazza Defendants also cite *Nuevos Destinos, LLC v. Peck*, No. 3:19-CV-00045, 2019 WL 6481441, at *21 (D.N.D. Dec. 2, 2019), where the court found that the scheme was hatched in Peru and "[t]he conduct underlying the predicate acts also occurred abroad."

[13] The Piazza Defendants seem to assume that the TNA Transfers took place entirely in Europe, but that ignores Gramercy's allegation that they were effectuated "through the use of wires between Austria, Cyprus, Ukraine and Wyoming" (Compl. ¶ 178), and omissions of material facts aimed at Gramercy in the U.S. (*id.* ¶ 182). It also ignores that the transfers were made to TNA, a Wyoming company the Piazza Defendants formed for this specific purpose.

the mail or wires was a core component of the scheme to defraud." *Bascuñán v. Elsaca*, 927 F.3d

108, 122 (2d Cir. 2019). Applying this standard, courts have repeatedly found that RICO claims

predicated on mail and wire fraud involve sufficient domestic conduct to survive dismissal.[14] As

alleged in the Complaint, Defendants' use of domestic mail and wires to send emails and letters,

and inducements to interstate travel from the U.S. for meetings, were a core component of their

campaign of misinformation directed at Gramercy, which they knew was located in the United

States, including: the transmission *to Gramercy in Connecticut* of the First Concorde Report from

Ukraine that "falsely represented that the Company was in a worse financial situation than it

actually was"; various emails and telephone calls from Piazza and/or other Bakhmatyuk allies

(including Petrashko and Kovtok) making false representations concerning various debt purchases

and the Company's financial situation; and the Second Concorde Report from Ukraine containing

"incongruously negative financial information" and falsely certifying the "independence" of the

EY Report. Compl. ¶ 178. Gramercy also alleges multiple instances where Gramercy's employees

were induced to travel from the U.S. to Europe for meetings with Bakhmatyuk and others acting

on his behalf in furtherance of the scheme, or even had meetings in the U.S. *Id.* ¶¶ 114, 180. The

use of U.S. mail and wires and inducements of Gramercy employees to travel interstate were "a

core component" of phases 1 and 2 of the alleged scheme. *Id.* ¶¶ 178-180.

---

[14] *See id.* at 123 (emphasizing that an overly narrow reading of RICO's extraterritorial reach "would effectively immunize offshore fraudsters from mail or wire fraud", and holding "[t]he SAC supports a reasonable inference that the repeated use of domestic mail and wires to fraudulently order a domestic bank to transfer millions of dollars out of a domestic account was a core component of the alleged scheme to defraud."); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 191 (S.D.N.Y. 2018) ("[A]lthough the conduct involved . . . is alleged to have taken place outside of the United States, the Court is not now in a position to dismiss plaintiffs' RICO claims as extraterritorial" because "Defendants' alleged scheme at least plausibly was directed at the United States, and the amended complaint therefore states a plausible domestic RICO claim.").

### B. Gramercy's Claims Would Not Be Actionable Under the Securities Laws and Are Not Barred By the PSLRA.

The Piazza Defendants' contention that the PSLRA bars Gramercy's RICO claims fails for a simple reason: the conduct forming the basis of Gramercy's claims is not actionable as fraud in the purchase or sale of securities. In 1995, the PSLRA amended the RICO statute by including the language, "except that no person may rely upon any conduct that would have been actionable as fraud *in the purchase or sale of securities* to establish a violation of section 1962." Pub. L. No. 104–67 § 107 (emphasis added).

The cases cited by the Piazza Defendants all involve precisely the type of claims the PSLRA amendment to RICO was designed to bar—that is, securities-fraud claims masquerading as RICO claims. For example, the Piazza Defendants rely primarily on *Bixler,* where the court began its analysis by citing other decisions dismissing RICO claims under the PSLRA, emphasizing that in those cases, the RICO claims alleged "fraud in connection with the sale of securities" and "a Ponzi scheme that was accomplished by the purchase and sale of securities," respectively. 596 F.3d at 759. The Court went on to note that "section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, are directed at fraud 'in connection with the purchase or sale' of securities." *Id.* Applying that framework, the Court found that the plaintiffs' "allegations that defendants defrauded them from receiving UKL stock as provided in the transaction . . . describe a 'purchase' and 'sale' of securities." *Id.* at 760.[15] The Piazza Defendants also rely on *Braverman v. LPL Fin. Corp.*, which

