Jeffrey Pope, WY S.B. No. 7-4859
Bryson C. Smith, WY S.B. No. 7-6199
HOLLAND & HART LLP
645 South Cache Street, Suite 100
P.O. Box 68
Jackson, WY 83001-0068
Telephone: (307) 734-9741
Facsimile:  (307) 739-9744
jspope@hollandhart.com
bcsmith@hollandhart.com

Greg Goldberg
HOLLAND & HART LLP
557 17th Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295 - 8099
Facsimile:  (303) 668 - 7524
ggoldberg@hollandhart.com

W. Gordon Dobie (*Pro Hac Vice*)
Emily N. Kath (*Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Facsimile:  (312) 558-5700
wdobie@winston.com
ekath@winston.com

Jeanifer E. Parsigian (*Pro Hac Vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1469
Facsimile:  (415) 591-1000
jparsigian@winston.com

*Attorneys for Defendants Nicholas Piazza, SP Capital
Management, LLC, Oleksandr Yaremenko, TNA
Corporate Solutions, LLC, and Oleg Bakhmatyuk*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| Gramercy Distressed Opportunity Fund II, L.P., Gramercy Distressed Opportunity Fund III, L.P., Gramercy Distressed Opportunity Fund III-A, L.P., Gramercy Funds Management LLC, Gramercy EM Credit Total Return Fund, and Roehampton Partners LLC,<br><br>      Plaintiffs,<br><br>   vs.<br><br>Nicholas Piazza, SP Capital Management, LLC, Oleksandr Yaremenko, and TNA Corporate Solutions, LLC, and Oleg Bakhmatyuk<br><br>      Defendants. | Civil Action No. 0:21-cv-00223-NDF<br><br>Judge:  Hon. Kelly Rankin |

---

**DEFENDANTS NICHOLAS PIAZZA, SP CAPITAL MANAGEMENT, LLC, OLEKSANDR YAREMENKO, AND TNA CORPORATE SOLUTIONS, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Defendants Nicholas Piazza, SP Capital Management, LLC, Oleksandr Yaremenko, TNA Corporate Solutions, LLC ("Piazza Defendants") (collectively, the "Piazza Defendants") by and through their counsel, hereby answer the Complaint and asserts their Affirmative Defenses as follows. By answering the Complaint, Defendants Yaremenko does not concede this Court has personal jurisdiction over him and reserves all rights to a defense based on lack of personal jurisdiction.

## **INTRODUCTION**

Plaintiffs' Complaint is a fiction wrapped in a lie that depends upon a wildly false theory of $800 million being transferred to Wyoming. Stated simply –there is no $800 million that was transferred to Wyoming, and there is no fraud. To put an end to these false claims, Defendants have proposed hiring one of the 'Big Four' accounting firms (at defendants' expense) to confirm the validity and appropriateness of the transactions of which Plaintiffs complain. This, however, was rejected by Plaintiffs as they are so-called vulture investors[1] hoping to profit on losses suffered by two Ukraine-based companies in the midst of a war.

In actuality, Plaintiffs purchased unsecured notes offered by Ukrlandfarming (ULF) and Avangardco (AVG), and they did so with full knowledge of the high risks involved and the possibility of losing their investment. Of course, making high risk investments in distressed companies is Plaintiffs' business model. The Notes were offered with detailed information disclosing such risks in Prospectuses issued by the companies. Consistent with their high risk business strategy, Plaintiffs knowingly agreed to the terms offered, including: (1) to arbitration in

---

[1] Gramercy and its Distressed Opportunity Funds have been criticized by the United Nations for acting as a so-called "vulture fund." *See* United Nations Conference Report (2016) at 6-7, 13 (Vulture funds, like Gramercy "are not true investors but entities purchasing distressed debt in the secondary markets with the sole purpose to litigate").

London, England, under English law for "any dispute arising out of or connected with the Notes;" and (2) to ensure that all Noteholders are treated equally, "No Noteholder may proceed directly against the Issuer or any Surety Provider unless the Trustee,[2] having become bound so to proceed, fails to do so within a reasonable time and such failure is continuing."

Plaintiffs now ask this Court to ignore their own agreements—why?  In short, they hope a Wyoming court will help them jump the line ahead of secured creditors and other noteholders who are similarly situated (and who contractually protected by the Trustee process set forth in the agreements governing these unsecured notes).

But not only is there no $800 million transferred to Wyoming, there are huge losses suffered as a result of the Obligor companies (ULF and AVG) losing a significant part of their assets and property following the Russian invasion of Crimea and Eastern Ukraine in 2014. Indeed, ULF and AVG went from having $540+ million in profits to huge losses. Yet, Plaintiffs continued to buy more unsecured notes after the invasion began, and now consistent with their litigious modus operandi, Plaintiffs have brought suit in a United States court raising sensational theories of fraud or "racketeering." Its *first* theory is that Defendants conspired to *"overstate"* the companies' losses, which is not only bizarre but flatly contradicted by independently audited financials that confirm the companies' losses. Plaintiffs' *second* theory—that Defendants purportedly acted improperly by not buying Plaintiffs' Notes at the price that they wanted—fails to state a claim for violation of any appliable law (let alone racketeering). Tellingly, Plaintiffs do not point to a single term of the governing agreements that was breached by any alleged purchase or negotiation. With respect to Plaintiffs' *third* theory, it is blown out of the water by the following

---

[2] BNY Mellon Corporate Trustee Services, Ltd. for AVG and Deutsche Trustee Company for ULF serve as Trustees pursuant to a detailed prospectuses and offering by Citigroup Global Markets, Deutsche Bank, and others with KPMG financials and audit.

facts of which Plaintiffs are well aware:  (a) ULF and AVG defaulted on their obligations to holders of *secured* debt that is *senior* to the Notes Plaintiffs hold; (b) Defendant TNA Corporate Solutions, LLC, as the Security Agent for a $600 million secured loan facility, was obligated to take action execute on the corporate pledges[3] provided for by that facility to protect the senior *secured* creditors; (c) all Noteholders (including Gramercy) were apprised of that Loan Facility and associated risks in a 300+ page Prospectus before they invested in unsecured notes.

It bears emphasizing that while Plaintiffs purport to have suffered huge losses on their investments, Plaintiffs have failed to initiate *any claim – anywhere* against these large companies (AVG and ULF) which are the actual obligors on the Notes that they purchased.

## ANSWER

1.    Since at least 2016, Ukrainian oligarch Oleg Bakhmatyuk has perpetrated a complex, multi-faceted scheme in order to maintain control over his agricultural business, UkrLandFarming PLC ("ULF") and its subsidiary Avangardco IPL ("AVG," and together with ULF, the "Company"), so that he could exploit the Company's assets as his own personal war chest and frustrate Gramercy's right to recover on its Notes.

**ANSWER:    Denied.**

2.    Gramercy[4]—one of the largest creditors of the Company and the largest single noteholder—had blocking rights under the Notes that made it the only meaningful check on Bakhmatyuk's control. Bakhmatyuk became increasingly concerned about Gramercy's ability to disrupt his control of the Company when, in the wake of the annexation of Crimea and global decline in commodity prices, another Ukrainian agricultural company, Mriya Agro Holding ("Mriya"), was seized by its creditors, exposing widespread fraud and mismanagement.

**ANSWER:    The Piazza Defendants admit that Gramercy is an unsecured noteholder, subject to the binding terms of the Notes and Trust Deeds, including the arbitration clauses contained therein. The Note issuing companies, ULF and AVG, were highly successful companies that lost almost half of their business assets and value following the 2014 invasion of Crimea and devaluation of Ukrainian currency. As an unsecured**

---

[3] Any and all relevant acts took place in Ukraine and overseas (not in Wyoming), and were in accordance with the applicable loan documents and agreement governing a $600 million loan facility that existed before plaintiffs' investments.

[4] References herein to Gramercy's purchases and holdings refer to the collective holdings of the Gramercy Funds and accounts managed by Gramercy Management.

creditor, Gramercy stands behind numerous other secured creditors of these companies which have rights senior to plaintiffs-- a point ignored throughout their Complaint. Equally bad, Plaintiffs allege that Defendants intentionally caused them loss on their investments, yet Plaintiffs have failed to initiate any claim – anywhere against these large companies (AVG and ULF) which are the actual obligors on the Notes that they purchased. Defendants do not have sufficient information with which to admit or deny the remaining allegations including those relating to Mriya Agro Holding, and therefore deny the same. Defendants further aver that based on public information Plaintiffs are so-called 'vulture investors' Korganized in the Cayman Islands and managed out of Connecticut that purchased unsecured Notes in two Ukrainian-based companies on the London and Irish Stock Exchanges. See, e.g., United Nations Conference Report (2016) at 6-7, 13 (Vulture funds, like Gramercy "are not true investors but entities purchasing distressed debt in the secondary markets with the sole purpose to litigate"). Consistent with Plaintiffs' status as so-called 'vulture investors,' Plaintiffs bought their unsecured Notes in (ULF and AVG) before and after the bad news -- just as three of these Plaintiffs affirmatively call themselves "*Distressed Opportunity* Funds." Upon information and belief, public information further confirms that Gramercy is the mastermind of abusive tax shelters as determined by the IRS, selling such schemes to wealthy Americans and retirees, causing millions of losses for their former clients, before getting sued for fraud.

3.      Shortly thereafter, Bakhmatyuk became the target of an investigation by the Ukrainian authorities for embezzlement of government relief funds from a Ukrainian bank he owned. The weight of this investigation, in combination with Gramercy strongly and vocally advocating for a transparent, fair and collective debt restructuring process, exacerbated Bakhmatyuk's fear that Gramercy would orchestrate a similar takeover. Then, more than ever, he needed to preserve his personal resources and to exploit the Company's resources to fortify his position. By 2016, Bakhmatyuk's reign as one of Ukraine's leading agriculture tycoons was under siege, eventually leading him to embark on the scheme described herein.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny and therefore deny this paragraph.**

4.      In the course of Bakhmatyuk's efforts to restructure Company Notes, his direct negotiations with Gramercy, by and through his agents and co-conspirators, were at center stage. Bakhmatyuk's goal was to force Gramercy to accept an unfair deal in a vacuum, independent of the arrangements he made with other creditors. Gramercy, by contrast, was consistent in demanding a comprehensive restructuring of the Company's Notes led by independent advisors, involving a robust diligence process, and multilateral negotiations where all creditors were at the same table working to divide up the Company's resources fairly. As part of a comprehensive restructuring, Gramercy repeatedly indicated its willingness to accept equity in exchange for debt relief, but it was unwilling to accept unfair offers with no transparency into the Company's finances and prospects.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny and therefore deny this paragraph.**

5.      This was contrary to Bakhmatyuk's plan, which hinged on his ability to control the flow of information about the Company and on keeping them siloed from one another. During his

negotiations with Gramercy, Bakhmatyuk made minor concessions along the way that suggested some willingness to negotiate in good faith, but ultimately these concessions all served the purpose of stringing Gramercy along until Bakhmatyuk could fully execute his scheme.

**ANSWER:** **The Piazza Defendants do not have sufficient information with which to admit or deny and therefore deny this paragraph.**

6.    Once it became clear that Gramercy would not blindly accept the unfair deal Bakhmatyuk was offering, his efforts shifted to keeping Gramercy at bay while he executed a blunt-force, de facto restructuring of the Company's other debt. He bought up chunks of the Company's secured and unsecured debt at artificially reduced prices through straw purchasers and reached preferential deals with the Company's institutional lenders (such as state-owned Ukrainian banks). When Gramercy still insisted on a fair process and a fair deal, he continued to put on a façade of good faith negotiation to forestall Gramercy from enforcing its rights and eventually effectuated the surreptitious transfer of more than a billion dollars of Company assets to dummy companies created to preserve his stronghold.

**ANSWER:** **The Piazza Defendants do not have sufficient information with which to admit or deny and therefore deny this paragraph.**

7.    At all times, Bakhmatyuk was aided by a cadre of loyalists who assisted him in spreading misinformation to Gramercy, sabotaging its legal and economic rights, and ultimately diverting assets into newly formed Wyoming shell companies in order to exploit the state's confidentiality protections.

**ANSWER:** **Denied.**

8.    Bakhmatyuk's main ally in this illegal scheme was Wyoming-based businessman Nicholas Piazza, with whom he has shared a close business relationship since at least 2008. Piazza, a US citizen with deep ties and property interests in Wyoming, has spent much of his career working in Ukraine, fostering the connections that allow him to market himself and his companies as fixers for wealthy Ukrainians and Eastern Europeans. In 2011, together with Defendant Oleksandr Yaremenko, Piazza formed SP Advisors, a group of companies that they later consolidated under the ownership of SP Capital, a Wyoming LLC that Piazza operates from offices in Wyoming and that does business under the name SP Advisors. SP Advisors holds itself out as providing advisory and asset management services to an Eastern European client base and touts in public fora its expertise in shielding foreign assets in Wyoming entities under the cloak of Wyoming law. Given his contacts, profile and "expertise" in shielding foreign assets through the creation of dummy companies, Piazza was integral to Bakhmatyuk's scheme from the outset, along with Company officers like Igor Petrashko, who carried out Bakhmatyuk's orders with impunity to their fiduciary duties to the Company and its creditors.

**ANSWER:** **The Piazza Defendants admit Piazza is a U.S. Citizen with property in Wyoming, and has worked in Ukraine. The Piazza Defendants aver that "SP Capital" is not an entity affiliated with SP Advisors or otherwise known to the Piazza Defendants. To the extent that "SP Capital" is referred to throughout this Complaint as interchangeable with "SP Capital Management" or "SP Capital Management, LLC", denied. Otherwise, denied.**

9.      Bakhmatyuk and his allies executed their plan to maintain Bakhmatyuk's control over the Company and to eliminate the risk Gramercy posed through a scheme rooted in deception, misinformation and fraudulent transfers, carried out through multiple predicate acts of mail and wire fraud. All along, they attempted to conceal their criminal agreement by shrouding it in a cloak of legitimacy, including by falsely representing that certain of their actions were in the best interests of the Company and its investors, and maintaining the façade that Bakhmatyuk was willing to negotiate in good faith when in reality he was amassing power by both buying up debt in his own Company via straw purchasers and siphoning assets.

**ANSWER:**   **Denied.**

10.      There were at least three phases of the scheme perpetrated by Bakhmatyuk and his co-conspirators:

      a.      *Campaign of Misinformation*. At the outset of the scheme, Bakhmatyuk and Piazza leveraged their connections in the media and elsewhere, including Piazza's connections to the purportedly independent analyst Concorde, to disseminate false information and deprive Gramercy of accurate information regarding the Company's financial performance. In at least one instance, the misinformation relayed to Gramercy in private face-to-face meetings was parroted back by Concorde in strikingly similar communications to the market. The purpose of this was to allow Bakhmatyuk to purchase other debt at a steep discount and put pressure on Gramercy to accept a restructuring of its Notes or otherwise sell its Notes— in either case at a steep haircut on their value and on terms dramatically tilted in Bakhmatyuk's favor. Along the way, Bakhmatyuk, with support from his allies (including Company officers), maintained the façade through false representations to Gramercy that he was willing to engage in good faith discussions. In fact, his intention was to string Gramercy along in restructuring negotiations and forestall any actions by Gramercy that might threaten his control over the Company. This campaign of misinformation diminished the value of the Notes (and Gramercy's associated rights), deprived Gramercy of the opportunity to sell the Notes at fair value and reinvest the money elsewhere and caused Gramercy to delay adopting a more aggressive approach to collective restructuring negotiations or pursuing other remedial measures—including enforcement of the Notes— until it was too late.

      b.      *Straw Purchasers*. Next, Bakhmatyuk and Piazza leveraged their personal and business connections to identify purchasers and execute purchases of debt held by other Company creditors with whom Gramercy sought to unite in comprehensive, multilateral restructuring negotiations. At least some of these debt purchases involved put-and-call arrangements whereby the purchaser gave Bakhmatyuk the option to re-acquire the debt himself or involved straw purchasers like Piazza, who posed as an independent third party but actually held the debt on behalf of Bakhmatyuk. These debt

purchases served Bakhmatyuk's scheme by marginalizing and isolating Gramercy through the substitution of independent creditors—with whom Gramercy had been collaborating in restructuring negotiations—with Bakhmatyuk loyalists and surrogates. The debt purchases also furthered the first phase of the scheme because Bakhmatyuk and his co-conspirators concealed the identities of the straw purchasers from Gramercy. In one instance, when Gramercy asked about the identity of a debt purchaser, Bakhmatyuk (through Petrashko) claimed not to know and even asserted that the Gramercy Funds had purchased the position, when in reality he must have known it was Piazza.

c.    *Asset Transfers*. Finally, having forestalled any enforcement action that Gramercy may have taken and picked off other creditors through straw purchasers, Bakhmatyuk began to transfer assets to dummy companies created to hide and shield assets. To do so, Bakhmatyuk leveraged Piazza's, Yaremenko's, and SP Advisors' expertise in asset transfers and sheltering foreign assets in Wyoming entities to orchestrate a complex set of transactions that stripped the Company of nearly a billion dollars of assets. These asset transfers left little or no value in the Company, thus shielding Bakhmatyuk's assets from any enforcement action led by Gramercy, obliterating the value of Gramercy's investment, and rendering Gramercy's rights to enforce the Notes worthless. As SP Advisors (through Piazza) advertised in a webinar, the main advantage of transferring assets to a Wyoming entity is that the confidentiality of the assets would be protected. Gramercy Management was forced to incur significant costs just to begin to unravel Defendants' complex web of transactions through Wyoming shell companies. Even after these transfers had taken place, when Gramercy confronted Bakhmatyuk about them, having discovered the bare facts of the transfers, Bakhmatyuk misleadingly downplayed their significance and (through Petrashko) wrongly stated that they amounted to no more than 15% of the Company's assets. This was designed to deceive Gramercy and dissuade it from taking action against Bakhmatyuk.

**ANSWER:**    **The Piazza Defendants admit they have interests in companies that have secured interests in debt and/or unsecured Notes for both AVG and ULF, subject to the binding terms of the Notes, Trust Deeds and loan documents, including the arbitration clauses contained therein. Otherwise, denied.**

11.    As the Ukrainian authorities' investigation of Bakhmatyuk demonstrates, he is no stranger to constructing complex and deceitful webs of transactions to abscond with corporate funds for his own purposes. In or around October 2019, the National Anti-Corruption Bureau of Ukraine ("NABU") issued notices of suspicion to Bakhmatyuk and nine others in connection with a historic stabilization loan that the National Bank of Ukraine had provided to PJSC VAB Bank ("VAB Bank"), a bank that Bakhmatyuk founded and owned until it was put into liquidation in the aftermath of the events under investigation. Bakhmatyuk's response was to move to Austria, where he had already "gifted" his personal property to his children, and to use his control of the

Company from afar to wage war against NABU, going so far as to cause the Company to print a message against the then-head of the NABU on 1 billion eggs sold to supermarkets in Ukraine.

**ANSWER:** **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

12. Through the foregoing pattern of racketeering activity, Bakhmatyuk carried out a scheme of misinformation and deception that culminated in the siphoning of nearly a billion dollars of assets for the purposes of preventing a Gramercy-led creditor takeover and obliterating the value of Gramercy's Notes. Thus, after years of pursuing a good faith resolution only to be impeded by a vast web of deception and fraud, Gramercy's only recourse, and only hope for salvaging its investment, is to seek relief from the courts.

**ANSWER:** **Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

13. Gramercy Funds Management LLC is a Connecticut-based investment management firm with a specific focus on emerging markets. Gramercy Management established the Gramercy Funds and has at all times managed the Gramercy Funds from its office in Connecticut. The Gramercy Funds appointed Gramercy Management as their Manager to conduct the everyday business and affairs of the Gramercy Funds. Pursuant to Management Agreements, Gramercy Management receives an annual fee to provide portfolio management and administrative services, to execute and deliver documents on behalf of the Gramercy Funds and otherwise bind the Gramercy Funds, to maintain the books and records of the Gramercy Funds, to provide personnel to sit on boards of directors when the Gramercy Funds' investments give it the power to appoint directors, and to otherwise do acts that are necessary and convenient to the management of the Gramercy Funds. Gramercy Management has discretionary authority with respect to the Gramercy Funds' investments, including the authority to evaluate, monitor, exercise voting rights, advise as to disposition opportunities, and take other appropriate action with respect to investments on behalf of the Gramercy Funds.

**ANSWER:** **Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same. Defendants further aver that based on public information Plaintiffs are so-called 'vulture investors' organized in the Cayman Islands and managed out of Connecticut that purchased unsecured Notes in two Ukrainian based companies on the London and Irish Stock Exchanges. See, e.g., United Nations Conference Report (2016) at 6-7, 13 (Vulture funds, like Gramercy "are not true investors but entities purchasing distressed debt in the secondary markets with the sole purpose to litigate"). The Ukraine-based companies, AVG and ULF, issued Notes to investors in 2010 and 2013 respectively to raise capital. Both were highly successful companies that lost almost half of their business assets and value following the 2014 invasion of Crimea and devaluation of the Ukrainian currency. Consistent with Plaintiffs' status as so-called vulture investors, Plaintiffs bought their unsecured Notes in (ULF and AVG) before and *after the bad news* -- just as three of these Plaintiffs affirmatively call themselves "*Distressed Opportunity* Funds."** Equally bad, Plaintiffs allege that Defendants intentionally caused them loss on their investments, yet Plaintiffs have failed to initiate *any claim – anywhere* against the large companies who are the obligors on the Notes that they purchased.

14.     Plaintiffs Gramercy Distressed Opportunity Fund II, L.P., Gramercy Distressed Opportunity Fund III, L.P., Gramercy Distressed Opportunity Fund III-A, L.P., Gramercy EM Credit Total Return Fund (collectively and together with Roehampton Partners, LLC[5] referred to herein as the "Gramercy Funds") are investment funds organized under the law of the Cayman Islands, each of which is managed by Gramercy Management. A substantial portion of the assets managed by Gramercy Management belong to government and corporate pension plans in the United States. Specifically, a majority of the investors in the Gramercy Distressed Opportunity Fund II, L.P. and the Gramercy Distressed Opportunity Fund III, L.P. are U.S. public pension plans. The General Partners of each of the Gramercy Funds are Cayman Islands exempted companies that operate out of office space provided, under their respective Management Agreements, by Gramercy Management in its Connecticut headquarters. Under the Gramercy Funds' Limited Partnership Agreements, any notices directed to the General Partner must be delivered to Gramercy Management in Connecticut, with a copy sent to the General Partner's attorney in New York. As discussed further below, the Gramercy Funds maintain bank accounts in the United States, including in New York and California, which Gramercy Management opened and manages on behalf of the Gramercy Funds.

**ANSWER:**     **Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same. Defendants further aver that based on public information Plaintiffs are vulture investors organized in the Cayman Islands and managed out of Connecticut that purchased unsecured Notes in two Ukrainian based companies on the London and Irish Stock Exchanges. See, e.g., United Nations Conference Report (2016) at 6-7, 13 (Vulture funds, like Gramercy "are not true investors but entities purchasing distressed debt in the secondary markets with the sole purpose to litigate"). The Ukrainian-based companies, AVG and ULF, issued Notes to investors in 2010 and 2013 respectively to raise capital. Both were highly successful companies that lost almost half of their business assets and value following the 2014 invasion of Crimea and devaluation of the Ukrainian currency. Consistent with Plaintiffs' status as so-called vulture investors, Plaintiffs bought their unsecured Notes in (ULF and AVG) before and *after the bad news* -- just as three of these Plaintiffs affirmatively call themselves *"Distressed Opportunity* Funds."* Equally bad, Plaintiffs allege that Defendants intentionally caused them loss on their investments, yet Plaintiffs have failed to initiate *any claim – anywhere* against the large companies who are the obligors on the Notes that they purchased.**

15.     Roehampton Partners LLC ("Roehampton") is a third-party investor that holds a custody account that Gramercy Management manages under an investment management agreement. Gramercy Management, on behalf of Roehampton and pursuant to its investment

---

[5] Although Gramercy Funds Management manages Roehampton's custody account separately under an investment management agreement, which differs in certain non-material respects from the partnership agreements organizing the other Gramercy Funds, all actions taken by Gramercy Management described herein were taken on behalf of Roehampton as well as on behalf of the other Gramercy Funds.

management agreement, invested account funds into the Notes at issue. Roehampton is organized under the laws of Delaware and maintains a principal place of business in Connecticut.