---

[15] The plaintiffs were minority shareholders of a uranium mining company, METCO, who alleged that the defendants (directors and majority shareholders of METCO) negotiated a trade of METCO's uranium mining claims to subsidiaries of defendant UKL, an Australian corporation, pursuant to which METCO would receive $6.5 million and stock in UKL, and that the UKL stock would in turn "be distributed among the METCO shareholders" including plaintiffs "on a pro rata basis." *Id.* at *754-755. UKL allegedly abandoned the agreement and never paid the money or stock to UKL, and the plaintiffs alleged in their RICO lawsuit that "defendants defrauded them of

likewise directly involved the purchase of securities. No. CV 11-0009 RB-LFG, 2011 WL 13289787, at *1 (D.N.M. Apr. 21, 2011) (plaintiff's claims that the defendant fraudulently induced the purchase of stock at an inflated price were barred by the PSLRA).

Contrary to the Piazza Defendants' contention that Gramercy has resorted to "artful pleading," Mot. at 40, the facts underpinning Gramercy's claims do not in any way involve the purchase or sale of securities. To the contrary, all three phases of Defendants' scheme began years after Gramercy began acquiring Company debt in 2011 and had amassed substantial holdings exceeding 25% of all outstanding Notes. *See* Compl. ¶ 46; *see id.* n.3. And even to the extent Gramercy acquired additional debt in 2017 unknowingly after the scheme's onset, Gramercy's allegations are not based on any fraud concerning those transactions.[16] That the scheme involves Gramercy's Notes, and that the Complaint contains allegations regarding misconduct by Defendants in connection the acquisition of debt from *other* creditors, is of no moment. The PSLRA does *not* bar all RICO claims that in any way involve securities transactions; it bars only RICO claims that would be actionable as securities fraud. *See Petters Co. v. Stayhealthy, Inc.*, No. CIV.03-3210 JRT/FLN, 2004 WL 1465830, at *3 (D. Minn. June 1, 2004) (requiring a "connection between the securities transaction and the misrepresentation").[17]

---

their share of the UKL stock and rendered their METCO investment virtually worthless." *Id.* at *755.

[16] *See Mezzonen, S.A. v. Wright*, No. 97 CIV. 9380 LMM, 1999 WL 1037866, at *4 (S.D.N.Y. Nov. 16, 1999) (plaintiff's claims concerning "post-investment fraud" that may have induced plaintiff to continue holding securities are not actionable under securities laws).

[17] Moreover, even if the Complaint were construed to include ancillary allegations of fraud in connection with purchases or sales of *other creditors'* notes, that would not save the Piazza Defendants' argument, because Gramercy has not alleged that any other creditors bought or sold their debt positions in reliance on the misrepresentations or omissions directed at Gramercy. *See Johnson v. KB Home*, 720 F. Supp. 2d 1109, 1117 (D. Ariz. 2010) (finding that there were no allegations that the investors who purchased securities did so in reliance on the deceptive acts, and thus the conduct would not be actionable under the securities laws).

Gramercy's claims are not actionable under the securities laws and thus are not barred by the PSLRA. *See Marani v. Cramer*, No. 19-CV-05538-YGR, 2021 WL 5865517, at *5 (N.D. Cal. Dec. 10, 2021).

**C.** **Gramercy's Detailed Allegations of an Extensive, Multi-Year Scheme Easily Plead Facts From Which a Jury Could Infer a Pattern of Racketeering Activity.**

The Piazza Defendants challenge only one of the four elements of a RICO claim under 18 U.S.C. § 1962 – whether the Complaint adequately pleads a pattern of racketeering activity. Even as to this single element, however, the Piazza Defendants do not dispute that Gramercy has alleged at least two predicate acts—all that is required under the RICO statute. *See* Mot. at 40-42; 18 U.S.C. § 1961 ("'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."). Indeed, Gramercy has alleged at least nine instances of mail or wire fraud spanning 2016 to 2021 (Compl. ¶ 178), and at least five instances of inducement to interstate travel spanning 2017 to 2019. *Id.* ¶ 180. Rather, they focus only on RICO's continuity requirement.