**ANSWER:    Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same. Defendants further aver that based on public information Plaintiffs are managed by vulture investors organized in the Cayman Islands and managed out of Connecticut that purchased unsecured Notes in two Ukraine-based companies on the London and Irish Stock Exchanges. See, e.g., United Nations Conference Report (2016) at 6-7, 13 (Vulture funds, like Gramercy "are not true investors but entities purchasing distressed debt in the secondary markets with the sole purpose to litigate").**

16.    Upon information and belief, Defendant Oleg Bakhmatyuk is a dual citizen of Ukraine and Cyprus, residing in Oberwaltersdorf, Austria. Bakhmatyuk is a businessman and former politician, who amassed his fortune through his ownership and control of the Ukrainian companies UkrLandFarming PLC and Avangardco IPL, which are among the largest crop farming companies and egg producers in Europe and Asia. As of March 1, 2011, *Forbes* included Bakhmatyuk on its list of billionaires, but by October 15, 2020, *Forbes* described him as a "former" billionaire, his personal assets having been hidden via the asset dissipation scheme.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

17.    Defendant Nicholas Piazza is a United States citizen who resides in Cody, Wyoming, and also has a home in Ukraine. Piazza is a businessman who, along with his business associate Defendant Oleksandr Yaremenko, operates a number of companies based in Wyoming, under the umbrella of SP Capital, which together purport to offer financial and consulting services to Ukrainian and Eastern European businesses. According to SP Capital's website, Piazza is the CEO/Partner of SP Capital, "has been actively involved in Ukraine and Georgia since 2004," has "sat on the board of the... Ukrainian bank, BG Bank," and was "included on the Kyiv Post's list of Wealthiest and Most Influential Expats in 2012 and was named one of the Top 25 Trailblazing Business Leaders in Ukraine in 2016." The SP Capital website further states that, earlier in his career, Piazza "coordinated the sales, research, and corporate finance departments at Concorde Capital." Piazza is also listed as the CEO of SP Advisors, which is the registered trade name of SP Capital and also refers to the group of SP Capital subsidiaries through which it operates.

**ANSWER: To the extent this paragraph quotes directly from SP Capital Management's website, it speaks for itself. Defendants admit Piazza is a U.S. Citizen residing in Cody, Wyoming. Defendants admit that Piazza is CEO/Partner of SP Capital Management LLC. Piazza was raised in Cody, Wyoming, received his Bachelor of Arts in History from Lake Forest College in northern Illinois before moving abroad to Europe and eventually Eastern Europe and Russia. He worked in the sales, research, and corporate finance department at Concorde Capital, before landing a job at BG Capital/ Galt & Taggart in the Republic of Georgia where he met his future business partner and friend, Oleksandr Yaremenko. Piazza launched SP Advisors with Yaremenko in Ukraine and later founded SP Capital Management LLC. Defendants admit that SP Advisors is the trade name of SP Capital Management LLC. Defendants aver that "SP Capital" is not an entity affiliated with SP**

**Advisors or otherwise known to the Piazza Defendants. To the extent that "SP Capital" is referred to throughout this Complaint as interchangeable with "SP Capital Management" or "SP Capital Management, LLC", denied. Otherwise, denied.**

18.     Defendant Oleksandr Yaremenko is a Ukrainian citizen and resident of Kiev. Yaremenko is a businessman who has partnered with Piazza in a number of business ventures. According to Yaremenko's profile on the website for the American Chamber of Commerce in Ukraine, Yaremenko is the Chief Legal Officer of SP Advisors, was "directly involved in the establishment of SP Advisors, [and] he is now responsible for the company's operations, as well as legal support in corporate law and M&A activities, including corporate restructuring and reorganization and setting up offshore structures." SP Capital's website lists Yaremenko as the COO/Partner, and a "founding partner" of SP Capital. Yaremenko also serves as the annual report signatory for TNA, and performs the same function for a number of Piazza's other businesses, including the companies organized under the umbrella of SP Capital.

**Defendants admit Yaremenko is a Ukrainian citizen residing in Kyiv on the date this Complaint was filed. Defendants also admit that Yaremenko is COO/Partner of SP Capital Management and that he has signed certain TNA's annual reports of good standing with the Wyoming Secretary of State. Defendants aver that "SP Capital" is not an entity affiliated with SP Advisors or otherwise known to the Piazza Defendants. To the extent that "SP Capital" is referred to throughout this Complaint as interchangeable with "SP Capital Management" or "SP Capital Management, LLC", denied. Otherwise, denied.**

19.     Defendant SP Capital Management, LLC is a Wyoming limited liability company with its principal office in Afton, Wyoming. SP Capital also has an office in Kyiv, Ukraine. SP Capital's registered agent is Cody Business Services LLC, a Wyoming LLC with a principal place of business in Cody, Wyoming. SP Capital's website describes the company as "the private investment vehicle of the Piazza Family and their partners." SP Capital was founded by Piazza in 2012, though it was not incorporated until 2016. According to its website, SP Capital's "first major investment was in its wholly owned Kyiv-based investment advisory firm SP Advisors." SP Advisors, as described above, is a trade name for a group of business entities that Piazza, with the help of his business partner, Yaremenko. Piazza started SP Advisors in 2011 with the incorporation of S. Pierce Advisors, a Cypriot corporation that does business in Ukraine. In 2016, Piazza and Yaremenko began forming other SP entities under the umbrella of SP Capital, which registered the trade name SP Advisors with the Wyoming Secretary of State in 2018. SP Advisors is the name that this group of companies uses to refer to itself in media reports and on its website. SP Advisors purports to offer financial and consulting services to Ukrainian and Eastern European businesses out of a primary office in Kiev, Ukraine. This group of companies, upon information and belief, includes at least seven Wyoming LLCs: SP Trust Partners Private Single Family Trust Company, LLC; SP Management LLC; SP Investments, LLC; S&P Real Estate Investments, LLC, SP Advisory Services LLC; SP Management 2 LLC; and SP Management 3 LLC. It also includes, upon information and belief, at least one Cyprus-based entity, S. Pierce Advisors.

**ANSWER:   To the extent this paragraph quotes directly from SP Capital Management's website, it speaks for itself. The Piazza Defendants admit that SP Capital Management is a Wyoming limited liability company with its principal office in Afton, Wyoming and an office in Kyiv, Ukraine. The Piazza Defendants aver that "SP Capital" is**

**not an entity affiliated with SP Advisors or otherwise known to the Piazza Defendants. To the extent that "SP Capital" is referred to throughout this Complaint as interchangeable with "SP Capital Management" or "SP Capital Management, LLC", denied. The Piazza Defendants further admit that SP Capital Management's registered agent is Cody Business Services LLC, a Wyoming LLC with a principal place of business in Cody, Wyoming. The Piazza Defendants further admit that Piazza and Yaremenko have beneficial interests in and/or manage several other Wyoming LLCs.**

20.     Defendant TNA Corporate Solutions, LLC ("TNA") is a limited liability company with its principal office in Jackson, Wyoming. TNA is beneficially owned by Piazza and managed by Piazza and Yaremenko. TNA was formed in January 2017. TNA's registered agent is Cody Business Services LLC.

**ANSWER:**   **The Piazza Defendants aver that TNA's principal office is located in Afton, Wyoming. Otherwise, admitted by the Piazza Defendants.**

21.     UkrLandFarming PLC was incorporated in Cyprus as a public limited company in or around 2008. It is one of Ukraine's largest agricultural conglomerates. ULF expanded in 2011¬2012, including through Urklandfarming Group's acquisition of Agro-Alpha (crop production and dairy farming) and Avangard (egg production and processing). ULF produces grain, eggs, milk and meat for human and animal consumption. Bakhmatyuk acts as CEO and Chairman of the Board and owns and controls ULF. Since 2011, ULF has been the parent company of AVG.

**ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

22.     Avangardco IPL was incorporated in Cyprus in 2007 to serve as the ultimate holding company for Avangard, which, according to its website, "became the largest producer of shell eggs and dry egg products in Ukraine" by 2009. In or around September 2011, AVG announced an agreement with Bakhmatyuk, to transfer his approximately 77.5% shareholding in AVG to ULF, which was 100% controlled by Bakhmatyuk. Since 2011, AVG has been a partially owned subsidiary of ULF. ULF and AVG, both of which are owned and controlled by Bakhmatyuk, are referred to herein as the Company.

**ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

23.     Concorde Capital ("Concorde") is a Ukrainian investment company that provides brokerage and investment banking services. It was founded in 2004 by its now CEO, Igor Mazepa and a group of nine other Ukrainian businessmen. As set forth below, Concorde has a longstanding connection to Piazza.

**ANSWER:**   **The Piazza Defendants deny that Piazza has a "longstanding connection" to Concorde. The Piazza Defendants admit that Concorde was founded in 2004. The Piazza Defendants do not have sufficient information with which to admit or deny the remaining allegations in this paragraph, and therefore deny the same.**

24.     Igor Petrashko served as the deputy general director of ULF from 2013 until March 17, 2020, when he was appointed to be Ukraine's Minister of Economic Development and Trade. He was dismissed from this position in May 2021, and, upon information and belief, he has since returned to ULF in an unofficial capacity. Petrashko acted as Bakhmatyuk's agent in much of the negotiation with Gramercy, as described further below.

**ANSWER:   The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

25.     In order to effectuate his scheme, Bakhmatyuk leveraged his network of allies and business partners.

**ANSWER:   Denied.**

26.     Piazza has a long personal and professional history in Russia and Ukraine that began right after he graduated from college. His first job was as a journalist for Interfax, a Russian news organization. While living in Moscow and working at Interfax, Piazza befriended a group of Ukrainian businessmen who went on to form Concorde in 2004, and who asked him to join around the time of its formation. Piazza worked for Concorde as the director of corporate relations from its founding until his departure in 2008. In that role, Piazza coordinated Concorde's sales, research, and corporate finance departments.

**ANSWER:   The Piazza Defendants admit Piazza was previously employed by Interfax and Concorde, with his first position as a Research Editor for Concorde. Otherwise, denied.**

27.     After Piazza left Concorde in 2008, he took on a new role as CEO of BG Capital, the investment banking wing of Bank of Georgia. BG Capital was involved in exporting ULF's grain to Georgia, and through this interaction, Piazza formed a business relationship with Bakhmatyuk.

**ANSWER:   The Piazza Defendants admit Piazza was previously employed at BG Capital. Defendants aver that Piazza left Concorde in 2007, not 2008. Defendants admit that Piazza has a business relationship with Bakhmatyuk. Otherwise, denied.**

28.     After he left BG Capital, Piazza established his own firm, SP Advisors, in 2011. In founding and growing SP Advisors, Piazza hired many former Concorde employees, including Alexander Viktorov, who followed Piazza from Concorde to BG Finance to SP Advisors, Olena Zuikova, and Vitaliy Vavryshcuk.

**ANSWER:   Defendants admit Piazza established SP Advisors in 2011. Defendants further admit that former Concorde employees Alexander Viktorov, Olena Zuikova, and Vitaliy Vavryshcuk became SP Advisors employees.**

29.     Piazza has a longstanding business relationship with Bakhmatyuk, and SP Advisors and has performed substantial services for the Company. The American Chamber of Commerce in Ukraine website states the following regarding SP Advisors' business:

> SP Advisors is a full-service investment house focused on advisory, asset management, and merchant banking, operating in Ukraine, Georgia, and Eastern Europe. Established in 2011, we have assembled a veteran management and corporate advisory team with experience in the Eastern European investment space. The SP Advisors team offers a one-stop shop for equity and debt instruments, as well as corporate finance advisory. We assist international investors in identifying attractive Ukrainian assets and viable transactions. We also provide market insight and support, and offer advisory services to local companies looking to raise capital and improve corporate governance standards. Since 2012, SP Advisors has been actively making direct investments in Ukraine through our merchant banking services, and in 2016 launched SP Capital Management and SP Trust Partners to formalize our asset management and family office-centered trust services.

**ANSWER:     Defendants admit that Piazza and Bakhmatyuk have a business relationship. To the extent this paragraph quotes directly from the American Chamber of Commerce website, it speaks for itself. Otherwise denied.**

30.     SP Capital's website describes ULF as one of SP Advisors' "key clients." Public records confirm that Bakhmatyuk repeatedly retained SP Advisors' services. In 2014, the Russian-language media reported that SP Advisors signed a cooperation agreement with ULF. According to the article, SP Advisors was appointed as ULF's advisor on investment relations and as a corporate broker for AVG. The same article quoted Piazza as saying, "[w]e are pleased to work with one of the most dynamic players in the Ukrainian agricultural market, and I am confident that our cooperation will strengthen the company's relationship with institutional investors."

**ANSWER:     To the extent this paragraph quotes directly from SP Capital Management's website, it speaks for itself. To the extent that this paragraph relies upon public records, those records speak for themselves. To the extent this paragraph refers to an unknown media outlet in Russia and an uncited article therefrom, any such article speaks for itself. Defendants aver that "SP Capital" is not an entity affiliated with SP Advisors or otherwise known to the Piazza Defendants. To the extent that "SP Capital" is referred to throughout this Complaint as interchangeable with "SP Capital Management" or "SP Capital Management, LLC," denied. The Piazza Defendants admit that Bakhmatyuk has engaged SP Advisors on more than one occasion, but they lack sufficient information with which to admit or deny the remaining allegations in this paragraph, and therefore deny the same.**

31.     Also in 2014, SP Advisors was involved in Bakhmatyuk's sale of 5% of ULF to Cargill. Piazza was quoted in the Financial Times: "The transaction will help Cargill secure long‑term supplies from one of Ukraine's largest farmers and gives UkrLandFarming a very

strong strategic partner that will help them achieve their goals of broadening exports, especially in Asia

**ANSWER:   Defendants deny that SP Advisors was involved in providing services in connection with a ULF/Cargill transaction but admit that there was a sale to Cargill. To the extent this paragraph quotes directly from an article, the document speaks for itself.**

32.   Piazza also has acted as a spokesperson for Bakhmatyuk's interests, both privately and to the media. For example, when the Company purportedly experienced financial difficulties following the Russian occupation of Crimea, Piazza was quoted in a July 15, 2016 article in the Ukrainian online publication Comments.ua, stating that Bakhmatyuk had opportunities for attracting new investments and that international creditors agreed to continue cooperating with ULF after having received a plan to restructure the Company's debts.

**ANSWER:   To the extent this paragraph quotes directly from an article, the document speaks for itself. Otherwise, denied, including the claim that Piazza was directed by ULF to act as a spokesperson for Bakhmatyuk' interests.**

33.   In addition to his long-standing relationship with Piazza, Bakhmatyuk turned to SP Advisors because it offers services that were particularly well-suited to his goal of protecting his control over the Company at all costs. SP Advisors caters to clients operating in Ukraine and other parts of Eastern Europe. One of the cornerstone services that SP Advisors offers to its clients is asset protection. Specifically, SP Advisors establishes corporate structures in Wyoming through which clients in Eastern Europe can hold their assets. Often, Piazza will act as a nominee director or shareholder to conceal the identity of the client and true owner.

**ANSWER:   The Piazza Defendants admit SP Advisors offers corporate planning advice. Otherwise, denied by the Piazza Defendants.**

34.   Piazza and Yaremenko explained this service in a public webinar entitled "Heading to the United States of America. Perspective of Doing Business in the United States for Ukrainian Companies" that they delivered on November 19, 2020. In this presentation, they said that SP Advisors began offering this service after it was approached by clients who wanted to find a permanent, "professional" jurisdiction in which to hold and protect their assets. On the webinar, Yaremenko further explained that Wyoming is a particularly attractive jurisdiction for businesses to store and protect their assets because it offers complete confidentiality. As they further explained, there is no register of shareholders or directors in Wyoming and ownership and director information is not submitted to the Secretary of State. Yaremenko suggested that these confidentiality protections are particularly important to Ukrainian businesses because, according to Yaremenko, these businesses have a unique need for a method of protecting businesses and assets against "corporate raiding." Yaremenko also noted that Wyoming does not have residency requirements for shareholders or directors.

**ANSWER:   Defendants admit Piazza and Yaremenko delivered a public webinar on November 19, 2020 which speaks for itself. Otherwise, denied.**

35.     Yaremenko's comments echoed an article Piazza wrote for the online publication Country Estate dated May 21, 2018, in which he explained that Ukrainian businesses could protect their assets by setting up a trust in Wyoming. As Piazza wrote, in Wyoming "information about participants in limited liability companies and beneficiaries of trusts is not public, unlike other states. Wyoming law does not provide for this information to be publicly available."

**ANSWER:     To the extent this paragraph quotes the article directly, it speaks for itself.**

36.     This Court has subject matter jurisdiction over this action because it arises under the laws of the United States, pursuant to 28 U.S.C. § 1331.

**ANSWER:     This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, Defendants deny the allegations in this paragraph, and further aver that all of the applicable documents governing the rights and obligations of the parties are subject to English or other foreign laws and the parties agreed to resolve any and all disputes in an UK forum and/or pursuant to arbitration.**

37.     All other claims alleged in this Complaint are so related to the claims within the original jurisdiction of this Court such that they form part of the same case or controversy. As a result, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367.

**ANSWER:     This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, Defendants deny the allegations in this paragraph.**

38.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action, is situated in this District. In the alternative, venue is proper under 28 U.S.C. § 1391(b)(3) because Defendants Piazza, SP Advisors, and TNA reside in, are incorporated in, and/or have their principal place of business in Wyoming, and because of Defendant Bakhmatyuk's substantial contacts with Wyoming, as set forth in detail herein.

**ANSWER:     This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, Defendants deny the allegations in this paragraph. Otherwise, denied including but not limited to the claim that TNA acted in or transferred assets to Wyoming.**

39.     After working in the gas industry, including for Naftogaz, a Ukrainian state-owned gas company, serving as a Deputy on the Ivano-Frankivsk City Council, and establishing a chain of grocery stores and a commercial bank, Bakhmatyuk entered the agricultural industry in 2003.

**ANSWER:     The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

40.     That year Bakhmatyuk purchased the Avangard poultry factory, incorporated a company with the same name, and used the factory and new corporation to produce eggs.

Bakhmatyuk rapidly expanded the business by constructing additional facilities for every step in the egg production process.

>  **ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

41.    In 2008, Bakhmatyuk expanded his presence in the agro-industrial space by establishing the Ukrainian agricultural conglomerate, ULF.

>  **ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

42.    In 2011, Bakhmatyuk consolidated AVG and ULF—both of which he owned and controlled—into one of the largest agricultural companies in Eurasia. He did this by transferring his approximately 77.5% ownership of AVG to ULF.

>  **ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

43.    Bakhmatyuk has at all times maintained tight control over the Company. He has directly or indirectly owned at least 77.5% of AVG's stock from the time of its incorporation in 2003 until the present day, and has always controlled its operations and management, either directly or indirectly through installing family members and loyalists in senior roles. For example, Bakhmatyuk installed his sister Nataliya Vasylyuk as AVG's CEO in 2007, and she held that role between 2007 and 2013, then left the CEO position to serve as Chair of the Board from 2013 to 2016, and then resumed her role as CEO in or around 2016, a role that, upon information and belief, she still holds.

>  **ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

44.    Also, at all material times, Bakhmatyuk has been the ultimate beneficial owner of ULF, holding 100% of its stock from the time of its founding until the present, except for the two years from 2014 to 2016 when Cargill, a Minnesota-based producer of agricultural products including grains and oilseeds, and provider of farmer services and risk management solutions, held 5% of ULF's stock. Bakhmatyuk has served as ULF's CEO and Chairman of the Board since at least 2010. As with AVG, Bakhmatyuk has controlled the operations and management of ULF by installing loyalists in senior positions. For example, his sister is also a director of ULF, and in 2013 he appointed Igor Petrashko as the deputy general director of ULF. Petrashko's initial tenure at the Company ended with his appointment in March 17, 2020 as Ukraine's Minister of Economic Development and Trade, but, upon information and belief, he re-joined the Company in an unofficial capacity after being dismissed from his government position in or around May 2021.

>  **ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

45.    In 2010, Bakhmatyuk turned to the global markets for capital, completing an IPO for AVG in April 2010 on the London Stock Exchange and raising $208 million. However,

Bakhmatyuk did not cede control over AVG through this IPO—he retained approximately 77.5% of the equity, which he later transferred to ULF in the 2011 consolidation described above. Building on the momentum from the IPO, Bakhmatyuk sought additional capital for AVG through a note issuance. On October 29, 2010, AVG issued $200 million worth of notes, redeemable on October 29, 2015, with interest payable semi-annually at a rate of 10.0% (the "AVG Notes").

> **ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

46.     Between 2011 and 2017, Gramercy purchased 41.4% of the AVG Notes.[6] As of September 30, 2021, Gramercy's AVG Notes have a face value, including principal and accrued and unpaid interest, of around $123 million. These purchases made Gramercy one of AVG's largest creditors by October 9, 2015.

> **ANSWER:**   **Defendants admit that Gramercy is an unsecured noteholder and an unsecured creditor, subject to the binding terms of the Notes and Trust Deeds, including the arbitration clauses contained therein, that there are secured creditors senior to Gramercy, and the Piazza Defendants do not have sufficient information with which to admit or deny the remaining allegations in this paragraph, and therefore deny the same.**

47.     The AVG Notes are governed by a Trust Deed (the "AVG Trust Deed") which grants Gramercy, as the holder of more than 25% of the principal amount of the total AVG Notes outstanding, the power to initiate enforcement proceedings on the AVG Notes and to block certain resolutions of the noteholders (including in relation to restructurings). The relevant features of the AVG Notes include:

     i.     Although the Notes are unsecured, sureties were provided by 15 of AVG's operating subsidiaries (the "AVG Surety Providers"). Also, AVG itself covenanted in the AVG Trust Deed, to, among other things, "at all times carry on and conduct [their] affairs and procure [their] Subsidiaries to carry on and conduct their respective affairs in a proper and efficient manner;"

     ii.     Noteholders with at least 25% of the principal amount of the total AVG Notes outstanding are entitled to direct the Trustee to (a) institute proceedings against the Issuer and/or any Security Provider to enforce the terms of the AVG Trust Deed, Notes and/or Security Deed (AVG Trust Deed, clause 8.1 and Condition 12); and to (b) give notice to the Issuer and Surety Providers that the AVG Notes are immediately due and repayable at their principal amount together with accrued interest, if an event of default occurs (AVG Trust Deed, clause 8.1, and Condition 11);

     iii.     Noteholders with at least 25% of the principal amount of the total AVG Notes outstanding have the power to block resolutions of the noteholders related to "Basic Term Modifications," which include various types of

---

[6] Gramercy's exact percentage holding has varied over time, but it has held more than 25% of the AVG Notes since October 9, 2015 and has held roughly 41% of the AVG Notes since 2017.

amendments to, or waiver of, the terms of the AVG Notes (AVG Notes, Schedule 4, para 7 and Condition 16.2(a)). Notably, a proposal to agree to a restructuring or compromise of the AVG Notes generally requires a Basic Term Modification, and could therefore be blocked by noteholders with at least 25% of the principal amount of total AVG Notes outstanding;

iv.   Under Condition 5.3 of the AVG Trust Deed, the sale of any material assets by AVG or certain of its subsidiaries must be for fair market value consideration, and that consideration must be used for one of three purposes, one of which is to reduce the indebtedness of AVG;

v.   Under Condition 5.8 of the AVG Trust Deed, AVG is restricted from engaging in transactions involving more than $5 million of assets with affiliates of AVG unless the terms are as favorable to AVG as they would be in an arms-length transaction, and notice is given to the Trustee;

vi.   Under Condition 5.12 of the AVG Trust Deed, AVG must report material acquisitions, dispositions, or restructurings to the Trustee promptly; and

vii.   The AVG Trust Deed states that "[t]he Issuer covenants with the Trustee that it will ... on the due date for the final maturity of the Notes ... pay or procure to be paid unconditionally to or to the order of the Trustee in U.S. dollars in New York City in immediately available funds the principal amount of the Notes repayable on that date together with any applicable premium ...."

**ANSWER:**   **Defendants admit the AVG Notes are governed by the AVG Trust Deed which terms speak for itself, and that noteholders are bound by the terms of the AVG Trust Deed, including the arbitration clauses contained therein. Defendants further deny that plaintiffs have fully set forth or accurately stated the terms of the Trust Deed, including Section 5.8 which provides for limitations on transfer of "consideration" in excess of $5 million rather than "assets."**

48.   After issuing the AVG Notes, Bakhmatyuk turned to the global market to raise capital again. On March 26, 2013, ULF issued notes in the amount of $275 million redeemable on March 26, 2018, with interest payable semi-annually at a rate of 10.875%. ULF subsequently issued two additional tranches of notes, in the amounts of $150 million (issued on May 17, 2013) and $75 million (issued on June 28, 2013), which were consolidated with ULF's original notes to form a single series (together, the "ULF Notes"). Between 2013 and 2017, Gramercy purchased approximately 28.6% of the ULF Notes,[7] which, as of September 30, 2021, have a face value of around $240 million, including principal and accrued unpaid interest.

**ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

---

[7] Gramercy's exact percentage holding has varied over time, but it has held more than 25% of the ULF Notes since July 21, 2016 and has held roughly 28.6% of the ULF Notes since 2017.

49.     The ULF Notes are governed by a Trust Deed dated March 26, 2013 (the "ULF Trust Deed"), as supplemented by further trust deeds dated May 17, 2013 (the "First Supplemental Trust Deed") and June 28, 2013 (the "Second Supplemental Trust Deed"). The various ULF trust deeds set out key features of the ULF Notes that are similar to the key features of the AVG Notes described above. In particular, the ULF Notes contain features that give Gramercy, as the holder of more than 25% of the principal amount of the ULF Notes, the power to initiate enforcement proceedings on the ULF Notes and to block certain resolutions of the noteholders. The relevant features of the ULF Trust Deed are set out below:

i.      The ULF Notes are unsecured, but sureties were provided by 64 companies within the Company (the "ULF Surety Providers"), some of which were also Surety Providers for the AVG Notes. Also, the ULF Surety Providers, as well as ULF itself, covenanted, in the ULF Trust Deed, to, among other things, "at all times carry on and conduct [their] affairs and procure [their] Subsidiaries to carry on and conduct their respective affairs in a proper and efficient manner;"

ii.     Noteholders with at least 25% of the principal amount of the total ULF Notes outstanding are entitled to direct the Trustee to (a) institute proceedings against the Issuer and/or any Security Provider to enforce the terms of the ULF Trust Deed, ULF Notes and/or Security Provider (ULF Trust Deed, clause 2.5); and (b) give notice to the Issuer and Surety Providers that the ULF Notes are immediately due and repayable at their principal amount together with accrued interest, if an event of default occurs (ULF Trust Deed, Condition 10);

iii.    Noteholders with at least 25% of the principal amount of the total ULF Notes outstanding can block any "Extraordinary Resolution" of the noteholders. Notable matters to be decided by Extraordinary Resolution include whether:

To any proposal by the Issuer, the Surety Providers or the Trustee for **any modification, abrogation, variation or compromise of, or arrangement in respect of, the rights of the Noteholders** against the Issuer or the Surety Providers, whether or not those rights arise under this Trust Deed or the Surety Deed;

To sanction the **exchange or substitution** for the Notes of, or the **conversion** of the **Notes** into, **shares, bonds or other obligations or securities** of the Issuer, the Surety Providers or any other entity; and

To assent to **any modification of this Trust Deed, the Surety Deed or the Notes** proposed by the Issuer, the Surety Providers or the Trustee;

iv.   Under Condition 5.3 of the ULF Trust Deed, the sale of any material assets by ULF or certain of its subsidiaries must be for fair market value consideration, and that consideration must be used for one of three purposes, one of which is to reduce the indebtedness of ULF;

v.   Under Condition 5.8 of the ULF Trust Deed, ULF is restricted from engaging in transactions involving more than $5 million of assets with affiliates of ULF unless the terms are as favorable to ULF as they would be in an arms-length transaction, and notice is given to the Trustee;

vi.   Under Condition 5.10 of the ULF Trust Deed, ULF must report material acquisitions, dispositions, or restructurings to the Trustee promptly; and

vii.   The provision governing Payments states that "Each payment in respect of the Notes pursuant to Condition 8.1 (*Principal and Interest*) will be made by transfer to a U.S. dollar account maintained by or on behalf of the payee with a bank in New York City."

**ANSWER:**   **Defendants admit the ULF Notes are governed by the ULF Trust Deed which speaks for itself, and that noteholders are bound by the terms of the ULF Trust Deed, including the arbitration clauses contained therein. Defendants further deny that Plaintiffs have fully set out the terms of the Trust Deed including Section 5.8 which provides for limitations on transfer of "consideration" in excess of $5 million rather than "assets."**

50.   Through its purchase of the AVG and ULF Notes (together, the "Notes"), Gramercy became one of the Company's largest, if not the largest, unsecured creditors and obtained significant rights, including the right to initiate enforcement proceedings on the Notes and to block certain resolutions of the noteholders, which equated to a veto right over any proposed restructuring of the Notes by Bakhmatyuk. Against the backdrop of other factors and external events described in Section III, Bakhmatyuk came to view Gramercy as an acute threat.

**ANSWER:**   **Defendants admit that Gramercy is an unsecured noteholder, subject to the binding terms of the Notes and Trust Deeds, including the arbitration clauses contained therein. Otherwise, denied.**

51.   Shortly after Gramercy acquired the Notes, Russia's annexation of Crimea in early 2014, together with a global collapse in commodity prices, disrupted the operations of Ukrainian agricultural companies, including the Company and one of its competitors, Mriya Agro Holdings Public Limited ("Mriya"). In the context of Mriya, this disruption resulted in it defaulting on its debt, which led to creditors strongly suspecting widespread fraud and mismanagement by the family that controlled Mriya and its executive team. In response to the default, certain of Mriya's unsecured creditors quickly launched liquidation proceedings in Cyprus which ultimately (in combination with other enforcement steps) allowed them to replace Myria's management and control the entire company. At the same time, Bakhmatyuk claimed that the economic disruption as a result of the annexation also caused cash flow and liquidity problems for the Company, which led him, in late 2015 and early 2016, to seek to restructure the Notes to postpone certain payment deadlines. Meanwhile, the Ukrainian government further ratcheted up the pressure on Bakhmatyuk

when, in 2016, it launched an investigation into his embezzlement of government funds in connection with a loan granted to a bank that Bakhmatyuk previously owned.

**ANSWER:    Defendants admit that in 2014 Russia annexed Crimea, resulting in political and economic turmoil in Ukraine, including in the agricultural sector of the economy and for the Company. The Piazza Defendants further admit that there was a restructuring of the Company, but the Piazza Defendants otherwise lack sufficient information to admit or deny and therefore deny same.**

52.    These events, described in further detail below, precipitated Bakhmatyuk's scheme to preserve his singular control over the Company's assets.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

53.    In early 2014, Russia annexed Crimea, causing significant political and economic turmoil in Ukraine. This had a destabilizing impact on the Ukrainian agricultural market as Ukrainian businesses with facilities and operations in Crimea suffered significant operational disruptions. The Company was among the businesses affected by the annexation and subsequent military conflict. It had a laying farm, a rearing farm, and a hatchery within Crimea that had to suspend production, and had two laying farms, a rearing farm, and a feed mill in the eastern part of Ukraine, where the military conflict was taking place.

**ANSWER:    With the exception of general knowledge of the war in Ukraine, the Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

54.    In August 2014, the *Financial Times* reported on the attempted "forced nationalization" of AVG's assets in Crimea by local officials. Although the report indicates that Bakhmatyuk did not believe the events in Crimea would affect AVG's overall performance, the report stated that those events were "cutting into the company's value." A *CNBC* report the same month stated that although "Crimea accounts for less than five percent of Avangardco's revenues ... the Donetsk and Luhansk regions made up around 19 percent of its group revenues last year, suggesting that the company may be in more trouble if fighting continues in those regions." It further stated that "[r]atings agency Fitch, which has a CCC rating on the Ukrainian egg company, warned the crisis 'may ultimately threaten the group's financial flexibility and its ability to meet its debt obligations.'"

**ANSWER:    Plaintiffs' citation to a newspaper article speak for itself. Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

55.    At the same time that Bakhmatyuk was dealing with disruptions arising from the annexation of Crimea, he watched as Mriya experienced even greater turmoil. In August 2014, Mriya had approximately $1.3 billion in total debt and announced that it was defaulting on some of its debt obligations. Reports indicate that Mriya's management referenced the difficult economic situation in Ukraine and the military conflict among the factors contributing to the

default, though it was later discovered that mismanagement and widespread fraud was a significant contributing factor that led to the default. Mriya's creditors obtained de facto control of the operating group in early 2015 through the appointment of a provisional liquidator in Cyprus following a petition by the Note Trustee acting on the instructions of a group of Mriya's unsecured noteholders. At the same time, members of the Huta family, which had owned Mriya, were indicted for gross fraud in Ukraine (though they were ultimately never prosecuted), and Mriya's CEO Mykola Huta left Ukraine to Switzerland, apparently to avoid prosecution. This was one of the only examples, if not the only example, of enforcement action being taken by creditors of a large Ukrainian company within the last decade.

**ANSWER:    Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

56.    After a long process during which a management team selected by Mriya's unsecured creditors managed the company, the creditors completed the restructuring and ultimate sale of the business in 2018. Members of the Huta family and Mriya management currently face criminal prosecution in Cyprus as well as multiple suits from Mriya's liquidators who are looking to recover amounts that were misappropriated prior to the default in 2014. The takeover of Mriya engineered by its unsecured creditors and its fallout stood as a cautionary tale for Bakhmatyuk.

**ANSWER:    Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

57.    Still wrestling with cash flow and liquidity problems in the wake of the turmoil in Crimea, Bakhmatyuk approached Gramercy and the other Noteholders to ask for a narrow restructuring of the AVG Notes, which were set to become due on October 29, 2015. Gramercy agreed to the restructuring proposal, in which the date of redemption was extended to October 29, 2018 and part of the semi-annual interest payments were converted to payment in kind ("PIK") from cash. The PIK payments were increases in the principal amount of the outstanding Notes in the amount that would otherwise have been owed in cash. Gramercy voted in favor of this restructuring, so it was approved and finalized on October 26, 2015.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

58.    Shortly after, Bakhmatyuk approached Gramercy and the other noteholders about restructuring the ULF Notes as well, although they were not redeemable until March 26, 2018. Initially, Bakhmatyuk asked for more extensive relief than that provided in the prior restructuring of the AVG Notes, but, when Gramercy stated that the restructuring should be effectuated consistent with international norms, involving robust due diligence and independent financial advisors, Bakhmatyuk changed his request to a narrow deal like that reached for the AVG Notes. ULF requested that Gramercy and the other Noteholders approve a restructuring of the ULF Notes to allow the semi-annual interest payments due on March 26, 2016 and September 26, 2016 to be satisfied partly in cash and partly by way of PIK, and for certain events of default under the ULF Notes to be waived. Gramercy voted in favor of this proposal, and it was approved and finalized on April 22, 2016. Both Bakhmatyuk and Gramercy understood, however, that this was a short-term fix and that a comprehensive restructuring soon would be needed.

**ANSWER:**   The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

59.     In October 2016, the National Anti-Corruption Bureau of Ukraine ("NABU") launched an investigation into Bakhmatyuk in connection with a historic stabilization loan of around UAH[8] 1.2 billion that the National Bank of Ukraine ("NBU") provided to VAB Bank in October 2014 (the "NBU Loan"), a bank that Bakhmatyuk owned at the time (the "NABU Investigation"). NBU provided the loan during the height of the period of crisis in Ukraine in order to try to save VAB Bank and avoid any cascading effects on ULF and AVG, which had borrowed from VAB Bank. The focus of NABU's investigation was whether Bakhmatyuk had embezzled the loan funds for his own personal use and benefit and/or for the use and benefit of companies he owned, rather than for their designated purpose—namely, meeting the guaranteed deposits of VAB Bank's clients.

**ANSWER:**   The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

60.     Subsequent criminal proceedings revealed that VAB Bank transferred this money outside of Ukraine through the Austrian bank, Meinl Bank AG, to Cyprus companies affiliated with Bakhmatyuk: Quickcom Limited, Mobco Limited, Tanchem Limited, Omtron Limited and Chavarria Trading Limited. In 2019, the European Central Bank revoked the license of Meinl Bank AG due to allegations of the bank's involvement in money laundering.

**ANSWER:**   The Piazza Defendants do not have sufficient information with which to admit or deny, and therefore deny this paragraph.

61.     NABU's investigation of Bakhmatyuk was spurred by several factors. According to sources describing the investigation, Bakhmatyuk secured the loan with a personal guarantee and pledges of real estate, the value of which Bakhmatyuk grossly overstated, claiming that it was worth nearly 25 times its actual value.[9] The NABU investigation subsequently revealed that this was a gross inflation of the actual value of the security.

**ANSWER:**   The Piazza Defendants do not have sufficient information with which to admit or deny and therefore deny this paragraph.

62.     Shortly after NBU made the loan, in November 2014, VAB Bank was declared insolvent by the NBU, and the Deposit Guarantee Fund of Individuals ("DGF") appointed a provisional administrator. This sparked multiple criminal and civil investigations into Bakhmatyuk—the relevant ones are described herein. In March 2015, NBU revoked VAB Bank's banking license and VAB Bank was liquidated. In addition, the NBU froze some of Bakhmatyuk's real estate and moveable property in Ukraine.

---

[8] The Ukrainian national currency, the hryvnia, is referred to herein as "UAH." At the time of the loan, 1.2 billion UAH equated to around $92,618,400.

[9] At that time, UAH 10 billion equated to around $771,820,000.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

63.    The NBU and DGF also launched multiple lawsuits against Bakhmatyuk and/or his companies seeking to enforce the personal guarantees he had provided (among other things). The NABU investigation led the Ukrainian Prosecutor General's office to launch further criminal proceedings on December 12, 2016.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

64.    Shortly thereafter, in December 2016, Bakhmatyuk transferred one of his significant personal assets, his large villa on an estate in a gated community in the center of Vienna, to his children, the oldest of whom was 16 at the time. Bakhmatyuk described the transfer in the Austrian cadastral register as "a gift." As the NABU Investigation intensified over the following years, Bakhmatyuk permanently relocated to Austria.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

65.    In the summer of 2016, knowing that the recently-completed restructurings of the AVG and ULF Notes were only short-term fixes for the Company's cash flow issues, Bakhmatyuk, with the aid of others, concocted a plan to effectuate a blunt-force restructuring of all of the Company's debt without having to make substantial concessions to any of the Company's creditors.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

66.    At the time, the Company had four primary groups of creditors: (1) unsecured noteholders, including large unsecured noteholders such as Gramercy and Ashmore Investment Management Limited ("Ashmore"); (2) European creditors and export credit agencies like US Exim and Canada Exim, which held a mix of relatively small secured and unsecured positions; (3) large international banks including the Russian bank Sberbank and Deutsche Bank, which held secured positions; and (4) Ukrainian state-owned banks like Oschadbank.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

67.    Each group of creditors presented unique issues for Bakhmatyuk. The secured creditors held security in portions of some of the individual subsidiaries held under the ULF and AVG umbrella, and therefore could chip off some of the Company's assets if they took enforcement action. Ukrainian banks, in contrast, were prevented from taking haircuts on debt they hold. And Gramercy had the rights under the Trust Deeds to, among other things, block a disadvantageous restructuring that Bakhmatyuk sought to force on the Company's creditors and direct the Trustee to take an enforcement action against the Company and some or all of the ULF and AVG subsidiaries, and, in the worst case for Bakhmatyuk, liquidate the 15 AVG subsidiaries and 64 ULF subsidiaries that were Surety Providers. In other words, Gramercy had the power to

do what the unsecured creditors of Mriya had done—use liquidation proceedings to take control of the Company and convert their debt into equity.

**ANSWER:** **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

68.     Bakhmatyuk's plan, as he and his agents expressed repeatedly throughout later negotiations, was to negotiate with each group of creditors in silos, and, to the extent possible, with each creditor individually. This approach served Bakhmatyuk's primary objective of preserving the Company's assets for his personal use because it allowed him to control the flow of information to each creditor and maximized his chances of persuading creditors to make substantial concessions. The first creditor Bakhmatyuk targeted was one of his biggest obstacles: Gramercy.

**ANSWER:** **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

69.     As Gramercy had already made clear in the discussions around the first restructuring of the ULF Notes, however, it believed any restructuring should follow international norms, including due diligence, independent advisors, and all of the creditors at one table. Thus, the stage was set for the negotiations that took place over years to come. But, unbeknownst to Gramercy, Bakhmatyuk and his co-conspirators had other plans for securing Bakhmatyuk's singular control over the Company's assets in the event Gramercy refused to acquiesce, culminating in the transfer of nearly a billion dollars-worth of assets with the aid of Piazza and his companies.

**ANSWER:** **The Piazza Defendants aver that TNA, as Security Agent, executed on the pledged property consistent with its rights and obligations under the Loan Facility. Otherwise, denied including but not limited to the claim that TNA acted in or transferred assets to Wyoming.**

70.     Unable to cajole Gramercy into a restructuring on his terms, Bakhmatyuk initiated a multi-faceted scheme—agreed to and carried out by Bakhmatyuk, SP Advisors, TNA, Piazza, and Yaremenko, aided and abetted by others including Concorde and Petrashko—that illegally undermined Gramercy's legal and economic rights through the intentional dissemination of misinformation (including direct misrepresentations), non-arms-length debt purchases, and asset stripping. To execute their scheme, Defendants acted in concert in their use of the mail and wires to perpetrate fraud, and thereby engaged in a pattern of racketeering activity.

**ANSWER:** **Denied.**

71.     In the first phase of their scheme, Bakhmatyuk and Piazza took advantage of their connections in the media and Piazza's connection to Concorde to disseminate false information that exaggerated the Company's poor financial performance and overstated the effect of certain internal reorganizations that would make a Mriya-style takeover difficult or impossible. Meanwhile, Bakhmatyuk maintained the facade that he was willing to engage in transparent, good

faith restructuring negotiations with Gramercy to buy himself time to shield his assets through transfers first to Cyprus-based entities and then to Piazza-created Wyoming entities.

**ANSWER:**   **Denied.**

72.     Bakhmatyuk and Piazza released an initial tranche of false information before the restructuring negotiations even started through Concorde, which published a report on the Company's financial situation on or about August 11, 2016 (the "First Concorde Report"). While Concorde would later act openly as an intermediary for Bakhmatyuk, at this time it purported to be an independent actor. It sent the First Concorde Report to investors, including Gramercy, via electronic mail, and, upon information and belief, Concorde included false and manipulated information in this report at the behest of Bakhmatyuk and Piazza.

**ANSWER:**   **Denied.**

73.     The First Concorde Report contained a strikingly negative outlook for the Company that did not align with positive market conditions in 2016. Entitled "Locked and loaded for a fight with creditors — negative view," the First Concorde Report stated that "no money is reserved for creditors for the foreseeable future" and that a restructuring is "unavoidable." Accordingly, it recommended that existing bondholders initiate "hard talks" with the company. It further stated that ULF "lacked the capacity to repay principal on its debt in 2014-15. Current grain and egg prices imply that the same tight liquidity might persist in 2016-17." It claimed that "ULF's revenue fell 40% yoy to USD 938 mln, as the company reported sharply lower volumes in its egg business." It also took a negative view of the devaluation of the UAH, speculating that it would lead to AVG's selling prices being "beaten down."

**ANSWER:**   **To the extent this paragraph quotes directly from the First Concorde Report, the document speaks for itself. Otherwise, denied.**

74.     These statements lacked credibility, particularly in light of Concorde's close ties to Bakhmatyuk through Piazza. In sharp contrast to the First Concorde Report, market conditions for Ukrainian agricultural businesses had improved in 2016 and the devalued UAH had sparked a major increase in exports. In particular, the egg market was in the process of a significant comeback. Reports indicate that, while Ukraine exported 650 million eggs in 2016, this number would grow to 1.79 billion in 2018.

**ANSWER:**   **Defendants deny that Piazza has "close ties" to Concorde. Defendants do not have sufficient information with which to admit or deny the remaining allegations in this paragraph relating to Concorde, and therefore deny the same.**

75.     Even Piazza suggested a very positive outlook on the Ukrainian economy in June 2016: "[T]he first months of 2016 were amazing, the best time since 2013. Hryvnia is stable, so you can make long-term plans. And new market channels are open to us." Yet at the same time Concorde was predicting doom and gloom.

**ANSWER:    Piazza Defendants admit having been interviewed for a newspaper and making statements which speak for themselves, unrelated to Gramercy, ULF, or AVG.**

76.    Tellingly and seemingly out of the blue, the First Concorde Report also detailed at length the purported obstacles to a Mriya-style unsecured creditor takeover of the Company. In particular, Concorde highlighted changes in the structure of the Company between 2012 and 2016 that made the structure "more complicated" and caused ULF's "direct control of its key assets [to be] dispersed between the group's other subsidiaries." As Gramercy would later discover, these transfers were focused on transferring the ownership of most of the Surety Providers so that they were no longer held directly by ULF (but still remained within the Company). None of these transfers were publicly disclosed by the Company or disclosed to the Trustee as required under both Trust Deeds. These changes were directed toward defending the Company against a Mriya-style takeover, which Concorde openly noted by saying that shifts in ownership structure left the Company "well-prepared ... for a scenario of a possible takeover by creditors (the case of agricultural holding Mriya)."

**ANSWER:    Defendants do not have sufficient information with which to admit or deny the allegations relating to Concorde in this paragraph, and therefore deny the same. Otherwise, denied.**

77.    A few months after the First Concorde Report, in October 2016, the Company confirmed to Gramercy and its other creditors that it was seeking a comprehensive restructuring of both sets of Notes.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

78.    In response, Gramercy and Ashmore together demanded a restructuring process that complied with internationally accepted standards—one with due diligence, independent advisors, and all of the creditors at one table. Specifically, Gramercy and Ashmore sent Bakhmatyuk and ULF a letter in or around October 2016 expressing their concerns about an approach that did not employ these internationally accepted standards and making clear that they would not make the substantial concessions that Bakhmatyuk wanted absent a more formal process, including extensive due diligence. In particular, Gramercy wanted more information about why the Company purportedly was performing so poorly while the rest of the Ukrainian egg and agricultural markets recovered, and Gramercy wanted more information on the corporate and legal structure of the Company, especially in light of the First Concorde Report's reference to changes in the Company's structure that might affect Gramercy's ability to take certain enforcement actions.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

79.    Accordingly, Gramercy and Ashmore proposed a two-step approach to restructuring negotiations. First, they proposed that between October 2016 and mid-December 2016, the parties should reach agreement on the restructuring framework, jointly appoint internationally recognized advisors to assist with the due diligence process (among other things),

and complete all due diligence. Second, they proposed that by the end of January 2017, the parties should reach agreement on a mutually acceptable set of terms to facilitate implementation prior to the March 26, 2017 coupon date for ULF.

**ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

80.    Gramercy and Ashmore's proposed plan was flatly rejected by Bakhmatyuk. Contrary to his earlier suggestion of a comprehensive restructuring, which, under international norms, requires transparency and the use of independent financial analysts, Bakhmatyuk was unwilling to provide transparency into the real financial condition of the Company, preferring instead to deal with creditors in silos based on misinformation.

**ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

81.    As the restructuring negotiations began, Ukrainian media continued to advertise the Company's supposedly deteriorating financial condition. For example, in 2017 the Ukrainian agricultural news outlet Latifundist.com began reporting that the Company's business was suffering despite the significant market rebound. One article claimed, without explanation, that by 2017, AVG's market share in industrial egg production in Ukraine had dropped from 52% in 2012 to 24% in the first half of 2017.

**ANSWER:**   **To the extent this paragraph quotes directly from Lantifundist.com, it speaks for itself. The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

82.    Ukrainian market experts have since called into question the general accuracy and independence of Latifundist's reporting. Specifically, Yaroslava Larina, Julia Gajchynska, and Oleksandr Popov of the National University of Life and Environmental Sciences of Ukraine, a leading research university within Ukraine, compared data from 2015 on the Latifundist website with data from the same year from the State Statistics Service of Ukraine, and with the annual reports of AVG and its largest competitor, Ovostar and found that it was drastically inaccurate. Apparently struck by a gaping discrepancy between the reported and actual market share, the market experts suggested that the "inconsistencies in the data might be a result of agreements between the portal's editorial staff and companies in order to comprise inaccurate data into the information space."

**ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

83.    In the same period, Bakhmatyuk also used the Company as a platform to publicly blame the NABU Investigation for the Company's deteriorating situation. In January 2017, he published an open letter to Ukraine's president and prime minister on ULF's website that accused the NBU Governor of raiding his business, attempting to tarnish his reputation, and trying to force ULF into bankruptcy. In the letter, Bakhmatyuk emphasized that ULF produced "almost 1.5% of Ukraine's GDP," that it contributed "over UAH 2bn in taxes," and that it employed 37,000 people.