The Piazza Defendants' argument hinges on its mischaracterization of the Complaint as alleging a "closed-ended series of predicate acts constituting a single scheme." Mot. at 41 (internal quotations omitted). This is a mischaracterization on several levels. As an initial matter, Gramercy in fact alleges both a closed-ended scheme *and an open-ended scheme*. *See, e.g.*, *Hansen v. Native Am. Refinery Co.*, No. 2:06CV00109, 2007 WL 1108776, at *4 (D. Utah Apr. 10, 2007) ("A

plaintiff may satisfy the continuity requirement either through a showing of closed or open-ended continuity" and "[i]n this case, under either approach, the plaintiffs' allegations are sufficient").[18]

Open-ended continuity may be established "when the predicate acts themselves evidence a danger of future repetition, or when a plaintiff can sufficiently establish that the predicate acts are part of an entity's regular way of conducting its ongoing legitimate business or its RICO enterprise." *Hansen*, 2007 WL 1108776, at *6. In *Hansen*, for example, the court was satisfied by plaintiffs' allegation that defendants had "continued their fraudulent practices up to the time of the filing of the plaintiffs' second amended complaint[,]" and also recognized that allegations that those orchestrating the scheme were principals of various business entities involved in the scheme "could support a finding that the defendants' wrongful actions constituted their regular way of doing business." *Id.* at *7.

Here, Gramercy has explicitly alleged the continuing nature of Defendants' scheme based on Defendants' very recently initiated efforts to transfer and shelter Company assets in Wyoming and Cyprus.[19] Furthermore, Gramercy has alleged Defendants' history of surreptitious, fraudulent financial transactions that evidence this was Defendants' "regular way of doing business", beginning with Bakhmatyuk's alleged embezzlement in connection with a 2014 loan to a bank he owned (Compl. ¶ 59); his transfer of personal assets to his children as a "gift" after fleeing to

---

[18] *See also Resol. Tr. Corp. v. Stone*, 998 F.2d 1534, 1545 (10th Cir. 1993) ("even if the evidence were insufficient to establish close-ended continuity, there would nevertheless be sufficient evidence to establish open-ended continuity").

[19] *See, e.g.,* Compl. ¶ 170 ("Bakhmatyuk has continued to treat the Company's assets like a shell game . . . . There remains considerable risk that Bakhmatyuk will continue to move any remaining assets of the Company to another set of shell companies . . . ."); *id.* ("there remains a real risk that SP Advisors will continue to transfer the Company's assets in order to keep them out of Gramercy's reach"; *id.* ¶ 172 ("This conduct involves a threat of repetition because the Count 1 Defendants will continue to shift the assets further out of reach and use misrepresentations and fraud to conceal any such transfers and to frustrate Gramercy's legal and economic rights.").

Austria (*id.* ¶ 64); the Piazza Defendants' long affiliation with Bakhmatyuk and aid in connection

with the alleged scheme over a multiple-year period, including in a manner consistent with their

advertised business plan of hiding assets (*id.* ¶ 170); the asset transfers to the Cypriot entity

Maltofex beginning in February 2019 (*id.* ¶ 124); and the subsequent asset transfers to TNA

beginning in November 2019, with respect to which Gramercy specifically alleges a risk of

continuing transfers (*id.* ¶¶ 138, 170).   Courts routinely have held lesser allegations sufficient.

*See, e.g.*, *Resol. Tr. Corp.*, 998 F.2d at 1545 ( "the jury could have inferred that [defendants] would

have continued to" engage in the deceptive loans "for as long as" there was demand for them).

Moreover, the Complaint amply alleges facts supporting a finding of closed-ended

continuity.  The Piazza Defendants begin with the myth that a "single" scheme is not actionable

under RICO.  That is simply wrong.  Indeed, several of the cases the Piazza Defendants cite on

this account were decided before the United States Supreme Court rejected the interpretation that

RICO's pattern requirement was not satisfied by predicate acts which all occurred within a single

illegal scheme.  *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989) ("it

is implausible to suppose that Congress thought continuity might be shown only by proof of

multiple schemes.").[20]

The Piazza Defendants also rely on clearly inapposite cases involving fraud in connection

with a single merger or securities transaction or a small number of connected transactions in a

condensed period of time.[21]  But Gramercy is not alleging fraud in connection with its purchase of

---

[20] *See also Hansen*, 2007 WL 1108776, at *4 ("even if all the predicate acts the plaintiffs alleged occurred in furtherance of a single scheme, such allegations may be sufficient to establish a RICO claim"); *Resol. Tr. Corp.,* 998 F.2d at 1544 ("a single fraudulent scheme can give rise to RICO liability").

[21] *See Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1555 (10th Cir. 1992) (fraud in connection with a merger over an approximately one-year period); *Sullivan v. Boettcher & Co.*, 714 F. Supp. 1132, 1135 (D. Colo. 1989) (fraud in connection with purchase of bonds in 1983);

the Notes, nor do its claims arise out of one transaction or a discrete set of transactions of limited duration or extensiveness. Rather, Gramercy alleges an extensive multi-phased scheme, occurring over a period of at least five years, s*ee* Compl. ¶¶ 72-76, 178, which far exceeds the duration of schemes that have been held to satisfy the continuity requirement. *See Hansen,* 2007 WL 1108776, at *5 ("predicate acts occurring between June 2003 and January 2004" were sufficient for continuity); *see also Resol. Tr. Corp.,* 998 F.2d at 1544 (evidence from which "jury could infer that the scheme lasted from seven or eight months to . . . as many as eighteen months" was sufficient for continuity).