Notably, he also accused the NBU Governor of pushing the Company down a path mirroring Mriya's bankruptcy and creditor takeover, saying:

> At the same, we are concerned lest the Company's difficult situation caused by the losses it has sustained in the occupied territories and further aggravated by the pressures being put on its business through NBU channels should force it down Mriya's path, a company currently undergoing bankruptcy proceedings. The Mriya situation caused quite a ripple both economically and politically when debt to foreign creditors was simply `written off.

> The company lost substantial production volume and assets when it fell prey to a takeover raid. The only party that benefited from it was the advisors who advised on the deal. Given the fact that Ukrlandfarming holds 10-15 times more in assets, there's evident interest in running our case along the lines of Mriya's in the presence of the vested interest pursued by the NBU Governor and her colleagues and partners who make money on corporate bankruptcies.

**ANSWER:   To the extent this paragraph quotes directly from the referenced letter, it speaks for itself. Otherwise, the Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

84.    Meanwhile, Bakhmatyuk enlisted his right-hand man, Igor Petrashko, the Deputy General Director of ULF, to take the lead on his negotiations with Gramercy while Bakhmatyuk turned to Piazza, Yaremenko, and SP Advisors to set up a backup plan. In January 2017, Piazza and Yaremenko organized TNA in Wyoming, which, as Piazza and Yaremenko would later advertise, is an ideal jurisdiction for Ukrainian business owners to store and protect their assets with complete confidentiality. Piazza listed himself as the beneficial owner of TNA, and Yaremenko, upon information and belief, agreed to sign the annual statements. TNA was on standby in case Bakhmatyuk and Petrashko could not coerce and deceive Gramercy into accepting Bakhmatyuk's restructuring plan through negotiations amid a cloud of misinformation.

**ANSWER:   Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. Defendants deny that TNA was organized in Wyoming in 2017 and that it had anything to do with Gramercy, AVG, or ULF as alleged in this paragraph, and denies the remaining allegations in this paragraph. The Piazza Defendants admit that Piazza was listed as a beneficial owner and Yaremenko has signed certain of TNA's annual statements. Otherwise, denied by Defendants.**

85.    On January 26, 2017, Bakhmatyuk arranged for Petrashko to travel from Ukraine to London along with AVG's Head of Investments, Oleksiy Yergiyev, to meet with Jason Cook of Gramercy and a representative of Ashmore. At the meeting, Cook, as well as representatives from Ashmore, discussed with the Company's representatives, Petrashko and Yergiyev, the process that the parties would follow in the restructuring negotiations. Petrashko and Yergiyev expressed that they understood the importance of keeping Gramercy, its largest single noteholder, engaged

throughout the restructuring negotiations due to Gramercy's blocking rights. As a result, although they pushed back on many of the Gramercy's requests and suggestions, they gave just enough ground to convince Gramercy that they were serious about reaching a consensual arrangement. In particular, Bakhmatyuk's representatives rejected Gramercy's proposal of a comprehensive restructuring exercise led by independent advisors, but agreed to a "light independent business review." Petrashko and Yergiyev defended their position by saying that a full-blown restructuring would disrupt its business at a time when stability and focusing on the Company's operations was of pivotal importance.

**ANSWER:** The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

86.     In February 2017, as negotiations continued, Petrashko and Yergiyev agreed to appoint the accounting firm Ernst & Young ("EY") to conduct the "light independent business review." However, the limitations Bakhmatyuk put on EY effectively confined its analysis to determining whether one set of false information conformed with another set of false information. Thus, Gramercy did not obtain any insight into the real financial condition of the Company.

**ANSWER:** The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

87.     In particular, by Bakhmatyuk's design, the work EY performed was based on proposals and financials prepared by the Company itself, and the Company did not instruct EY to conduct any independent, "ground up" analysis of the figures in order to form a truly independent view of the Company's financial health. Indeed, EY's reports expressly state that the firm did not take any independent steps to verify the accuracy or completeness of the information provided by ULF and AVG employees; instead, the review was limited to testing the financial models developed by the Company based on the information it provided. For example, due to restrictions imposed by Bakhmatyuk, EY, as noted in the section of its report entitled "Limitation related to scope of work and responsibility," did not:

    a.     Consider the consistency of the Company's model with external files;

    b.     Conduct any due diligence of historical operational information that was not disclosed in the Company's own financial statements but that explicitly affects the Company's model's projections;

    c.     Review the assumptions in the Company's model against financial plans or other documents;

    d.     Consider cash flows, account balances and taxation in respect of the potential restructuring from the perspective of specific shareholders and lenders, other than to the extent described and explicitly represented in the Company's own model; or

    e.     Take other common steps to verify the information in the model provided by the Company.

**ANSWER:**     The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

88.     As a result, through no fault of its own, the report EY produced in October 2017, conveyed via electronic mail to Gramercy (the "EY Report"), was limited to reliance on the same false financial information that the Company had disseminated at Bakhmatyuk's command. Thereafter, Bakhmatyuk and his agents repeatedly invoked the EY Report throughout restructuring negotiations to support his position.

**ANSWER:**     The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

89.     As negotiations between Gramercy and the Company continued in earnest in February 2017, Bakhmatyuk, through the Company's counsel Latham and Watkins, continued to promise that the Company would provide some of the diligence materials Gramercy requested, such as a structure chart of the Company, and would fund the legal expenses of Gramercy and Ashmore (a common feature of a consensual restructuring). Tellingly, however, the Company never actually provided this structure chart. Moreover, the Company (through its counsel) pushed back on many other of Gramercy's reasonable diligence requests.

**ANSWER:**     The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

90.     Nevertheless, Bakhmatyuk's agreement to the independent business review and promises of additional diligence kept Gramercy from leaving the negotiating table. In or around March 2017, a bondholder with a much smaller position than Gramercy's approached Gramercy and Ashmore to suggest they join forces in the restructuring negotiations to increase the pressure on Bakhmatyuk and the Company. Relying on Bakhmatyuk's false representations and promises, Gramercy and Ashmore declined the invitation.

**ANSWER:**     The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

91.     Having laid the groundwork through misinformation, Bakhmatyuk made his first low-ball restructuring offer to Gramercy on April 6, 2017 at another in-person meeting with Cook and Rob Rauch, who traveled from Connecticut to London for the meeting. Specifically, Petrashko asked Gramercy and the other noteholders to accept a haircut of half of the value of their notes, half the value of the interest and to extend the maturity date of their notes for ten years, without offering any upside for these substantial requested concessions. The pretext for asking Gramercy to agree to these unfair terms was Bakhmatyuk and Piazza's campaign of misinformation, which sought to convince Gramercy their Notes were worth much less than they were and that they had no choice but to compromise significantly in the restructuring negotiations. Petrashko also revealed their strategy by indicating that ULF planned to conduct a "phased" restructuring where it would seek deals with its other groups of creditors before it would finalize a deal with Gramercy and the other Noteholders.

**ANSWER:**   The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

92.     Gramercy understood that, like other Ukrainian companies at that time, the Company was facing some external financial challenges. But Bakhmatyuk's offer lacked any upside, so Gramercy flatly rejected the offer. Nevertheless, as detailed further below, Bakhmatyuk, Piazza and their allies did not give up on trying to convince Gramercy to accept a restructuring on similar or worse terms based on continued misinformation and other tactics.

**ANSWER:**   Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. Otherwise, denied.

93.     As 2017 wore on, Gramercy persisted in its efforts to convince Bakhmatyuk to conduct multilateral negotiations with all of the creditors. These attempts proved increasingly futile, however, as Bakhmatyuk and their allies began to implement the next phase of their scheme. In this next phase, Bakhmatyuk enlisted Piazza, SP Advisors, and others to act as straw purchasers to buy up Company debt, with the aim of isolating Gramercy so that it either would be forced to sell at a rock bottom price or left without meaningful recourse under the Notes. Along the way, whenever Gramercy asked Bakhmatyuk or one of his agents about another debt purchase it uncovered, they falsely represented that they were not involved.

**ANSWER:**   Defendants admit AVG and ULF were engaged in negotiations to restructure the notes. The Piazza Defendants admit they were involved in purchasing Notes during this time period, had discussions with Gramercy on this topic, and that they are noteholders, subject to the binding terms of the Notes and Trust Deeds, including the arbitration clauses contained therein. Otherwise, denied.

94.     The first of these purchases occurred in the spring of 2017. In April, Gramercy (through counsel) was pushing Bakhmatyuk, through an email exchange with Petrashko, to open up restructuring negotiations to include the Company's secured institutional creditors like the Russian bank, Sberbank. In response, via an email on April 28, 2017, Petrashko indicated that Bakhmatyuk was "ready to consider expanding the process into a multilateral general restructuring of bank and bond creditors if we agree together that this is the most effective way to achieve a holistic long-term restructuring," but that he believed that opening up the restructuring to include institutional creditors would lead to complications and delay, given the disparate nature of the creditors and their motivations. Petrashko specifically noted that "Sberbank's intention with respect to [its debt] exposure is unclear although we have not yet received any confirmation that they have sold it. In any event, Sberbank's participation in a multilateral general restructuring will significantly complicate the process. We have a long and challenging relationship with Sberbank and, on the basis of extensive experience, we strongly prefer to deal with them bilaterally and not force them to participate in a multilateral general restructuring."

**ANSWER:**   To the extent this paragraph directly quotes from the referenced emails, it speaks for itself. The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

95.    Gramercy responded to Petrashko's email on May 3, 2017, informing Petrashko that it was aware that Sberbank had agreed to sell its exposure at a deep, roughly 80%, discount and asking about the identity of the purchaser, reiterating that it preferred simultaneous, multilateral negotiations to Bakhmatyuk's creditor-by-creditor approach. When Petrashko responded, on May 4, 2017, he ignored the question about the identity of the purchaser of Sberbank's position and simply stated that they had reached an impasse in negotiations.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

96.    As Gramercy would discover by March 2018, when Petrashko sent his email, Sberbank had sold its position to a private equity fund called PS Capital, which, upon information and belief, purchased the debt as a front for Bakhmatyuk. Gramercy learned of PS Capital's involvement when, at a later date, Sergei Lioutyi, the Vice President of EMEA Corporate Credit at Gramercy, met with Max Lozhevsky of PS Capital. PS Capital's identity as the buyer of the Sberbank debt was confirmed in a letter sent by the US-Ukraine Business Council, an organization of which SP Capital is a member, to, *inter alia*, the Deputy Assistant for Russia and Eurasia at the Office of the US Trade Representative and the Ukrainian president, Volodymyr Zelensky, dated December 24, 2019 (the "Business Council Letter"). The letter states that PS Capital owns debt in the company that is "mainly a syndicated loan facility from Deutsche Bank/Sberbank."

**ANSWER:    To the extent this paragraph directly quotes from the referenced letter, it speaks for itself. The Piazza Defendants further admit that they were aware of and supported the US-Ukraine Business Council's letter. Otherwise, denied. Defendants aver that "SP Capital" is not an entity affiliated with SP Advisors or otherwise known to the Piazza Defendants. To the extent that "SP Capital" is referred to throughout this Complaint as interchangeable with "SP Capital Management" or "SP Capital Management, LLC", denied.**

97.    Having purchased Sberbank's debt through a put/call arrangement, Bakhmatyuk eliminated one threat to his control over the Company and its assets, but preserved his ability to inaccurately claim that the debt was held by a third party when, in fact, this was a facade given that PS Capital was effectively fronting the debt for Bakhmatyuk.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

98.    After orchestrating the purchase of Sberbank's debt, Bakhmatyuk and the Company continued to negotiate with Gramercy using the same tactics—making minor concessions to keep Gramercy at the table but ultimately continuing to frustrate Gramercy's efforts to gain insight into the true structure and financial condition of the Company.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

99.    In the summer and fall of 2017, the next minor concession was the engagement of independent restructuring advisor Ziff Ivin on similar terms as the engagement of EY—namely,

without enough access to Company information to provide any real insight—and the provision of minimal diligence materials. During this time, Bakhmatyuk and the Company also presented another unfavorable restructuring proposal, this time asking Gramercy and the noteholders to take haircuts between 35-50% on the Notes, extend the redemption date for 9 years, and accept other unfavorable terms. Gramercy rejected this proposal but continued its attempts to negotiate.

**ANSWER:    With the exception of knowing that Ziff Ivin was engaged, the Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

100.    Gramercy's efforts to get Bakhmatyuk to agree to a standard restructuring process suffered another major setback when, in February 2018, Ashmore informed Gramercy that it had sold its entire position to an undisclosed third party purchaser (the "Ashmore Debt Purchase"), and therefore would no longer be taking part in any further negotiations. Ashmore had held a material amount of the Notes, albeit a smaller position than Gramercy. This debt purchase was particularly significant because Ashmore and Gramercy shared common views on the need to unite the creditors and negotiate a global restructuring of all of the Company's debt at once. When Gramercy asked Ashmore about the identity of the buyer, Ashmore expressed its understanding that the buyer was a local person with an interest in ULF's land portfolio.

**ANSWER:    Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. The Piazza Defendants further aver that discussions with Ashmore occurred concerning its interest in selling its position in 2018, and on information and belief Ashmore may have sold certain positions prior to and/or in 2017. Defendants further admit Ashmore sold some of its position in 2018. Otherwise, denied.**

101.    Later that same month, on February 18, 2018, Lioutyi travelled to Kiev to represent Gramercy in further restructuring negotiations with Bakhmatyuk. At that meeting, Lioutyi asked Bakhmatyuk about the Ashmore Debt Purchase and who the buyer of Ashmore's position was. Bakhmatyuk responded that he had no idea. In October 2018, Petrashko even went so far as to assert that Gramercy had purchased Ashmore's position, which was false because he must have known that Gramercy was not the buyer of Ashmore's position.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

102.    As Gramercy would learn from Ashmore in late February 2018, the Ashmore Debt Purchase was made by an investor named Beaufort. Beaufort is partially owned by S. Pierce Advisors, which is, upon information and belief, part of SP Advisors, Piazza's network of related companies under the umbrella of SP Capital. The Business Council Letter further suggested that Piazza, through SP Capital, controlled Ashmore's former position by stating that SP Capital holds roughly $200 million in the Company's secured and unsecured debt, which is consistent with Piazza having orchestrated the Ashmore Debt Purchase and being the ultimate owner of the debt.

**ANSWER:    The Piazza Defendants admit that, upon information and belief, some portion of the Ashmore debt was purchased by Beaufort, and that S. Pierce Advisors had a minority stake of less than 10-percent in Beaufort, and that another company in which Piazza**

had an interest owned a 20-percent stake in S. Pierce Advisors. **With respect to the Business Council Letter, it speaks for itself, otherwise denied. Defendants aver that "SP Capital" is not an entity affiliated with SP Advisors or otherwise known to the Piazza Defendants. To the extent that "SP Capital" is referred to throughout this Complaint as interchangeable with "SP Capital Management" or "SP Capital Management, LLC", denied.**

103.    Following the Ashmore purchase, in the spring of 2018, Bakhmatyuk and his agents continued to negotiate with Gramercy. In or around March 2018, Rauch and Lioutyi again travelled to Kiev to meet with Bakhmatyuk and Petrashko, and at this meeting, Bakhmatyuk offered to repurchase Gramercy's position at $0.11 per dollar. Gramercy declined Bakhmatyuk's proposal on the basis that it was unreasonably low.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

104.    In mid-April 2018, Gramercy sent Bakhmatyuk term sheets setting out a counter proposal indicating that it and the other Noteholders would accept a 30% haircut, a five-year extension of the Notes, and reductions in interest payments with some interest in the form of PIK *on the conditions that* (1) other classes of creditors made similar concessions and (2) the Noteholders (and certain other creditors) would receive 49% of the fully diluted equity of ULF and 40% of AVG (subject to Bakhmatyuk's right to buy back a portion of that equity in return for a cash distribution to those creditors).

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

105.    On June 23, 2018, Bakhmatyuk rejected Gramercy's terms, stating that they could not serve as a basis for an agreeable restructuring deal. In particular, his representatives emphasized that Bakhmatyuk would never agree to an equity grant, and that it would not accept a deal that required its domestic lenders to defer certain repayments. In refusing to delay payments to the domestic creditors in order to satisfy some of what it owed to Gramercy and the other Noteholders, Bakhmatyuk's representatives reneged on his commitment in the November 2017 offer not to favor the Company's domestic creditors over its foreign ones, a necessary precondition to the unified, comprehensive restructuring that Gramercy desired.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

106.    Bakhmatyuk's representatives followed this rejection with counterproposals, which continued to contain manifestly unfair terms premised on Bakhmatyuk's plan to deal with each group of creditors bilaterally, and continued to not meaningfully address Gramercy's concerns about the prior proposals. Thus, Gramercy rejected the terms.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

107.    Undeterred, Bakhmatyuk and his allies continued to use misinformation in an effort to pressure Gramercy into accepting an unfair restructuring deal that steeply discounted the value of its Notes. On July 2, 2018, representatives of Gramercy (namely Lioutyi and Rauch) met with Petrashko once again to discuss the restructuring. During those discussions, Petrashko indicated that the noteholders would face difficulties in recovering their investments due to Bakhmatyuk's extensive indebtedness under the personal guarantees he had given to guarantee loan to VAB Bank that was then under investigation by NABU. These personal guarantees were based on, as the NABU Investigation revealed, Bakhmatyuk's fraudulent inflation of the value of his assets. So, given Bakhmatyuk's lack of cash, according to Petrashko, any debt recovery by Gramercy would only be $0.11 per dollar, assuming a 25% discount rate.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

108.    Reinforcing Petrashko's false claims, Concorde transmitted via email a new report (the "Second Concorde Report') to Gramercy two days later, on July 4, 2018. Tellingly, the Second Concorde Report parroted Petrashko's statement at the meeting that the best debt recovery Gramercy could hope for would be $0.11 per dollar, assuming a 25% discount rate. The Second Concorde Report also included the following assertions and implied threats:

    (1)    due to the "complicated, vague and fragile structure of assets" consolidated by the Company, Bakhmatyuk's leadership was "a necessary condition for [the Company] to have a chance to survive," implying that the Company could not survive a Mriya-style restructuring;

    (2)    the financial situation of the Company continued to deteriorate at a rapid pace, despite the recovering market. In a section titled "Recent financials: everything goes wrong," Concorde stated that "[s]ince its peak financial result in 2013, [the Company] has shown increasingly deteriorating P&L through 2017, with its EBITDA collapsing 89% from peak levels;"

    (3)    "EY performed independent review" of the Company's operational models, but also that these models "overestimated," the Company's profit; and

    (4)    Bakhmatyuk would be ready to spend "some years generating cash for debt holders exclusively," but "only if the biggest creditors agree on a debt restructuring deaI."

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

109.    Shortly after the July 2, 2018 meeting, Bakhmatyuk and Piazza arranged another debt purchase. BNP Paribas' Ukrainian banking arm, Ukrsibank, which had held Company debt, sold out at distressed prices. Again, Gramercy did not learn about this transaction from Bakhmatyuk or the Company. Rather, it learned from Giovanni Salvetti ("Salvetti") of Rothschild & Co ("Rothschild")—an advisor Gramercy had engaged in connection with its restructuring negotiations in early July 2018—that Ukrsibank sold its debt position to one of Bakhmatyuk's

affiliates "after [Bakhmatyuk] came to them openly saying that their grain collateral would disappear and that his objective was to sandbag results until bondholders sell for $0.03-5 [per dollar]." Upon information and belief, Piazza bought Ukrsibank's debt in this transaction.

> **ANSWER:**   **The Piazza Defendants deny that Piazza bought Ukrsibank's debt in this transaction. The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

110.   Having learned of at least three debt purchases covertly orchestrated by Bakhmatyuk and/or Piazza, Gramercy began to explore other options in parallel with the negotiations, including whether it could drum up support from influential high net-worth individuals in Ukraine who could assist in facilitating a foreign creditor takeover or to work with state officials to persuade Bakhmatyuk to adopt a more reasonable approach in the ongoing negotiations.

> **ANSWER:**   **Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. Otherwise, Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

111.   Pursuant to this plan, on October 4, 2018, Salvetti, on Gramercy's behalf, met with Petrashko and told him that Bakhmatyuk could either buy Gramercy's debt at a fair price, accept Gramercy's original restructuring proposal, or Gramercy would look to move forward with a "plan b," Mriya-style foreign creditor takeover. Petrashko responded that "plan b" would end up in "bloodshed," and said that Gramercy, as an unsecured creditor, would receive no more than $0.02¬0.03 per dollar in any Mriya-style takeover. Petrashko said that Bakhmatyuk was not opposed to walking away from the negotiations entirely and claimed that Bakhmatyuk's position was secure because he had money abroad. As far as the deal that Gramercy offered, Petrashko said that Bakhmatyuk was not ready to relinquish any equity to the noteholders, clearly implying that Bakhmatyuk was reserving his liquid funds to settle his other scores (*i.e.*, with the NBU and DGF). Finally, Petrashko revealed that the Company itself had been buying up its own secured debt at Bakhmatyuk's direction, although he again denied that Bakhmatyuk directed the purchase of the Ashmore position.

> **ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

112.   Shortly thereafter, on October 18, 2018, Gramercy received an unsolicited email from Piazza referring to a market rumor that a large bondholder was "shopping a block around in the market" and asking if Gramercy had any further information. Piazza referred to his company, SP Advisors, as having shifted its focus onto secured debt and purchasing "a couple of pieces" and being in negotiations with some other noteholders. This conversation reinforced that Piazza was buying up debt on behalf of Bakhmatyuk. One day later, on October 19, 2018, a representative of Concorde, Piazza's former firm, now openly working as an intermediary for Bakhmatyuk, reached out to Gramercy to try to arrange a meeting between Concorde, Gramercy and Petrashko on October 29, 2018.

**ANSWER:**   To the extent this paragraph quotes directly from an email, it speaks for itself. Defendants admit that Piazza and TNA Corporate Solution became interested in the company's secured debt. Defendants do not have sufficient information with which to admit or deny the remaining allegations in this paragraph, and therefore deny the same.

113.   In response to these overtures, on October 26, 2018, Gramercy (through Salvetti) extended an offer to Petrashko for the Company to buy back Gramercy's position at a price of $0.37 per dollar and stated that Gramercy expected to receive a response by mid-November 2018. Petrashko rejected this offer on November 16, 2018, declining to offer any counter proposal.

**ANSWER:**   Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds, but that Plaintiffs proposal that the "Company [ ] buy back' only its interests violated the terms of the Trust Deed and reflects further Gramercy conduct violative of applicable law. Otherwise, Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

114.   At the subsequent meeting in Connecticut on October 29, 2018 between Gramercy's representative Rob Rauch and Concorde's founder, Igor Mazepa, which Mazepa reached out to arrange seemingly out of the blue, Mazepa unsurprisingly echoed the sentiments expressed by the Second Concorde Report and Petrashko, reiterating Bakhmatyuk's position that a Mriya-style unsecured creditor takeover or other enforcement action would result in poor recoveries in light of the Company's complex structure. Mazepa also reiterated Bakhmatyuk's claims that the Company had been suffering financially, despite the recovering agricultural market in Ukraine.

**ANSWER:**   Defendants admit AVG and ULF were engaged in negotiations to restructure the Notes in accordance with and in compliance with the terms of the Trust Deeds. Otherwise, Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

115.   Despite Bakhmatyuk's attempt to undermine Gramercy's efforts, Gramercy began to develop a Creditors Committee in an effort to present a unified front in negotiations with Bakhmatyuk in late 2018. By December 4, 2018, Gramercy's Creditors Committee had grown in size and Gramercy organized a meeting of the Creditors Committee in Berlin. Besides Gramercy, the following creditors were represented at the meeting: Deutsche Bank; Credit-Suisse; Berliner Sparkasse; Aka Bank; Landesbank Berlin; US Exim; EFK; SACE; Pala; and Euler Hermes (the "Creditors Committee"). Spearheaded by Gramercy, the Creditors Committee agreed to work together to persuade Bakhmatyuk and the Company to engage in a comprehensive, multi-lateral restructuring through: (a) political support for a consensual restructuring ; (b) coordination among the Creditors Committee; (c) urging greater transparency in the restructuring negotiations; and (d) the formation of a coherent steering group.

**ANSWER:**   The Piazza Defendants aver that they were not invited to join the Creditors Committee by Gramercy and therefore lack sufficient information with which to admit or deny the allegations in this paragraph.