As to the extensiveness factors, Gramercy meets all of them.[22] Gramercy has alleged at least *fourteen* racketeering acts, involving various emails, letters, and inducements to travel. Gramercy also alleges a variety of distinct injuries, including the evisceration of its rights to block a restructuring and impairment of its enforcement rights, economic damages as a result of lost opportunities to sell or otherwise dispose of the assets, and sunk travel and investigation costs. *See* Compl. ¶¶ 182-184. The complexity of the scheme is self-evident, as it involved (among other things) an alliance to orchestrate a scheme in multiple jurisdictions through market misinformation, multiple complex debt purchases and two sets of asset transfers involving over a billion dollars. And while Gramercy was the sole target of the scheme because, as it alleges, it had the blocking rights and Bakhmatyuk himself regarded it as the only unsecured creditor of concern,

<hr>

*Kaplan v. Reed*, 28 F. Supp. 2d 1191, 1198 (D. Colo. 1998) (fraudulent transactions orchestrated by one individual for the purpose of defrauding his creditors); *Bixler*, 596 F.3d at 755 (fraud in connection with a stock transaction); *Torwest DBC, Inc. v. Dick*, 810 F.2d 925, 929 (10th Cir. 1987) (fraud in connection with real estate transaction).

[22] Courts have identified the following relevant factors: "the number of the racketeering acts," "the variety of racketeering acts," "whether the injuries caused were distinct," "the complexity and size of the scheme," "the number of victims," "and the nature or character of the enterprise or unlawful activity." *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1543-44 (10th Cir. 2016).

other debtors and stakeholders also may be victims of the scheme and, in any case, there is no multiple-victim requirement.[23] Compl. ¶¶ 2, 50. *See Hansen*, 2007 WL 1108776, at *6 (although plaintiffs claim that they were the "direct victims," they also "refer to creditors of the transferred entities as victims"); *100 Mount Holly Bypass v. Axos Bank*, No. 2:20-cv-00856, 2021 WL 3172024, at *12 (D. Utah July 27, 2021) (rejecting single-victim argument as applying "an inappropriate standard"). Courts have found far less extensive schemes sufficient. *See, e.g., CGC Holding Co., LLC*, 974 F.3d at 1212 (involving loan scheme orchestrated by one individual with assistance of two immediate family members).

Finally, in the event there were any doubts that Gramercy adequately alleges RICO continuity, the Tenth Circuit has held that "[w]hether a pattern exists is a question of fact for the jury to determine" and the court's role is to determine if "there is sufficient evidence to support the jury's finding." *Resol. Tr. Corp.*, 998 F.2d at 1543-45; *see also In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1320 (D. Kan. 2018). Applying that standard, Gramercy's allegations are more than enough to satisfy the pattern requirement at this stage.

### D. Gramercy's Damages Satisfy RICO's Standing Requirement.

The Piazza Defendants claim that "Gramercy has not stated cognizable RICO damages," and seeks "speculative" damages, because it "could still recover on its Notes" and thus "has not shown that it has exhausted contractual or other legal remedies." Mot. at 42 (internal quotations omitted). Their entire argument is that if Gramercy were to "recover on its Notes under the process agreed to with their issuance" – namely, through an enforcement action brought by the Trustee

---

[23] The victims exclude, among others, those who acquired their position as a result of the scheme in non-arms'-length transactions, including, most notably, Bakhmatyuk and the Piazza Defendants themselves.

pursuant to the Trust Deeds – then Gramercy "would benefit" and "any injury would decrease." *Id.*[24]  Yet again, the Piazza Defendants' argument hinges on the fallacy that Gramercy can pursue contractual remedies for the alleged misconduct by third parties.  They cannot.