116.    To effectuate these goals, Gramercy—with the blessing of the Creditors Committee—instructed its counsel to send a letter to the NBU and the Ukrainian President at the time, Petro Poroshenko, which was delivered on December 21, 2018. The letter expressed the creditors' concern about the lack of progress in discussions to achieve a consensual restructuring of the Company's debt, despite it having been in uncured payment default of its financial obligations for over 12 months, and in contrast to the approach taken by other Ukrainian corporations in successful restructurings in recent years (including, *inter alia*, Metinvest, a steel and mining group, and DTEK, an energy group). The Creditors Committee invited the NBU to engage with ULF's creditors to achieve a solution to ULF's financial difficulties that would maximize value for all stakeholders. US Exim also spoke to the NBU at or around this time. On the same day, Gramercy and the Creditors Committee (although only Pala, US Exim and Gramercy were expressly named in the letter) directed its counsel to send a letter to Bakhmatyuk inviting him to a meeting in London during the week of January 21, 2019.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

117.    Bakhmatyuk was not receptive to the Creditors Committee's demands or approach. At Bakhmatyuk's direction, Petrashko informed Gramercy and the Creditors Committee in an email dated January 17, 2019 that ULF rejected their proposal to have a "creditor group approach" to the restructuring discussions because ULF considered that this would be "counterproductive and even hazardous to the viability of the company." Petrashko once again invoked the Mriya takeover as a cautionary tale against collective creditor action. He also explicitly referred to the Second Concorde Report in his email and said that the "stability" and "better operational and financial results ... on par with market peers" that Bakhmatyuk had purportedly secured for the Company was in stark contrast to the fate of Mriya following the takeover, which Petrashko asserted had suffered "a heavy loss of value with a recovery rate of about 4% for the unsecured creditors." Petrashko also implored the Creditors Committee to not take any action at that time because the Company was in the midst of its "annual sowing campaign" which, according to Petrashko, required around $150 million in liquidity. He threatened that "any disruption to this process ... can result in heavy and unrecoverable losses."

**ANSWER:    Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. To the extent that the paragraph refers to an email, the document speaks for itself. Otherwise, Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

118.    Throughout his email, Petrashko continued to claim that ULF's intention was to negotiate in good faith with its creditors "under the guidance of [its] financial advisor Ziff Ivin," despite the fact that Ziff Ivin stopped being involved much earlier in 2018. He said that ULF had "achieved good progress in discussions with almost all secured lenders represented by Ukrainian banks and major international secured lenders" and that it "hope[d] to achieve similar understanding with Bondholders and other unsecured creditors," noting that "ULF is committed to a transparent dialogue with all creditors using the approach employed in 2018." Accordingly, Petrashko reiterated his and Bakhmatyuk's preferred creditor-by-creditor approach to restructuring negotiations. He said that the Company would enter into negotiations with each individual creditor

group separately and said that the Company would like to have such a meeting with Gramercy, due to its status as the largest single noteholder, and US Exim, given its status as a secured creditor.

**ANSWER:** **Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. To the extent that the paragraph refers to an email, the document speaks for itself. Otherwise, Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

119.  Gramercy once again resisted the Company's insistence on a creditor-by-creditor approach. Rauch, on January 17, 2019, sent a response email in which he stated that Gramercy's one-on-one negotiations with the Company over a two-year period had not been successful, and that the aim of the Creditors Committee was to hold a "holistic discussion among all creditors" in keeping with the "standard approach in all global corporate restructurings," rather than to replicate what had happened with Mriya. In fact, Rauch's letter expressly rejected Petrashko's reliance on the Second Concorde Report, which Rauch made clear contained a "material misstatement of facts," and which did not carry an "objective perspective." Rauch concluded by asking Bakhmatyuk to consider attending a meeting in London with the Creditors Committee as the Creditors Committee originally proposed in its December 2018 letter.

**ANSWER:** **Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. To the extent that the paragraph refers to a specific document, it speaks for itself. Otherwise, Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

120.  Next, Salvetti, on Gramercy's behalf, travelled to Kyiv to meet with Petrashko on January 19, 2019.C During the meeting, Petrashko revealed that, although Bakhmatyuk had originally been inclined to accept the meeting requested in Rauch's letter, he later concluded it was not a good idea because Gramercy was the only unsecured creditor of relevance and it was unclear who else would attend the meeting. Despite this statement, Petrashko indicated that Bakhmatyuk would be amenable to a meeting with a core group of creditors, namely Gramercy, US Exim, SACE and Euler Hermes. Petrashko also reported back on Bakhmatyuk's recent negotiations with the US agricultural firm Cargill, which he now said was prepared to buy out Gramercy's position at a price of $0.20 per dollar. According to Petrashko, the Company and Cargill had reached an offtake agreement that was contingent on Cargill buying out Gramercy and supporting the restructuring. As explained by Petrashko, the substance of the offtake agreement was that Cargill would commit to buying a substantial amount of crops per year at a profit margin of around 1-2%, which Cargill would then transport using a port it had acquired in Ukraine (which was being developed) (the "Offtake Agreement").

**ANSWER:** **Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. Otherwise, Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

121.    Essentially, as Petrashko explained it, Cargill was negotiating a deal with the Company in which it would finance certain debt restructuring plans on behalf of the Company in exchange for beneficial contracts with the Company. To that end, Cargill began approaching Gramercy and other creditors to buy their debt. Cargill met with Salvetti, on Gramercy's behalf, on January 24, 2019 and formally advanced an offer of $0.20 per dollar. Salvetti responded that Gramercy was not prepared to sell for less than $0.30 per dollar. At the same time, Cargill approached ULF's second group of creditors, its export credit agency creditors, namely Euler Hermes, US Exim, SACE, SERV-CH, Atradius, and EKF, and offered to buy up these creditors' debts at a price of around $0.15-0.20 per dollar, together with certain mortgages. Also at this time, Piazza approached at least one of these export credit agency creditors, SACE, and offered to buy them out at the same price offered by Cargill, $0.19-0.20 per dollar. After the ECA creditors turned Cargill down, Cargill proposed to the whole group of creditors aggregating various loan facilities, acquiring and restructuring the Company's debt with a term of 5 to 7 years at the value of the purchase price of the debt, and thus providing significant debt relief to the Company in exchange for the Company's agreement to enter into a supply contract on favorable terms to Cargill, consistent with the Offtake Agreement described above.

**ANSWER:    Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. The Piazza Defendants admit that Piazza approached SACE during this time period but do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

122.    By early 2019, having failed to cajole Gramercy into accepting an unfair restructuring proposal or selling its Notes, Bakhmatyuk and his loyalists continued to effectuate a *de facto* creditor-by-creditor restructuring by arranging debt purchases and reaching deals with individual creditors. Bakhmatyuk's aim was to marginalize and isolate Gramercy, increasing the pressure on it to accept whatever deal Bakhmatyuk put on the table. However, Gramercy still refused to accept unfair terms, instead responding to Bakhmatyuk's pressure by organizing the remaining creditors into another Creditors Committee committed to concerted action. Against this backdrop, Bakhmatyuk began the final phase of his scheme—covertly transferring Company assets to shield them from Gramercy.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

123.    Starting in or around February 2019, Bakhmatyuk enlisted Piazza, Yaremenko, and SP Advisors to plan and orchestrate a complex set of transactions through which the Company's assets could be isolated from creditors—at this point, ostensibly Gramercy—by transferring them to a number of newly-formed shell companies. Some of these shell companies were organized under the umbrella of a Cypriot company called Maltofex, which is owned by Bakhmatyuk. The other shell companies were organized under the umbrella of TNA, which is nominally owned by Piazza, but, upon information and belief, is actually under Bakhmatyuk's control.

**ANSWER:    Denied.**

124.    The first set of transfers, to the Bakhmatyuk-owned Cypriot entity Maltofex (the "Maltofex Transfers"), took place between February 5, 2019 and March 28, 2019. During this time, at least 65 ULF subsidiaries were transferred from ULF to Maltofex as follows:

(1)    On February 5, 2019, Maltofex acquired a company called LLC Algey-Agro from LLC Rise Pivden, an entity held by a direct subsidiary of ULF called LLC Management Company ULF.

(2)    From February 5, 2019 to March 4, 2019, LLC Algey-Agro acquired sixty-three entities which were held by ULF.

(3)    In exchange for Algey-Agro and the sixty-three subsidiaries it now holds, Maltofex agreed to pay a nominal consideration of approximately $900, which it still had not paid as of December 31, 2019.

(4)    On March 28, 2019, Maltofex acquired Europa-Trans LTD for the promised payment of $3 million, which was also unpaid as of December 31, 2019.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

125.    Upon information and belief, the Company entities and their assets that were transferred through the Maltofex Transfers were worth, conservatively, $312.3 million and included the following:

(1)    Europa-Trans LLC, whose balance sheet as of December 31, 2018 (i.e. immediately preceding its transfer to Algey-Agro LLC) recorded total assets of some UAH 7,229,582,000 (c. $261 million ), including UAH 364.5 million (c. $13 million) of fixed assets, which, in turn, included significant volumes of agricultural equipment, including at least 130 trucks, 26 harvesters and 260 trailers;

(2)    Pukiv Agro LLC, whose 2018 balance sheet recorded total assets of UAH 2,127,936,100 (c. $77 million), including lease rights over approximately 42 land plots in the Ivano-Frankivsk with a total area of approximately 24 hectares;

(3)    Berezovolutske APLE, whose 2018 balance sheet recorded total assets of UAH 1,754,285,000 (c. $63 million), including lease rights over 21 land plots with a total area of approximately 39 hectares; and

(4)    Named after Dukhova ALLC, whose 2018 balance sheet recorded total assets of UAH 1,686,413,000 ($61m), including lease rights over 32 land plots with a total area of approximately 80 hectares.

A large number of these transferred entities, including the four listed above, were ULF Surety Providers.

**ANSWER:**    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

126.    Upon information and belief, these were sham transactions for which Maltofex or Bakhmatyuk did not pay any or adequate consideration. The amount promised in exchange for Algey-Agro was the nominal value of $900, and Maltofex had not even paid that ten months after the transfer (according to Maltofex's 2019 accounts; no accounts have been filed in subsequent years so there is nothing to suggest that this amount has now been paid). And though Maltofex promised more for Europa-Trans, that amount was still insufficient and was also unpaid nine months after the transfer. That Maltofex and Bakhmatyuk did not pay any or adequate consideration is further made evident based on the fact that Maltofex's accounts do not indicate sufficient assets, or the ability to generate revenue to enable them to generate sufficient funds, to purchase the transferred entities. For example, in Maltofex's 2018 accounts, which indicate the assets it had available prior to the Maltofex transfers, recorded gross assets of UAH 1,758,298 (c. $63,000), comprised entirely of "Available-for-sale financial assets," of which the overwhelming majority takes the form of investment certificates (along with one share in each of AVG and ULF). Maltofex's principal activities are said to be in "investments and the provision of finance."

**ANSWER:**    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

127.    Despite the fact that Bakhmatyuk was the ultimate beneficial owner of both the seller and the buyer, the Company failed to give notice to the Trustee of these affiliate transactions, as required under the Trust Deeds. The Company also failed to follow the terms of the asset sale restrictions in the Trust Deeds by failing to sell these material assets for fair market consideration and failing to use any consideration that it did receive in the manner prescribed by those provisions.

**ANSWER:**    Defendants admit the binding terms of the Trust Deeds govern affiliate transactions, and allegations related to breach of terms of the Trust Deeds are subject to the binding arbitration provisions contained therein. Otherwise denied as the transfers done in accordance with Trust Deed.

128.    Unaware that Bakhmatyuk and his compatriots were in the process of stripping valuable assets from the Company, Gramercy and the Creditors Committee pressed forward with negotiations. During the negotiations, Bakhmatyuk and his representatives did not disclose the transfers and bought themselves more time to effectuate these and later transfers through their strategy of making minor concessions to keep Gramercy at the negotiating table, at all times omitting to disclose the surreptitious transfers and their true intent.

**ANSWER:**    Denied.

129.    On or around March 11, 2019, Rauch travelled from Connecticut to London in order to attend a meeting with Bakhmatyuk and Petrashko on March 12, 2019. Also present at the meeting were representatives of US Exim, EKF, Hogan Lovells and Rothschild. The meeting lasted around two hours, during which Bakhmatyuk for the first time appeared to make certain concessions aimed at placating Gramercy. Most critically, Bakhmatyuk for the first time represented that he supposedly would be willing to give up some equity in order to reach a

consensual restructuring with Gramercy and the other creditors—something which he had previously adamantly resisted. Bakhmatyuk also discussed with Gramercy the methodology to be applied to the restructuring, (*i.e.*, whether to involve all major creditors simultaneously or to zero in on individual creditors in bilateral discussions). Although Bakhmatyuk previously resisted a unified approach, he now indicated he was open to all options and would leave the details to Petrashko and his other advisors. At the same time, Petrashko openly rejected the idea of a comprehensive restructuring.

**ANSWER:** The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

130. Bakhmatyuk also made a number of misrepresentations to disguise the steps he had taken in the first two phases of his scheme. First, Bakhmatyuk represented that the only ULF debt which had been purchased by third parties was the debt originally held by Sberbank. Gramercy's subsequent independent investigation would reveal that this was untrue, although it had no means of knowing this at the time of the meeting. In addition, Bakhmatyuk gave his high-level views on the historic performance of the Company, once again describing its purportedly poor financial performance, which inexplicably ran contrary to the otherwise surging market.

**ANSWER:** The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

131. Immediately following the March 12, 2019 meeting, Bakhmatyuk went to lunch with a reporter from the restructuring news website *Reorg*, who published an article that reported on the substance of the discussions during the meeting that same day. The article, which included direct input from Bakhmatyuk, reported that ULF was "ready to offer creditors EBITDA-linked securities" or a "debt-for-equity swap" to ensure a consensual restructuring could be reached. Bakhmatyuk also emphasized the "active and constructive" nature of the dialogue between the Company and its creditors, and that ULF was looking to attract a minimum of $300 million into the business to create working capital reserves. The report quotes Bakhmatyuk as stating: "I have injected all that I have" and "if I had cash, I would certainly inject it into the business." Despite the current difficulties, Bakhmatyuk stated that ULF's business strategy was sound and that investors had "to be patient" and wait for the price of grain to increase.

**ANSWER:** The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.

132. Bakhmatyuk and Petrashko's efforts to maintain the façade of good-faith negotiations in the midst of the covert asset transfers extended to the negotiations between Gramercy and Cargill, which were taking place at Bakhmatyuk's suggestion in parallel to the restructuring discussions between Gramercy and the Company. In a debrief following the March 12 meeting with Bakhmatyuk, Petrashko indicated to Salvetti that the Company was making progress in its negotiations with Cargill for the Offtake Agreement. However, Cargill had indicated to Gramercy that it was unwilling to increase its offer above $0.20 per dollar, and Petrashko informed Gramercy that Bakhmatyuk could not afford to supplement Cargill's offer in order to get to a price acceptable to Gramercy while the NABU investigations were ongoing.

**ANSWER:**   **Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. Otherwise, the Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

133.     In subsequent follow-up meetings between Cargill and Petrashko at the end of May and beginning of June 2019, Salvetti, on Gramercy's behalf, explored with Petrashko how Bakhmatyuk could support a deal with Cargill to make sure it could go ahead, but the negotiations stalled and Cargill's offers worsened. By September 2019, Cargill had reduced its offer to $0.15 per dollar. Subsequent offers from Cargill, unaccompanied by any more of the promised support from the Company, continued to lower in value.

**ANSWER:**   **Defendants admit AVG and ULF were engaged in negotiations to restructure the notes in accordance with and in compliance with the terms of the Trust Deeds. Otherwise, Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

134.     Meanwhile, Piazza was using his newly acquired debt, which included the debt formerly held by Ashmore and Ukrsibank as well as the small, insured position of GSI that Piazza had recently acquired, to undermine Gramercy's position within the Creditors Committee. For example, on September 20, 2019, Piazza surreptitiously listened in on a call between certain of the Company's creditors, including US Exim, Pala, and Gramercy, to discuss next steps in negotiations with Bakhmatyuk. Gramercy and its advisors had tried to ensure that Piazza was not provided with dial-in details due to his connections with Bakhmatyuk. Despite this, Piazza (ostensibly as a result of his newly acquired debt) was able to dial-in to the call and listen without announcing his presence. Shortly after the call, Piazza called a representative of US Exim to criticize Gramercy's approach and ask about buying US Exim's position. While on the call Piazza denied that he was working on behalf of Bakhmatyuk.

**ANSWER:**   **Piazza Defendants admit that Piazza, as a creditor, participated on numerous calls with creditors. Otherwise denied. Piazza Defendants further aver that Plaintiffs' allegations say nothing about Piazza having knowledge of attempts by Gramercy to exclude him as a creditor from calls.**

135.     An additional development in the fall of 2019 came in the NABU Investigation into Bakhmatyuk's alleged prior embezzlement. In or around October 2019, NABU issued notices of suspicion to eight persons suspected of embezzlement of the loan, one of whom was Bakhmatyuk. Shortly thereafter, Bakhmatyuk was put on the "wanted list" in Ukraine by NABU, on suspicion of large-scale embezzlement.

**ANSWER:**   **Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

136.     In the wake of the notice of suspicion, Bakhmatyuk escalated his public relations battle against the NABU Investigation. Contrary to his prior representations regarding his supposed lack of personal resources, Bakhmatyuk indicated that he would be able to repay $330 million to the Deposit Guarantee Fund in respect to the personal guarantees he had given.

Bakhmatyuk also was reported to have said that ULF produces sufficient quantities of grain per year to generate the money necessary to pay off this debt, which contradicts representations he made to Gramercy throughout the negotiations, including his statement at the March 2019 meeting that if he had cash that he would inject it into the Company, and statements that his finances were strained as a result of the investigation and related proceedings against him. Bakhmatyuk also made press statements asserting that the revival of the investigation was purely politically motivated.

**ANSWER:   To the extent that this paragraph refers to a specific document, it speaks for itself. Otherwise, the Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

137.   Bakhmatyuk took two additional steps under the increased pressure from the NABU Investigation. First, he permanently moved from Ukraine to the villa in Austria that he had transferred into his children's names in 2016. Second, Bakhmatyuk escalated phase three of his scheme with another, bigger, set of covert transfers.

**ANSWER:   The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

138.   From November 2019 onwards, Bakhmatyuk procured the transfer of another series of assets, this time using TNA, a newly formed entity owned, formed and incorporated in Wyoming with the assistance of Piazza, Yaremenko, and SP Advisors (the "TNA Transfers"). As part of this second set of transfers, certain of the ULF subsidiaries that had transferred their direct subsidiaries to Maltofex in early 2019 were themselves transferred to TNA, and other ULF assets were transferred directly from ULF to TNA.

**ANSWER:   Defendants deny that TNA was a "newly formed entity" in 2019. Defendants aver that TNA, as Security Agent, executed on the pledged property consistent with its rights and obligations under the Loan Facility. Otherwise, denied including but not limited to the claim that TNA acted in or transferred assets to Wyoming.**

139.   From November 2019 until at least May 2020, Bakhmatyuk transferred at least 100 subsidiaries from ULF to TNA in Wyoming. Of the companies transferred, eight were formerly owned by AVG. After these transfers, only two subsidiaries remained in AVG, both of which are based in Crimea and are therefore no longer under AVG's control. So, the transfers to TNA effectively dissipated all of AVG.

**ANSWER:   Defendants aver that TNA, as Security Agent, executed on the pledged property consistent with its rights and obligations under the Loan Facility. Otherwise, denied, including but not limited to the claim that TNA acted in or transferred assets to Wyoming.**

140.   Upon information and belief, the Company entities and their assets that were transferred through the TNA Transfers were worth, conservatively, $872.5 million and included the following:

    (1)       PrJSC Agroholding Avangard, a major producer of shell eggs, whose balance sheet as of December 31, 2018 records total assets of some UAH 27,252,406,000 (c. $980 million);

    (2)       PSPC InterBusiness, another shell egg producer, whose balance sheet as of December 31, 2018 records total assets of some UAH 10,545,830,000 (c. $379 million);

    (3)       LLC Rise-Shid, a crop producer, whose balance sheet as of December 31, 2018 records total assets of some UAH 1,545,279,000 (c. $55 million);

    (4)       LLC Rise Pivnich, another crop producer, whose balance sheet as of December 31, 2018 records total assets of some UAH 1,575,413,000 (c. $56 million); and

    (5)       (5) LLC Agro-Kray, yet another crop production company, whose balance sheet as of December 31, 2018 records total assets of some UAH 1,184,394,000 (c. $42 million).

**ANSWER:**    **Defendants aver that TNA, as a Security Agent, executed on the pledged property consistent with its rights and obligations under the Loan Facility. Otherwise, denied, including but not limited to the claim that TNA acted in or transferred assets to Wyoming. Defendants further aver that Plaintiffs' allegations of "worth" are highly misleading in that they list asset values only without the corresponding liabilities.**

141.    On information and belief, Piazza holds the entities transferred to TNA on Bakhmatyuk's behalf, such that Bakhmatyuk retains ultimate beneficial control and ownership of these entities.

**ANSWER:**    **Defendants admit that Piazza owns an interest in TNA. Defendants admit TNA, as Security Agent, executed on the pledged property consistent with its rights and obligations under the Loan Facility. Otherwise, denied including but not limited to the claim that TNA acted in or transferred assets to Wyoming.**

142.    The timing of the incorporation of TNA, in January 2017, just before the Company's default, indicates that Bakhmatyuk was taking measures to begin this phase of his scheme as early as January 2017. Further, the fact that certain of the companies that had transferred their subsidiaries out of ULF to Maltofex were themselves later transferred to TNA suggests that both series of transfers were part of a scheme targeting Gramercy.

**ANSWER:**    **Denied.**

143.    The TNA Transfers follow the exact roadmap of SP Advisors' business plan and pitch that Piazza and Yaremenko laid out in the November 19, 2020 SP Advisors webinar described above—transferring at least two-thirds of ULF's assets to Wyoming shell companies nominally owned by Piazza under the cloak of Wyoming law.

**ANSWER:**    **Denied by the Piazza Defendants.**

144.    There are several other indications that Bakhmatyuk has retained beneficial ownership of the entities subject to the TNA Transfers. As with the Maltofex Transfers, there does not appear to be evidence of any consideration passing from Piazza to Bakhmatyuk in respect to the series of asset transfers to TNA, let alone consideration of commensurate value to the entities transferred. There is also no indication that TNA or Piazza had sufficient assets, or the ability to generate revenue, to raise the required sums to finance the transfers.

**ANSWER:**    **Denied by the Piazza Defendants.**

145.    Despite the significance of the entities transferred to Maltofex and TNA, there was no press coverage, very little official reporting of the purported change in ownership, and, of course, the Company did not disclose the change to the Trustee under the Notes or the Noteholders, despite being required to do so by the Trust Deeds. Some of the changes were registered with the Ukrainian companies registry, but only at the individual subsidiary level, obscuring the magnitude of the transfers.

**ANSWER:**    **Denied.**

146.    The transfers were further obscured by a systematic failure to make legally required disclosures. A change in ownership of such valuable assets would have required permission to be sought and obtained by the Ukrainian Anti-Monopoly Committee ("AMC"); however, the relevant applications were never made. Instead, the AMC discovered the transfers through its own research in early 2020. Also, when the AMC sought additional information about the assets of AVG and companies within its group, AVG failed to provide the requested information. After further investigation, the AMC levied a fine in August 2020 for this failure. Further, ULF stopped filing the annual accounts required by Cypriot law after the Maltofex transfers because, upon information and belief, filing the accounts would have revealed the transfers and their impact on ULF's finances. Finally, the terms of the Trust Deeds require the Company to report material dispositions or restructurings promptly and to give notice of affiliate transactions over $5 million, but ULF never provided such a report about either the Maltofex or TNA Transfers, nor did Bakhmatyuk or any of his agents mention the transfers in any of their meetings in connection with restructuring negotiations.

**ANSWER:**    **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

147.    Further, notwithstanding the Maltofex and TNA Transfers, Bakhmatyuk and ULF's public statements continued to describe Bakhmatyuk as the owner and controller of ULF and AVG. On July 17, 2020, Bakhmatyuk publicly described himself as "a shareholder of ULF and Avangard Group companies." In September 2020, Bakhmatyuk referred to ULF and AVG as "his company." Press releases published on ULF's website in 2020, including letters to the President of Ukraine, refer to Bakhmatyuk as both CEO and shareholder of both ULF and AVG. Given that AVG had effectively been transferred in its entirety to TNA, these statements were fundamentally incorrect and misleading, unless, of course, Bakhmatyuk was indicating that he continued to own them through TNA/Piazza.

**ANSWER:   To the extent that this paragraph refers to a specific unknown document, it speaks for itself. Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

148.    By late 2019, Gramercy still had yet to receive certain material, financial information (such as up-to-date structure charts) that it had requested from ULF years before and it could not ascertain any information from public account filings, because the Company had ceased filing any accounts. Gramercy Management therefore decided to take matters into its own hands and conduct an independent investigation of ULF's corporate structure.