The principal cases the Piazza Defendants rely on to support their position are inapposite. *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56 (2d Cir. 1998) concerns the accrual of claims for purposes of the statute of limitations (not whether there were cognizable RICO damages), and *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) involved antitrust (not RICO) claims.  The remaining cases they cite involve the dismissal of RICO claims based on narrow circumstances not present here.  In *Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*, lenders sought to recover the value of a loan through one lawsuit while, simultaneously, a litigation trust sought to recover on the *same loan against the same defendants*.  347 F. App'x 711, 713 (2d Cir. 2009) (the lenders "acknowledge[d] the possibility of some recovery through the bankruptcy proceedings").[25]  In *First Nationwide Bank v. Gelt Funding Corp.*, the plaintiff alleged it was fraudulently induced to make a collateralized, nonrecourse loan, where it was "confined to recourse against the collateral property" and gave up "its right to sue the borrower personally upon default." 27 F.3d 763, 766-769 (2d Cir. 1994).

---

[24] The Piazza Defendants also contend that "Gramercy was on inquiry notice in early 2015" of its injury, and note their intention to "pursue an early summary judgment motion on statute of limitations grounds."  Mot. n.20.  Such a motion would be meritless.  "A civil RICO injury means harm *from the predicate acts* that constitute racketeering." *Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1234 (10th Cir. 2006) (emphasis added).  Here, all of the predicate acts took place between 2016 and 2021.  Thus, the injuries arising from these predicate acts could not have been felt until 2016, at the earliest.

[25] A brief submitted by one Defendant-Appellee states that "The Plan and disclosure statement contemplate that the Trustee will commence litigation against third parties, including [Defendants-Appellees] WCM and BDO, and that any recoveries from such actions will be shared with plaintiffs."  Brief for Defendant-Appellee Wachovia Capital Markets, LLC at *7, *Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*, 347 F. App'x 711 (2d Cir. 2009) (No. 08-4692-CV)

Multiple courts have recognized this line of Second Circuit authority is limited to the distinct facts not present here and does *not* establish that exhaustion of legal remedies is a prerequisite for RICO claims, as the Piazza Defendants suggest. For example, in *Town of Islip v. Datre*, the court found that those cases "involved situations where the amount of damages suffered was directly dependent on either a separate, ongoing proceeding . . . or a debt recoverable via foreclosure" and that "[n]one of them stand for the broad principle that, before bringing a RICO claim, all plaintiffs must exhaust every alternative means of recovery." 245 F. Supp. 3d 397, 409–10 (E.D.N.Y. 2017). In *Banco Intercontinental, S.A. v. Alvarez Renta*, the court rejected the application of *First Nationwide* because, unlike that case, "these loans did not have collateral for the Plaintiff to foreclose upon," and also rejected the notion that plaintiff was "required to seek recovery from every other person or entity suspected of defrauding it before it may seek recovery from Defendants," because that "would allow every person or entity accused of fraud to argue no recovery could be had against them or it until claims had been pursued against everyone." No. 04-20727-CIV, 2005 WL 8168717, at *3 (S.D. Fla. Aug. 23, 2005)

Indeed, the Tenth Circuit and district courts within it have held that the possibility of other avenues of recovery does not bar RICO claims. For example, in *Deck v. Engineered Laminates*, the court expressly held that where, as here, it is alleged that the defendant's misconduct caused the plaintiff to forego contractual remedies until after assets have been dissipated, such allegations are sufficient to state a cognizable RICO injury. 349 F.3d 1253, 1259-60 (10th Cir. 2003). The court also squarely rejected the argument that the claim was not ripe because there was no judgment on the contract claim. *Id.* at 1260. Instead, the court held that because the plaintiff had alleged other, non-contractual damages – and the injury was therefore "not dependent on the Plaintiff's being unable to recover fully on his contract claim" – "Plaintiff's RICO claim is ripe,

even though some alleged damages may be too speculative to recover before the contract claim is resolved." *Id.*[26]

Unlike the cases the Piazza Defendants cite, there is no parallel contract action here (nor could there be), and Gramercy is an unsecured creditor. Compl. ¶ 50. Gramercy alleges that Defendants' scheme "rendered Gramercy's rights to enforce the Notes worthless, as the Company was left with little to no assets to enforce against," including because "ownership of most of the Surety Providers" was transferred so that they "were no longer held directly by ULF[,]" *Id.* ¶¶ 76, 171 (emphasis added), and Gramercy seeks damages that are not recoverable in an enforcement action under the Notes, much less against the Defendants who are all non-parties to the agreements. *See supra* § II(B), p. 21. At most, the Piazza Defendants speculation about the remote possibility of duplicative recovery is an issue for consideration, if ever, at the damages phase of this case, but not one that supports dismissal.[27]

**E.      Gramercy's Allegations Concerning the Piazza Defendants' Participation In the Fraudulent Scheme Satisfy the Rule 9(b) Standard.**