**ANSWER:   Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

149.    In January 2020, Gramercy Management first uncovered (as a result of these investigations) that, in November and December 2019, Bakhmatyuk had transferred certain assets out of ULF and AVG to TNA, making Piazza the ultimate beneficial owner on record instead of Bakhmatyuk. However, the full extent of the TNA Transfers, as well as the extent of the Maltofex Transfers, still remained unknown.

**ANSWER:   Defendants aver that TNA, executed on the pledged property consistent with its rights and obligations under the Loan Facility. Otherwise, denied.**

150.    Shortly after Gramercy learned this information, on January 16, 2020, Salvetti, on Gramercy's behalf, met with Bakhmatyuk and Petrashko in Vienna to discuss the restructuring. The meeting covered a number of important topics. First, Bakhmatyuk asked Salvetti directly whether Gramercy intended to orchestrate a Mriya-style takeover of ULF, to which Salvetti responded that this was not Gramercy's intention. Nevertheless, Bakhmatyuk and Salvetti agreed that, as long as Bakhmatyuk remained CEO and the main shareholder of ULF, they could not obtain any Ukrainian-government support for a restructuring in light of the on-going NABU Investigation. Bakhmatyuk stated that, without him, ULF would collapse quickly, echoing the message of the Second Concorde Report. Bakhmatyuk also said that he might be willing to have somebody "fronting" him as equity owner with a put/call arrangement. This is exactly the sort of arrangement that, upon information and belief, Bakhmatyuk entered into with PS Capital and Piazza in connection with the debt purchased from Sberbank and Ashmore. Bakhmatyuk agreed to follow-up with Cargill to see if Cargill would be interested in being involved in such an arrangement.

**ANSWER:   The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

151.    Salvetti, on Gramercy's behalf, also asked Bakhmatyuk about the recent changes to the ULF corporate structure and, in particular, the TNA Transfers. Petrashko responded on Bakhmatyuk's behalf that the assets transferred to Piazza "should not represent more than 15% of the business." This statement was false and designed to lull Gramercy into a false sense of security about the nature and extent of the asset transfers out of the Company. As uncovered much later, the transfers represent at least 66% of the Company. Petrashko and Bakhmatyuk also denied that Piazza was holding the transferred assets on their behalf. When Salvetti suggested that they might have a put/call arrangement in place, they still denied it, though less firmly.

**ANSWER:**   **To the extent this paragraph quotes from an existing document, it speaks for itself. Otherwise, denied.**

152.   Following the meeting, Bakhmatyuk provided financial projections for ULF (not including AVG) that had been prepared for fellow creditor Ukreximbank in December 2019 via electronic mail to Gramercy. These financial projections likewise did not reflect the Maltofex and TNA Transfers, but merely echoed the sentiments of prior, false financial reports by indicating a decline in revenues and gross margins, but not such a dramatic decline that would suggest that a substantial number of the Company's subsidiaries had been transferred to separate entities in Cyprus and Wyoming. Bakhmatyuk falsely claimed that this decline was as a result of the worsening business climate, including by reason of the political pressures the Company was facing. In response, Salvetti informed Gramercy that he had heard market rumors confirming that the numbers in these projections did not reflect reality, and that Bakhmatyuk himself was downplaying the Company's prospects.

**ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

153.   While Gramercy's doubts continued to mount as to the veracity of the information the Company provided, by February 2020, the TNA Transfers were all but complete. At this point, the facade of Bakhmatyuk's cooperation began to deteriorate. First, in a February 6, 2020 meeting between Salvetti, on Gramercy's behalf, and Petrashko in Kiev, Petrashko took a hardline stance, indicating that Bakhmatyuk and the Company had very little to offer unsecured creditors such as Gramercy. When Salvetti maintained Gramercy's position that if Gramercy were to be forced to take a material haircut, it needed to be compensated with a sufficient amount of equity, Petrashko indicated that equity was no longer on the table, reversing without explanation one of the key concessions that Bakhmatyuk appeared to have made at the meeting in March 2019. Salvetti and Petrashko discussed the equitization of the $480 million debt that had been bought up by persons fronting Bakhmatyuk (including Piazza), as referred to in the Business Council Letter, but Petrashko was not open to this plan. Petrashko once again falsely denied that the $480 million of debt was owned by parties fronting Bakhmatyuk, and indicated that these creditors expected any equitization to be conducted on arms-length terms. As such, any progress the parties made toward negotiating a deal over the last several months was lost.

**ANSWER:**   **Defendants aver that TNA, as Security Agent, executed on the pledged property consistent with its rights and obligations under the Loan Facility, deny that TNA acted in or transferred assets to Wyoming. Defendants do not have sufficient information with which to admit or deny the remaining allegations in this paragraph, and therefore deny the same.**

154.   Meanwhile, Gramercy's negotiations with Cargill were also deteriorating. In March 2020, Cargill's offer for Gramercy's position was a mere $0.05 per dollar. At this same time, on March 24, 2020, Piazza called Gramercy and, posing as an independent third party, made a parallel offer of $0.05-.06 per dollar for Gramercy's position.

**ANSWER:**   **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

155.    Nonetheless, Gramercy continued to pursue meetings with Bakhmatyuk and provide proposals to try to reach a reasonable compromise. Salvetti, on Gramercy's behalf, met with Bakhmatyuk in Vienna on June 17, 2020 with no progress made. Likewise, when Gramercy submitted a revised proposal to Bakhmatyuk on July 30, 2020, Bakhmatyuk did not respond. Subsequent communication attempts from Salvetti, on Gramercy's behalf, to Bakhmatyuk were likewise ignored.

**ANSWER:    The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

156.    In March 2021, negotiations resumed after delays caused by the pandemic and Bakhmatyuk's preoccupation with fighting the NABU Investigation before it was suspended on April 5, 2021. However, Bakhmatyuk continued to deny the extent of the Maltofex and TNA Transfers. For example, on March 24, 2021, a director of ULF (Galyna Kovtok, former COO of the ULF) sent Gramercy a letter indicating ULF's "desire and commitment" to cooperate in discussions regarding a restructuring of its debt. ULF indicated that, as a first step, it would finalize management accounts and share these with Gramercy to enable a roadmap to be drawn up. ULF set out details of how the "financial state of the Group deteriorated in 2020." Rather than disclose the Maltofex or TNA Transfers, the letter cited political pressure from NABU (which seemed to have dissipated by this point), a loss of land (due to purportedly limited access to short term financing options), decreasing prices of eggs and market demand from China (despite the positive upturn in the market during this time), bankruptcy proceedings initiated against certain subsidiaries, and the global pandemic leading to the suspension of operations of certain plants.

**ANSWER:    To the extent that this paragraph refers to a document, it speaks for itself. Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

157.    Not only were a number of the purported explanations set out in the Company's letter inconsistent with Gramercy's belief, but the Company's letter provided further proof that the TNA Transfers were a sham. One piece of purported evidence that the letter relied on with respect to the Company's supposedly poor financial performance was the alleged suspension in the production of Imperovo Foods plant, which had formerly been owned by an entity under the umbrella of AVG. However, this entity was transferred from AVG to TNA on March 12, 2019, and therefore could hardly explain a decline in the Company's business more than a year later.

**ANSWER:    To the extent that this paragraph refers to a document, it speaks for itself. The Piazza Defendants admit that TNA, as Security Agent, executed on the pledged property consistent with its rights and obligations under the Loan Facility, deny that TNA acted in or transferred assets to Wyoming, and further aver that Imperovo Foods located in Ivan-Frankivsk, Ukraine was among such pledged property. Otherwise, denied.**

158.    Bakhmatyuk and his representatives continued to make misrepresentations of this sort to Gramercy in subsequent meetings. On March 31, 2021, Salvetti, on behalf of Gramercy, met with Bakhmatyuk's new negotiating agent, Oleksiy Yergiyev (formerly the Head of Investments at AVG, but who now appears to have a broader role within the Company). During

the meeting, Yergiyev told Salvetti that the reason consolidated financials had not been prepared since 2019 was that the relevant employees had resigned and there was no one available to prepare the accounts, when, upon information and belief, the real reason was to obscure the fact of the transfers. Yergiyev also continued to point to external factors like the loss of land or lack of short-term financing as the reason for the Company's allegedly poor financial performance, when, as described above, companies comparable to the Company were performing much better. And Yergiyev also falsely promised Gramercy that the Company would send over certain operational details and respond to information requests from Gramercy in lieu of providing consolidated financial statements, but the Company failed to fully respond to Gramercy's subsequent information request and provided a small fraction of the initially promised information.

**ANSWER:** **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

159.    Gramercy and ULF continued to negotiate until very recently, with Gramercy demanding that Bakhmatyuk provide an improved offer, but these negotiations have been hampered by Bakhmatyuk's and his agents' continued reliance on the false narrative that ULF was performing poorly, with no acknowledgment that nearly a billion dollars of assets had been fraudulently transferred to shell companies in Wyoming and Cyprus.

**ANSWER:** **Denied.**

160.    Faced with mounting costs incurred in investigating Defendants' pattern of misrepresentations and fraud, and fearing that Bakhmatyuk could be engaged in further asset dissipation, Gramercy had no choice but to seek legal recourse. It brought an action in the courts in Cyprus to recover the damages caused by the Maltofex Transfers, and now brings this action to seek legal relief for the damages caused by the TNA Transfers and underlying scheme, as set forth below.

**ANSWER:** **The Piazza Defendants do not have sufficient information with which to admit or deny the allegations in this paragraph, and therefore deny the same.**

## FIRST CAUSE OF ACTION

### Federal Civil RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants – Except Yaremenko)

161.    Gramercy repeats and realleges the preceding Paragraphs as if fully set forth herein.

**ANSWER:** **The Piazza Defendants[10] restate and incorporate by reference herein their answers to each of the foregoing allegations.**

---

[10] As Yaramenko is not a Defendant in Count I, Defendants in this Count refers only to Piazza, SP Capital Management, LLC, TNA Corporate Solutions, LLC, and Bakhmatyuk.

162.    This cause of action is asserted against all Defendants (the "Count 1 Defendants") and is asserted in addition to and in the alternative to the other RICO Causes of Action contained herein.

**ANSWER:    The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

163.    Section 1962(c) of Title 18 of the U.S. Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

**ANSWER:    This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, Defendants deny the allegations in this paragraph.**

164.    Each Count 1 Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

**ANSWER:    This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, Defendants deny the allegations in this paragraph.**

165.    Each Count 1 Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior Paragraphs, and as further described below.

**ANSWER:    Denied.**

166.    The Count 1 Defendants, along with their fellow agents, co-conspirators, and surrogates including, but not limited to Concorde, Petrashko, Yergiyev, and Kovtok, along with others known and unknown, form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity (the "Count 1 Enterprise"). The members of the Count 1 Enterprise function as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.

**ANSWER:    This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, Defendants deny the allegations in this paragraph.**

167.    The Count 1 Enterprise is structured through, among other things, (1) the personal and financial relationships between the Count 1 Defendants, on the one hand, and each of the other members of the Count 1 Enterprise, on the other hand; (2) Bakhmatyuk's management of and/or direct or indirect ownership interest in the Company, which has employed the services of the other members of the Count 1 Enterprise; (3) Piazza's and Yaremenko's management of and/or direct

or indirect ownership interest in SP Advisors and TNA, which have provided services to Bakhmatyuk and the Company; (4) the financing and loans, if any, provided by Bakhmatyuk or the Company and used by Piazza or entities he controls, including SP Advisors and TNA, to acquire assets of the Company; (5) the financing and loans, if any, provided by Bakhmatyuk or the Company and used by Piazza or entities he controls, including SP Advisors and TNA, to acquire or seek to acquire debt controlled by creditors of the Company, including Gramercy; and (6) the personal and business relationships between Bakhmatyuk, Piazza, and Concorde, originating from Piazza's years spent working for and helping to launch Concorde.

**ANSWER:**    **Denied.**

168.    The Count 1 Enterprise was, and is, distinct from each of the Count 1 Defendants. The Count 1 Enterprise was formed for the purpose of facilitating, committing, perpetuating, and concealing the fraudulent and other criminal conduct alleged herein. The aim of the Count 1 Enterprise's unlawful conduct was to maintain Bakhmatyuk's control over the Company and its assets by employing all means necessary to prevent Gramercy, one of the largest creditors with significant contractual rights, from exercising its contractual rights under the Notes and to prevent Gramercy from achieving a meaningful recovery on its Notes. As set forth above in Section V of the Factual Background, the Count 1 Enterprise employed multiple, interrelated schemes in pursuit of this goal. First, the Count 1 Enterprise leveraged its connections in the media and elsewhere, including Piazza's connections to Concorde, to disseminate false information and deprive Gramercy of accurate information regarding the Company's financial performance to depress the value of the Company's notes. The purpose of this aspect of the Count 1 Enterprise's scheme was to deceive Gramercy into accepting a restructuring of its Notes or otherwise selling its Notes—in either case at a steep haircut on the face value of the Notes and on terms dramatically tilted in Bakhmatyuk's favor. Second, the Count 1 Enterprise helped Bakhmatyuk maintain a façade through false representations to Gramercy that Bakhmatyuk was willing to engage in good faith, and, at times, multilateral negotiations. This element of the scheme was designed to string Gramercy along in restructuring negotiations and forestall any actions by Gramercy that might threaten Bakhmatyuk's control over the Company so as to permit the Transfers to be effectuated. Third, the Count 1 Enterprise leveraged its personal and business connections to identify purchasers and execute purchases of debt held by the other creditors of the Company with whom Gramercy sought to unite in comprehensive, multilateral restructuring negotiations. At least some of these debt purchases involved undisclosed put/call arrangements where straw purchasers within and/or selected by the Count 1 Enterprise gave Bakhmatyuk the option to eventually acquire the debt himself or arrangements where the straw purchasers held the debt on behalf of Bakhmatyuk. These debt purchases served the Count 1 Enterprise's mission by marginalizing and isolating Gramercy through the substitution of independent creditors—with whom Gramercy had been collaborating in restructuring negotiations—with Bakhmatyuk loyalists and surrogates. Fourth, the Count 1 Enterprise leveraged Piazza's, Yaremenko's and SP Advisors' expertise in asset transfers and sheltering foreign assets in Wyoming entities to orchestrate a complex set of transactions that stripped the Company of virtually all of its assets. These asset transfers left little or no value in the Company, thus shielding Bakhmatyuk's assets from a potential unsecured creditor takeover led by Gramercy. The Count 1 Enterprise also enabled each of the Count 1 Defendants to provide outward appearances of independence and legitimate financial dealings while concealing their coordination, true relationships, and self-dealing.

**ANSWER:**   **Denied.**

169.   The Count 1 Enterprise has engaged in, and its activities have affected, foreign and interstate commerce, including through (i) email and other communications in furtherance of the Count 1 Enterprise's aims across state and national boundaries; (ii) travel for meetings in furtherance of the Count 1 Enterprise's aims across state and national boundaries; and (iii) transactions that involve individuals and business entities located in multiple states and nations. The Count 1 Enterprise has directly and foreseeably affected commerce in the United States through the involvement of U.S. financial institutions and individuals in the affairs of and in furtherance of the aims of the Count 1 Enterprise, including through contractual arrangements, wire transfers and communications, and inducements to travel.

**ANSWER:**   **This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, the Piazza Defendants deny the allegations in this paragraph.**

170.   The Count 1 Defendants, each of whom are persons associated with the Count I Enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The Count 1 Defendants each committed multiple predicate acts of racketeering that are indictable under the provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. The Count 1 Defendants each committed, or conspired to or aided and abetted other Count 1 Defendants in committing, at least two such acts, one of which occurred after the effective date of the applicable statute, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. The acts of racketeering activity span at least from 2016 to the present. The Count 1 Defendants played the following roles in the racketeering scheme:

> (1)   **Bakhmatyuk**. From the inception of the scheme through today, Bakhmatyuk was a ringleader of the Count 1 Enterprise. He is the owner and day-to-day manager of the Company, and hatched the scheme with others due to his fear that a Gramercy-led Mriya-style takeover or other enforcement action would divest him of his ownership and control of the Company. In furtherance of the scheme, he relied on high-level employees of the Company such as Petrashko, Yergiyev, and Kovtok. Through his personal and financial relationships with the other members of the Count 1 Enterprise, Bakhmatyuk had knowledge of the various connections between the members of the Count 1 Enterprise that were integral to the scheme and coordinated the acts of the other members of the Count 1 Enterprise. Bakhmatyuk also met or communicated with Gramercy repeatedly in furtherance of the scheme, either directly or through his agents such as Petrashko, Yergiyev, Kovtok, and Pima. As set forth below, as a participant in the scheme to defraud, Bakhmatyuk committed, coordinated, ordered to be committed, and aided and abetted acts of mail fraud, wire fraud, and fraudulent inducement to travel in connection with his schemes to disseminate false information regarding the Company's financial situation,

arrange straw purchasers for Company debt, and transfer the Company's assets in order to protect his control over the Company and defraud Gramercy. Bakhmatyuk has continued to treat the Company's assets like a shell game, transferring many of them first from the Company to Maltofex, then from Maltofex to TNA. There remains considerable risk that Bakhmatyuk will continue to move any remaining assets of the Company to another set of shell companies in order to prevent Gramercy from detecting the transfers and ensure that enforcing against them is even more complex and difficult.

(2)     **Piazza**. Piazza is a long-time associate and business partner of Bakhmatyuk. His company, SP Advisors, lists the Company as a "key client." Since at least 2014, Piazza and SP Advisors have worked closely with Bakhmatyuk in a variety of business ventures, and Piazza has generally worked as a fixer, spokesperson, and agent for Bakhmatyuk during this time. Piazza, on behalf of Bakhmatyuk, surreptitiously purchased debt held by other creditors, including Ashmore, and held that debt on behalf of Bakhmatyuk. In addition, Piazza created and held TNA as a nominal owner for Bakhmatyuk, so that Bakhmatyuk could shelter Company assets in Wyoming entities, out of Gramercy's reach. Piazza has touted his own and SP Advisors' expertise in shielding assets in Wyoming, and Piazza leveraged that expertise in furtherance of the Count 1 Enterprise's objectives. Through his participation in the scheme, Piazza was able to ensure that his close, long-term business associate, Bakhmatyuk, was able to maintain control of a firm which his own company considered to be a key client. As a participant in the scheme to defraud, Piazza committed, coordinated, ordered to be committed, and aided and abetted acts of mail fraud, wire fraud, and fraudulent inducement to travel.

(3)     **SP Advisors**. Piazza founded and is the CEO of SP Advisors. As set forth above, SP Capital lists the Company as a "key client" of SP Advisors on its website. Piazza has acted through SP Advisors in effectuating and coordinating aspects of the Count 1 Enterprise's scheme. For example, SP Advisors was involved in the Ashmore Debt Purchase. Piazza and Yaremenko touted their own and SP Advisors' expertise in asset transfers and in protecting assets and their confidentiality through Wyoming entities in a webinar presentation. SP Advisors brought that expertise to bear in support of the Count 1 Enterprise scheme by helping to structure and implement the TNA Transfers, and specifically in forming TNA to shelter the transferred assets. As a participant in the scheme to defraud, SP Advisors committed, coordinated, ordered to be committed, and aided and abetted acts of mail fraud, wire fraud, and fraudulent inducement to travel. As with Bakhmatyuk, there remains a real risk that SP Advisors will continue to transfer the Company's assets in order to keep them out of Gramercy's reach.

(4)    **Yaremenko**. Yaremenko is an executive officer of and helped Piazza establish SP Advisors. SP Capital's website states that he is responsible for the company's operations, and specifically in "setting up offshore structures." He was closely involved in SP Advisors' efforts to further the Count 1 Enterprise's scheme. Specifically, he signed the annual accounts for TNA and, on information and belief, was involved in establishing TNA in order to facilitate the transfers of Company assets to Wyoming dummy companies.

(5)    **TNA**. TNA is the corporate vehicle nominally owned by Piazza and established two months prior to the Company's default on its debt obligations to Gramercy and the other creditors. As part of a type of scheme advertised by Piazza and Yaremenko to clients of SP, including in their webinar presentation, TNA is currently holding assets of the Company in Wyoming so that they remain outside Gramercy's reach. Pursuant to that scheme, between November 2019 and early 2020, TNA received numerous fraudulent asset transfers from the Company. As a participant in the scheme to defraud, TNA committed, coordinated, ordered to be committed, and aided and abetted acts of mail fraud and wire fraud. Moreover, given that it is controlled by and/or associated with Bakhmatyuk and Piazza, there remains a real risk that TNA will continue to transfer the Company's assets in order to keep them out of reach of Gramercy.

**ANSWER:**    **The Piazza Defendants admit that Piazza founded and is CEO of SP Advisors, that Yaremenko is an executive officer of SP Advisors, and that Piazza owns TNA. Defendants aver that "SP Capital" is not an entity affiliated with SP Advisors or otherwise known to the Piazza Defendants. To the extent that "SP Capital" is referred to throughout this Complaint as interchangeable with "SP Capital Management" or "SP Capital Management, LLC", denied. Otherwise, denied.**

171.    The Count 1 Defendants' acts of racketeering were related in that they were all committed for the purpose of maintaining Bakhmatyuk's control over the Company by employing all means necessary to prevent Gramercy, one of the largest creditors and a threat to Bakhmatyuk's control, from exercising its rights under the Notes. Their acts of racketeering included misrepresentations of the Company's financial situation, the orchestration of non-arms-length debt purchases and asset transfers—all of which furthered the Count 1 Enterprise's fraudulent scheme and involved the use of the mail and/or interstate wires. By their fraudulent acts, the Count 1 Defendants were able to sabotage Gramercy's legal and economic rights, intentionally devalue Gramercy's Notes, and marginalize and isolate Gramercy in order to eliminate Gramercy's ability to negotiate a favorable restructuring of its Notes. In addition, by their fraudulent acts, the Count 1 Defendants forced Gramercy Management to incur significant costs in order to uncover the complex, covert transactions the Count 1 Defendants orchestrated, and to forestall remedial actions, including litigation. Further, by their fraudulent acts, the Count 1 Defendants deprived Gramercy of opportunities to sell the Notes at fair value and reinvest the money elsewhere, and instead left Gramercy holding artificially depreciated Notes issued by a Company that the Count 1 Defendants had stripped of virtually all of its assets. The Count 1 Defendants' fraudulent acts also rendered Gramercy's rights to enforce the Notes worthless, as the Company was left with little

to no assets to enforce against. These acts, and others to be identified after further investigation and discovery, not only shared a common or related result, participants, and victim—as described above—but they also shared a common method of commission, as described further below.

**ANSWER:** **Denied.**

172.     The Count 1 Defendants' acts of racketeering activity as set forth herein, each of which directly and proximately injured Gramercy, constituted a continuous course of conduct spanning a period from approximately 2016 to present, which was intended to preserve Bakhmatyuk's control over the Company by sabotaging Gramercy's legal and economic rights through false representations, fraud, deceit, and other improper and unlawful means. The Count 1 Defendants' conduct was extensive—although Gramercy was the direct target, all of the Company's independent creditors were victimized by the scheme; the scheme involved a multitude and variety of individual acts of racketeering; it caused several distinct injuries to Gramercy; and was in furtherance of a vast, complex, international scheme. This conduct involves a threat of repetition because the Count 1 Defendants will continue to shift the assets further out of reach and use misrepresentations and fraud to conceal any such transfers and to frustrate Gramercy's legal and economic rights. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

**ANSWER:** **Denied.**

173.     Each of the Count 1 Defendants committed and aided and abetted the predicate acts described below in order to further the objectives of the Count 1 Enterprise.

**ANSWER:** **Denied.**

174.     Bakhmatyuk committed and aided and abetted the predicate acts described below in his individual capacity or through his direct or indirect corporate or executive control of the Company, or through his or the Company's agents and employees including Petrashko. Bakhmatyuk directly and indirectly committed or aided and abetted numerous predicate acts, or could reasonably have foreseen that predicate acts would be used in the ordinary course of business as a result of his actions in furtherance of the Count 1 Enterprise.

**ANSWER:** **Denied.**

175.     Piazza committed and aided and abetted the predicate acts described below in his individual capacity or through his direct or indirect corporate or executive control of SP Advisors, TNA, or through his or SP Advisors' or TNA's agents and employees including Yaremenko. Piazza directly and indirectly committed or aided and abetted numerous predicate acts, or could reasonably have foreseen that predicate acts would be used in the ordinary course of business as a result of his actions in furtherance of the Count 1 Enterprise.