The Piazza Defendants do not contend Gramercy has failed to adequately allege predicate acts. *See* Compl. ¶¶ 178 and 180. Rather, they argue Gramercy "has failed to plead with particularity *that any of the Moving Defendants committed predicate acts* under RICO or were

---

[26] *See also Trejo v. Xclusive Staffing, Inc.*, No. 17-CV-01602-RM-MJW, 2018 WL 4372724, at *4 (D. Colo. May 16, 2018) (rejecting contention that plaintiff is "required to exhaust all other civil remedies against a defendant before bringing a RICO claim"); *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 888-891 (10th Cir. 2017) ("whether the Reillys might have pursued separate nuisance claims is irrelevant to whether their § 1964(c) claims are viable" and rejecting the "unsupported announcement that a plaintiff must plead a 'concrete financial loss' to maintain a RICO claim for an injury to her property . . . [because] those words do not appear in § 1964(c).").

[27] *See Imperial Cap. Bank v. Sussex Grp.*, LLC, No. CIV--09-0483-F, 2009 WL 2497326, at *4 (W.D. Okla. Aug. 17, 2009).

involved in a conspiracy." Mot. at 44 (emphasis added). This ignores a litany of detailed allegations concerning each Defendant.

Beginning with Yaremenko, the Piazza Defendants contend Gramercy has done "nothing to explain Yaremenko's involvement in this alleged scheme," because "[t]here are no allegations that Yaremenko even had a single conversation with Gramercy" and Gramercy is "rely[ing] solely on Yaremenko's professional affiliations with SP Advisors and TNA." Mot. at 44-45. Once again, they ignore the TNA Transfers. Gramercy alleges that Yaremenko was "involved in establishing TNA in order to facilitate the transfers of Company assets to Wyoming dummy companies," and in managing TNA. Compl. ¶¶ 20, 170. Gramercy also alleges that "[i]n every year" after the formation of TNA, "Yaremenko signed the annual reports for TNA in order to continue to obscure Bakhmatyuk's interest in TNA which assisted in the commission of the fraud." *Id.* ¶ 221. The Piazza Defendants' effort to downplay the significance of that allegation fails, given that the entire purpose of forming TNA was to serve as a repository for the TNA Transfers; thus, the allegation that Yaremenko signed TNA's annual statements demonstrates his involvement in a critical component of Defendants' scheme. Moreover, Gramercy alleges that Yaremenko was involved in conceiving the plan to transfer Company assets to shell companies, agreeing with Bakhmatyuk and the other Defendants on this plan, and was "closely involved in SP Advisors'" efforts to facilitate the scheme, as SP Advisors served as Piazza's and Yaremenko's vehicle to effectuate various aspects of the scheme. *See id*. ¶¶ 170, 202, 221.

The assertion that Gramercy failed "to allege more than two isolated incidents of contact with Piazza" likewise ignores Piazza's critical role in all three phases of Defendants' scheme. Mot. at 5. Gramercy has alleged Piazza's personal involvement in multiple predicate acts of mail or wire fraud in furtherance of Defendants' misinformation campaign and straw purchases. *See, e.g.*,

Compl. ¶ 178. The Piazza Defendants also ignore Gramercy's allegation that "Piazza on behalf of Bakhmatyuk, surreptitiously purchased debt held by other creditors, including Ashmore, and held that debt on behalf of Bakhmatyuk." *Id.* ¶ 170. And once again, they ignore the TNA Transfers, including Gramercy's allegations that "Piazza created and held TNA as a nominal owner for Bakhmatyuk, so that Bakhmatyuk could shelter Company assets in Wyoming entities, out of Gramercy's reach." *Id.*

The Piazza Defendants also claim "Gramercy does not plead any instances of direct interaction between itself and SP Capital or TNA." Mot. at 46. That is beside the point, given that this is a RICO case, not a securities-fraud case. And in any event, Gramercy has alleged multiple instances of contact, including multiple telephone calls, between Piazza (acting on behalf of SP Capital and Bakhmatyuk) and Gramercy. *See* Compl. ¶170, 178. The Piazza Defendants' focus, once again, on the limited "interaction" directly between Gramercy and the Defendants is a red herring. The Complaint alleges SP Capital's and TNA's direct involvement in the scheme. *See* Compl. ¶ 102 (SP Capital's involvement in Ashmore Debt Purchase); *id.* ¶ 170 (SP Advisors' involvement in TNA Transfers and formation of TNA); *id.* (describing TNA as the corporate vehicle formed to receive and currently holding Company assets in Wyoming).