**ANSWER:** **Denied.**

176.     The predicate acts by SP Advisors and TNA were committed by representatives of those entities acting through, on behalf of and for the benefit of those entities. Because of their

relationship with Bakhmatyuk, and Piazza's control over them, SP Advisors and TNA committed the predicate acts described below to further the aims of the Count 1 Enterprise.

**ANSWER:   Denied.**

177.    Specific RICO predicate acts committed or aided and abetted by the Count 1 Defendants include but are not limited to the following:

**ANSWER:   Denied.**

**(i)    Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.**

178.    The Count 1 Defendants voluntarily and intentionally devised or participated in a scheme to defraud Gramercy. As set forth above, the Count 1 Defendants engaged Gramercy in years of sham restructuring negotiations, intentionally drove down the value of Gramercy's Notes, marginalized and isolated Gramercy to prevent it from collectively negotiating a favorable restructuring of its Notes with other creditors, and stripped the Company of its assets, thereby rendering Gramercy's investment virtually worthless. The Count 1 Defendants took these steps with the intent to defraud Gramercy, which served the Count 1 Enterprise's overarching goal of preserving Bakhmatyuk's control over the Company and eliminating Gramercy's legal and economic rights and devaluing its Notes. It was reasonably foreseeable that interstate wire communications would be used in connection with this scheme, particularly because the scheme involved interstate and international transactions and communications. In furtherance of the scheme, and as described herein, the Count 1 Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343; and also caused matters and things to be placed in a post office or auhorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier in violation of 18 U.S.C. § 1341. The Count 1 Defendants made, or caused to be made, these false and material representations by means of U.S. wire and mail communications directly to representatives of Gramercy and its agents, knowing that Gramercy is located in the United States, and specifically the state of Connecticut. The specific mailings and wirings in furtherance of the scheme to defraud include, but are not limited to, the following:

(1)    The transmission via electronic mail of the First Concorde Report by Concorde in the Ukraine, which, upon information and belief, it sent as an agent of Bakhmatyuk and Piazza, to Gramercy in Connecticut. The First Concorde Report falsely represented that the Company was in a worse financial situation than it actually was, and furthered a pattern by Bakhmatyuk of disseminating false financial information in order to artificially deflate the value of the Company's debt so that it could be repurchased by his agents, including Piazza. The First Concorde Report also stated that alterations in the Company's structure made a Mriya-style takeover all-but-impossible.

(2)    The April 28, 2017 email from Petrashko in Ukraine to Gramercy and its representatives, including Rauch and Cook in Connecticut, in response to

Gramercy's letter of April 11, 2017. In his email Petrashko falsely represents that the Company had not yet received confirmation from Sberbank that Sberbank had sold its position, despite the fact that—by this time—PS Capital had agreed to purchase Sberbank's position in a put/call arrangement with Bakhmatyuk. Petrashko also falsely represented that Bakhmatyuk and the Company were willing to engage in good faith negotiations, saying that the Company was "ready to consider expanding the process into a multilateral general restructuring of bank and bond creditors if we agree together that this is the most effective way to achieve a holistic long-term restructuring." In reality, the Company used every tactic possible to prevent and frustrate all of Gramercy's efforts to commence a multilateral restructuring.

(3)     The July 4, 2018 transmission via electronic mail of the Second Concorde Report by Concorde in the Ukraine to Gramercy, which, upon information and belief, it sent as an agent of Bakhmatyuk and Piazza, that mirrored Petrashko's representations from a few days prior as to the potential recovery for private bondholders. It also disseminated further incongruously negative financial information and claimed to certify the "independence" of the EY report despite the fact that the EY Report itself indicated that it was not fully "independent."

(4)     The October 18, 2018 email from Piazza in Wyoming to Gramercy in Connecticut, falsely claiming that SP Advisors was focused on purchasing secured debt when, by this time, SP Advisors had purchased the unsecured debt formerly held by Ashmore, and referring to a market rumor that a large bondholder was "shopping a block around in the market" and asking if Gramercy had any further information.

(5)     The January 17, 2019 email from Petrashko in the Ukraine (writing on behalf of Bakhmatyuk) to Rauch in Connecticut, attaching the Second Concorde Report and invoking it for the proposition that a Mriya-style restructuring would not be possible due to the Company's structure, while also falsely representing that the Company's management had been able to maintain stability and "delivered significantly better operational and financial results which are also on par with market peers," when in reality the Company's management (namely Bakhmatyuk) were in preparations to begin a scheme of stripping the Company's assets in less than one week.

(6)     The September 20, 2019 telephone call between Piazza in Wyoming (acting on behalf of Bakhmatyuk) and US Exim in Washington D.C. in which Piazza, on behalf of Bakhmatyuk, criticized Gramercy, proposed buying US Exim's debt and denied that he had any connection to Bakhmatyuk.

(7)     Each of the transfers described in Section V(D), in which Bakhmatyuk in Austria directed the transfer of at least 66% of the Company's assets in Ukraine and Cyprus, between November 2019 and June 2020, to TNA in

Wyoming, which were completed, upon information and belief, through the use of wires between Austria, Cyprus, Ukraine, and Wyoming.

(8)     The March 24, 2020, call from Piazza in Wyoming to Gramercy in Connecticut in which Piazza, posing as an independent third-party, offered to buy Gramercy's position.

(9)     The March 24, 2021 letter from Kovtok in Ukraine (on behalf of Bakhmatyuk) to Gramercy in Connecticut falsely representing that the Company's financial conditions were worse than they were and maintaining the façade of the Company's "desire and commitment" to cooperate in discussions regarding a restructuring of its debt.

**ANSWER:    Denied.**

179.    In engaging in the aforementioned mail and wire fraud, the Count 1 Defendants knew and intended that Gramercy would reasonably rely on the Count 1 Defendants' misrepresentations and omissions, which the Count 1 Defendants intended would further their scheme to sabotage Gramercy's legal and economic rights and thereby preserve Bakhmatyuk's control over the Company. Specifically, the Count 1 Defendants intended that Gramercy would rely on the false financial information regarding the Company, and that the dissemination of this false financial information by the Count 1 Enterprise would therefore drive down the value of Gramercy's Notes, diminish, impede or eliminate its legal and economic rights under the Notes, and deceive Gramercy into agreeing to a restructuring deal or sale of its Notes at a steep haircut on the face value of the Notes and on terms dramatically tilted in Bakhmatyuk's favor. The Count 1 Defendants also intended for others to rely on the false financial information regarding the Company, and that this would facilitate the Count 1 Enterprise's efforts to buy up other creditors' debt in furtherance of its scheme to preserve Bakhmatyuk's control over the Company. Further, the Count 1 Defendants intended that Gramercy would rely on its false representations regarding Bakhmatyuk's willingness to engage in good faith, multilateral and transparent restructuring negotiations. Gramercy did rely on the Count 1 Defendants' misrepresentations to its detriment. In reliance on the Count 1 Defendants' misrepresentations, Gramercy continued its attempts to negotiate with Bakhmatyuk when it could have instead pursued alternative avenues—such as a more aggressive approach to collective restructuring negotiations or other remedial measures such as litigation or selling the Notes for less than their fair value. Moreover, potential buyers of Gramercy's debt relied on the Count 1 Enterprise's false representations about the Company's poor financial performance, and as a result, the market value of Gramercy's Notes, and Gramercy's ability to find a purchaser willing to buy the Notes at their fair value, were diminished.

**ANSWER:    Denied.**

**(ii)    Inducement to Interstate or Foreign Travel in Violation of 18 U.S.C. § 2314.**

180.    As set forth above, the Count 1 Defendants, among other things, intentionally drove down the value of the Notes, marginalized and isolated Gramercy to prevent it from collectively negotiating a favorable restructuring of its Notes with other creditors, and stripped the Company

of its assets, thereby rendering Gramercy's investment worthless or virtually worthless. The Count 1 Defendants took these steps with the intent to defraud Gramercy, which served the Count 1 Enterprise's overarching goal of preserving Bakhmatyuk's control over the Company and preventing Gramercy from exercising its contractual rights to veto a restructuring. The Count 1 Enterprise's scheme constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, within the meaning of 18 U.S.C. § 2314. The Count 1 Defendants, having devised or intended to devise such a scheme, by which they sought to defraud Gramercy of money or property having a value in excess of $5,000, in execution or concealment of the scheme, induced Gramercy to foreign or interstate travel in furtherance of that scheme including but not limited to the following circumstances:

(1)     On or around April 6, 2017, Rauch of Gramercy travelled across state lines from Connecticut to New York and then abroad to London to meet with Petrashko (acting on behalf of Bakhmatyuk) and Ashmore. This inducement to travel furthered the scheme as it was intended to mollify Gramercy and convince them that Bakhmatyuk and the Company were willing to cooperate in a consensual restructuring.

(2)     On or around February 18, 2018, Lioutyi of Gramercy travelled from London to Kiev to meet with Bakhmatyuk. At that meeting, Lioutyi inquired of Bakhmatyuk as to the identity of the purchaser of Ashmore's position. Bakhmatyuk falsely represented to Lioutyi that he did not know who had purchased Ashmore's position when, upon information and belief, Ashmore's position had been purchased by Piazza in a put/call arrangement with Bakhmatyuk. This inducement to travel furthered the scheme as it was intended to mollify Gramercy, deceive Gramercy as to the identity of the purchaser of Ashmore's debt, and convince Gramercy that Bakhmatyuk and the Company were willing to cooperate in a consensual restructuring.

(3)     On or around March 2018, Rauch and Lioutyi of Gramercy travelled, Rauch from Connecticut and Lioutyi from London, to Kiev to meet with Bakhmatyuk and Petrashko. At the meeting, Bakhmatyuk made an offer to repurchase Gramercy's position at the unfair price of $0.11 per dollar. This inducement to travel furthered the scheme as it was intended to further deceive Gramercy into believing that Bakhmatyuk and the Company were willing to cooperate in a consensual restructuring.

(4)     On or around January 19, 2019, Salvetti, on Gramercy's behalf, travelled from London to Kyiv to meet with Petrashko on January 19, 2019. This inducement to travel furthered the scheme as it was another performance of Bakhmatyuk's and the Company's false willingness to cooperate in a consensual restructuring.

On or around March 11, 2019, Rauch travelled from Connecticut to London in order to attend a meeting with Bakhmatyuk and Petrashko on March 12, 2019. At this meeting Bakhmatyuk made a number of concessions aimed at placating Gramercy, including the

false representation that he would be willing to give up some equity in order to reach a consensual restructuring with Gramercy. This inducement to travel furthered the scheme's goal of keeping Gramercy at the negotiating table and away from taking enforcement action.

**ANSWER:    Denied.**

181.    The unlawful actions of the Count 1 Defendants directly, illegally, and proximately caused and continue to cause injuries to Gramercy in its business and property. In furtherance of their scheme and through fraudulent acts, the Count 1 Enterprise sabotaged Gramercy's legal and economic rights as one of the largest creditors of the Company by intentionally devaluing Gramercy's Notes, marginalizing and isolating Gramercy in order to curtail Gramercy's ability to negotiate a favorable restructuring of its Notes, destroying any remaining value in the Notes by transferring the Company's assets to shell companies, and rendering Gramercy's contractual right to enforce the Notes, block an unfair restructuring, or pursue remedial action ineffectual or worthless.

**ANSWER:    Denied.**

182.    But for the Count 1 Enterprise's campaign of misinformation regarding the Company's financial situation and Bakhmatyuk's willingness to engage in good faith negotiations—and omissions of material facts concerning the Company's true financial status, including debt purchases and asset transfers—Gramercy would not have continued its attempts to negotiate with Bakhmatyuk when it could have instead pursued other avenues. Specifically, if not for the Count 1 Enterprise's misrepresentations and omissions of material facts, Gramercy would have sought to enforce its rights under the Notes, more aggressively pursued collective restructuring negotiations, sold its Notes at fair value and reinvested the money, and/or taken other remedial measures such as litigation. The Gramercy Funds collectively control more than 25% of the outstanding principal of each set of Notes, and therefore have the contractual right to demand through Gramercy Management (which acts on their behalf) that the Trustee pursue an enforcement action on the Notes. Had Gramercy known that Bakhmatyuk was not willing to engage in good faith negotiations, that he, Piazza and their allies were lying and withholding material information about the Company's financial situation, including about their efforts to buy debt and strip the Company of all of its assets, Gramercy would have sought to enforce its contractual rights under the Notes. However, Bakhmatyuk and Piazza, along with their allies, fraudulently induced Gramercy to forego enforcement of its contractual rights, and such action will no longer provide Gramercy any relief or remedy because of the Count 1 Enterprise's scheme to divert Company assets to Wyoming dummy companies. Moreover, when another creditor approached Gramercy and Ashmore in or around March 2017 to suggest they join forces in the negotiations or pursue an enforcement option, Gramercy refused the offer in reliance on Bakhmatyuk's false representations that he was willing to engage in a consensual restructuring. Had Gramercy known that Bakhmatyuk's purported willingness to cooperate was a façade, and that Bakhmatyuk was simultaneously working to undermine Gramercy's position and the value of its investment, Gramercy would have cooperated with the creditor in taking enforcement action and thereby recover a greater portion of its investment than is possible now. Further, but for the Count 1 Enterprise's campaign of misinformation regarding the Company's financial situation,

Gramercy's Notes would have been worth more, and in turn, Gramercy would have had the opportunity to sell the Notes at fair value and reinvest the money elsewhere.

**ANSWER:    Denied.**

183.    But for the Count 1 Enterprise's omissions of material facts regarding the Company's financial situation and corporate structure, Gramercy Management would not have had to incur significant costs investigating the Count 1 Enterprise's complex transactions.

**ANSWER:    Denied.**

184.    But for the Count 1 Enterprise's debt purchases, Gramercy would have had the opportunity to unite other creditors in a multilateral restructuring negotiation common of all large companies and leverage their collective power to reach a favorable restructuring deal.

**ANSWER:    Denied.**

185.    It was reasonably foreseeable to the Count 1 Defendants that the Count 1 Enterprise's scheme would diminish the value of Gramercy's Notes, undermine Gramercy's ability to negotiate a more favorable restructuring deal, undermine Gramercy's ability to sell its Notes at fair value and reinvest the money elsewhere, and ultimately leave Gramercy holding Notes in a Company devoid of any value and without any recourse as a result of the asset transfers. In fact, the Count 1 Enterprise specifically intended for their scheme to have all of these effects on Gramercy, which served the overarching goal of preserving Bakhmatyuk's control over the Company and eliminating the risk of an unsecured creditor takeover led by Gramercy.

**ANSWER:    Denied.**

186.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Gramercy is thereby entitled to recover three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

**ANSWER:    This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, Defendants deny the allegations in this paragraph.**

## SECOND CAUSE OF ACTION

### Federal Civil RICO, 18 U.S.C. § 1962(b)
### (Against Bakhmatyuk)

187.    Gramercy repeats and realleges the preceding Paragraphs as if fully set forth herein.

**ANSWER:    The Piazza Defendants restate and incorporate by reference herein the answers to each of the foregoing allegations.**

188.    This cause of action is asserted against Bakhmatyuk and is asserted in addition to and in the alternative to the other RICO Causes of Action.

**ANSWER:    The Piazza Defendants restate and incorporate by reference herein the answers to each of the foregoing allegations.**

189.    Section 1962(b) of Title 18 of the U.S. Code makes it illegal for "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

**ANSWER:    This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, the Piazza Defendants deny the allegations in this paragraph.**

190.    The Count 2 Enterprise is the Company (the "Count 2 Enterprise"). The Company constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4).

**ANSWER:    This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, the Piazza Defendants deny the allegations in this paragraph.**

191.    The aim of the Bakhmatyuk's unlawful conduct in relation to the Count 2 Enterprise was to maintain Bakhmatyuk's control over the Company by employing all means necessary to prevent Gramercy, one of the largest creditors and a perceived threat to Bakhmatyuk's control, from exercising its rights under the Notes. Gramercy incorporates by reference the allegations set forth in ¶ 168 regarding the aim of the Count 1 Enterprise, which is applicable to the Count 2 Enterprise as well.

**ANSWER:    Denied. The Piazza Defendants restate and incorporate by reference herein the answers to each of the foregoing allegations.**

192.    The Count 2 Enterprise has engaged in, and its activities have affected, foreign and interstate commerce, including through (i) email and other communications in furtherance of the Count 1 Enterprise's aims across state and national boundaries; (ii) travel for meetings in furtherance of the Count 1 Enterprise's aims across state and national boundaries; and (iii) transactions that involve individuals and business entities located in multiple states and nations. The Count 2 Enterprise has directly and foreseeably affected commerce in the United States through the involvement of U.S. financial institutions and individuals in the affairs of and in furtherance of the aims of the Count 2 Enterprise, including through contractual arrangements, wire transfers and communications, and inducements to travel.

**ANSWER:    Denied. The Piazza Defendants restate and incorporate by reference herein the answers to each of the foregoing allegations.**

193.    Bakhmatyuk orchestrated and directed much of the racketeering activity alleged in Count 1 in order to maintain his control over the Company, including by sabotaging Gramercy's legal and economic rights. Therefore, Gramercy incorporates by reference the allegations recited in ¶¶ 170(a); 178.

**ANSWER:    Denied. The Piazza Defendants restate and incorporate by reference herein the answers to each of the foregoing allegations.**

194.    Bakhmatyuk has directly and indirectly maintained his interests in and control of the Count 2 Enterprise through this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).

**ANSWER:    Denied. The Piazza Defendants restate and incorporate by reference herein the answers to each of the foregoing allegations.**

195.    As a direct and proximate result of Bakhmatyuk maintaining of control through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b), Gramercy has been injured in its business and property. The manner in which Bakhmatyuk caused harm to Gramercy is described in detail above in ¶¶ 181-184, and those allegations are incorporated by reference here. The scheme and resulting damages described in Count 1 would not have been possible if not for Bakhmatyuk maintaining control over the Count 2 Enterprise through a pattern of racketeering activity. Moreover, the damages to Gramercy were reasonably foreseeable consequences of Bakhmatyuk using a pattern of racketeering activity to maintain control over the Count 2 Enterprise. In fact, Bakhmatyuk focused his racketeering activity specifically on sabotaging Gramercy's legal and economic rights in an effort to crush what he perceived to be a foreign threat to his control over the Count 2 Enterprise.

**ANSWER:    Denied. The Piazza Defendants restate and incorporate by reference herein the answers to each of the foregoing allegations.**

### THIRD CAUSE OF ACTION

### Federal Civil RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

196.    Gramercy repeats and realleges the preceding Paragraphs as if fully set forth herein.

**ANSWER:    The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

197.    This cause of action is asserted against all Defendants and is asserted in addition to and in the alternative to the other RICO Causes of Action.

**ANSWER:    The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

198.    Section 1962(d) of Title 18 of the U.S. Code makes it illegal for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

**ANSWER:    This paragraph contains a legal conclusion for which no answer is required. To the extent that an answer is required, the Piazza Defendants deny the allegations in this paragraph.**

199.    Defendants have each unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

**ANSWER:    Denied.**

200.    Each Defendant knew of the illegal activity. First, Defendants knew that Bakhmatyuk, Piazza, and their allies were deliberately disseminating false information regarding the Company's financial information to depress the value of Gramercy's Notes, and thereby deceive Gramercy into accepting a restructuring of its Notes or otherwise selling its Notes—in either case at a steep haircut on the face value of the Notes and on terms dramatically tilted in Bakhmatyuk's favor. Second, Defendants knew that Bakhmatyuk, Piazza and their allies were maintaining a facade through false representations to Gramercy that Bakhmatyuk was willing to engage in good faith, multilateral negotiations. Third, Defendants knew that Bakhmatyuk, Piazza and their allies leveraged their personal and business connections to identify purchasers and execute purchases of debt held by the other creditors of the Company with whom Gramercy sought to unite in comprehensive, multilateral restructuring negotiations. Defendants knew that at least some of these debt purchases involved put/call arrangements whereby straw purchasers, including Piazza himself, gave Bakhmatyuk the option to eventually acquire the debt himself, or where the straw purchasers held the debt on Bakhmatyuk's behalf. Defendants understood that these debt purchases served the Count 1 Enterprise's mission by marginalizing and isolating Gramercy through the substitution of independent creditors—with whom Gramercy had been collaborating in restructuring negotiations—with Bakhmatyuk loyalists and surrogates. Fourth, Defendants knew that Bakhmatyuk was leveraging Piazza's, Yaremenko's and SP Advisors' expertise in asset transfers and sheltering foreign assets in Wyoming entities to orchestrate a complex set of transactions that stripped the Company of virtually all of its assets. Defendants knew that these asset transfers left little or no value in the Company, thus shielding Bakhmatyuk's assets from a potential foreign creditor takeover led by Gramercy.

**ANSWER:    Denied. The Piazza Defendants restate and incorporate by reference herein its answers to each of the foregoing allegations.**

201.    Each Defendant knew that Bakhmatyuk, Piazza, and their allies were committing numerous RICO predicate acts in support of the scheme. Each Defendant understood that they were participating in a racketeering scheme, evidenced, inter alia, by their involvement in disseminating false information regarding the Company's financial performance, disseminating false representations regarding Bakhmatyuk's willingness to engage in good faith restructuring negotiations, participating in debt purchase transactions and asset transfers while taking steps to

ensure that those transactions were not discovered by Gramercy, and their repeated actions taken to further the interests of other co-conspirators.

**ANSWER:** **Denied. The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

202.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the affairs of the Count 1 Enterprise described in in 166-169 through a pattern of racketeering activity. Each Defendant agreed to further the scheme, as demonstrated by, among other things, the following facts:

(1)    Piazza, through SP Advisors, signed a cooperation agreement with ULF in 2014. Under this agreement, Piazza assisted ULF with business deals like the sale to Cargill, and he served as Bakhmatyuk's spokesperson in both public and private, a role which occasionally included feeding misleading information to the media and to ULF's creditors. In one such instance, as described in ¶ 134, Piazza called one of ULF's creditors, criticized Gramercy's strategy, offered to buy the creditor's position, and misrepresented his connection to Bakhmatyuk by denying it altogether.

(2)    Upon information and belief, Piazza and SP Advisors agreed with Bakhmatyuk to purchase ULF's unsecured debt as a front for Bakhmatyuk, and Piazza, through SP Advisors, did in fact purchase Ashmore's debt position. Piazza misrepresented the intent behind his purchases, saying that SP Advisors had shifted its focus to secured debt instead of admitting that he was buying debt on Bakhmatyuk's behalf to help him undermine Gramercy's position.

(3)    Piazza, Yaremenko, and SP Advisors further agreed with Bakhmatyuk to incorporate TNA in Wyoming, with Piazza as the nominal owner and to surreptitiously transfer substantially all of the Company's assets to shell companies under the umbrella of TNA, as further described in ¶¶ 138-144. These transfers followed a pre-conceived pattern described by Piazza and Yaremenko in advertising for SP Advisors, which touted their expertise in sheltering assets from creditors in Wyoming entities, and have a degree of complexity that can only support an inference of a preconceived plan pursuant to an agreement.

(4)    Piazza agreed to facilitate Bakhmatyuk's campaign of misinformation to mislead Gramercy, other creditors and the public as to the Company's financial situation, in furtherance of the Count 1 Enterprise's scheme. Piazza leveraged his connections in the media and elsewhere, including at Concorde, to disseminate false information about the Company's financial situation.

**ANSWER:**   **Denied. The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

203.   Further evidence of an agreement among Defendants is peculiarly within the knowledge and control of Defendants.

**ANSWER:**   **Denied.**

204.   The participation and agreement of each Defendant was necessary to allow the commission of the pattern of racketeering activity described in Count 1. Bakhmatyuk's and Piazza's connections in the media and elsewhere, including, in particular, Piazza's connections to Concorde, were necessary to the dissemination of false information regarding the Company's financial situation. By arranging for third party news outlets and analysts to report this false information, Bakhmatyuk, Piazza and their allies gave these false representations the appearance of legitimacy and objectivity, and made it difficult to detect the predicate acts of racketeering. Bakhmatyuk's and Piazza's obfuscation of the identities of the debt purchasers, which included Piazza himself, made it difficult to detect the predicate acts of racketeering, and concealed Bakhmatyuk's substitution of independent creditors who might otherwise have aligned with Gramercy. Piazza, Yaremenko, SP Advisors, and TNA brought their unique expertise in sheltering assets in Wyoming entities to bear in support of the scheme. The use of Wyoming entities to shelter assets obfuscated the complex web of transactions and thus made it difficult to detect the predicate acts of racketeering. Without each of the individual Defendants' active participation in the scheme, Bakhmatyuk would not have been able to preserve his control over the Company by sabotaging Gramercy's legal and economic rights.