Finally, the Piazza Defendants' Rule 9(b) arguments ignore that Gramercy also asserted a RICO conspiracy claim under 18 U.S.C. § 1962(d). It is not necessary "to prove that each defendant personally committed two predicate acts to prove a RICO conspiracy." *United States v. Kamahele*, 748 F.3d 984, 1006 (10th Cir. 2014). "To prevail under Section 1962(d), plaintiffs must prove that each defendant conspired to commit the substantive RICO offense, in that each defendant agreed to commission of the predicate acts and was aware that others had done likewise." *Shepard v. DineEquity, Inc.*, No. CIV.A. 08-2416-KHV, 2009 WL 8518288, at *9

(D. Kan. Sept. 25, 2009). Thus, even if the Court were to determine that Gramercy has not satisfied the "pattern" requirement as to any particular Defendant, that Defendant nonetheless is liable under § 1962(d).

The Piazza Defendants' cursory argument that the Court "dismiss Gramercy's state law claims . . . for the same reasons" should be rejected. *See* Mot. at 46-47.[28] Apart from their baseless arguments as to the particularity requirement under Rule 9(b), the Piazza Defendants do not otherwise assert that Gramercy failed to allege the elements of its state law causes of action, many of which need not be alleged with particularity. *Id.*[29]

## VI.  YAREMENKO IS SUBJECT TO PERSONAL JURISDICTION IN WYOMING.

The Piazza Defendants contend that the only contact Gramercy alleges between Yaremenko and Wyoming is that Yaremenko signs the annual statements for TNA, a Wyoming-based company. Mot. at 48-49. (quoting Complaint). While these contacts alone support specific jurisdiction, Gramercy has pleaded a lot more than that. Gramercy alleges that Yaremenko is a "founding partner" and the Chief Operating Officer of SP Capital, a Wyoming LLC with its principal office in Afton, Wyoming that openly advertises (through Piazza and Yaremenko) its

---

[28] As the Piazza Defendants acknowledge, the Court has discretion to retain jurisdiction over the remaining state law claims even if the RICO claims are dismissed. *See* Mot. at 47-48. Gramercy respectfully submits that retaining the state law claims would serve judicial economy in light of the substantial resources Gramercy has expended – including in connection with effectuating service on Bakhmatyuk in Austria in compliance with the Hague Service Convention – and the additional expenses that Gramercy will incur prior to a decision on the Motion. *See Parker v. Town of Chelsea*, 620 F.Supp.2d 1266, 1271 (N.D. Okla. 2008) ("a federal court justifiably may retain jurisdiction of pendent [state law] claims if substantial time and energy has been expended on the case prior to disposition of the federal claims[,] particularly when the complaint does not present 'novel or unsettled questions of [state] law.'") (internal citation omitted).

[29] As to the tortious interference claim, the Piazza Defendants claim that Gramercy failed to demonstrate "how the transfers were unlawful, much less the role Piazza or either of the two entity Defendants played." *Id.* at 47. As set forth above, Piazza's role is set forth with particularity, and Gramercy alleged that the transfers were alleged to have been for no consideration, for no proper purpose, and to frustrate Gramercy's rights. Compl. ¶¶ 138-144.

expertise in shielding the assets of wealthy European businesspersons, like Bakhmatyuk, through the use of Wyoming shell companies. Compl. ¶¶ 18-19, 34. What's more, Gramercy alleges Yaremenko's role with respect to the formation and operation of TNA, alleging he "was involved in establishing TNA *in order to facilitate the transfers of Company assets to Wyoming dummy companies*." *Id*. ¶ 170(4) (emphasis added); *id.* ¶¶ 20, 84. Gramercy also alleges Yaremenko's willing and knowing participation in the scheme, including the fraudulent and tortious TNA Transfers. *Id.* ¶¶ 10.c., 70, 84, 123, 138, 168, 170(4), 175, 202(3), 204, 221. The Court thus has personal jurisdiction over Yaremenko because Gramercy's claims against him arise out of his purported contacts with Wyoming.

The Piazza Defendants' assertion that "a court cannot exercise jurisdiction over an agent based on allegations of the company's wrongful act" is unavailing because Gramercy's allegations directly implicate Yaremenko. Mot. at 49. *See ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 764 (10th Cir. 2011) ("In the instant case, the record firmly establishes that [the corporate officer] participated in the wrongful activity, and thus the corporate shield doctrine has no applicability to him.").[30] And contrary to the Piazza Defendants conclusory assertion, the Court's exercise of personal jurisdiction over Yaremenko—the COO of at least one Wyoming-based business, with affiliations to others—in no way would violate principles of fair play and substantial justice. Mot. at 50.[31] *See* Compl. ¶ 18.