**ANSWER:**   **Denied.**

205.   Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the Count 1 Enterprise scheme. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C. § 1962(d).

**ANSWER:**   **Denied. The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

206.   As a direct and proximate result of this conspiracy, the overt acts taken in furtherance of it (including all predicate acts recited in Count 1), and violations of 18 U.S.C. § 1962(d), Gramercy has been injured in its business and property. The manner in which Defendants' conspiracy caused harm to Gramercy is described in detail above in ¶¶ 181-184, and those allegations are incorporated by reference here.

**ANSWER:**   **Denied. Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

## FOURTH CAUSE OF ACTION

### Fraud
### (Against Bakhmatyuk and Piazza)

207.    Gramercy repeats and realleges the preceding Paragraphs as if fully set forth herein.

**ANSWER:**    **The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

208.    As stated above, Bakhmatyuk and Piazza made and caused to be made numerous false communications directed toward Gramercy in connection with their scheme to defraud Gramercy and maintain Bakhmatyuk's control over the Company. Specifically:

(1)    Starting in October 2016 and continuing through the present day, Bakhmatyuk has continually misrepresented his willingness to engage in good faith negotiations to reach a mutually agreeable restructuring of the Notes.

(2)    On April 28, 2017, Petrashko, acting as an agent of Bakhmatyuk, emailed Gramercy, including Rauch and Cook, and falsely represented that the Company had not yet received confirmation from Sberbank that Sberbank had sold its position, despite the fact that—by this time—PS Capital had agreed to purchase Sberbank's position in a put/call arrangement with Bakhmatyuk. Petrashko also misrepresented that the Company would engage in good faith, saying that the Company was "ready to consider expanding the process into a multilateral general restructuring of bank and bond creditors if we agree together that this is the most effective way to achieve a holistic long-term restructuring." In reality, the Company used every tactic possible to prevent and frustrate all of Gramercy's efforts to commence a multilateral restructuring.

(3)    On February 18, 2018, when Gramercy asked Bakhmatyuk who the buyer of Ashmore's position was, Bakhmatyuk falsely responded that he was not aware. In fact, the buyer was Piazza, acting, upon information and belief, on Bakhmatyuk's behalf.

(4)    Through his tampering and the transmission of false financial information to EY, Bakhmatyuk caused EY to transmit draft reports containing false information, as described in ¶¶ 86-88.

(5)    On October 18, 2018, Piazza emailed Gramercy, falsely claiming that SP Advisors was focused on purchasing secured debt when, by this time, SP Advisors had purchased the unsecured debt held by Ashmore. He also

referred to a market rumor that a large bondholder was "shopping a block around in the market" and asked if Gramercy had any further information.

(6)     On January 17, 2019, Petrashko, writing on behalf of Bakhmatyuk, emailed Rauch attaching the Second Concorde Report and invoked it for the proposition that a Mriya-style restructuring would not be possible due to the Company's structure. He also falsely represented that the Company's management had been able to maintain stability and "delivered significantly better operational and financial results which are also on par with market peers," when in reality the Company's management (namely Bakhmatyuk) were in preparations to begin a scheme of stripping the Company's assets less than a week later.

(7)     On January 16, 2020, when Salvetti asked, on behalf of Gramercy, about the transfers of the Company's assets to TNA, Petrashko, while acting as an agent of Bakhmatyuk, falsely stated that the assets transferred to Piazza "should not represent more than 15% of the business," and that Piazza was not holding the transferred assets on Bakhmatyuk's behalf. As described above, the transfers represent at least 66% of the Company, and, upon information and belief, were being held on behalf of Bakhmatyuk.

(8)     Also on January 16, 2020, Petrashko, on behalf of Bakhmatyuk, sent Gramercy updated financial projections that contained false information suggesting that the Company was performing, and would continue to perform, poorly.

(9)     On February 6, 2020, Petrashko, as an agent of Bakhmatyuk, denied that $400 million of debt, which Gramercy had proposed equitizing and treating differently than third-party debt, was owned by parties fronting for Bakhmatyuk.

(10)    On March 24, 2020, Piazza called Gramercy and posed as an independent third-party while, in reality, upon information and belief, offering to buy Gramercy's position on behalf of Bakhmatyuk.

(11)    On March 24, 2021, Kovtok, on behalf of Bakhmatyuk, wrote a letter to Gramercy falsely representing that the Company's financial conditions were worse than Gramercy has reason to believe they actually were and maintaining the façade of the Company's "desire and commitment" to cooperate in discussions regarding a restructuring of its debt.

(12)    On March 31, 2021, Yergiyev, on behalf of Bakhmatyuk, falsely told Salvetti, who was representing Gramercy, that the reason consolidated financials had not been prepared since 2019 was that the relevant employees had resigned and that there was no one available to prepare the accounts, when, upon information and belief, the real reason was to obscure the fact of the transfers.

**ANSWER:**   **Denied.**

209.   In addition, and as described above, despite owing Gramercy a duty to disclose material facts, Bakhmatyuk made or caused to be made several omissions of such material facts in connection with his scheme to defraud Gramercy and maintain his control over the Company. In particular:

(1)   Bakhmatyuk caused material financial information, including structure charts of the Company, to be withheld indefinitely from Gramercy, despite the Company's promise to provide the information in February 2017.

(2)   Bakhmatyuk failed to disclose that PS Capital purchased Sberbank's debt position on his behalf pursuant to a put/call arrangement.

(3)   Bakhmatyuk failed to disclose that Piazza purchased Ashmore's debt position on his behalf.

(4)   Upon information and belief, Bakhmatyuk failed to disclose other straw purchases of debt.

(5)   Bakhmatyuk, or his agents, in at least five different meetings with Gramercy representatives where the Gramercy representatives pressed him to disclose accurate information about the financial condition of the Company and the structure of the Company in order to conduct fully-informed restructuring negotiations, failed to disclose the material information that substantially all of the Company's assets had been transferred, or were set to be transferred, to shell companies in Cyprus and Wyoming. These meetings, as described above, occurred on March 12, 2019, January 6, 2020, February 6, 2020, June 17, 2020, and March 31, 2021.

**ANSWER:**   **Denied. The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

210.   Bakhmatyuk and Piazza knew and intended that Gramercy would rely on their misrepresentations and omissions, which they intended would further the scheme to sabotage Gramercy's legal and economic rights and thereby preserve Bakhmatyuk's control over the Company. Specifically, Bakhmatyuk and Piazza that Gramercy would rely on the false financial information regarding the Company that they disseminated, as well as on the omission of accurate financial information, and proceed under the false belief that the value of Gramercy's Notes was less than their true value. Bakhmatyuk and Piazza intended for their misrepresentations and omissions to deceive Gramercy into agreeing to a restructuring deal or sale of its Notes at a steep haircut on the face value of the Notes and on terms dramatically tilted in Bakhmatyuk's favor. Bakhmatyuk and Piazza also intended for others to rely on the false financial information regarding the Company, and that this would facilitate their efforts to buy other creditors' debt in furtherance of the scheme to preserve Bakhmatyuk's control over the Company and further marginalize and isolate Gramercy. Further, Bakhmatyuk and Piazza intended for Gramercy to rely on their false representations regarding Bakhmatyuk's willingness to engage in good faith, multilateral and

transparent restructuring negotiations—and misrepresentations and omissions of material facts concerning the Company's true financial status, including debt purchases and asset transfers—by remaining engaged in negotiations and deterred from enforcing its contractual rights under the Notes or more aggressively pursuing collective action with other creditors. Bakhmatyuk and Piazza knew that all of these misrepresentations and false statements were false when they made them or caused them to be made by their allies and agents.

**ANSWER:    Denied.**

211.    Gramercy did justifiably rely on Bakhmatyuk's and Piazza's misrepresentations and omissions of material fact to its detriment, and suffered damages as a result of their fraud. In reliance on Bakhmatyuk's and Piazza's misrepresentations regarding the Company's financial situation and Bakhmatyuk's willingness to engage in good faith negotiations—and omissions of material facts concerning the Company's true financial status, including debt purchases and asset transfers—Gramercy continued its attempts to negotiate with Bakhmatyuk when it could have instead pursued other avenues. Specifically, if not for the misrepresentations and omissions of material facts, Gramercy would have sought to enforce its rights under the Notes, more aggressively pursued collective restructuring negotiations, sold its Notes at fair value and reinvested the money, and/or taken other remedial measures such as litigation.

**ANSWER:    Denied.**

212.    The Gramercy Funds collectively control more than 25% of the outstanding principal of each set of Notes, and therefore have the contractual right to demand through Gramercy Management (which acts on their behalf) that the Trustee pursue an enforcement action on the Notes. Had Gramercy known that Bakhmatyuk was not willing to engage in good faith negotiations, that he, Piazza, and their allies were lying and withholding material information about the Company's financial situation, including about their efforts to buy debt and strip the Company of all of its assets, Gramercy would have sought to enforce its contractual rights under the Notes. However, Bakhmatyuk and Piazza, along with their allies, fraudulently induced Gramercy to forego enforcement of its contractual rights and such action will no longer provide Gramercy any relief or remedy because of Defendants' scheme to divert Company assets to Wyoming dummy companies.

**ANSWER:    Denied.**

213.    Finally, but for Bakhmatyuk's, Piazza's and their allies' misrepresentations and material omissions regarding the Company's financial situation and corporate structure, Gramercy Management would not have had to incur significant costs investigating the complex transactions orchestrated by Bakhmatyuk, Piazza and their allies.

**ANSWER:    Denied.**

## FIFTH CAUSE OF ACTION

**Tortious Interference with Contract
(Against Bakhmatyuk, Piazza, SP Capital, and TNA)**

214.    Gramercy repeats and realleges the preceding Paragraphs as if fully set forth herein.

**ANSWER:    The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

215.    Gramercy formed binding contracts with the Company, the terms of which are contained in the ULF Trust Deed and the AVG Trust Deed. Gramercy's contracts with the Company require that the Company pay the Gramercy Funds semi-annual interest payments, fully repay the principal to the Gramercy Funds on the redemption dates, only sell material assets for fair market consideration and use the proceeds, in part, to reduce the Company's indebtedness, notify the Trustee of the Notes about any affiliate transactions with consideration over $5 million, report material acquisitions, dispositions, or restructurings to the Trustee promptly, and that the Company and the Surety Providers "at all times carry on and conduct [their] affairs and procure [their] Subsidiaries to carry on and conduct their respective affairs in a proper and efficient manner."

**ANSWER:    The Piazza Defendants admit that Gramercy is an unsecured noteholder, subject to the binding terms of the Notes and Trust Deeds, including the arbitration clauses contained therein. Otherwise, Defendants do not have sufficient information with which to admit or deny the remaining allegations in this paragraph, and therefore deny the same.**

216.    Bakhmatyuk was aware of the contracts between the Company and Gramercy. Bakhmatyuk has been directly involved in all restructuring negotiations of the Notes. Piazza, SP Advisors and TNA were also aware of the contracts between the Company and Gramercy and the terms of the Notes.

**ANSWER:    The Piazza Defendants admit that Gramercy is an unsecured noteholder, subject to the binding terms of the Notes and Trust Deeds, including the arbitration clauses contained therein. Otherwise, denied.**

217.    As set forth in Section V(d), Bakhmatyuk, Piazza, SP Advisors and TNA intentionally and wrongfully interfered with these contractual obligations, and in doing so, caused the Company to breach its contractual obligations to Gramercy, rendered the Company completely unable to perform under its contracts with Gramercy, and destroyed Gramercy's contractual rights to remedy the breach, including by rendering Gramercy's right of enforcement worthless by stripping the Company of all of its assets. Specifically, Bakhmatyuk and Piazza orchestrated a complex set of transactions—by and through SP Advisors and TNA—that stripped the Company of hundreds of millions of dollars of assets, hid those assets in Wyoming entities, and left little or no value in the Company. These transactions obliterated the value of Gramercy's investment, rendered it impossible for the Company to fulfill its contractual obligations to pay interest and principal on the Notes, and caused the Company to violate its contractual obligations. Bakhmatyuk further caused the Company to breach its requirements to provide notice of affiliate transactions about $5 million and of material dispositions and restructurings to the Trustee of the Notes.

**ANSWER:    Denied.**

218.    The tortious actions of Bakhmatyuk, Piazza, SP Advisors and TNA caused and continue to cause injuries to Gramercy in its business and property. Their actions have prevented the Company from ever meeting its contractual obligation to pay interest and repay the principal on the Notes, meaning that Gramercy has suffered a total loss of its investment principal. Further, because Bakhmatyuk, Piazza, SP Advisors and TNA caused the Company to violate its contractual obligation to conduct its affairs in a proper and efficient manner through transferring its assets to shell companies for no consideration and failing to disclose these transfers to creditors like Gramercy, Gramercy Management incurred significant costs investigating Defendants' scheme and taking litigation action in order to unravel the scheme. Finally, Bakhmatyuk's, Piazza's, SP Advisors' and TNA's tortious actions caused the Company to sabotage Gramercy's contractual rights as the controller of more than 25% of the outstanding principal of each set of Notes, including its right to pursue an enforcement action under the Notes.

**ANSWER:   Denied.**

## SIXTH CAUSE OF ACTION

### Civil Conspiracy
### (Against All Defendants)

219.    Gramercy repeats and realleges the preceding Paragraphs as if fully set forth herein.

**ANSWER:   The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

220.    Defendants knowingly and intentionally conspired to defraud Gramercy and to tortiously interfere with the Company's contracts with Gramercy. The manner in which the Defendants combined and agreed to participate in a scheme designed to defraud Gramercy and deprive it of its contractual rights is described in detail above in ¶¶ 200-203, and those allegations are incorporated by reference here.

**ANSWER:   Denied. The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

221.    Each Defendant took at least one action in furtherance of the conspiracy, including but not limited to:

(1)    In January 2017, Piazza, Yaremenko, and SP Advisors formed TNA and registered it in Wyoming in preparation for the asset stripping scheme;

(2)    In every year thereafter, Yaremenko signed the annual reports for TNA in order to continue to obscure Bakhmatyuk's interest in TNA and the fact it was set up to shield assets that he stripped from the Company;

(3)    As detailed extensively above, Bakhmatyuk and Piazza made or caused to be made myriad misrepresentations designed to defraud Gramercy or to conceal their asset stripping scheme;

(4)     TNA was the corporate vehicle used to facilitate the asset-stripping scheme and was used to obscure Bakhmatyuk's interest and control over the stolen assets; and

(5)     SP Advisors served as a corporate vehicle for Piazza and Yaremenko to use in effectuating and coordinating aspects of the scheme to defraud. For example, SP Advisors was involved in the Ashmore Debt Purchase, and SP Advisors helped to structure and implement the TNA Transfers, especially by forming TNA to shelter the transferred assets.

**ANSWER:     The Piazza Defendants admit that Piazza and Yaremenko formed TNA which is a  Wyoming company in January 2017 and Yaremenko has signed annual reports for TNA, otherwise denied. Bakhmatyuk does not have sufficient information with which to admit or deny the remaining allegations in this paragraph, and therefore denies the same.**

222.     As a result of this conspiracy, Gramercy has suffered significant damages. The manner in which Defendants' conspiracy caused harm to Gramercy is described in detail above in ¶¶ 181-184, and those allegations are incorporated by reference here.

**ANSWER:     Denied.**

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting
### (Against All Defendants)

223.     Gramercy repeats and realleges the preceding Paragraphs as if fully set forth herein.

**ANSWER:     The Piazza Defendants restate and incorporate by reference herein their answers to each of the foregoing allegations.**

224.     As participants in the scheme to defraud Gramercy detailed above, each Defendant knew of the conduct of the other Defendants that amounted to fraud and tortious interference with a contract, as described in ¶ 200.

**ANSWER:     Denied.**

225.     Each Defendant provided substantial assistance and encouragement to the other Defendants in carrying out their tortious conduct. These actions include, but are not limited to:

(1)     In January 2017, Piazza, Yaremenko, and SP Advisors formed TNA and registered it in Wyoming in order to facilitate the TNA transfers, which constituted tortious interference with the Company's and the Surety Providers' contractual relations with Gramercy;

(2)     In every year thereafter, Yaremenko signed the annual reports for TNA in order to continue to obscure Bakhmatyuk's interest in TNA which assisted

in the commission of the fraud and tortious interference with contractual relations, as described above;

(3)  Bakhmatyuk and Piazza, as detailed above, made numerous misrepresentations and material omissions in order to defraud Gramercy and conceal the fraud;

(4)  TNA assisted in the tortious conduct by receiving the assets stripped from the Company; and

(5)  SP Advisors assisted Yaremenko and Piazza in effectuating and coordinating the scheme to defraud and to interfere with the contracts between Gramercy, ULF, AVG, and the Surety Providers.

**ANSWER:    The Piazza Defendants admit that Piazza and Yaremenko formed TNA as Wyoming company in January 2017 and Yaremenko has signed annual reports for TNA, otherwise denied.**

226.   As a result of the tortious conduct made possible by the substantial assistance of each Defendant, Gramercy has suffered significant damages. The manner in which these torts caused harm to Gramercy is described in detail above in ¶¶ 181-184, and those allegations are incorporated by reference here.

**ANSWER:    Denied.**

## THE PIAZZA DEFENDANTS' AFFIRMATIVE DEFENSES:

Without admitting liability as to any of the claims asserted in this Complaint, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that otherwise would rest with Plaintiffs, the Piazza Defendants assert the following affirmative defenses. Defendants' investigation in this matter continues, and they reserve their right to supplement or modify any portion of this Answer, including by asserting additional affirmative or other defenses or claims not yet asserted based on discovery or other factual investigations, consistent with the Federal Rules of Civil Procedure and the Court's scheduling order in this matter.

### FIRST DEFENSE
(Fails to State a Claim)

Plaintiffs' claims against the Defendants are barred, in whole or in part, because this Amended Complaint fails to adequately state a claim upon which relief may be granted.

**SECOND DEFENSE**
(No Standing)

Plaintiff lacks standing to bring this lawsuit, as their suit is predicated on injury to AVG and ULF.

**THIRD DEFENSE**
(Lack of Personal Jurisdiction)

The Court is precluded from hearing this matter based on a lack of personal jurisdiction over Bakhmatyuk and Yaremenko.

**FOURTH DEFENSE**
(Lack of Subject Matter Jurisdiction)

The Court is precluded from hearing this matter based on a lack of subject matter jurisdiction, where Plaintiff fails to state a RICO claim, leaving no federal claims at issue subject to supplemental jurisdiction under 28 U.S.C. § 1367.

**FIFTH DEFENSE**
(Improper Venue)

This matter has been brought in an improper venue.

**SIXTH DEFENSE**
(Forum Non Conveniens)

Plaintiffs' claims are barred by the doctrine of forum non conveniens.

**SEVENTH DEFENSE**
(Advice of Counsel)

Plaintiffs' claims are barred because Defendants have acted in good faith and reasonably relied on legal advice.

**SEVENTH DEFENSE**
(Arbitration)

Plaintiffs' claims are barred to the extent that they have agreed to arbitration or chosen a different forum for the resolution of their claims.

## EIGHTH DEFENSE
(No-Action Clause)

Plaintiffs' claims are barred to the extent that they have agreed to the "no-action" clause

contained in the Trust Deeds governing the notes.

## NINTH DEFENSE
(Failure to Join Indispensable Parties)

Plaintiffs' claims should be dismissed for their failure to join indispensable parties pursuant

to Federal Rule of Civil Procedure 19. Plaintiffs' failure to join such parties, including but not

limited to AVG and ULF, leaves the Court unable to accord complete relief among existing parties;

or otherwise leaves the Defendants subject to a substantial risk of incurring double, multiple or

otherwise inconsistent obligations because of the interest of such parties.

## TENTH DEFENSE
(Lack of Intent)

Plaintiffs' claims against Defendants are barred, in whole or in part, because Defendants

did not act with the requisite intent.

## ELEVENTH DEFENSE
(Good Faith)

Plaintiffs' claims against Defendants are barred, in whole or in part, Defendants acted in

good faith and lawfully, and any actions taken by Defendants were taken for legitimate reasons.

## TWELVTH DEFENSE
(No Factual or Legal Support for Treble or Punitive Damages)

Plaintiffs are not entitled to treble or punitive damages under any theory, including without

limitation, because Plaintiffs cannot satisfy the requirements for punitive or treble damages under

Federal statue, the United States Constitution, Wyoming state law, or common law, because no act

or omission of Defendants was malicious, willful, wanton, reckless, grossly negligent, or

intentional.

**THIRTEENTH DEFENSE**
(No Legal Basis for Attorneys' Fees)

Plaintiffs' request for attorneys' fees is barred because there is no legal basis for attorneys' fees for Plaintiffs' claims.

**FOURTEENTH DEFENSE**
(Statute of Limitations)

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

**FIFTEENTH DEFENSE**
(Laches, Waiver, and or Estoppel)

Plaintiffs' claims are barred, in whole or in part, by laches, waiver, and/or estoppel.

**SIXTHEENTH DEFENSE**
(No Actual or Proximate Causation)

Plaintiffs' claims and damages, if any, are barred because the Defendants' conduct was not the factual or proximate cause of any injury or loss that Plaintiffs allegedly sustained and any such injury or loss was caused. Additionally, Plaintiff claims and damages, if any, were contributed in part, by Plaintiffs and/or another third party.

**SEVENTEETH DEFENSE**
(Assumption of Risk)

Plaintiffs' claims Entities are barred, in whole or in part, because Plaintiffs voluntarily assumed the risk of the position in which they find themselves.

**EIGHTEENTH DEFENSE**
(Lack of Mitigation of Damages)

Plaintiffs' claims are barred, or recovery is reduced, due to Plaintiffs' failure to mitigate, reduce, or otherwise avoid the alleged damages or injuries.

**NINTEENTH DEFENSE**
(Unclean Hands, *In Pari Delicto*, and Illegality)

Plaintiffs' claims are barred in whole or in part as a result of Plaintiffs' acts which constitute unclean hands, *in pari delicto*, and illegality in so far as the acts of which they complain include, Plaintiffs' demands for and efforts to seek inside information not available to other investors concerning ULF/AVG and upon which to trade their Notes, and in so far as plaintiffs further engaged in illegal conduct, unclean hands, and/or *in pari delicto* in furtherance of their ULF and/or AVG investments.

## TWENTEENTH DEFENSE
### (Bar of the PSLRA)

Plaintiffs claims are barred in whole or in part by Section 107 of the Private Securities Litigation Reform Act which provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [RICO]," given that Plaintiffs purport to allege claims based on conduct that would have been actionable as securities violations, including predicate acts of mail and wire fraud based upon conduct purporting to be fraud by Defendants relating to plaintiffs' securities investments.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants respectfully request judgment dismissing the Complaint on its merits, in its entirety and with prejudice, awarding Defendants their attorneys' fees, costs and disbursements incurred in this action, and awarding such additional relief as this Court may deem just and appropriate.

Dated:  May 31, 2024.

BY:   _/s/ Jeffrey S. Pope_
       Jeffrey Pope, WY S.B. No. 7-4859
       Bryson C. Smith, WY S.B. No. 7-6199
       HOLLAND & HART LLP
       645 South Cache Street, Suite 100
       P.O. Box 68
       Jackson, WY 83001-0068
       Telephone: (307) 734-9741
       Facsimile:  (307) 739-9744
       jspope@hollandhart.com
       bcsmith@hollandhart.com

       Greg Goldberg
       HOLLAND & HART LLP
       557 17th Street, Suite 3200
       Denver, CO 80202
       Telephone: (303) 295 - 8099
       Facsimile:  (303) 668 - 7524
       ggoldberg@hollandhart.com

       W. Gordon Dobie (_Pro Hac Vice_)
       Emily N. Kath (_Pro Hac Vice_)
       WINSTON & STRAWN LLP
       35 W. Wacker Drive
       Chicago, IL 60601-9703
       Telephone: (312) 558-5600
       Facsimile:  (312) 558-5700
       wdobie@winston.com
       ekath@winston.com

       Jeanifer E. Parsigian (_Pro Hac Vice_)
       WINSTON & STRAWN LLP
       101 California Street
       San Francisco, CA 94111
       Telephone: (415) 591-1469
       Facsimile:  (415) 591-1000
       jparsigian@winston.com
       _Attorneys for Defendants Nicholas Piazza,_
       _SP Capital Management, LLC, Oleksandr_
       _Yaremenko, TNA Corporate Solutions, LLC,_
       _and Oleg Bakhmatyuk_

32145635_v4