---

[30] *See also, Rusakiewicz v. Lowe,* 556 F.3d 1095, 1102–03 (10th Cir. 2009); *Hopkins AG Supply LLC v. First Mountain Bancorp*, No. CIV-12-1141-C, 2014 WL 12770215, at *2 (W.D. Okla. July 1, 2014); *Pharmacy Providers of Oklahoma, Inc. v. Q Pharmacy, Inc.*, No. CIV-12-1405-C, 2013 WL 1688921, at *3 (W.D. Okla. Apr. 18, 2013).

[31] The Piazza Defendants cite *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1232 (10th Cir. 2020), which is distinguishable because the Court found that the defendant did not have any "business dealings, property, or offices" in the forum.

In addition, the Complaint adequately pleads a basis for the Court to exercise conspiracy jurisdiction over Yaremenko. When a plaintiff "plead[s] with particularity a conspiracy and overt acts taken in furtherance of the conspiracy, a co-conspirator's contacts with the forum may be attributed to other conspirators for jurisdictional purposes." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Kozeny*, 115 F. Supp. 2d 1231, 1237 (D. Colo. 2000), *aff'd sub nom. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Kozeny*, 19 F. App'x 815 (10th Cir. 2001). The Piazza Defendants assert, in a conclusory manner, that Gramercy has not alleged "more than 'bare allegations' that a conspiracy existed.'" Mot. at 49. But that ignores the detailed and extensive allegations of a conspiracy among the Defendants, including Yaremenko and the Wyoming-based Defendants Piazza, SP Capital, and TNA, whose Wyoming contacts may be imputed to Yaremenko. *See* Compl. ¶¶ 200-206, 219-222; *see also Kozeny*, 115 F. Supp. 2d at 1237.

Finally, if the Court were to have doubts about personal jurisdiction over Yaremenko, jurisdictional discovery should be permitted. *See Health Grades, Inc. v. Decatur Mem'l Hosp.*, 190 F. App'x 586, 589 (10th Cir. 2006) ("a refusal to grant discovery constitutes an abuse of discretion if either the pertinent jurisdictional facts are controverted or a more satisfactory showing of the facts is necessary").

## CONCLUSION

For all the foregoing reasons, Gramercy respectfully requests that this Court deny the Piazza Defendants' Motion to Dismiss the Complaint.

Date: March 9, 2022                    Respectfully submitted,

BY: */s/Robert C. Jarosh*
   **ROBERT C. JAROSH, #6-3497**
   **BILLIE LM ADDLEMAN, #6-3690**
   **ERIN E. BERRY, #7-6063**
   Hirst Applegate, LLP
   P. O. Box 1083
   Cheyenne, WY 82003-1083
   Phone: (307) 632-0541
   Fax: (307) 632-4999
   rjarosh@hirstapplegate.com

   **RYAN M. PHILP (*admitted pro hac vice*)**
   **ALAN M. MENDELSOHN *(admitted pro hac vice)***
   Hogan Lovells US LLP
   390 Madison Avenue
   New York, New York 10017
   T. (212) 918-3000
   F. (212) 918-3100
   ryan.philp@hoganlovells.com

   **MARK D. GIBSON, #7-5495**
   Hogan Lovells US LLP
   1601 Wewatta Street, Suite 900
   Denver, CO 80202
   Phone: (303) 899 7300
   Fax: (303) 899 7333
   mark.gibson@hoganlovells.com

**CERTIFICATE OF SERVICE**

I certify the foregoing ***Plaintiffs' Opposition to Motion to Dismiss*** was served upon all counsel of record in this action pursuant to the Federal Rules of Civil Procedure on March 9, 2022, and that copies were served as follows:

By ECF to:

Bryson Campbell Smith
Paula Ann Fleck
HOLLAND & HART LLP
PO BOX 68
Jackson, WY 83001
307-734-4507
Email: bcsmith@hollandhart.com
      pfleck@hollandhart.com

W. Gordon Dobie
Emily N. Kath
WINSTON & STRAWN
35 West Wacker Drive
Chicago, IL 60601
312-558-5691
Email: wdobie@winston.com
      ekath@winston.com

Jeanifer E. Parsigian
WINSTON & STRAWN
101 California Street
Ste 35th Floor
San Francisco, CA 94111
415-591-1000
Fax: 415-591-1400
Email: jparsigian@winston.com

                                      s/Shannon M. Ward          
                                        OF HIRST APPLEGATE, LLP
                                        Attorneys for Plaintiffs